IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re:

Heart 2 Heart Volunteers, Inc., Case No. 25-00087

Debtor Chapter 11

MOTION TO REQUEST RECONSIDERATION OF THE MOTION OF THE UNITED STATES FOR A TRUSTEE BASED ON THE FACTS PRESENTED AND THAT WERE NOT PRESENTED. ALSO, RECONSIDERATION FOR EXTENDED TIME TO FIND AN ATTORNEY.

*Plan Of Reorganization Included Exhibit A 4*

*Former  Board Member letter Exhibit A 5*

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

FEB 1 8 2026

Dear Honorable Judge,

Time: 10:15  am/pm

It is very rare for a court to appoint a trustee in a Chapter 11 case. Heart 2 Heart Volunteers Inc dba Serenity Hills Life Center (SHLC) believes that this would not be In the best interest of Serenity Hills Life Center nor fair and just.

Serenity Hills Life Center believes that these decisions have been made on erroneous facts, and it would be an injustice to all involved if the decisions were made to give this business to a trustee when it has saved so many lives.

The court is aware that there is a lawsuit against OHFLAC for the closing of SHLC

In 2022 and reversed by the courts. The finale decision stated by the court that there were deaths caused by the closing.

SHLC believes that the OHFLAC, the state entity, is targeting not only the business but the CEO. The person who makes the decisions at OHFLAC, the state entity, is James Patterson. He is named in the lawsuit and is the main character behind the closing. This is a conflict of interest. Gwenyth Ortman, the attorney for SHLC also agreed that SHLC was being targeted, and the CEO. On an exit call with the state, Attorney Harry Greenfield told the OHFLAC surveyors that they obviously are not following their own rules again. This conversation was recorded, and they knew that at the time.

SHLC will show evidence that what the ombudsman stated was not true, the CEO did not curse and out the residents as the OHFLAC concluded via a Human Rights Committee meeting, that conducted by a counselor and the CRO. This committee has residents who are doing well in their recovery on the committee. This is required by state regulations. The resident testified that Marie did not yell or scream at the residents. *Exhibit R is the minutes of the human rights committee and the minutes were approved by the CRO who was present. Exhibit T*

When the CEO was interviewed by OHFLAC, she was told that they had heard that SHLC's Board of Directors had been placed. This is very disturbing, and now it is playing out. The CEO asked the lawyer if something had been said at the hearings, and she said it had not. I believe that if Heart 2 Heart Volunteers is given to the Trustee, it will jeopardize the lawsuit, and the state is counting on this. SHLC

believes that justice will not be served. The reason that we are at this hearing today and in bankruptcy is that we were closed down and had no start-up money to help us reopen.

SHLC does agree that the CEO should not continue in the capacity of CEO. Not because of wrongdoing, but because of all the erroneous allegations that were not properly authenticated and insufficient in support of its findings, and the toll it has taken on her health. We know that this has hurt the company and the CEO. We know that at this time, only through civil actions can the truth be known.

The court at the last hearing listened to an attorney who was asked to be removed from the case, a CRO who had signed a 30-page contract with a managing company run by a man who had an extensive, unethical, criminal business background that I will present in the timeline, an ombudsman who has not been at the facility often, and she did not develop her facts objectively.

Therefore, the witnesses gave biased testimony in which much weight was given and consideration by the court in its decisions.  We will address those allegations with evidence below, but would first like to make our proposals to the courts instead of a trustee.

I want the courts to remember that Heart 2 Heart Volunteer Inc. has other programs besides Serenity Hills Life Center. We also help the sick and disabled. We have a sober living house, and we have a continuous grant. These programs

and our organization should not all be affected.

Proposals

1. Serenity Hills Life Center sells the facility to another rehab that provides treatment for substance abuse. With the understanding that the women will not be affected that are there and will continue their treatment.

2. That Serenity Hills Life Center sells part of the property to pay off the unsecured depts and finds a Managing company to run the company. Continues to pay the USDA.

3. Serenity Hills Life Center sells the facility and parts of the property to another treatment Center and keeps parts of the property for continuing the sober living home and takes any money after all the depts are paid to build more sober living houses on site, that would which is needed in the community.

4. Dismiss the case, and Serenity Hills Life Center sells the facility and parts of the property and continues to run her sober living homes and build others with any profit from the sale after paying off all the depts. Which is needed in the community.

5. The fourth option is preferred by Heart 2 Heart Volunteers Inc., and then 3rd option

6. Please see our Plan that we are now able to sustain after the beginning of The year taxes. This will start Next month. Exhibit

   There is a respected Treatment Center in WV that has an interest in talks.
   SHLC knew that the courts would have to approve anything, and they
   wanted us to sign a non-disclosure form. We have not signed anything.
   This is a treatment Center that I have heard great things about.

The CEO would like her vision to continue.

Sharon Travis asked Kirk Burkley, the attorney for Heart to Heart Volunteers Inc., and he said it is too late, and also, he told us to change our board of directors. I believe if he had done evidentiary hearings on the accusation, this would not have happened. He also told Sharon Travis she will never get her money back now that it will go to a trustee.

**Allegations and evidence to refute the testimony.**

1. **Allegations that the CEO held back**
   - Only the treatment team can decide hold back a resident
   - The insurance company takes the information provided by the counselors and then decides whether they can stay longer.
   - It is impossible for the CEO to make those decisions, nor has she ever been to a treatment team meeting.
   - The ombudsman had no conversation with the CEO about these accusations and came after the incident with the case manager.
   - These accusations came after our 6-month program had started.
   - The Ombudsperson stated that she talked to residents who told her this. This would not be something the residents would know.
   - We have evidence of an inappropriate counselor who was investigated and terminated. Stated this to the residents that Marie was forcing them into the 6-month program. To make them stay longer.
   - We believe the ombudsman was getting this information from the two unprofessional and abusive employees who were stating inappropriate information affecting the residents.

- The truth is that the residents pick the program they want to be in before they come in. Many are court-ordered.
- It does not make a difference what program they pick; if the insurance company states they are ready to leave, then they leave. *See exhibits a, b, c, d, g, h, i, j, k.*

2. **The attorneys and the CRO testified that the income fluctuated.**
   - The attorney testified that the income fluctuated and has been stable and growing.
   - The attorney did not mention that the CEO had put in the 6-month program that was working. There are many 6-month programs around the state.
   - The Attorney sent us a letter in October stating that we needed 40 residents to be able to make a plan for the courts. *See letter from Kirk Burkley exhibit F*

   - Our insurance reimbursements and Census show that the program was climbing and had reached forty in December, and January would have been more if the CRO had not told us to quit bringing in residents. Only dropped the months that we were working on the Joint Commission certification. *See exhibit P, the census, and amounts paid.*

3. **The CRO gave you testimony that we had a small amount of money in our Checking account.**
   - He made that off on one day after payroll and before more money came in.
   - Every year, one insurance company is late during the holiday because its employees are out for vacation.

4. **That the residents did not have supplies, as stated by the ombudsman.**
   - When this was brought up at the quality assurance committee meeting, the CRO was present via phone. Testimony came from the

MHT supervisor that we are never out of supplies, but once we were out of Q-tips.

- The residents have to put their order slips on Wednesdays, and then given out on every Friday. If they did not put their slip in and they run out on the weekends, they cannot get the supplies because the person with the keys to the supply room is not there.
- We have never been without supplies. *Exhibit S: The quality assurance meeting where the supplies are addressed.*


5. **We will show you that we do not only have 3 people who have been there from the opening.**

- We reopened in June of 2023.
- We were closed for over a year.
- Most of our former staff already had jobs.
- Some remained during the closing, paid for by the CEO's Retirement money.
- So, is she going by our original opening in 2019? There are only a few.
- As you can see by the exhibit provided, there are many staff that have been there for a long time.
- The reason there is a turnover in our Mental Health, cleaning, and cooks positions is intentional.
- Our program gives women who have gone through our program and live at our sober living house a chance to learn a skill and get confident in the work field again, also providing supervision and drug testing as they stay at the house.
- Many, after their six months are up at the sober house, go back to their towns near their families.
- This is room for the next girls graduating to have the same chance.
- Many rehabs are doing the same.

*See Exhibit L list of persons at the facility, and many have been there for a while.*

6. The Ombudsman claimed that the CEO was bringing is residents with health issues. That we did not have the facilities ready for these residents.

- Our policy is that we do not bring residents in who cannot take care of themselves.
- We passed the OFLAC inspection when we opened, concerning disability rooms, and we have them, with disability bathrooms. That is all we need.
- This misinformation about the CEO came from the nursing department that the CEO brought in persons who had health issues.
- The CEO helps out with referrals.
- She takes the information and brings it to the Medical director to sign or via email confirmation.
- The CEO cannot, by law, authorize or accept a client; only the nurse practitioner or medical director.

- You will see this example of misinformation by nursing in consecutive emails.
- *Exhibit U. After being misinformed by the Nurse department that Marie had brought in clients who they had not given permission.  Clients R S and M G.  The CRO sent an email reprimanding the CEO.*
- *Exhibit W. Is the email that is forwarded to the CRO showing at the bottom of the email from the Medical Director showing that she accepted D S.  She then sent her to a detox when she came in with it in her system. The rehab she came from sent a letter to us stating that she did not need detoxed and that she only had some to come her down before she got to us because she was nervous. I also addressed the misinformation to the nurses about that and their previous accusations.*
- *Exhibit V shows the highlighted acceptance of MG from the Medical Director. Inform her to let her lawyer know she was accepted.*

7. We will not address a criminal case, but we will provide information to the courts on two staff members who were toxic to the facility and caused stress on residents, and what was behind their intentionally trying to cause

problems for the CEO and the company and is behind a lot of what has brought us to this place and to sustain for the record.

- One was a counselor -  Exhibits a, c, d, y
- One was a case manager Exhibits j, g, h, I, and k
- This is where a lot of information was given to the Ombudsman concerning holding persons back.
- The counselor called the state in while she was under investigation and while threatening the CEO. Then she was asked to stay out of the building.
- The case manager called the state after she was no longer there.

8. **The information on the Gentleman that managing company that the CRO hired. SHLC was looked upon as difficult for not allowing this man for to be involved in our company. He was friends with attorney Harry Greenfield form the Bernstein and Berkley.**
- Keith Greenburg Exhibit A1, A2,A3

Giving our facility to a trustee is a very serious decision, and we believe it will cause harm to the facility, the staff that has been here for a long time, including former residents in recovery who work there.

Please review this before making your decision. We pray that you make the right decision for all.

Sincerely,

 Tara Singer

Secretary of the Board

≡ M Gmail

Compose

**Inbox** 1,995
Starred
Sent
**Drafts** 114
**Purchases** 28
Travel
More

**Labels**

🔍 rtomasiello.alias@gmail.com

(no subject)   Inbox ×

≡⁺ Summarize this email

**Robert Tomasiello** <rtomasiello.alias@gmail.com>
to me

https://www.sec.gov/enforcement-litigation/litigation-releases/lr-17483

https://www.forbes.com/sites/jayadkisson/2015/05/30/the-sec-gets-high-living-debtor-sent-to-jail-in-greenberg/

https://mlutah.com/court-cases-defeating-offshore-trusts/sec-v-greenberg-2/

https://trellis.law/case/34023/midd-c00908-18/lvnv-funding-llc-vs-greenberg-keith

Robert Tomasiello | Chief Operating Officer
Angels Light Addiction Specialists

Inline image

Exhibit
A.1

×   ⋮⋮⋮

S **Sharon Travis** <serenityhillscenterceo@gmail.com>
to Robert



**U.S. Securities and Exchange Commission**

# Keith Greenberg and Coyote Consulting and Financial Services, LLP

## LITIGATION RELEASE NO. 17483 / April 23, 2002

_Securities and Exchange Commission v. Keith Greenberg and Coyote Consulting and Financial Services, LLP_, 00-9109-CIV-HURLEY/LYNCH (S.D. Fla. filed Dec. 20, 2000).

**DISTRICT COURT ENTERS DEFAULT JUDGMENT AGAINST KEITH GREENBERG IN COMMISSION'S LITIGATION ALLEGING CONCEALMENT OF PREVIOUS FELONY CONVICTION AND VIOLATION OF BROKER-DEALER REGISTRATION REQUIREMENTS**

On April 4, 2002, the U.S. District Court for the Southern District of Florida entered a Final Judgment of Permanent Injunction by Default in _Securities and Exchange Commission v. Keith Greenberg and Coyote Consulting and Financial Services, LLP_, 00-9109-CIV-HURLEY/LYNCH (S.D. Fla.), against defendants Keith Greenberg and Coyote Consulting and Financial Services LLP ("Coyote"). Greenberg was a co-founder of US Diagnostic, Inc. ("USDL"), a company that operates outpatient diagnostic imaging centers and has its headquarters in West Palm Beach, Florida. In June 1993, Greenberg consented to a judgment enjoining him from violating the antifraud

Exhibit
A.2

provisions of the federal securities laws, and, in September 1994, Greenberg pleaded guilty to two felony counts in a related federal criminal proceeding. The Commission's complaint alleged that Greenberg prepared or directed the preparation of numerous statements by USDL to the press and to shareholders which identified him as an officer of USDL and purported to discuss his background, but which fraudulently failed to disclose his criminal conviction and previous injunction. The Commission's complaint further alleged that, although Greenberg operated as an officer of USDL, was represented as such in statements disseminated to the press and investors, and held himself out as such, Greenberg was not identified as an officer in USDL's filings with the Commission, and his conviction and injunction were not disclosed in those filings. Although Greenberg was aware of the fraudulent omissions in those filings, he did nothing to correct or prohibit them. The complaint also alleged that Coyote, through the activities of Greenberg, acted as a broker without registering with the Commission. Coyote is a Florida limited liability company owned by a Greenberg family trust and Greenberg's wife and controlled by Greenberg.

The Final Judgment by Default permanently enjoins Greenberg from violating Section 17(a) of the Securities Act of 1933, Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Exchange Act Rule 10b-5, and from aiding and abetting violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, and 13a-13. It also permanently enjoins Coyote from violating Section 15(a) of the Exchange Act. The Final Judgment by Default also bars Greenberg, pursuant to Section 21(d)(2) of the Exchange Act, from acting as an officer or director of any public company. The District Court also held Greenberg and Coyote liable for civil penalties and jointly and severally liable for disgorgement, the amounts of which will be determined by the District Court after an evidentiary hearing.

The Commission previously instituted, and simultaneously settled, related cease-and-desist proceedings against USDL and its former Chairman and CEO. See Securities Act Rel. No. 7928 (/litigation/admin/33-7928.htm) (Dec. 20, 2000); Litigation Rel. No. 16836 (/litigation/litreleases/lr16836.htm) (Dec. 20, 2000).

ADVERTISEMENT

Exhibit

A3

Flash Sale: Less than $1/week

MONEY › PERSONAL FINANCE

# The SEC Gets High Living Debtor Sent To Jail In Greenberg

By **Jay Adkisson**, Contributor. ⊙ I cover Wealth Preservation in its legal....

Published May 30, 2015, 12:29am EDT, Updated May 30, 2015, 03:07pm EDT

Follow Author

⟨ ⤢

⏱ This article is more than 10 years old.

⤴ Add Us On Google    ⊙    NOW PLAYING: WHY MARKETERS NEED TO BE FOCUSED ON R...

1 of 4 free articles

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

Flash Sale: $49.99 for your first year.  Unlock trusted journalism, member-only events and more. Limited time only.

*Greenberg was a co-founder of U.S. Diagnostic, Inc. ("USDL"), a company that operates outpatient diagnostic imaging centers and has its headquarters in West Palm Beach, Florida. In a complaint filed in December 2000, the Commission alleged that Greenberg prepared or directed the preparation of numerous public statements by USDL which identified him as an officer of the company, but which fraudulently failed to disclose his criminal conviction and his injunction in previous litigation with the Commission.*

Greenberg of course paid nothing on his judgment between 2002 and 2010. In the latter year, the SEC discovered that, far from being broke, Greenberg was living an "extravagant lifestyle" and started pursuing him for the unpaid judgment.

Soon thereafter, in 2011, Greenberg sold a condominium and remitted $114,592 to the SEC, and then went pay back to paying the SEC nothing.

On November 26, 2013, the SEC filed a motion for Greenberg to show cause why he should not be held in contempt for failing to make payments to the SEC. The Court granted the motion, and referred the matter to a U.S. Magistrate Judge to hold an evidentiary hearing.

Meanwhile, to try to deflect the SEC's contempt motion, beginning in



FORBES FEATURED VIDEO

1 of 4 free articles

Subscribe Now

ADVERTISEMENT

Greenberg's wife, Elise Greenberg, settled the Elise Trust with $1 million as a Gibraltar trust in 1996, and over the next 15 years, Greenberg's own efforts had grown the trust to over $6 million in assets, including a condominium in Miami, Florida -- which the Greenbergs leased from the Elise Trust. The Greenberg trust is what is known as a "Foreign Asset Protection Trust" (FAPT) or more commonly an "offshore trust".

The Trustee of the Elise Trust was a company called First Rock Trustees Ltd, whose website says that it is one of the Moore Stephens companies. The Greenbergs acted as the "trust advisors" and "manager" for the Elise Trust.

Another, domestic trust, the Raintree Development Irrevocable Trust (Raintree Trust), owns a house in Goldens Bridge, New York, which the Greenbergs also leased.

The Elise and Raintree trusts both pay for the Greenbergs to have to luxury vehicles and golf memberships in both New York and Miami. The cars included an Aston Martin purchased in 2008 for $157,875, a Mercedes, a Land Rover, and an Audi. The golf memberships were characterized, apparently with a straight face, as "business expenses" by one of First Rock's directors.

**Forbes Daily: Join over 1 million Forbes Daily subscribers and get our best stories, exclusive reporting and essential analysis of the day's news in your inbox.**

1 of 4 free articles

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

Apparently, although the record is not clear, Elise owns some or all of Braintree Properties LLC, which is a New York company that invests in medical centers. Braintree paid over $2.1 million of the Greenbergs' personal expenses from 2006 to 2011.

Braintree also sold some of its medical centers, got into a dispute over the sale, and eventually the buyer agreed to pay Greenberg personally $600,000 over five years plus provide him with $38,400 in automobile expenses, and pay other entertainment and travel expenses. These payments were made to J.D. Keith LLC, in which Greenberg acted as a "consultant", and Greenberg used the moneys for his personal expenses.

The Elise Trust also owns Vantage Beach Holdings LLC, which apparently took the place of J.D. Keith LLC and is now used to pay the Greenbergs' personal expenses.

For his part, Greenberg was (no surprise) also behind in his tax payments, and even before the SEC's judgment in 2002, owed the IRS over $2 million. The IRS ultimately wrote off $5 million of that liability, the Greenbers made some payments to the IRS from 2006-2008, but still as of October, 2014, owed the IRS at least $675,000.

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

Flash Sale: $49.99 for your first year.  Unlock trusted journalism, member-only events and more. Limited time only.

contempt, and incarcerated until he either paid up or proved that could not.

In reviewing the Magistrate Judge's recommendation, the U.S. District Court first noted that the burdens of proof shift in a contempt matter. First, the SEC had the burden of proving that Greenberg had the ability to comply with the SEC's Judgment. If the SEC met that burden, then, second, Greenberg had the burden of proving his inability to comply.

As to the first issue, whether the SEC proved that Greenberg had the ability to comply, the District Court agreed with the Magistrate Judge that Greenberg had the ability to pay the judgment, at least in some part. This then shifted the burden to Greenberg to conversely prove his inability to comply.

Critically important is that Greenberg was not required to show that he always had an inability to pay, but merely that he had a "present inability to comply", meaning, in the words of the District Court, "from the time of the contempt hearing to the time of the contempt citation."

But here, Greenberg's lifestyle and ability to get money out of his structure totally demolished his claim that he was without the means to comply:

**First, the Magistrate found that Greenberg used the Entities to pay his personal expenses. Had he**

ADVERTISEMENT

1 of 4 free articles

Subscribe Now

Flash Sale: $49.99 for your first year.  Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

Greenberg to pay his Final Judgment. The Magistrate found "it to be beyond belief" that the Elise Trust would not, if it were asked, "agree to a compromise" to avoid Greenberg's contempt. Third, the Magistrate found that Greenberg withdrew money from the Entities to pay the IRS, Defendant, the Magistrate concluded, could do same for the SEC. Finally, the Magistrate concluded that Greenberg's monthly payments, compared to the findings of his "lavish lifestyle," were insufficient to show his good faith to comply with the Final Judgment. Upon de novo review, the Court not only agrees with the Magistrate's conclusions, but finds additional support for them in the record. The record shows that although Greenberg has no "assets," not even a personal bank account, the Entities have become his piggy bank.

For example, Braintree purchased a Miami condominium for Greenberg in his own name. Braintree paid to renovate the condominium, Braintree made its mortgage payments, and Braintree paid the condominium fees. Vantage Beach, the Entity which replaced Braintree in paying Greenberg's personal expenses, lists Greenberg as the sole checking account signatory. From 2011 to 2012, Vantage Beach paid to renovate the Greenberg's condominium. Furthermore, the

1 of 4 free articles

among other things an asset protection, you know,
vehicle."

*For these, and the reasons cited in the Report, the
Magistrate correctly concluded that Greenberg
could use some, or all, of the Entities to pay or make
reasonable efforts to comply with his Final
Judgment. Such efforts could include selling or
renting the New York home, selling or renting the
Miami condominium, terminating the lease on the
luxury cars, terminating the golf memberships, and
withdrawing funds from the Entities.*

Thus, Greenberg failed to prove that he had a "present inability to comply",
and the District Court adopted the Magistrate Judge's recommendation,
and ordered that Greenberg surrender himself to the U.S. Marshal's Office
on June 1, 2015, to be held by the U.S. Bureau of Prison until he either (1)
paid the SEC's judgment, or (2) prove his inability to pay on the SEC's
judgment.

## ANALYSIS

This is a case that a creditor right's lawyer would say falls into the
"flaunting debtor" category, which itself is a subset of the "stupid debtor"
category. The "flaunting debtor" is one who, despite owing lots of money,
continues to live the high life while stiffing creditors.

Flash Sale: $49.99 for your first year.  Unlock trusted journalism, member-only events and more. Limited time
only.

Subscribe Now

make the debtor feel the full wrath of courts -- which usually means casting the debtor into the general prison population for some significant length of time.

As I have written many times before, as somebody who sometimes represents debtors as well as creditors: If you are going to claim that you're dead busted broke, then you'd better appear to be dead busted broke at all times. This isn't any sage wisdom, but simple (and when applied in retrospect, quite obvious) common sense.

The largest part of the problem is the mixture of arrogance, stupidity, and lack of minimal common sense on the part of debtors -- a cocktail that will usually result in their downfall, despite its only temporary buzz that they are pulling one over on their creditors.

A smaller part of the problem is how asset protection is sometimes marketed, quite falsely, which is that folks can flip The Bird to their creditors while continuing to lead their previous profligate lifestyle. That may sound really good at an asset protection seminar, that may sound really good in a conference room with clients, but it doesn't sound so hot in a courtroom -- in fact, that debtors have continued to live their previous high lifestyle while not paying their debts will almost always be the kiss-of-death with the Court.

**Passing on to the technical aspects of the case, it is first important to note**

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

1 of 4 free articles

Subscribe Now

that they have statutory powers that ordinary creditors do not, and which in this case means that debtors can be forced to pay their judgments to the SEC under penalty of contempt if they do not comply (conversely, civil creditors have to go out and collect through the judgment enforcement process).

Because of this, there are some types of creditors (the SEC and the FTC seem to appear more often in these types of cases than most) where most asset protection planning simply will not work, nor should it since most of the debtors in these cases have already been essentially judged to be crooks, and protecting the assets of crooks has nothing to do with legitimate asset protection planning.

Nonetheless, the contempt proceedings work basically the same for both "Super Creditors" and ordinary civil creditors, and they work as illustrated in this case.

First, the burden is on the creditor to prove that the debtor had at least some significant ability to comply with the Court's order. If the creditor cannot meet that burden, then the contempt matter ends in favor of the debtor. But if the creditor can meet that burden, then the Court proceeds to the next step of the analysis.

Second, if the creditor meets its burden, then the burden shifts to the debtor to prove that he or she had a "present inability to comply" with the

1 of 4 free articles

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Court that it is utterly impossible for the debtor to substantially comply with the Court's order.

This second standard is very difficult for a debtor to meet, since the debtor essentially has to "prove a negative", which is that the debtor doesn't have the ability from the debtor's resources anywhere in the world to comply with the Court's order. But if there is any evidence at all that the debtor could have complied, and here there was no shortage of that evidence, then the debtor needs to bring either a cashier's check or his toothbrush to the contempt hearing.

Once in a blue moon, a debtor will be able to prove an inability to comply as in the *Bellinger* case (which arguably was more due to the failure of the creditor to get its ducks in a row before moving for contempt than anything the debtor did), but the odds have proven to be so low of winning on the Impossibility Defense that a debtor should presume otherwise.

As a practical litigation matter, the debtor in such a case has almost no chance of avoiding jail where the debtor claims that he has no ability to comply but at the same time is living a lavish style.

It is also important to note that there is a difference between "civil contempt" and "criminal contempt".

Civil contempt means that the Court is addressing the present problem of

Subscribe Now

traditionally afforded quite expansive discretion to the lower courts to both decide that such sanctions are warranted and the type of sanction to be employed.

Contrast that with criminal contempt, which seeks only to punish the defendant for a past violation of the Court's order, and which is considered to be quasi-criminal in nature, thus entitling the defendant to a jury trial. The appellate courts ride close herd on criminal contempt cases, and such holdings by the lower courts are frequently reversed.

The important point is that with civil contempt, the defendant who appeals the lower court's finding of contempt and selection of remedy must appeal on an "abuse of discretion" basis, i.e., that the lower court totally ran off the rails, and which is a very difficult standard for the defendant to meet on appeal. This is why in civil contempt cases, the defendant shouldn't count on being bailed out by the Court of Appeals, because that rarely happens.

Greenberg will doubtless appeal this case to the 11th Circuit Court of Appeals, which has in recent years been quite protective of its lower court judges in these situations. So we may still see more of this case if the 11th Circuit decides to issue an opinion.

Stay tuned.

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

Subscribe Now

This article at http://onforb.es/1coVHZ8 and http://goo.gl/uHmvX9

**Interesting case documents:**

The SEC's Motion to Show Cause re Contempt with supporting Memo and Affidavit --
http://www.assetprotectionbook.com/casedocs/greenberg/027_Mo_Show

Transcript of the U.S. Magistrate Judge's evidentiary hearing --
http://www.assetprotectionbook.com/casedocs/greenberg/062_Transcript

Report of the U.S. Magistrate Judge --
http://www.assetprotectionbook.com/casedocs/greenberg/067_Rep_Magi

Editorial Standards        Reprints & Permissions

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.

1 of 4 free articles

Subscribe Now

Related Topics

Flash Sale: $49.99 for your first year.  Unlock trusted journalism, member-only events and more. Limited time only.

1 of 4 free articles

Subscribe Now



You can find
Acrolein
in Vapes
(and weed killer).

Learn more at odh.o

© 2026 Forbes Media LLC. All Rights Reserved.

AdChoices    Privacy Statement    ⬅️ Your Privacy Choices    Cookie Preferences    Digital Terms of Sale    Terms of Service    Contact Us    Send Us Feedback

Report a Security Issue    Jobs At Forbes    Reprints & Permissions    Forbes Press Room    Advertise

1 of 4 free articles

Flash Sale: $49.99 for your first year. Unlock trusted journalism, member-only events and more. Limited time only.    Subscribe Now



**Employee Name:**  <u>Sharon Travis</u>         **Date:**  <u>10/21/21</u>

Current position:  <u>CEO</u>

Reason for Change:   <u>Amount previously approved by board</u>

New Yearly salary:  <u>$105,000</u>

Effective Date:   <u>10/04/21</u>

Employee agrees that they will at all times faithfully, industriously, and to the best of their skills, experience and talents, perform all of the duties required of the position.  In carrying out these duties and responsibilities, the employee shall comply with all employer policies, procedures, rules, and regulations both written and verbal.

HR Signature: _Tara Singer_       Date: _10/21/21_

CEO Signature: _Sharon Travis_       Date: _10-21-21_



**Employee Name:**  Sharon Travis          **Date:**  10/21/21

**Current position:**  CEO

**Reason for Change:**   Amount previously approved by board

 **New Yearly salary:**  $105,000

**Effective Date:**   10/04/21

 Employee agrees that they will at all times faithfully, industriously, and to the best of their skills, experience and talents, perform all of the duties required of the position.  In carrying out these duties and responsibilities, the employee shall comply with all employer policies, procedures, rules, and regulations both written and verbal.

HR Signature: _Tina Singer_          Date: _10/21/21_

CEO Signature: _Sharon Travis_          Date: _10-21-21_

 Outlook

---

**Fwd:**

---

**From**  Tara Singer <tara.serenityhills@gmail.com>
**Date**  Wed 2/18/2026 8:50 AM
**To**    Tara Singer <accountant@serenityhillslifecenter.org>

Tara Singer, HR
Serenity Hills Life Center
667 Stone & Shannon Rd
Wheeling, WV 26003
304-277-4657 ext 126
304-277-1037 fax

---------- Forwarded message ---------
From: **Rose Halverson** <rose.halverson@yahoo.com>
Date: Mon, Feb 16, 2026, 4:37 PM
Subject:
To: Tara Singer <tara.serenityhills@gmail.com>

To whom it may concern
This is Rose Halverson a former board member of Serenity Hills. I was asked to write a letter concerning my reasons for stepping down from the board. It had nothing to do with anything but health complications. I have ocular Myathenia gravis along with a small brain aneurysm at the base of the brain. To my knowledge the CEO Sharon Travis has dedicated herself and worked tirelessly to making Serenity Hills a place to help women succeed in recovery and has done a good job. It saddened me to step away from a place that is needed in the area and so helpful to so many because of Ms Travis
Thank you
Rose Halverson

## Payroll Summary

**Pay Frequency:** Biweekly
**Department:** 00007 - Office-administrative

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/2021 | Travis, Sharon M | 0.00 | 2,137.54 | 451.88 | 0.00 | 1,685.66 | DD | 163.52 | 2,301.06 |
| 12/17/2021 | Travis, Sharon M | 0.00 | 2,137.54 | 447.65 | 16.32 | 1,673.57 | DD | 162.26 | 2,299.82 |
| 12/03/2021 | Travis, Sharon M | 16.00 | 4,038.46 | 944.21 | 16.32 | 3,077.93 | DD | 307.69 | 4,346.15 |
| 11/19/2021 | Travis, Sharon M | 0.00 | 4,038.46 | 949.39 | 0.00 | 3,089.07 | DD | 308.94 | 4,347.40 |
| 11/05/2021 | Travis, Sharon M | 0.00 | 4,038.46 | 949.40 | 0.00 | 3,089.06 | 50144 | 308.94 | 4,347.40 |
| 10/22/2021 | Travis, Sharon M | 0.00 | 4,038.46 | 949.41 | 5.00 | 3,084.05 | 50140 | 308.94 | 4,347.40 |
| 10/08/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.58 | 25.00 | 2,211.94 | DD | 220.68 | 3,105.30 |
| 09/24/2021 | Travis, Sharon M | 9.00 | 2,884.62 | 647.66 | 15.00 | 2,221.96 | DD | 220.68 | 3,105.30 |
| 09/10/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.58 | 0.00 | 2,236.84 | DD | 220.68 | 3,105.30 |
| 08/27/2021 | Travis, Sharon M | 40.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 08/13/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 5.00 | 2,231.95 | DD | 220.68 | 3,105.30 |
| 07/30/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.68 | 5.00 | 2,231.94 | DD | 220.68 | 3,105.30 |
| 07/16/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 07/02/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 06/18/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.68 | 0.00 | 2,236.94 | DD | 220.68 | 3,105.30 |
| 06/04/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 05/21/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 05/07/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.68 | 0.00 | 2,236.94 | DD | 220.68 | 3,105.30 |
| 04/23/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 04/09/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.68 | 3.00 | 2,233.94 | DD | 242.59 | 3,127.21 |
| 03/26/2021 | Travis, Sharon M | 0.00 | 3,880.86 | 907.43 | 0.00 | 2,973.43 | DD | 401.66 | 4,282.52 |
| 03/12/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.43 | 0.00 | 1,181.11 | DD | 151.27 | 1,612.81 |
| 02/26/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.42 | 0.00 | 1,181.12 | DD | 151.27 | 1,612.81 |
| 02/12/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.44 | 0.00 | 1,181.10 | DD | 151.27 | 1,612.81 |
| 01/29/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.42 | 0.00 | 1,181.12 | DD | 151.27 | 1,612.81 |
| 01/15/2021 | Travis, Sharon M | 8.00 | 1,461.54 | 280.43 | 0.00 | 1,181.11 | DD | 151.27 | 1,612.81 |

**Department Totals: 00007 - Office-administrative** | | 72.00 | $72,002.16 | $16,068.94 | $90.64 | $55,842.58 | | $5,829.75 | $77,831.91

Total Net Pays for 00007 - Office-administrative: 26
Pay Frequency Totals: Biweekly

**Total Net Pays for Biweekly frequency: 26**

**Company Totals:** | | 72.00 | $72,002.16 | $16,068.94 | $90.64 | $55,842.58 | | $5,829.75 | $77,831.91

Total Net Pays for Company: 26

Company: HEART 2 HEART VOLUNTEERS INC

Check dates from: 1/15/2021 - Payroll 1 to: 12/31/2021 - Payroll 1
Pay Period from: 12/28/2020 to: 12/26/2021

1 of 1

Date Printed: 02/18/2026 08:57

24966745 - RB/7OS

# Payroll Summary

Company: HEART 2 HEART VOLUNTEERS INC

Pay Period from: 12/26/2022 to: 12/24/2023

Date Printed: 02/18/2026 08:59

24965745 - RB7OS

1 of 1

**Pay Frequency: Biweekly**
**Department: 00007 - Office-administrative**

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| 12/29/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 12/15/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.82 | 16.44 | 804.51 | DD | 79.89 | 1,140.66 |
| 12/01/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.84 | 16.44 | 804.49 | DD | 79.89 | 1,140.66 |
| 11/17/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 11/03/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 10/20/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 116.44 | 704.50 | DD | 79.89 | 1,140.66 |
| 10/06/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 235.60 | 32.88 | 792.29 | DD | 78.63 | 1,139.40 |
| 09/22/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 08/31/2023 - Manual | Travis, Sharon M | 0.00 | 1,060.75 | 239.81 | 16.44 | 804.50 | 3405 | 79.89 | 1,140.64 |
| 08/11/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.84 | 16.44 | 804.49 | DD | 79.89 | 1,140.66 |
| 07/28/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 07/14/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 06/30/2023 | Travis, Sharon M | 8.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 06/16/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 79.89 | 1,140.66 |
| 06/02/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 05/19/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.05 | 0.00 | 817.72 | DD | 81.15 | 1,141.92 |
| 05/05/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 104.27 | 1,165.04 |
| 04/21/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.07 | 0.00 | 804.70 | DD | 128.88 | 1,189.65 |
| 04/07/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 03/24/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.05 | 0.00 | 804.72 | DD | 128.88 | 1,189.65 |
| 03/10/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 02/24/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 02/10/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 01/27/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 01/13/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| **Department Totals: 00007 - Office-administrative** | | 8.00 | 26,519.23 | 6,108.26 | 330.16 | 20,080.81 | | 2,416.07 | 28,935.30 |

Total Net Pays for 00007 - Office-administrative: 24

| **Pay Frequency Totals: Biweekly** | | 8.00 | 26,519.23 | 6,108.26 | 330.16 | 20,080.81 | | 2,416.07 | 28,935.30 |
|---|---|---|---|---|---|---|---|---|---|

Total Net Pays for Biweekly frequency: 24

| **Company Totals:** | | 8.00 | 26,519.23 | 6,108.26 | 330.16 | 20,080.81 | | 2,416.07 | 28,935.30 |
|---|---|---|---|---|---|---|---|---|---|

Total Net Pays for Company: 24

Company: HEART 2 HEART VOLUNTEERS INC
Check dates from: 1/13/2023 - Payroll 1 to: 12/29/2023 - Payroll 1
Pay Period from: 12/26/2022 to: 12/24/2023

📧 Outlook

**Board**

**From** Rose Halverson <rose.halverson@yahoo.com>
**Date** Sun 12/28/2025 8:11 AM
**To** Tara Singer <accountant@serenityhillslifecenter.org>; Sharon Travis <serenityhillscenterceo@gmail.com>

Dear board members it's with a heavy heart that I have decided to formally resign from the board of directors of Serenity Hills addiction center effective immediately.
This decision has not been made lightly. Due to personal and medical reasons I need to step away from my responsibilities at Serenity Hills to focus on my family and my own health.
It has been an honor to serve with all of you on the mission of Serenity Hills and the dedication of all I have worked along side with, it was a pleasure to contribute to the organization with you.
I wish the board,the staff and those you serve continued success
Sincerely
Rose Halverson

# Payroll Summary

Company: HEART 2 HEART VOLUNTEERS INC

Check dates from: 1/9/2026 - Payroll 1 to: 2/11/2026 - Payroll 1
Pay Period from: 12/22/2025 to: 02/01/2026

Date Printed: 02/18/2026 09:02

1 of 1

24966745 - RB/7OS

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| **Pay Frequency:** Biweekly | | | | | | | | | |
| **Department:** 00007 - Office-administrative | | | | | | | | | |
| 02/11/2026 | Travis, Sharon M | 0.00 | 3,404.51 | 898.07 | 16.44 | 2,490.00 | DD | 358.71 | 3,763.22 |
| 01/28/2026 | Travis, Sharon M | 0.00 | 3,388.07 | 898.07 | 16.44 | 2,473.56 | DD | 383.29 | 3,771.36 |
| 01/14/2026 - Manual | Travis, Sharon M | 0.00 | 3,388.07 | 898.07 | 16.44 | 2,473.56 | 11420262 | 383.29 | 3,771.36 |
| **Department Totals:** 00007 - Office-administrative | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| **Total Net Pays for 00007 - Office-administrative: 2** | | | | | | | | | |
| **Pay Frequency Totals:** Biweekly | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| **Total Net Pays for Biweekly frequency: 2** | | | | | | | | | |
| **Company Totals:** | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| **Total Net Pays for Company: 2** | | | | | | | | | |

# Payroll Summary

Pay Frequency: **Biweekly**
Department: **00007 - Office-administrative**

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,082.84 | 82.84 | 0.00 | 1,000.00 | 82324 | 82.84 | 1,165.68 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 605.24 | 516.44 | 1,878.32 | 101245 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 714.26 | 0.00 | 2,285.74 | 11292450 | 229.50 | 3,229.50 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 682.08 | 16.44 | 2,301.48 | 12272450 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 697.83 | 16.44 | 2,285.73 | 10161828 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 417.49 | 1,394.36 | 0.00 | 123129 | 137.35 | 1,949.20 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 417.48 | 16.44 | 1,377.93 | 123156 | 137.35 | 1,949.20 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 | 8232024 | 189.99 | 2,689.99 |
| 11/15/2024 | Travis, Sharon M | 0.00 | 3,000.00 | 697.82 | 16.44 | 2,285.74 | DD | 228.24 | 3,228.24 |
| 11/01/2024 | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 | DD | 189.99 | 2,689.99 |
| 11/01/2024 | Travis, Sharon M | 0.00 | 500.00 | 51.25 | 0.00 | 448.75 | DD | 38.25 | 538.25 |
| 10/04/2024 | Travis, Sharon M | 0.00 | 1,878.32 | 0.00 | 0.00 | 1,878.32 | DD | 0.00 | 1,878.32 |
| 09/23/2024 | Travis, Sharon M | 8.00 | 3,000.00 | 697.83 | 16.44 | 2,285.73 | DD | 228.24 | 3,228.24 |
| 09/06/2024 | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 | DD | 189.99 | 2,689.99 |
| 08/23/2024 | Travis, Sharon M | 0.00 | 1,000.00 | 0.00 | 0.00 | 1,000.00 | DD | 0.00 | 1,000.00 |
| 08/12/2024 | Travis, Sharon M | 0.00 | 954.00 | 0.00 | 0.00 | 954.00 | DD | 0.00 | 954.00 |
| 08/09/2024 - Manual | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 1,975.43 | 0.00 | 77777 | 189.99 | 2,689.99 |
| 07/26/2024 | Travis, Sharon M | 0.00 | 1,811.85 | 417.49 | 1,394.36 | 0.00 | | 137.35 | 1,949.20 |
| 06/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,060.76 | 235.89 | 16.44 | 808.43 | 6292424 | 79.89 | 1,140.65 |
| 06/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 417.50 | 1,394.35 | 0.00 | 6292457 | 137.35 | 1,949.20 |
| 06/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 421.71 | 16.44 | 1,390.14 | 5312024 | 136.60 | 1,950.45 |
| 06/28/2024 | Travis, Sharon M | 0.00 | 1,811.85 | 417.49 | 16.44 | 1,377.92 | DD | 137.35 | 1,949.20 |
| 06/14/2024 | Travis, Sharon M | 0.00 | 1,811.85 | 417.50 | 16.44 | 1,377.91 | DD | 150.12 | 1,961.97 |
| 05/03/2024 | Travis, Sharon M | 0.00 | 1,811.85 | 417.48 | 1,394.37 | 0.00 | | 218.88 | 2,030.73 |
| 04/19/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.90 | 16.44 | 808.43 | DD | 127.62 | 1,188.39 |
| 04/05/2024 | Travis, Sharon M | 0.00 | 808.43 | 0.00 | 0.00 | 808.43 | DD | 0.00 | 808.43 |
| 03/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 16.44 | 808.42 | 9999940 | 127.62 | 1,188.39 |
| 03/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,060.77 | 235.90 | 16.44 | 808.43 | 3685 | 127.62 | 1,188.39 |
| 03/22/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.89 | 16.44 | 808.44 | DD | 127.62 | 1,188.39 |
| 03/12/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.90 | 16.44 | 808.43 | DD | 127.62 | 1,188.39 |
| 02/23/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 16.44 | 808.42 | DD | 108.53 | 1,169.30 |
| 02/09/2024 | Travis, Sharon M | 0.00 | 808.42 | 0.00 | 0.00 | 808.42 | DD | 0.00 | 808.42 |
| 01/12/2024 | Travis, Sharon M | 8.00 | 1,060.77 | 235.90 | 16.44 | 808.43 | DD | 108.53 | 1,169.30 |
| **Department Totals: 00007 - Office-administrative** | | | **$58,012.96** | **$11,558.77** | **$8,365.23** | **$38,088.96** | | **$4,381.15** | **$62,394.11** |
| **Total Net Pays for 00007 - Office-administrative: 17** | | | | | | | | | |
| **Pay Frequency Totals: Biweekly** | | | | | | | | | |
| **Total Net Pays for Biweekly frequency: 17** | | 8.00 | $58,012.96 | $11,558.77 | $8,365.23 | $38,088.96 | | $4,381.15 | $62,394.11 |
| **Company Totals:** | | | | | | | | | |
| **Total Net Pays for Company:17** | | 8.00 | $58,012.96 | $11,558.77 | $8,365.23 | $38,088.96 | | $4,381.15 | $62,394.11 |

Company: HEART 2 HEART VOLUNTEERS INC
Check dates from: 1/12/2024 - Payroll 1 to: 12/31/2024 - Payroll 1
Pay Period from: 12/25/2023 to: 01/19/2025

1 of 1

Date Printed: 02/18/2026 09:00

24966745 - RB/OS

# Payroll Summary

**Company: HEART 2 HEART VOLUNTEERS INC**
Check dates from: 1/1/2024 to: 12/31/2024 - Payroll 1 to: 12/31/2024 - Payroll 1
Pay Period from: 12/25/2023 to: 01/19/2025

Date Printed: 02/18/2026 09:00

**Pay Frequency: Biweekly**
**Department: 00007 - Office-administrative**

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,082.84 | 82.84 | 0.00 | 1,000.00 | 82324 | 82.84 | 1,165.68 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 605.24 | 516.44 | 1,878.32 | 101245 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 714.26 | 0.00 | 2,285.74 | 11293245 | 228.50 | 3,228.50 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 682.08 | 16.44 | 2,301.48 | 112272450 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 3,000.00 | 697.83 | 16.44 | 2,285.73 | 10181828 | 228.24 | 3,228.24 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 417.49 | 0.00 | 1,394.36 | 123129 | 137.35 | 1,949.20 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.85 | 417.48 | 16.44 | 1,377.93 | 123156 | 137.35 | 1,949.20 |
| 12/31/2024 - Manual | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 | 8232024 | 189.99 | 2,689.99 |
| 11/15/2024 | Travis, Sharon M | 0.00 | 3,000.00 | 697.82 | 16.44 | 2,285.74 |  | 228.24 | 3,228.24 |
| 11/01/2024 | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 |  | 189.99 | 2,688.99 |
| 11/01/2024 | Travis, Sharon M | 0.00 | 500.00 | 51.25 | 0.00 | 448.75 | DD | 38.25 | 538.25 |
| 10/04/2024 | Travis, Sharon M | 0.00 | 1,878.32 | 0.00 | 0.00 | 1,878.32 | DD | 0.00 | 1,878.32 |
| 09/23/2024 | Travis, Sharon M | 8.00 | 3,000.00 | 697.83 | 16.44 | 2,285.73 |  | 228.24 | 3,228.24 |
| 09/06/2024 | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 16.44 | 1,958.99 |  | 189.99 | 2,689.99 |
| 08/23/2024 | Travis, Sharon M | 0.00 | 1,000.00 | 0.00 | 0.00 | 1,000.00 | DD | 0.00 | 1,000.00 |
| 08/12/2024 | Travis, Sharon M | 0.00 | 954.00 | 0.00 | 0.00 | 954.00 | DD | 0.00 | 954.00 |
| 08/09/2024 - Manual | Travis, Sharon M | 0.00 | 2,500.00 | 524.57 | 1,975.43 | 0.00 | 77777 | 189.99 | 2,689.99 |
| 07/26/2024 | Travis, Sharon M | 0.00 | 0.00 | 0.00 | 1,394.36 | 0.00 |  | 0.00 | 0.00 |
| 06/28/2024 - Manual | Travis, Sharon M | 0.00 | 1,060.76 | 235.89 | 16.44 | 808.43 | 6292424 | 79.89 | 1,140.65 |
| 06/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.65 | 417.49 | 1,394.35 | 0.00 | 6292457 | 137.35 | 1,949.20 |
| 06/29/2024 - Manual | Travis, Sharon M | 0.00 | 1,811.65 | 417.49 | 0.00 | 1,394.35 | 5312024 | 137.35 | 1,949.20 |
| 06/28/2024 | Travis, Sharon M | 0.00 | 1,811.65 | 427.71 | 0.00 | 1,390.14 | DD | 138.60 | 1,950.45 |
| 06/14/2024 | Travis, Sharon M | 0.00 | 1,811.65 | 417.49 | 16.44 | 1,377.92 | DD | 137.35 | 1,949.20 |
| 05/03/2024 | Travis, Sharon M | 0.00 | 1,811.65 | 417.48 | 16.44 | 1,377.91 | DD | 137.35 | 1,949.20 |
| 04/19/2024 | Travis, Sharon M | 0.00 | 1,811.65 | 417.48 | 16.44 | 1,377.91 | DD | 150.12 | 1,961.97 |
| 04/05/2024 | Travis, Sharon M | 0.00 | 808.43 | 235.50 | 16.44 | 808.43 | DD | 218.88 | 2,030.73 |
| 03/31/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 0.00 | 808.42 | 9999840 | 127.62 | 1,188.39 |
| 03/28/2024 - Manual | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 16.44 | 808.43 | 3685 | 127.62 | 1,188.39 |
| 03/22/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.50 | 16.44 | 808.44 | DD | 127.62 | 1,188.39 |
| 03/12/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 16.44 | 808.44 | DD | 127.62 | 1,188.39 |
| 02/23/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.91 | 16.44 | 808.42 | DD | 127.62 | 1,188.39 |
| 02/09/2024 | Travis, Sharon M | 0.00 | 808.42 | 0.00 | 0.00 | 808.42 | DD | 108.53 | 1,169.30 |
| 01/12/2024 | Travis, Sharon M | 0.00 | 1,060.77 | 235.50 | 16.44 | 808.43 | DD | 127.62 | 1,188.39 |

**Department Totals: 00007 - Office-administrative** | | 8.00 | $58,012.96 | $11,558.77 | $8,365.23 | $38,088.96 | | $4,381.15 | $62,394.11

Total Net Pays for 00007 - Office-administrative: 17

**Pay Frequency Totals: Biweekly**
Total Net Pays for Biweekly frequency: 17

**Company Totals:** | | 8.00 | $58,012.96 | $11,558.77 | $8,365.23 | $38,088.96 | | $4,381.15 | $62,394.11

Total Net Pays for Company: 17

24966745 - RB/7OS

## Payroll Summary

Company: HEART 2 HEART VOLUNTEERS INC
Check dates from: 1/9/2026 - Payroll 1 to: 2/11/2026 - Payroll 1
Pay Period from: 12/22/2025 to: 02/01/2026

Date Printed: 02/18/2026 09:02

1 of 1

24966745 - RB7OS

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| **Pay Frequency:** | **Biweekly** | | | | | | | | |
| **Department:** | **00007 - Office-administrative** | | | | | | | | |
| 02/11/2026 | Travis, Sharon M | 0.00 | 3,404.51 | 898.07 | 16.44 | 2,490.00 | DD | 358.71 | 3,763.22 |
| 01/28/2026 | Travis, Sharon M | 0.00 | 3,388.07 | 898.07 | 16.44 | 2,473.56 | DD | 383.29 | 3,771.36 |
| 01/14/2026 - Manual | Travis, Sharon M | 0.00 | 3,388.07 | 898.07 | 16.44 | 2,473.56 | 11420282 | 383.29 | 3,771.36 |
| Department Totals: 00007 - Office-administrative | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| Total Net Pays for 00007 - Office-administrative: 2 | | | | | | | | | |
| **Pay Frequency Totals: Biweekly** | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| Total Net Pays for Biweekly frequency: 2 | | | | | | | | | |
| **Company Totals:** | | 0.00 | $10,180.65 | $2,694.21 | $49.32 | $7,437.12 | | $1,125.29 | $11,305.94 |
| Total Net Pays for Company: 2 | | | | | | | | | |

 Outlook

---

**Board**

---

**From** Rose Halverson <rose.halverson@yahoo.com>

**Date** Sun 12/28/2025 8:11 AM

**To**   Tara Singer <accountant@serenityhillslifecenter.org>; Sharon Travis <serenityhillscenterceo@gmail.com>

Dear board members it's with a heavy heart that I have decided to formally resign from the board of directors of Serenity Hills addiction center effective immediately.

This decision has not been made lightly. Due to personal and medical reasons I need to step away from my responsibilities at Serenity Hills to focus on my family and my own health.

It has been an honor to serve with all of you on the mission of Serenity Hills and the dedication of all I have worked along side with, it was a pleasure to contribute to the organization with you.

I wish the board,the staff and those you serve continued success

Sincerely

Rose Halverson

# Payroll Summary

Company: HEART 2 HEART VOLUNTEERS INC
Check dates from: 1/13/2023 - Payroll 1 to: 12/29/2023 - Payroll 1
Pay Period from: 12/26/2022 to: 12/24/2023

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| **Pay Frequency: Biweekly** | | | | | | | | | |
| **Department: 00007 - Office-administrative** | | | | | | | | | |
| 12/29/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 12/15/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.82 | 16.44 | 804.51 | DD | 79.89 | 1,140.66 |
| 12/01/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.84 | 16.44 | 804.49 | DD | 79.89 | 1,140.66 |
| 11/17/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 11/03/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 116.44 | 704.50 | DD | 79.89 | 1,140.66 |
| 10/20/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 235.60 | 32.88 | 792.29 | DD | 78.63 | 1,139.40 |
| 10/06/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 09/22/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 08/31/2023 | Travis, Sharon M | 0.00 | 1,060.75 | 239.81 | 16.44 | 804.50 | DD | 79.89 | 1,140.64 |
| 08/11/2023 - Manual | Travis, Sharon M | 0.00 | 1,060.77 | 239.84 | 16.44 | 804.49 | 3405 | 79.89 | 1,140.66 |
| 08/11/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 07/28/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 07/14/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 06/30/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 239.83 | 16.44 | 804.50 | DD | 79.89 | 1,140.66 |
| 06/16/2023 | Travis, Sharon M | 8.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 06/02/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 05/19/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 81.15 | 1,141.92 |
| 05/05/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 104.27 | 1,165.04 |
| 04/21/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.06 | 0.00 | 817.71 | DD | 128.88 | 1,189.65 |
| 04/07/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 243.05 | 0.00 | 817.72 | DD | 128.88 | 1,189.65 |
| 03/24/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 03/10/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.07 | 0.00 | 804.70 | DD | 128.88 | 1,189.65 |
| 02/24/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 02/10/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.05 | 0.00 | 804.72 | DD | 128.88 | 1,189.65 |
| 01/27/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| 01/13/2023 | Travis, Sharon M | 0.00 | 1,060.77 | 256.06 | 0.00 | 804.71 | DD | 128.88 | 1,189.65 |
| **Department Totals: 00007 - Office-administrative: 24** | | 8.00 | 26,519.23 | 6,108.26 | 330.16 | 20,080.81 | | 2,416.07 | 28,935.30 |
| **Total Net Pays for 00007 - Office-administrative: 24** | | | | | | | | | |
| **Pay Frequency Totals: Biweekly** | | 8.00 | $26,519.23 | $6,108.26 | $330.16 | $20,080.81 | | $2,416.07 | $28,935.30 |
| **Total Net Pays for Biweekly frequency: 24** | | | | | | | | | |
| **Company Totals:** | | 8.00 | $26,519.23 | $6,108.26 | $330.16 | $20,080.81 | | $2,416.07 | $28,935.30 |
| **Total Net Pays for Company: 24** | | | | | | | | | |

Date Printed: 02/18/2026 08:59
24966745 - RB7OS

# Payroll Summary

Company: HEART 2 HEART VOLUNTEERS INC
Check dates from: 1/15/2021 - Payroll 1 to: 12/31/2021 - Payroll 1
Pay Period from: 12/28/2020 to: 12/26/2021

1 of 1

Date Printed: 02/18/2026 08:57

24966745 - RB/7OS

**Pay Frequency: Biweekly**
**Department: 00007 - Office-administrative**

| Check Date | Name | Hours | Total Paid | Tax Withheld | Deductions | Net Pay | Check No | Employer Liability | Total Expense |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/2021 | Travis, Sharon M | 0.00 | 2,137.54 | 451.88 | 0.00 | 1,685.66 | DD | 163.52 | 2,301.06 |
| 12/17/2021 | Travis, Sharon M | 0.00 | 2,137.54 | 447.65 | 16.32 | 1,673.57 | DD | 162.28 | 2,299.82 |
| 12/03/2021 | Travis, Sharon M | 16.00 | 4,038.46 | 944.21 | 16.32 | 3,077.93 | DD | 307.69 | 4,346.15 |
| 11/19/2021 | Travis, Sharon M | 16.00 | 4,038.46 | 949.39 | 0.00 | 3,089.07 | DD | 308.94 | 4,347.40 |
| 11/05/2021 | Travis, Sharon M | 0.00 | 4,038.46 | 949.40 | 0.00 | 3,089.06 | DD | 308.94 | 4,347.40 |
| 10/22/2021 | Travis, Sharon M | 0.00 | 4,038.46 | 949.41 | 5.00 | 3,084.05 | 50144 | 308.94 | 4,347.40 |
| 10/08/2021 | Travis, Sharon M | 8.00 | 2,884.62 | 647.68 | 25.00 | 2,211.94 | 50140 | 220.68 | 3,105.30 |
| 09/24/2021 | Travis, Sharon M | 8.00 | 2,884.62 | 647.66 | 15.00 | 2,221.96 | DD | 220.68 | 3,105.30 |
| 09/10/2021 | Travis, Sharon M | 40.00 | 2,884.62 | 647.68 | 0.00 | 2,236.94 | DD | 220.68 | 3,105.30 |
| 08/27/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 08/13/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 5.00 | 2,231.95 | DD | 220.68 | 3,105.30 |
| 07/30/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.68 | 5.00 | 2,231.94 | DD | 220.68 | 3,105.30 |
| 07/16/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 07/02/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 06/18/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 06/04/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 05/21/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 05/07/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 04/23/2021 | Travis, Sharon M | 0.00 | 3,880.86 | 907.43 | 0.00 | 2,973.43 | DD | 401.66 | 4,282.52 |
| 04/09/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 3.00 | 2,233.94 | DD | 242.69 | 3,127.21 |
| 03/26/2021 | Travis, Sharon M | 0.00 | 2,884.62 | 647.67 | 0.00 | 2,236.95 | DD | 220.68 | 3,105.30 |
| 03/12/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.42 | 0.00 | 1,181.12 | DD | 151.27 | 1,612.81 |
| 02/26/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.42 | 0.00 | 1,181.11 | DD | 151.27 | 1,612.81 |
| 02/12/2021 | Travis, Sharon M | 0.00 | 1,461.54 | 280.42 | 0.00 | 1,181.10 | DD | 151.27 | 1,612.81 |
| 01/29/2021 | Travis, Sharon M | 8.00 | 1,461.54 | 280.43 | 0.00 | 1,181.11 | DD | 151.27 | 1,612.81 |
| 01/15/2021 | Travis, Sharon M | 8.00 | 1,461.54 | 280.42 | 0.00 | 1,181.11 | DD | 151.27 | 1,612.81 |
| **Department Totals: 00007 - Office-administrative: 26** | | 72.00 | $72,002.16 | $16,068.94 | $90.64 | $55,842.58 | | $5,829.75 | $77,831.91 |
| Total Net Pays for 00007 - Office-administrative: 26 | | | | | | | | | |
| **Pay Frequency Totals: Biweekly** | | | | | | | | | |
| Total Net Pays for Biweekly frequency: 26 | | | | | | | | | |
| **Company Totals: 26** | | 72.00 | $72,002.16 | $16,068.94 | $90.64 | $55,842.58 | | $5,829.75 | $77,831.91 |
| Total Net Pays for Company: 26 | | | | | | | | | |

Outlook

Fwd:

**From** Tara Singer <tara.serenityhills@gmail.com>
**Date** Wed 2/18/2026 8:50 AM
**To** Tara Singer <accountant@serenityhillslifecenter.org>

Tara Singer, HR
Serenity Hills Life Center
667 Stone & Shannon Rd
Wheeling, WV 26003
304-277-4657 ext 126
304-277-1037 fax

---------- Forwarded message ---------
From: **Rose Halverson** <rose.halverson@yahoo.com>
Date: Mon, Feb 16, 2026, 4:37 PM
Subject:
To: Tara Singer <tara.serenityhills@gmail.com>

To whom it may concern
This is Rose Halverson a former board member of Serenity Hills. I was asked to write a letter
concerning my reasons for stepping down from the board. It had nothing to do with anything but
health complications. I have ocular Myathenia gravis along with a small brain aneurysm at the base of
the brain. To my knowledge the CEO Sharon Travis has dedicated herself and worked tirelessly to
making Serenity Hills a place to help women succeed in recovery and has done a good job. It
saddened me to step away from a place that is needed in the area and so helpful to so many because
of Ms Travis
Thank you
Rose Halverson



Serenity Hills
LIFE CENTER

Employee Name: __Sharon Travis__          Date: __10/21/21__

Current position: __CEO__

Reason for Change: __Amount previously approved by board__

New Yearly salary: __$105,000__

Effective Date: __10/04/21__

Employee agrees that they will at all times faithfully, industriously, and to the best of their skills, experience and talents, perform all of the duties required of the position. In carrying out these duties and responsibilities, the employee shall comply with all employer policies, procedures, rules, and regulations both written and verbal.

HR Signature: _Sara Sanders_          Date: __10/21/21__

 Outlook

---

Fwd:

---

**From** Tara Singer <tara.serenityhills@gmail.com>
**Date** Wed 2/18/2026 8:50 AM
**To**   Tara Singer <accountant@serenityhillslifecenter.org>

Tara Singer, HR
Serenity Hills Life Center
667 Stone & Shannon Rd
Wheeling, WV 26003
304-277-4657 ext 126
304-277-1037 fax

---------- Forwarded message ---------
From: **Rose Halverson** <rose.halverson@yahoo.com>
Date: Mon, Feb 16, 2026, 4:37 PM
Subject:
To: Tara Singer <tara.serenityhills@gmail.com>

To whom it may concern
This is Rose Halverson a former board member of Serenity Hills. I was asked to write a letter concerning my reasons for stepping down from the board. It had nothing to do with anything but health complications. I have ocular Myathenia gravis along with a small brain aneurysm at the base of the brain. To my knowledge the CEO Sharon Travis has dedicated herself and worked tirelessly to making Serenity Hills a place to help women succeed in recovery and has done a good job. It saddened me to step away from a place that is needed in the area and so helpful to so many because of Ms Travis
Thank you
Rose Halverson



**Internal Investigation**

12/10/2025

Outlined below are the findings of our investigation on ▓▓▓ and ▓▓▓, therapists at Serenity Hills Life Center. We have compiled interviews with the CEO, Marie Travis, and several residents.

**Marie's statement findings:**

In the days leading up to Thanksgiving, Marie stated that she entered one of ▓▓▓'s groups and found that they were watching a movie. She stated that she told ▓▓▓ this was not allowed, and that ▓▓▓ returned to the room and told the residents she was "getting fired" for showing them movies.

Marie also reported that ▓▓▓, a resident, told her that "counselors told me you were getting fired" and that ▓▓▓ did not trust the counselors.

Marie reported that it was reported to her by Taylor, mental health technician supervisor, that ▓▓▓ was projecting her phone to the TV and that she received a call from a former case manager. This was visible to the residents at the time.

On or around Thanksgiving Day, Marie reported that she held a residential meeting to discuss reports of residents concerned over Marie leaving or going to jail. Marie stated that she discussed with the residents that she was not going to jail or leaving the facility, and that residents stated that the counselors told them this. She also reported that the residents stated that "▓▓▓ was trying to make us hate you" and that she told them about Marie going to court for harming the former case manager. According to her, the residents stated "We don't need to know about this stuff."

tell them what to do. ████ confirmed that this conversation was in relation to groups, not just
activities. ████ reported that she has been here since November 7th and has not had any
therapy from Ch████ll. In relation to De████'s groups, she said that De████ did not bring court up
herself and that she tried to steer the groups away from "drama."

**Brit████'s statement findings:**

B████ee reported that she neither therapist discussed court with the residents in the group
setting, however that Ch████ll frequently discussed complaints in the group setting. She also
denied that G████ll and De████ spoke negatively about Marie.

**R██'s statement findings:**

The investigators interviewed R██ to confirm what she had stated in her statement. R██ stated
that De███ told the residents in a group session that Marie was "emotional and bankrupt." She
also told them that Marie had court that day for her daughter and for "twisting an employee's arm
for coming into the building." R██ reported that De███ would play music in group that was
meant to be recovery-oriented, but included cursing and sexual innuendo. She also reported that
at the onset of group discussions, De████ would ask the residents how they were, but she did not
stop them from complaining. She stated that she felt that E████ "wanted it to happen" and
"engaged in it with them." R██ reported that Ch████l told the residents she would find them
other places to go, other than here, and that she would bring in brochures to other facilities. She
noted, however, that Ch████l never brought brochures in. R██ reported that Marie asked the
residents at dinner one evening who was talking to them about transferring to another facility.
When no one would speak up, R██ stated that she said it was Ch████ll and De████. Later, during
a case management session (11/30/2025) with Marie, Marie asked her if she would write a
statement and to note that she was not instructed on what to say. R██ agreed and reported that

she wrote the statement upon her own volition. R█████ stated that the evening after writing this statement, she confided in her roommate, S█████y, about the statement. The next morning, S█████y told her that Ch█████ll asked her to write an opposing statement to say the opposite of everything R███ said. R███ stated that it was alluded to that S█████y told Ch█████ about her statement for Marie. Last night, R███ stated that she overheard S█████y telling other residents that it was Rosa's fault Ch█████ll was fired. This interview corroborates her written statement.

**Ch█████'s statement findings:**

Ch█████ reported that Ch█████ll told them during group sessions that Marie was going to court, getting fired, and other people were coming in to "fix things." She also stated that Ch█████ll said that Marie has "narcissistic qualities." Ch█████a reported that Ch█████ll, during a group session, told them that if they want "change, they need to hold a sit-in and not go to any activities." When asked for clarification, Ch█████a confirmed that Ch█████ll told them to not go to groups. Ch█████a stated that Ch█████ll told them that Marie controls whether they do 3 or 6 months and that "Marie needs the money because of the bankruptcy." Ch█████a stated that she did not experience this from Marie and that Marie told her she could "change her mind at any time." During a case management session (11/30/2025) with Marie, Marie asked her if she would write a statement. Ch█████a agreed and reported that she did not feel coerced into this statement. In relation to D█████, Ch█████a reported that D█████n did not condone the negative talk in her sessions and tried to steer Ch█████ll back on topic when D█████n sat in on a session. This interview corroborates her written statement.

**D█████'s statement findings:**

D█████ denied comments during the group session related to Marie touching a former employee and Marie having emotional or money problems. In relation to the inappropriate context of music

shown, D████n stated that she attempted to find the clean versions of songs, but that they did not include any sexual innuendo. She also stated that the songs were used to demonstrate how people express anger in artistic ways and that she stopped doing so when Marie asked her to.

**Chantell's statement findings:**

Ch█████ reported that she did not bring to the residents' attention that Marie was involved with court proceedings, but that the residents asked her questions about it. She stated that when the residents would talk to their family members at night, their family members would tell them about the incident and then they would ask Ch████ll for clarification. G██████ll stated that it is her job to assist the residents in processing information and she tried to calm them in regards to what they were hearing. She stated that she let the residents know that someone would be coming in the interim to assist SHLC, which was already stated in a facility-wide meeting with the residents. Ch█████ stated that she also did not tell the residents that the court date was not for Marie's daughter. She stated that Brit████e (resident) stated that she already knew Marie's daughter and told the group that this new court date couldn't be for her daughter because her "daughter's court date is in January." Ch████ll reported that she did not state that Marie was being forced out of her position, only that the CRO would come in IF anything happened. She said she simply wanted to provide emotional support. Ch████ll also reported that the residents stated that Marie would hold meetings with them at night about certain events and that the residents would come to group the next day to ask for clarification. In relation to her stating that an ombudsman was coming in, Ch████ll denied this, but noted that she said a "CRO" was coming in to assist. She reiterated that the residents were already told this information in a facility-wide setting.

████ stated that complaints would start at the onset of group discussions when she asked how they were. However, she reported that this would only go on for 7-10 minutes and then she would pull them back to the group topic.

In relation to telling the residents to stage a "sit-in," █████ stated that some residents were saying that their needs were not being met. For example, she stated that █████ said in group that she came specifically for education assistance and that since this was no longer being offered, she felt she was not getting all of what she came for. Therefore, █████ told them, as a group, that when Marie gives them extra cigarette breaks or fun activities to not go to them until their needs get met. She stated that she did not want them to be swayed by fun activities when their needs are not being met here. █████ stated that she did not tell them not to go to groups, only not to partake in the 'fun' activities.

In relation to whether or not she stated that Marie decides whether or not the residents participate in 3-or 6-months, she said that she did not state this in the group setting. However, she did state that she does feel Marie has the final say in what length of time the residents complete. She stated that she told ██████ (resident) that since Marie has the final say, that she should write her a letter about wanting to leave. She also stated that ██████ told her that Marie wanted her to do the 6-months and that treatment team would take care of her concerns.

In relation to the statement █████ (resident) was writing, █████ stated she did not tell her to write it, but that ██████ told her she wanted to and was going to move forward with it. █████ stated that she told ██████ she didn't need her to do that, but ██████ insisted. When asked about whether she told ██████ to write the opposite of ████ (resident), █████ stated she did not and that these are "all lies."

Marie stated that it was reported to her by ████l (staff) and ████n (staff) that Ch████ threatened to physically harm Marie after an argument.

Marie stated that it was brought to her attention by K████a, staff, that S████y, resident, had a list of names that Ch████ll asked her to compile. S████y reported to Marie that it was so that Ch████ would be able to find a job after she was fired.

Marie then provided the investigation team with two statements written by R████ and C████a, both residents, regarding the conversations discussed in Ch████ll and D████'s groups. **These statements are enclosed in these findings.**

Marie stated that she let both counselors, Ch████ll and D████, know that they were not to see residents while this investigation was underway.

**J████'s statement findings:**

J████ stated that her and R████n (staff) were out smoking and went into the employee break room. She stated that she heard Ch████ll on the phone in the kitchen, but that she could not tell who it was she was on the phone with. J████ stated that Ch████ll said "I put my hand in her face, but she touched me how she did ████na." She also stated that Ch████ll said "I'll f*** her up."

**R████'s statement findings:**

R████ stated that her and J████l (staff) were outside smoking and then walked into the break room when they heard Ch████ll on the phone with someone in the kitchen. She stated that the call was on speaker and sounded like ████a (former staff). Ra████ stated that she heard her state Marie "put hands on her" and that "Marie doesn't want to do this, I'm not the one to f*** with." She stated that from where she was, she did not hear any specific physical threats.

**K████'s statement findings:**

▨▨▨, staff, reported that after group, she found S▨▨y standing in the doorway of another resident's room. She attempted to tell S▨▨y to go to the next group, but S▨▨y stated "Wait, I'm doing something for C▨▨▨," and told her she would tell her about it after the next group. K▨▨ reported that after the group, S▨▨y approached her and told her "Ch▨▨ll wanted us to write a piece of paper, in case she got fired, so she could give it to the state." K▨▨ stated this piece of paper was petition-like and included a list of names. Later that evening, K▨▨i, resident, reported to K▨▨ that "girls were passing around a piece of paper to sign for Ch▨▨ll." K▨▨ then contacted Marie and let her know what was going on.

**Sydney's statement findings:**

S▨▨y stated that after a group session, G▨▨ll asked her to write a letter of recommendation. She stated that she "felt like she [Ch▨▨l] knew she was going to get fired, so it was to secure a job after." Sydney reported that Ch▨▨ll did not ask her what to write, just to make sure "multiple people" signed it. The day after, around 6 am, Marie contacted S▨▨y and asked her about this paper. This paper was then confiscated and given to Marie. S▨▨y then told Ch▨▨ll that the list was taken from her. The list contained 13 names, and was likely to include S▨▨▨'s, once she finished writing it.

**Jo▨▨'s statement findings:**

Jo▨▨n (resident) consented to give her statement on her interpretation of Ch▨▨ll and De▨▨ group practices. She stated that some topics in the group setting would "spiral." In relation to Ch▨▨l telling the group about Marie's hearing, she stated that Ch▨▨ll said "because it's public knowledge she could tell them." She stated that she also told them it was court for bankruptcy. Jo▨▨n stated that the sit-in was not G▨▨l's idea, but that she told them "if that's what you need to do to get your needs met." However, she said that she stated that she couldn't

█████ stated that all of her documentation was completed, however, she was told by investigators that it appeared they were not done. She stated that they were possibly done wrong because she was "never trained" to use the documentation system. To remedy this, █████ agreed to complete whatever was unfinished remotely. █████ also asked if she would be able to resume group sessions remotely, that she loves the vision of Serenity Hills, and stated she "wanted to come back."

**Recommendation**

Because of multiple corroborating statements surrounding █████ discussing **irrelevant court information** in the group setting, multiple witnesses stating **she asked S████y to write the statement**, and because of a **lack of therapy or notes** being completed by her, we recommend that █████ be terminated from her position with Serenity Hills Life Center.

Because of the **limited statements** surrounding D████'s involvement in the inappropriate group discussions and the evidence of her **improvement in the content of the group setting**, we recommend that D████ be given a disciplinary action, rather than termination of employment.

_Paula ██████_    12/12/25

_Breanna ██████_    12/12/2025

_Kayla ██████_    12-12-25

<Therapist4@serenityhillslifecenter.org>; Intake 2 <intake2@serenityhillslifecenter.org>; Jaylynn McClarren <SupportCounselor2@serenityhillslifecenter.org>; Marie Travis <ceo@serenityhillslifecenter.org>; Michelle Forshey <MB@serenityhillslifecenter.org>; SamanthaGroh <utilizationnurse@serenityhillslifecenter.org>; Shelia Weese <NP@serenityhillslifecenter.org>; NursingTeam <Nursingteam@serenityhillslifecenter.org>; MHT Serenity Hills <mht@serenityhillslifecenter.org>; Maggie Cha <secretary@serenityhillslifecenter.org>; Tara Singer <accountant@serenityhillslifecenter.org>; dfish@allardfishpc.com <dfish@allardfishpc.com>

**Subject:** Census & Group Division 05/02

## Exhibit B

Good Morning Team,

Attached is the updated census and group division for May 2nd.

Today, May 2nd, the following individuals will participate in their graduation ceremony :

~~[redacted]~~

Monday May 5th, the following individual will transition to level 3.1 :

~~[redacted]~~

I. T[redacted] will be participating in the program for two more weeks, due to disciplinary write ups regarding behavioral concerns, such as aggressive and confrontational communication, as well as covert or deceptive behaviors that undermine her treatment. These behaviors indicate a need to further work on emotional regulation, interpersonal boundaries and accountability. Continued stay is intended to support Lisa in developing healthier relational patterns to decrease potential relapses.

If you have any questions or concerns, please contact me.

Much appreciated,

*Charlie Endly*

Supportive Counselor
Serenity Hills Life Center
(304) 277-4657
Supportcounselor@serenityhillslifecenter.org
667 Stone Shannon Rd Wheeling WV 26003

*Email Confidentiality Notice: The information contained in this transmission is privileged and confidential and/or protected health information (PHI) and may be subject to protection under the law, including the Health Insurance Portability and Accountability Act of 1996, as amended (HIPAA). This transmission is intended for the sole use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are notified that any use, dissemination,*

Exhibit C

Counselor

There were two sessions where Ch████e had told the patients in the group information about a hearing that Miss Marie was supposedly scheduled for some time that week and that whenever that hearing happened she was going to be fired or forced out of her position at Serenity Hills Life Center and that she would be replaced the next day. She also informed the group that UNBUSMAN was called in and here to look through any and all information as well and would be part of revamping of Serenity Hills. Ch████e at one point in time also told the patients that it maybe a good idea to stage a "sit-in" of sorts and to not go to groups or any other scheduled sessions until the needs or wants of the patients were met because they could not be physically moved. She also said that Miss Marie is personally responsible for putting patients in either the 3 month or 6-month programs and that she would push patients into the 6-month program specifically to make money due to some bankruptcy allegation. I knew this to be untrue because I specifically remember when I did my Intake interview on the phone with Miss Marie she asked me which program I wished to sign up for and in no way shape or form did I feel pressured or coerced into any program other than the one that I wanted to sign up for. I also did not pay as close attention in the group sessions because I personally know that Serenity Hills and Miss Marie have and outstanding reputation in the community as well as the local court systems for helping many women in their recovery journey.

Ch████ A. P████te

11-30-25

Counselor

This is R▮▮▮▮▮ I was asked to write a statement pertaining to some things I have witnessed as far as in class with ▮ we have been told about things that are not associated with recovery and that are not appropriate for client and counselors to discuss. For example, Mrs. Marie getting into an altercation and having court over someone entering the building without permission and gossip about her twisting her arm and having emotional and money problems. DJ's class purposely was running off of music, complaints, and movies to purposely affect the growth of the program here at Mrs. Marie's. Many people were complaining that it was affecting their treatment, it made them uncomfortable. I was not instructed what to say.


Also, ▮▮▮▮▮ I was speaking inappropriately about Mrs. Marie about her money and court issues and was even offering to bring people brochures from other facilities to help them leave If they wanted. When questioned what people didn't like about the program here it was only selfish complaints such as they didn't like the way our smoke breaks went and they didn't like that they couldn't call their boyfriends. No one had any legitimate complaints.

R▮▮ C▮▮▮

11/30/25

# Exhibit E

≡ M Gmail

✎ Compose

Q charli

🗑

*uuuuuuuuuuu/ runuuuy compuuu.*

**Inbox** 1,987
Starred
Sent
**Drafts** 114
**Purchases** 28
Travel
More

Labels

---

**From:** Charlie Endly <SupportCounselor@serenityhillslifecenter.org>
**Sent:** Friday, December 5, 2025 10:12 AM
**To:** Clinical Team <ClinicalTeam@serenityhillslifecenter.org>; NursingDepartment <nursing@serenityhillslifecenter.org>; Deborah Fish <dfish@allardfishpc.com>
**Subject:** Census & Group Division 12/05

Good Morning, Team, Happy Friday!

Attached is the census and group division for today, December 5th.

We will be facilitating treatment team today and will be evaluating the following individuals for level

████
████
████

After the meeting concludes, I will inform the team of the transitions that will take place on Monday.

If you have any questions or concerns, please feel free to reach out.

Much appreciated,

*Serenity Hills Life Center*
*(304) 277-4657*
*Supportcounselor@serenityhilllifecenter.org*

# Exhibit h

Case ID: 25-M35S-00146
Party Type: Defendant/Respondent

**Sharon Travis**
c/o 667 Stone Shannon Road
Wheeling, WV 26003

**IN THE MAGISTRATE COURT OF** _____OHIO_____ **COUNTY, WEST VIRGINIA**

Magistrate Court Case No. **25-M35S-00150**

Sharon Travis
_____
Petitioner *(First/Middle/Last)*


_____
By Parent/Guardian/Custodian *(if applicable)*

v.

Chantell Williams
_____
Respondent *(First/Middle/Last)*

| Law Enforcement |
| :---: |
| Completed Service Verification on Page 4 |
| ☐ Yes |
| ☐ No |

---

## PERSONAL SAFETY ORDER FOLLOWING FINAL HEARING

### *W. Va. Code § 53-8-7; § 53-8-10*

On the __16th__ day of __December__, 20 25, the petitioner filed with this Court a PETITION, pursuant to *West Virginia Code § 53-8-4*, alleging certain acts or offenses by the respondent and requesting this Court grant appropriate relief.

The Court held a Final Hearing in this matter on the __19th__ day of __December__, 2025, based upon the following: *(Check one as applicable.)*

☐ Service was waived by the respondent.

OR

☐ A Temporary Personal Safety Order was previously issued and served upon the respondent, scheduling this matter for a Final Hearing.

OR

☑ The respondent appeared at the hearing on the Temporary Personal Safety Order, and both the petitioner and respondent expressly consented to waiving the hearing on the Temporary Personal Safety Order.

The following were present for the hearing:

Sharon Travis and Chantell Williams

Based on the matters set forth in the PETITION, and based upon a preponderance of the evidence, the Court finds as follows:

A. This Court has jurisdiction and this county is a proper venue to hear the PETITION.

B. The respondent has committed the act(s) described below against

☑ the petitioner.

☐ the following child(ren): _____

☐ the following incapacitated adult(s): _____

MPSORFH – Personal Safety Order Following Final Hearing
Revised: 06/13/2025; WVSCA Approved: 11/4/2021; Docket Code: MSFIN

Page 1 of 4

Magistrate Court Case No. 25-M35S-00150

C. The petitioner has reasonable apprehension of continued, unwanted, or unwelcome contacts by the respondent, based upon the following act(s) committed by respondent *(Check any or all that apply.)*:

☐ Sexual Offense(s) or Attempted Sexual Offense(s) as defined in *West Virginia Code § 53-8-1.*

☐ Stalking in violation of West Virginia Code *§ 61-2-9a(a).*

☑ Repeated credible threats of bodily injury knowing or having reason to know that the threats caused reasonable fear for safety in violation of *West Virginia Code § 53-8-4(a)(3).*

-OR-

Without admitting any act:

☐ The respondent consents to the entry of a Personal Safety Order.

D. The Court also finds that *(Check any that are applicable OR check Not Applicable.)*

☐ a weapon was used, or threatened to be used, in the offense(s) for which the PETITION was filed.

☐ the respondent has violated a prior Personal Safety Order.

☐ the respondent has been convicted of an offense involving the use of a firearm.

-OR-

☑ Not Applicable

The Court further makes the following findings of fact in relation to the conclusions stated in Paragraphs A,B,C, and D:

*The Petitioner, under oath, swears and has proved by clear and convincing evidence that she/he is in fear of his/her safety due to the threats and/or actual violence from the respondent in a hearing by those present before the Magistrate.*

Based upon the foregoing, the Court ORDERS the relief designated below with regard to the following protected person(s):

**(Check and complete as applicable.)**

☑ Respondent shall refrain from attempting, committing, or threatening to commit any sexual offense, as defined in *West Virginia Code § 53-8-1(9);* any stalking as defined in *West Virginia Code § 61-2-9a(a);* or any repeated credible threats of bodily injury as defined in *West Virginia Code §53-8-4(a)(3).*

☑ Respondent shall refrain from contacting, attempting to contact, or stalking the person(s) named above, directly or indirectly, or through third party, regardless of whether those third parties know of this Order.

Magistrate Court Case No. 25-M35S-00150

☑ Respondent shall refrain from entering the residence of the person(s) named above.

☑ Respondent shall stay away from the place of employment, school, and residence of the person(s) named above.

☑ Respondent shall not visit, assault, molest, or otherwise interfere with the persons(s) named above; and if any such protected person is a child, respondent shall not engage in such conduct with siblings or minors residing in the household of the child.

☐ Based upon the matters found in Paragraph D of the Findings stated above, the respondent is prohibited from possessing a firearm as defined in *West Virginia Code § 61-7-7*. *(Check one below.)*

    ☐ Respondent shall surrender all firearms and ammunition possessed or owned by the respondent to the law enforcement officer serving this Order.

    ☐ Respondent shall transfer all firearms and ammunition possessed or owned by the respondent to a qualified third party. The law enforcement officer serving this Order shall determine if the third party is qualified to possess firearms and is not otherwise prohibited by law from possessing firearms.

    *If no qualified third party is available, the respondent shall surrender all firearms and ammunition possessed or owned by respondent to the law enforcement officer serving this Order.*

If the respondent is required to surrender firearms and ammunition, the respondent shall provide, within 5 days of the date of this Order, written documentation to the Magistrate Court Clerk of all firearms and ammunition surrendered or transferred. The written documentation shall include the description of each firearm and the name of the law enforcement agency or third party having possession of the respondent's firearms.

☐ Respondent shall pay the fees and costs of this proceeding in the amount of $ _____

to the Magistrate Court unless a fee waiver request has been granted.

☑ Other relief the Court deems necessary:

> *No contact by any means (verbal, physical, third party, text, cellphone, email, social media etc.) Stay away at least 500 feet from residence, employment, school, etc.*

**VIOLATION OF THIS ORDER MAY RESULT IN CRIMINAL PROSECUTION AND, IF CONVICTED, INCARCERATION, FINE, OR BOTH.**

This Order shall remain in effect until the __19th__ day of __December__, 20 26 ____.

A copy of this Order shall be served upon the parties by the Court or law enforcement. Copies of this Order shall be transmitted immediately, but no later than the next business day to any law enforcement agency having jurisdiction to enforce this Order, including the county sheriff, the local office of the state police, and any municipal police force, to be placed in a confidential file by such law enforcement agencies pursuant to *W. Va. Code § 53-8-2(a)*.

☐ The Clerk shall serve a copy of this Order by first-class mail upon the following:

*(specify any non-party(ies) to be served, e.g. Board of Education)*

Issued this ____12-19-2025 3:50 pm____         _____

       (Date and Time)                  Magistrate's Signature

Magistrate Court Case No. 25-M35S-00150

---

**NOTICE TO PARTIES**

YOU HAVE THE RIGHT TO APPEAL THIS ORDER TO THE CIRCUIT COURT WITHIN 20 DAYS OF THE ENTRY OF THIS ORDER. YOUR APPEAL MUST USE THE ***PETITION FOR APPEAL OF ORDER GRANTING OR DENYING FINAL PERSONAL SAFETY ORDER*** FORM THAT CAN BE OBTAINED FROM THE MAGISTRATE COURT CLERK'S OFFICE OR ON THE WEBSITE OF THE SUPREME COURT OF APPEALS OF WEST VIRGINIA. THE COMPLETED APPEAL FORM MUST BE FILED WITH THE MAGISTRATE COURT CLERK'S OFFICE.

IF YOU CANNOT AFFORD THE COSTS OF THESE PROCEEDINGS, YOU MAY FILE A FEE WAIVER REQUEST WITH THE MAGISTRATE COURT CLERK'S OFFICE.

---

**SERVICE BY COURT**

Served upon petitioner on this ___19th___ day of ___December___, 20 25 , by ___Tom Howard___ ,

☑ Magistrate / ☐ Magistrate's Assistant/Clerk/Deputy Clerk.

_____
Signature

Served upon respondent on this ___19th___ day of ___December___, 20 25 , by ___Tom Howard___ ,

☑ Magistrate / ☐ Magistrate's Assistant/Clerk/Deputy Clerk.

_____
Signature

Served upon _____ by first-class mail on .
*[specify non-party(ies) served]*

this _____ day of _____, 20 _____, by _____

_____
Signature

---

**SERVICE BY LAW ENFORCEMENT (if party not present at conclusion of hearing)**

Served upon petitioner by _____ in _____

County, WV, on _____ at _____ ☐ a.m. ☐ p.m.
                  (date)              (time)

_____
Law Enforcement Signature

Served upon respondent by _____ in _____

County, WV, on _____ at _____ ☐ a.m. ☐ p.m.
                  (date)              (time)

_____
Law Enforcement Signature

---

**FOR COURT USE ONLY**

Law enforcement agencies to which a copy of this Order was transmitted:

*WPD, OCSD, WVSP*

*(Place an asterisk next to the agency responsible for completing service, if known.)*

---

**MPSORFH - Personal Safety Order Following Final Hearing**
Revised: 06/13/2025; ⚖ WVSCA Approved: 11/4/2021; Docket Code: MSFIN

Page 4 of 4

I first came to Serenity Hills Life Center on July 10, 2025. Despite going to numerous detoxes and rehabs and never making it past a week or two, I found my place here. Miss Marie has always went above and beyond for all of us girls. Now even as an employee, I feel the same love and respect I felt as a resident. When running a business like this, it's bound to happen that many people get upset over the rules and expectations that are expected of them. Miss Marie does her best to ensure that her staff try as hard as she does and treats all of us girls with the same love and respect that she does. Even on the 3 times my mail was lost or received empty when ███████ was in control of the mail, Miss Marie did her best to make things right. I am so lucky and blessed to have found Serenity Hills! I wrote this not because I was asked and not made and because I love Miss Marie and want to do everything I can to help her and support her like she has supported and helped me.

Ravon Williams

11/01/25

I came to Serenity Hills on April 25, 2025 and Miss Marie has done so much for me since that day. I don't have any support on the outside and she has bought me and other girls, underwear, bras, socks, body wash, shampoo, and even cigarettes. She has always treated me with love and support and believed in me when I didn't believe in myself. That's the reason after my graduation of the 6-month program at Serenity Hills, I decided to then go to her sober house and work at the center. That's because I know the love and support and opportunities she gives women like me who have been pushed to the side or underestimated by the rest of society. ███████ had done a lot of wrong around the center, including having her daughter and another client in her office during a zoom court hearing of mine without Miss Marie's knowledge. This has been the best thing that could ever happen to me and its all in thanks to Miss Marie! I was asked to write this on behalf of Miss Marie and did so because she has done so much for me and I think its important people know that some of the things people say are just flat out not true.

-Roxanne Parker

11/2/25

Exhibit 9 *Casemanager*

11/4/2025

We are conducting an investigation on the incident occurring between CEO Marie Travis and M██████ N████ on 10/28/2025. We would like to note that none of the cameras used in this investigation contain sound. Outlined below are the findings of the investigation.

On 10/28/2025, at Serenity Hills Life Center, M███████████ was observed on the 'Dining Hall South' camera attempting to gain entry into the building using the side entrance. Because her key fob entry had been dismantled, she was unable to scan in. M████a was observed attempting to scan in and open the door three times, at 11:12:16 a.m., 11:12:22 a.m., and 11:12:26 a.m. Immediately afterward, on the 'Kitchen Loading Dock' camera, M█████a was observed speaking to M█ke, a member of the maintenance staff. According to M█ke, M██████a asked him "Is yours still working?" to which Mike responded, "Yes." M██████a then stated, "I just got fired and didn't know it." He then observed her walking around the building toward the lobby entrance and out of his vision.

M███████a was then observed on the 'Main Lobby West' camera at 11:13:25 a.m. placing her key fob entry on the scanner and opening the front door, gaining entry into the facility. According to Mike (maintenance), key fob locations have to be individually dismantled, so the lobby location may not have been dismantled. Additionally, he notes that the door may not have been latched all the way. M█████a is then seen walking down the hallway toward the dining hall.

On the 'South Hall Office' camera, M██████a is observed opening her email and placing an undistinguishable phone call on her personal phone. Afterwards, Marie enters the office and they are observed speaking to each other. M███████a begins to pack things up and is observed placing a Facility Census in her handbag, containing client confidential information, among other undistinguishable papers at 11:16 a.m. Sheila (FNP, Medical Director) then enters the office and

confiscates ████'s key. Marie exits the office. █████ then begins to erase client information, including appointments, discharge information, and visit dates, off of the white board calendar located in her office. At 11:18:52 a.m., Marie re-enters the office, walking toward ██████. Marie puts her hand on top of ██████'s arm and lowers it, attempting to stop her from erasing the board. They are observed speaking to each other. █████ then picks up her phone and dials an undistinguishable number, while they continue to speak to each other. At 11:19:50 a.m., Marie exits the room and does not return. ██████ is observed packing her things and exits the office subsequently.

Using the 'Dining Hall North' camera, █████ (maintenance staff) and █████ (FNP, Medical Director) are observed outside the room in the hall during the incident. It is unclear whether or not they are able to see into the room from this angle. On the camera, █████e is observed stepping toward the door after Marie's entry and Sheila is looking toward the door. According to █████, he was only able to see the white board from his point of view. He states that he stepped closer after he heard Marie state loudly, "No, that's mine." ████e alleges that he did not observe any contact between Marie and ██████ due to his location in the hall at the time of the incident. Sheila stated that she was unable to see into the room during the incident.



Exhibit h

Dear Ms. Marie                                                                    case manger                              10/03/25

I want to express my gratitude for the opportunity to work at Serenity Hills Life Center. In the short time since I joined, I have greatly valued contributing to our mission of supporting residents and clients while strengthening the efficiency of our operations. I take pride in stepping into responsibilities that extend beyond my original job description and in delivering consistent, measurable value to the organization.

**Key Contributions**
Since joining  almost 90 days, I have:
• Streamlined scheduling and case management systems, resulting in improved efficiency and fewer scheduling conflicts.
• Coordinated with external agencies to ensure compliance with court and CPS requirements, reducing the risk of fines, penalties, or case setbacks.
• Maintained proactive communication with the management team by providing timely, detailed updates on each case.
• Handled resident service requests within 72 hours, ensuring client satisfaction and reducing potential escalation costs.
• Balanced efficient scheduling with individualized client support, offering counseling and assistance to keep residents engaged and on track.

**Financial & Operational Impact**
These contributions have produced clear value to Serenity Hills:
• Reduced Staffing Costs: By independently managing a full caseload, I have reduced the immediate need for an additional case manager. This represents a direct savings in payroll and training expenses.
• Operational Efficiency: My ability to multitask across scheduling, compliance, casework, and client support has streamlined workflows, reducing administrative delays that could otherwise incur additional costs.
• Retention & Client Outcomes: Consistent, timely support for residents helps prevent disengagement or relapse, protecting the organization's investment in client success and reducing turnover in our programs.

**Proposal**
To continue delivering results at this level, I respectfully propose a $5 per hour raise. This adjustment would:
• Align my compensation with the market value of my role.
• Recognize the measurable financial savings and operational benefits I have already generated.
• Support employee retention, which is more cost-effective than turnover and training new staff.
• Motivate me to continue contributing at a high level, with a long-term commitment to the success of Serenity Hills Life Center.

**Conclusion**
I am dedicated to the mission and growth of Serenity Hills Life Center and am confident that this adjustment reflects both the value I have already delivered and my potential for continued impact.
I would appreciate an answer within the next week so we can move forward efficiently. Thank you for your time and consideration.

Sincerely,


*Exhibit I*

# Board of Review
## WORKFORCE WEST VIRGINIA
**5707 MacCorkle Avenue SE**
**Suite 500, Room 104**
**Charleston, West Virginia 25304**
**304-558-2636/1-800-635-0189**

HEART 2 HEART VOLUNTEERS INC, DBA

*case manager*

667 STONE SHANNON RD
WHEELING, WV 26003

Case No. R ~~███████~~

**IN THE MATTER OF:**

**Claimant:** ~~████████~~ J ~~█████~~
S.S. No.: XXX-XX-XXXX
Address: ~~████████████████~~EE, WV 26037

**Employer:** HEART 2 HEART VOLUNTEERS INC, DBA
Address: 667 STONE SHANNON RD  WHEELING, WV 26003

This case came on for telephonic hearing before Ryan Sims, Administrative Law Judge, on January 14, 2026.

**APPEARANCES:**

Claimant appeared telephonically individually, and through witnesses ~~████~~ ~~████~~s, C~~██████~~s, and ~~████~~ ~~████~~r.  Employer appeared telephonically through Sharon Travis, Chief Executive Officer, P~~████████~~m, ~~███~~ ~~████~~m, Maintenance, ~~████~~, Human Resources Generalist, ~~████~~ K~~████~~Kitchen Manager, Ta~~████~~x, MHT Supervisor, R~~███████~~er, former client, and J~~████~~ca Harrison, ~~████~~ ~~████~~ist.

**ISSUES:**

The employer appealed from the decision of the deputy at Wheeling, West Virginia,  dated November 25, 2025, which held: The claimant is not disqualified.  The claimant was discharged but not for misconduct.

**FINDINGS OF FACT:**

1.     The claimant was employed by the above employer as a case manager, from J~~████~~, 2025 to O~~██████~~8, 2025, earning $23.00 per hour and scheduled to work over 40 hours per week.

2.    The employer operates a residential substance use disorder treatment facility.

3.    The claimant's primary duties included managing cases of certain patients.

4.    On the evening of October 27, 2025, the claimant cleared out her office of most things and went home, without clear explanation, but tacitly indicating she was quitting.

5.    The claimant had told a patient that she was going to quit soon and that, when she did, she was going to take things to make it difficult on her employer.

6.    The claimant showed a clear intent to quit her job, on the evening of October 27, 2025, when she removed most of her belongings from her office and left the employer's facility.

7.    The claimant voluntarily left employment without good cause involving fault on the part of the employer.

## CONCLUSIONS OF LAW and DISCUSSION:

While the deputy decision states that the employer discharged the claimant, the credible evidence presented by the employer established that the claimant quit her job by taking her stuff from the office indicating she was quitting. This is bolstered by the fact that, shortly before she did this, she told a patient she intended to quit. Chapter 21A-6-3(1) of the West Virginia Code provides that an individual shall be disqualified from receiving unemployment compensation benefits for the week in which he or she left his or her most recent work voluntarily without good cause involving fault on the part of the employer, and until he or she returns to covered employment and has been employed therein at least thirty working days. The claimant has the burden of proving that there was good cause involving fault on the part of the employer for the claimant to leave employment.

Here, with the burden shifting based on the evidence, and the claimant becoming the moving party in her separation from employment, the claimant did not carry her burden of proving that she quit her employment for good cause involving fault on the part of the employer. The claimant previously told a patient that she was going to quit, and the patient was so concerned that the patient had the encounter documented by having a coworker of the claimant transcribe the events. Thereafter, on the evening of October 27, 2025, the claimant made a personal decision to quit her job by packing up most of her things in her office and leaving the employer's facility.

Moreover, the claimant's testimony was riddled with inconsistencies. For example, the claimant asserted that her key fob had been turned off on the side door but worked on the front door. However, the employer submitted evidence showing the claimant's key fob had been permanently disabled, including when the claimant tried to swipe it at the front door.

Credibility determinations made by an Administrative Law Judge are entitled to deference because the Judge who observed the witness testimony is in the best position to make credibility judgments. Cahill v. Mercer County Bd of Educ., 539 S.E.2d 437 (W.Va. 2000). The Judge may consider several factors to assess a witness' testimony including: demeanor; opportunity or capacity to observe an event; consistency of memory and evasive responses; presence or absence of bias or motive; the consistency of prior statements; the plausibility of the witness' statements; and any contradiction or corroboration of the witness' testimony.

Consequently, the claimant failed to carry her burden of proving that she quit the job for good cause involving fault on the part of the employer.

Accordingly, the claimant was not discharged by the employer. The claimant left work voluntarily without good cause involving fault on the part of the employer and is disqualified from receiving unemployment compensation benefits.

## DECISION:

The decision of the deputy is reversed. The claimant left work voluntarily without good cause involving fault on the part of the employer. The claimant is disqualified until claimant returns to covered employment and has been employed therein at least thirty working days.

If West Virginia is in an Extended Benefit Period when your regular benefits are exhausted, this decision, if it becomes final, will have the effect of denying entitlement to Extended Benefits in accordance with the West Virginia Unemployment Compensation Law [§21A-6A-1(12)].

This decision, if it becomes final, may result in an overpayment of benefits to the claimant, which will be collected as provided for in the Statute.

This, the 16th day of January, 2026.


**Ryan M. Sims**
**ADMINISTRATIVE LAW JUDGE**
**BOARD OF REVIEW**
**WORKFORCE WEST VIRGINIA**

RMS/rhn
Date Mailed: 01/16/2026
By: rhn

RIGHT OF FURTHER APPEAL: This decision is final unless a party appeals to the UC Board of Review within EIGHT DAYS. If any party in this decision desires to take a further appeal, such appeal must be filed in writing within EIGHT DAYS from the date the decision was mailed to you, or not later than **01/24/2026**.

If a party in this case misses the hearing, and can show just cause, the case may be remanded for a Hearing De Novo. To request a remand, please submit a detailed, signed written statement explaining why you missed the hearing. This statement must include your name and case number. This statement must be submitted within EIGHT CALENDAR DAYS from the date the decision was mailed to you, or no later than **01/24/2026**.

The appeal or remand motion may be mailed directly to Jeffrey K. Mullins, Chairman, UC Board of Review, 5707 MacCorkle Avenue SE, Suite 500, Room 104, Charleston, WV 25304, faxed to 304-558-1363, or emailed to wfrfbor@wv.gov and must be **postmarked** no later than the above date, unless such

## ACTIVE Employees Months of Service

**Company: HEART 2 HEART VOLUNTEERS INC**          IID: 24966745

Report Generated On: 02/05/2026 15:00

| Employee Name | Hire Date | Months of Service | Job Description |
|---|---|---|---|
| B. ██████ L | 08/07/2025 | 6 | MHT |
| B, ██████ | 05/03/2024 | 21 | Maintenance |
| B, ██████ | 09/15/2025 | 5 | MHT |
| B, ██████ D | 01/04/2026 | 1 | Mental Health Counselor |
| C. ██████ | 03/30/2025 | 11 | MHT |
| D., ██████ R | 05/02/2023 | 33 | Maintenance |
| E. ██████ | 08/07/2023 | 30 | Supportive counselor/Program Coordinator |
| F. ██████ D | 09/15/2025 | 5 | Kitchen |
| F, ██████ M | 02/01/2019 | 85 | Medical Biller |
| F. ██████ E | 04/28/2025 | 10 | Clinical Director |
| G. ██████ K | 08/21/2023 | 30 | Utilization Nurse |
| H. ██████ L | 03/25/2019 | 83 | Lead Peer Specialist |
| H. ██████ M | 04/10/2025 | 10 | Secretary |
| H. ██████ A | 03/18/2025 | 11 | RN Supervisor |
| K. ██████ R | 09/09/2025 | 5 | Mental Health Counselor |
| K. ██████ J | 11/03/2025 | 3 | Peer Specialist |
| M. ██████ L | 12/08/2025 | 2 | Case manager |
| M. ██████ D | 01/19/2026 | 1 | Kitchen |
| M. ██████ L | 05/12/2025 | 9 | Supportive counselor |
| M ██████ | 06/09/2025 | 8 | LPN |
| M. ██████ | 10/21/2025 | 4 | Supportive Counselor |
| P. ██████ | 09/14/2025 | 5 | Housekeeping |
| P. ██████ P | 06/01/2023 | 32 | MHT |
| Q. ██████ | 05/01/2023 | 33 | Housekeeping Supervisor |
| S., ██████ | 01/11/2024 | 25 | MHT |
| S. ██████ R | 10/20/2024 | 16 | Housekeeping |
| S. ██████ | 04/22/2019 | 82 | HR/accountant |
| T, ██████ | 06/26/2025 | 8 | MHT |
| T., ██████ | 02/02/2024 | 24 | LPN |
| T. ██████ M | 05/16/2022 | 45 | CEO |
| T. ██████ | 02/02/2024 | 24 | asst Housekeeping Supervisor |
| W. ██████ M | 02/19/2024 | 24 | Medical Director |
| W. ██████ | 11/12/2025 | 3 | Kitchen Supervisor |
| Y. ██████ | 12/05/2025 | 2 | MHT |

date falls on a weekend or holiday, at which time the UC Board of Review will accept the appeal if it is filed on the next working day. Your request will be presented to the UC Board of Review on the next available docket and you will be notified by mail of the determination.

Any party having good cause to offer additional evidence and having a valid reason for not offering such evidence at the hearing before the Administrative Law Judge shall forward to the Board of Review, IN WRITING, **a request for a remand** for an additional hearing before an Administrative Law Judge for an opportunity to present such evidence. The written request for a remand shall include the nature of such evidence to be offered, the importance of such evidence to the issues in the case and the reasons for failure to offer the evidence at the prior hearing before the Administrative Law Judge.

A copy of such request for an appeal or a remand, and all supporting documentation, must be provided to the opposing party. Failure to do so may result in your request being denied.

To avoid the unauthorized practice of law, an agent of a corporate employer submitting a motion to remand or appeal must have the motion made by an attorney licensed to practice law in the State of West Virginia. If not, the motion will not be considered by the UC Board of Review.

CC:     WORKFORCE WEST VIRGINIA
          Benefits Admin #9733
          Benefits Tech Support #9733

Exhibit K

my name is ▓▓▓ ▓▓▓▓▓
I came to marie and told her on the 27th of October I had overheard ▓▓▓▓ a on the phone while I was sitting in her office - I heard her tell whoever it was that if she was leaving she planned on taking everything with her, patients files, everything. Then they would see how much they'd be screwed without her.

my name is Taylor Cox I am documenting what Ms. ▓▓▓▓▓ is saying because she is blind and cannot for herself.

Taylor Cox : Taylor Cox



Exhibit Q



**1/30/2026**
**4th Quarter Meeting**
**Safety Committee**

**Committee Members**

Sheila Weise- Medical Director- Not present

James Dual – Maintenance Director

Mike Black Burn–Assistance Maintenance-not present-vacation

Dayna Hehr- Nurse Supervisor

Marie Travis – CEO- Chair

William – CRO Via-Phone

Taylor Cox – Mental Health Technician Supervisor

Stewart – Clinical Director

Ravine Williams-in process of Kitchen Manager License

Amanda-Cleaning Director

## Agenda

**Medical Department**.

1. New med pass is working out well.
2. Suspending transport to non-emergency eye appointments or denture appointments
3. Talked about a resident who was going out for surgery and not coming back to the facility because we do not have around-the-clock care. Score rated a 5 out of 10.

**Emergency snowstorm protocol and assessment.**

1. Staff stated that the person who cleared the roads came up and did not detail the snow clearance properly. He did not put down salt. Score rated a 5 out of 10.
2. The staff that was available onsite and stayed overnight. Score rated 10 out of 10.
3. Supplies, food, and Ice were purchased before the storm. Marie Travis made sure that the radios and all supplies were available.
4. Salt was purchased before the storm.
5. Sober living all came down and slept in unoccupied rooms for their safety and because they were employed.
6. Medical had all that was needed, and a nurse stayed all night until the roads were cleared.
7. The state roads were called to get cleared roads to Serenity Hills.
8. The maintenance supervisor was not able to help out because of an injury caused off-site. The maintenance assistant helped with putting ice on the sidewalks.


Things to get for emergencies

1. Looking to see if they make battery-run heaters
2. Getting a small container of salt for the staff to use on the back deck if needed.





**1/30/2026**
**4th Quarter Meeting**
**Human Rights Committee**

**Committee Member**

1. Breanna McElwain, Supportive Counselor

2. Will Frederick CRO

3. Kayla Bolyard – Mental Health Technician

4. J█████ D██████n (resident) J D

5. T█████a W████d (resident)T W

6. Marie Travis-Chair

7. Ann Bauduin (Outside member)


Residents are chosen by the Mental Health Technician based on having no write-ups and on their showing that they are serious about their recovery process. Also Maturity.

AGENDA

First Part: All Members included.

1. Members who were residents were asked if there were any concerns or complaints as representatives for the residents' rights.

2. They stated that sometimes lunch and dinner were not on time.

   *Answer: The chair stated that we will discuss this concern with the Kitchen. It has been discussed and ratified.*

3. Mostly wanting to get more coffee.  (At present, they get coffee before and after breakfast. Each meal and at internal AA/NA meetings.)

   *Answer: The chair stated that there were plenty of coffee breaks and that would not change. That there was a budget.*

4. They discuss wanting to clean their own rooms.

   *Answer: It has always been a concern to allow the residents to have chemicals because of some of their mental health conditions. Also, if paper towels are flushed down the septic system, it would cause problems.*

   Solution: *We will allow them to scrub their floors. Also, they MHTs would spray cleaner, give them a paper towel, and they must return the paper towel to be thrown in the trash (Which was their main concern). Salt from snow storm was being trampled into the building.*

5. They stated some women complained about not having cigarettes.

Some women do not have the money for cigarettes.

*Answer: They can be put on the Nicotine patch because we do not have it in our budget for cigarettes.*

6. They stated that, besides those concerns, everything was good.

7. They said that they liked the new telehealth counselor.

Second Part: All Members included except Sharon "Marie" Travis, and chaired by Breanna McElwain, Supportive Counselor.

Regarding the CRO's questions to the residents, TW and JD, concerning accusations against the CEO.

1. Regarding the incident with the former employee, ~~████████~~ins, and the CEO, neither resident had any knowledge of the incident.
2. Concerning allegations made about the CEO during a residential meeting, in which it was said she cursed at the residents, called them liars, and called their boyfriends pimps.
3. Answer: Neither resident, TW, nor JD heard cussing or calling them liars.
4. TW did not remember there being any discussion about pimps.
5. JD resident reported that the CEO, Marie Travis, stated "that some of you might have had pimps or bad people in your lives," regarding not being allowed to speak to their boyfriends during the holiday weekend.
   The resident did not believe that the CEO meant to cause harm with these statements. Some residents were hurt by the statement.



**1/30/2026**
**4th Quarter Meeting**
**Quality Insurance Committee**

**Committee Members**

1. Charlie Endly- absent – on vacation

2. Breanna McElwain

3. Will Frederick

4. Dayna Hehr

5. Taylor Cox

6. Raven Williams

7. Marie Travis - Chair

## Agenda

**Clinical**

1. The new telehealth counselor is doing a great job. They are getting their individual therapy, and it is making a huge difference in their peace of mind.

2. MHTs are doing a great job and are some of the best MHTs that we have had.

3. Nurses should make recommendations early on if any outside evaluations are needed. This would include mental health, physical, cognitive, or learning disability evaluations.

4. There were discussions about the treatment team needing to apply write-ups evenly to the residents when it comes to disciplinary actions. Mental Health technicians were hearing complaints about favoritism—the need for consistency.

5. The need for a 24-hour counselor on call for the staff to know who to call.

**Residents' issues and needs.**

1. Mental health technicians were asked about residents not having personal hygiene products, as reported by the ombudsman.
2. Taylor, the supervisor, reported that the only thing that they were out of was q- tips and that was one time. Stating that this report was not true.

Vehicle Safety

1. Talked about the vehicles having the transportation emergency policy up in the front seat
2. Having a transportation Emergency training for those who drive but have not been trained as of yet.
3. Making sure all maintenance on vehicles is checked monthly.

Cleaning

1. They need a sweeper because sweeping up salt was hard it and different Mop Heads.
2. The suggestion from Marie Travis was to get the shop Vacuum from maintenance to sweep up the salt.
3. Need a new sweeper.

Patient Safety

1. Boundaries training needs to be had.
2. Behavioral contracts are put on two residents. Stating the need to notify the PO of the resident's behavior.

 Outlook

**Exhibit T**
104

---

## Re: Commitee Meeting updates

---

**From** William Frederick <wfrederick@meridianmp.com>
**Date** Fri 2/6/2026 10:54 AM
**To** Intake 2 <intake2@serenityhillslifecenter.org>

These are good to send.



**William R. Frederick**
Managing Director | Meridian Management Partners

📞  412 - 480 - 8230          ✉  wfrederick@meridianmp.com
🌐  www.meridianmp.com        📍  39 Newgate Road
Leaders. Advisors. Partners.    Pittsburgh, PA 15202

*CONFIDENTIALITY NOTICE: The information transmitted, together with any attachment, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination, or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material, along with any attachment, from any computer.*

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Date:** Friday, February 6, 2026 at 10:47 AM
**To:** William Frederick <wfrederick@meridianmp.com>
**Subject:** Commitee Meeting updates

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**Exhibit F**

**BERNSTEIN • BURKLEY**
ATTORNEYS AT LAW

Kirk B. Burkley

kburkley@bernsteinlaw.com | (412) 456-8108

__VIA ELECTRONIC MAIL__

October 23, 2025

Sharon Travis
667 Shannon Road
Wheeling, WV 26003
Email: serenityhillscenterceo@gmail.com

Sharon,

The purpose of this letter is to set forth a strategy for H2H to emerge from bankruptcy. As explained below and based on the performance of H2H during the 7 months in bankruptcy, we do not see how a viable plan can be proposed under the current financial conditions.

As you know, this case began with the filing of a voluntary chapter 11 petition for relief on February 27, 2025. Our initial chapter 11 plan of reorganization was due to be filed on June 30, 2025. We requested, and the court granted, an extension until October 28, 2025. We requested the extension because you assured us that with additional time, you could rehabilitate and grow the business. You assured us that the census would increase to 40 patients per month. That has not happened. Because we did not see the business obtaining the cash flow necessary to propose a plan, we advised you that a third-party should be hired to manage the business through its Chapter 11 bankruptcy. You have chosen not to accept that advice.

In order to confirm a plan of reorganization, there are a number of steps the company needs to perform. A plan of reorganization needs to treat all creditors fair and equitably. H2H's case will have four classes of creditors. These are administrative (fees of our firm and the ombudsman, the U. S. Trustee, and bills incurred during the bankruptcy), secured creditors, unsecured creditors, and equity. H2H has three secured creditors of concern. First, the USDA holds a secured claim of $3,144,584.47 and the contract calls for monthly payments of $13,823.00 per month. Second, the SBA, holds a secured claim of $166,031.00 and the loan documents call for monthly payments of $641 per month. And finally, Partner Community Capital, holds a secured claim of $232,022.28 and the contract calls for monthly payments of $2,961.88. In total, paying all three of these secured creditors, pursuant to their loan docs, requires monthly payments totaling $17,425.88. During the course of the bankruptcy, H2H has failed to come close to that amount in any month since filing.

A plan of reorganization needs to be accepted by your creditors, or you need to pay all creditors in full so that they are not impaired. To confirm a plan with an impaired classes (a class not receiving full payment of its respective claim) unsecured creditors need to vote in favor of confirmation. This requires votes in favor of the plan of all voting unsecured creditors of at least (1) two-thirds of the amount of claims and (2) more than 50% of the claims.

As it stands now, H2H is averaging a profit of $7,376. Meaning, under the loan documents, we lack sufficient funds to satisfy each secured creditor in full and will have at least one impaired class as a result. Your current profit does not even allow for the payment of the USDA, yet alone other creditors. Given the low monthly profit and historically inconsistent monthly operating reports, it is unlikely we will get a consensual plan confirmed.



## Insurance Reimbursements

| 2025 | Amount Received | Ave # Residents | |
|---|---|---|---|
| August | $198,096.64 | 31 | payment based on how many residents in July |
| September | $198,125.00 | 33 | payment based on how many residents in August |
| October | $214,975.00 | 29 | payment based on how many residents in September |
| November | $154,155.07 | 36 | payment based on how many residents in October |
| December | $161,729.76 | 39 | payment based on how many residents in November |
| 2026 | | | |
| January | $237,073.64 | 40 | payment based on how many residents in December |
| February | $110,650.00 | 40 | ave as of 2/17/2026 |

◉ Outlook

---

**Fw: M█████ G█████'s acceptance letter**

---

**From** Intake 2 <intake2@serenityhillslifecenter.org>

**Date** Tue 2/17/2026 10:28 AM

**To** Tara Singer <accountant@serenityhillslifecenter.org>

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

---

**From:** Shelia Weese <NP@serenityhillslifecenter.org>
**Sent:** Thursday, January 29, 2026 11:19 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Subject:** Re: M████ G█████'s acceptance letter

M████ G█████ is accepted to the facility. You may let her attorney know.

---

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Wednesday, January 28, 2026 1:31 PM
**To:** Shelia Weese <NP@serenityhillslifecenter.org>; NursingDepartment <nursing@serenityhillslifecenter.org>
**Subject:** Fw: Megan Grigsby's acceptance letter

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

---

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Wednesday, January 28, 2026 12:13 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Subject:** Re: M████████igsby's acceptance letter

Please let me know if this one is accepted.

**Marie Travis "CEO"**

Outlook

Fw: Deloris Starkey's Medication list

From  Intake 2 <intake2@serenityhillslifecenter.org>
Date  Tue 2/17/2026 10:35 AM
To    Tara Singer <accountant@serenityhillslifecenter.org>

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Sunday, February 8, 2026 1:04 PM
**To:** William Frederick <wfrederick@meridianmp.com>; Deborah Fish <dfish@allardfishpc.com>; Sheila Weese <NP@serenityhillslifecenter.org>; Intake 2 <intake2@serenityhillslifecenter.org>
**Subject:** Fw: ████████ Medication list

This email is sent by Sheila, the Nurse Practitioner, to okay D██████ S██████ to come into the program, as sent to me.
Nowhere does it state that she must detox off of Ativan first, and I will call BBC rehab to see if you informed them to do so,
which I am sure you did not. I will get them to send me a letter verifying this, also. I do not know why this is being done, and I
do not know who is accepting the referrals I send you, because you both are sending me emails from Sheila's email. Please
refrain from providing false information about me and the intakes. This has been going on for a while, and you know I do not
do approvals; Sheila does, so it is illegal to provide false information that goes to the courts.

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Friday, February 6, 2026 11:13 AM
**To:** William Frederick <wfrederick@meridianmp.com>
**Subject:** Fw: ████████████████on list

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Thursday, February 5, 2026 9:31 AM
**To:** Sheila Weese <NP@serenityhillslifecenter.org>
**Subject:** Re:█████████████ Medication list

Thank you

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**From:** Sheila Weese <NP@serenityhillslifecenter.org>
**Sent:** Thursday, February 5, 2026 9:03 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>; William Frederick <wfrederick@meridianmp.com>
**Subject:** Re: ████████████Medication list

Hi Marie,
D█████ S██████ acceptable for the facility on the condition of her discontinuing the Ativan. Ativan is a medication that isn't prescribed at our facility.

Exhibit U

🔑 Outlook

---

Fw: Intake Protocols - Immediate Clarification

---

**From** Intake 2 <intake2@serenityhillslifecenter.org>
**Date** Tue 2/17/2026 10:26 AM
**To** Tara Singer <accountant@serenityhillslifecenter.org>

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

---

**From:** William Frederick <wfrederick@meridianmp.com>
**Sent:** Friday, February 6, 2026 10:18 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Cc:** Sharon Travis <serenityhillscenterceo@gmail.com>; Marie Travis <ceo@serenityhillslifecenter.org>
**Subject:** Intake Protocols - Immediate Clarification

Marie,

We had an agreement that intakes would continue only with approval from the medical staff. It has come to my attention that the two most recent intakes were declined by medical, yet were still accepted into the facility.

The first was declined due to suicidal ideation and behavior; the second due to active Ativan use. Despite this, both were admitted. As of this email, the first client left against advice, and the second required hospitalization for withdrawal and detox. These situations placed an undue burden on staff and resulted in no billable services.

**To be clear, the state does not mandate that the facility accept any patient.**

Effective immediately, all intakes must meet the following conditions:
- Prior approval by medical staff
- Intake completed during office hours, Monday–Thursday only

These conditions are non-negotiable moving forward.

Thanks,
Will

Exhibit X

**BBC Rehab**
2048 VIP Way
Fairmont, WV 26554
681-404-100

To whom it may concern,

███████████████, ███ 12/28/1982, was admitted to BBC Rehab on 12/04/2025 for Alcohol detox and 28-day program and discharged 02/05/2026. Deloris had an active order for Ativan 1mg PO QD PRN, which she was aware that she would not be discharged with. ██████ was administered prn Ativan once daily through January 16th, 2026. ██████ was administered one dose of Ativan 1mg on February 4th, 2026 and February 5th 2026, as she was experiencing intense anxiety about transitioning to a long-term treatment program. Due to the dosage and frequency of Ativan that was administered in February 2026, detox from the Ativan is not medically necessary and she does not qualify for any detoxification program.

Jennifer Lauderman, LPN, BA
BBC Rehab LPN/Supportive Therapist

Dr. Muhammad Salman MD
Medical Director

I came to serenity hills Life Center on 1-15-25 as a resident in the 3 month program As a resident, Ms. Marie always strived to go above and beyond to make our time here as enjoyable as it was healing. She had us parties, cookouts and celebrations. Since celebriating the 3 month program and moving up to the soberliving living house I've been a kitchen staff for 6 months and now an MHT and love working and being a part of serenity hills. This place is Life Changing Ms. Marie treats us girls with the respect and kindness and patience we deserve She's not demeaning or belittling and gives us opportunities that most of the rest of the world or our communities would'nt She has always showed me love and respect as a resident and that same love and respect as

Serenity Hills is a program - a great tool for you
From the dark valley of addiction - it will lead you through
All the tools await you - all you need is desire
Serenity Hills staff will walk you through the fire

They are thoughtful, caring and full of good advice.
They'll hold your hand if you want - you needn't ask twice
If a need to succeed is all you posses
Worry not my sister - they will provide the rest

Food, clothing, and a roof over your head.
Blankets, a pillow and your very own bed.
A structured environment is just what you need.
Stay focused on yourself - let them take the lead.

With love for yourself and faith restored
You'll soon be ready to walk out that door.
Your ring on your hand - a smile on your face
You'll look at life anew - no trace of disgrace

Holding your head high - your eye on the ball.
Clinging to what you've gained - never again to fall.
So come forth my sisters - one and all.
Serenity Hills awaits - just make the call.

Jenna '25

I Came to serenity hills Life Center on 1-19-25 as a resident in the 3 month program As a resident, Ms. Marie always strived to go above and beyond to make our time here as enjoyable as it was healing. She had us parties, cookouts and celebrations. Since celebrating the 3 month program and moving up to the sober living living house I've been a kitchen staff for 6 months and now an MHT and love working and being a part of serenity hills. This place is Life Changing Ms. Marie treats us girls with the respect and kindness and patience we deserve She's not demeaning or belittling and gives us opportunities that most of the rest of the world or our communities would'nt She has always showed me love and respect as a resident and that same love and respect as

Outlook

**please print**

From MHT Serenity Hills <mht@serenityhillslifecenter.org>

Date Sun 1/4/2026 8:09 PM

To NursingTeam <Nursingteam@serenityhillslifecenter.org>

My name is Kayla Bolyard I was a resident at SHLC from June through August 2025. I completed the program and was very pleased with the experience I had during that time. Marie Travis was very hands on and always did what she could for her residents. She gave us a chance to start our lives in the right direction, and experience what its like to have fun sober. She is a very determined, and self-driven person. She works hard at what she believes in order to help those coming out of addiction and get to know their self-worth. We would have residential meetings where residents and Ms. Marie would talk about any problems anyone was having and or the program. We would all have time to say how we felt and let her know. We would suggest fun things to do. If any one had a problem she would help us through it. If ever there was any altercations of someone not liking how things were going she would always assure us that everything was okay. Marie has always been helpful and direct.

In September 2025 I had started working at SHLC and a resident (M.M.) had a visit with her family she was able to walk downstairs so she could see her family.

K. Bolyard
1-3-25

I first came to Serenity Hills Life Center on July 10, 2025. Despite going to numerous detoxes and rehabs and never making it past a week or two, I found my place here. Miss Marie has always went above and beyond for all of us girls. Now even as an employee, I feel the same love and respect I felt as a resident. When running a business like this, it's bound to happen that many people get upset over the rules and expectations that are expected of them. Miss Marie does her best to ensure that her staff try as hard as she does and treats all of us girls with the same love and respect that she does. Even on the 3 times my mail was lost or received empty when Marlena was in control of the mail, Miss Marie did her best to make things right. I am so lucky and blessed to have found Serenity Hills! I wrote this not because I was asked and not made and because I love Miss Marie and want to do everything I can to help her and support her like she has supported and helped me.

-    Ravon Williams

I came to Serenity Hills on April 25, 2025 and Miss Marie has done so much for me since that day. I don't have any support on the outside and she has bought me and other girls, underwear, bras, socks, body wash, shampoo, and even cigarettes. She has always treated me with love and support and believed in me when I didn't believe in myself. That's the reason after my graduation of the 6-month program at Serenity Hills, I decided to then go to her sober house and work at the center. That's because I know the love and support and opportunities she gives women like me who have been pushed to the side or underestimated by the rest of society. Marlena had done a lot of wrong around the center, including having her daughter and another client in her office during a zoom court hearing of mine without Miss Marie's knowledge. This has been the best thing that could ever happen to me and its all in thanks to Miss Marie! I was asked to write this on behalf of Miss Marie and did so because she has done so much for me and I think its important people know that some of the things people say are just flat out not true.

-Roxanne Parker

I Tina Yoho was a resident at serenity hills life center. I did the 3 month program and now I currently work at serenity hills life center now as a MHT I was Ms Marie's secretary and I worked around her alot I have never heard Ms Marie scream at her residents or miss treat them bad. We had residential meetings thats where Ms Marie would advocate for us make sure we was treated right by staff and make sure we had what we needed. Ms Marie would work with us so we would do better in our recovery. All Ms Marie's girls are very important in her life. She has done so much for us I wouldn't be where I am without her. I am writing this on my own free will.

Tina Yoho
Tina Yoho

I have not heard Marie
yell or scream at the residents.
Nor have I ever been aware of
a resident not being aloud a
visit due to a disability.

JEFF PROHASKA    1/5/26

I came to Serenity Hills on 6-5-25 to do the 3 month program and its truly changed my life. Miss Marie goes out of her way to make all of the residents comfortable and happy. Shes taken us to the swimming pool, had cookouts, relay races, and fall festivals, and done her best to celebrate the holidays. Shes even made it a point to buy clothes, underwear, bras, soaps, and even cigarettes for girls in need. Ive always known Miss Marie to treat residents and employees with love and respect which is why i felt lucky to be able to come up to the sober living house after my graduation and work here at the center. I was asked to write this and do this because i know the goodness Miss Marie tries so hard to do for all of us and its upsetting that just because people become disgruntled by her rules, regulations, and expectations that they lie and try to take away from her character. Im happy and proud to be a part of serenity Hills.

AF   11-21-25

Outlook

please print

**From** MHT Serenity Hills <mht@serenityhillslifecenter.org>
**Date** Sun 1/4/2026 8:09 PM
**To** NursingTeam <Nursingteam@serenityhillslifecenter.org>

My name is Kayla Bolyard I was a resident at SHLC from June through August 2025. I completed the program and was very pleased with the experience I had during that time. Marie Travis was very hands on and always did what she could for her residents. She gave us a chance to start our lives in the right direction, and experience what its like to have fun sober. She is a very determined, and self-driven person. She works hard at what she believes in order to help those coming out of addiction and get to know their self-worth. We would have residential meetings where residents and Ms. Marie would talk about any problems anyone was having and or the program. We would all have time to say how we felt and let her know. We would suggest fun things to do. If anyone had a problem she would help us through it. If ever there was any altercations of someone not liking how things were going she would always assure us that everything was okay. Marie has always been helpful and direct.

In September 2025 I had started working at SHLC and a resident (M.M.) had a visit with her family she was able to walk downstairs so she could see her family.



I Tina Yoho was a resident at serenity Hills life Center. I did the 3 month program and now I currently work at serenity hills life center now as a MHT I was Ms Marie's secretary and I worked around her alot I have never heard Ms Marie scream at her residents or miss treat them bad. We had residential meetings thats where Ms Marie would advocate for us make sure we was treated right by staff and make sure we had what we needed, Ms Marie would work with us so we would do better in our recovery. All Ms Marie's girls are very important in her life. She has done so much for us I wouldn't be where I am without her. I am writing this on my own free will.

Tina Yoho
Tina Yoho

I have not heard Marie
yell or scream at the residents.
Nor have I ever been aware of
a resident not being allowed a
visit due to a disability.

JEFF PROHASKA   1/5/26

# HEART 2 HEART VOLUNTEERS, INC

## PLAN OF REORGANIZATION

### BY BOARD OF DIRECTORS

### 2/17/2026

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

FEB 1 8 2026

Time:___10:15___ am/pm

**40 Residents** | | | **Monthly**

| Insurance | # Res | | Current Ins rate |
|---|---|---|---|
| 3.1 res @ $5250 | | 25 | $131,250.00 |
| 3.5 Res @ $6750 | | 15 | $101,250.00 |
| | | | $232,500.00 |
| Sober House Rents | | | $7,800.00 |
| Peer Grant | | | $11,250.00 |
| Commission | | | $300.00 |
| **Revenue** | | | **$251,850.00** |
| Payroll | | | $148,794.70 |
| WV SUTA | | | $734.60 |
| workers comp | | | $674.67 |
| **Payroll Expense** | | | **$150,203.97** |
| Activities for Residents | | | $700.00 |
| American electric power | | | $9,000.00 |
| Brewer- fire inspections | | | $116.67 |
| citynet - Internet/server | | | $1,293.83 |
| Computers, software, IT Guys | | | $375.15 |
| Culligan - drinking water | | | $412.00 |
| Dish- Cable sober house | | | $87.00 |
| Emergency Funds | | | $1,500.00 |
| Events | | | $250.00 |
| Fire Fees | | | $130.38 |
| First Choice Fire extinguisher | | | $195.00 |
| Frontier- phone | | | $90.87 |
| Garbage | | | $278.03 |
| Go daddy emails | | | $221.00 |
| Gordon Food - Resident Food | | | $14,300.00 |
| Hughes office | | | $520.00 |
| Joint Commission | | | $333.33 |
| Lauttamus security | | | $37.00 |
| License and fees | | | $25.00 |
| Medez- Medical billing program | | | $2,160.30 |
| Onboarding | | | $195.00 |
| Maintenance | | | $416.67 |
| Maintenance- sewage plant | | | $1,225.00 |
| medical supplies | | | $75.00 |
| Miscellaneous exp | | | $500.00 |
| Office exp | | | $400.00 |
| OH County PSD - water bills | | | $1,235.00 |
| OH County Fire fees | | | $260.76 |
| OH CO HD - Food Permit | | | $25.00 |
| Resident Needs | | | $600.00 |
| Supplies- cleaning | | | $425.00 |
| SBA (small business adm) | | | $641.10 |
| sprinkler inspection | | | $117.00 |
| Stericycle- Medical waste | | | $185.00 |
| Subaru (leased #4703) | | | $693.53 |
| Subaru (leased #4751) | | | $693.52 |
| quality envirnomental | | | $190.42 |
| WV BRIM- Insurance | | | $3,677.00 |
| westfax | | | $39.95 |
| Yahn Electric- security | | | $96.87 |
| **General/Fixed expenses** | | | **$43,717.38** |
| **Profit/Loss before Creditors** | | | **$57,928.65** |
| Administration Fees | (attorneys) | | $12,500.00 |
| USDA Payment | | | $13,823.00 |
| SBA Payment | | | $641.00 |
| PCAP Payment | | | $2,961.88 |
| Unsecrued Creditors | | | $1,295.75 |
| CEO Reimbursements | | | $2,000.00 |
| **total Debt Payments** | | | **$33,221.63** |
| **Net cash flow** | | | **$24,707.02** |

| 37 Employees at 40 Residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 2 | | |
| Supportive Counselors | 3 | | |
| Clinical Cost | | $14,844.63 | $29,689.26 |
| MHT | 9 | $12,530.46 | $25,060.92 |
| Nurses | 3 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $17,896.40 | $35,792.80 |
| Case Manager | 1 | $1,894.64 | $3,789.28 |
| Intake | 0 | | |
| Peer specialists | 2 | $3,358.68 | $6,717.36 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 3 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $5,511.68 | $11,023.36 |
| House Keeping staff | 3 | | |
| Supervisor | 1 | | |
| House Keeping cost | | $5,167.20 | $10,334.40 |
| Totals | 37 | $74,397.35 | $148,794.70 |

**45 Residents**

| Insurance | | Current Ins rate |
|---|---|---|
| 3.1 res @ $5250 | 30 | $157,500.00 |
| 3.5 Res @ $6750 | 15 | $101,250.00 |
| | | $258,750.00 |
| Sober House Rents | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| **Revenue** | | **$278,100.00** |
| Payroll | | $160,162.54 |
| WV SUTA | | $794.17 |
| workers comp | | $674.67 |
| **Payroll expense** | | **$161,631.38** |
| Activities for Residents | | $750.00 |
| American electric power | | $9,200.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $400.00 |
| Culligan - drinking water | | $424.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $1,500.00 |
| Events | | $500.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $14,500.00 |
| Hughes office | | $520.00 |
| Joint Commission | | $333.33 |
| Lauttamus security | | $37.00 |
| License and fees | | $25.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $195.00 |
| Maintenance | | $500.00 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $75.00 |
| Miscellaneous exp | | $1,250.00 |
| Office exp | | $400.00 |
| OH County PSD - water bills | | $1,255.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD - Food Permit | | $25.00 |
| Resident Needs | | $625.00 |
| Supplies- cleaning | | $450.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $185.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $190.42 |
| WV BRIM- Insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| **General/Fixed expenses** | | **$44,780.18** |
| **Profit/Loss before Creditors** | | **$71,688.44** |
| Administration Fees | (attorneys) | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unscrued Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| **total Debt Paayments** | | **$33,221.63** |
| **Net cash flow** | | **$38,466.81** |

| 40 Employees at 45 residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 2 | | |
| Supportive Counselors | 4 | | |
| Clinical Cost | | $16,739.27 | $33,478.54 |
| MHT | 9 | $12,530.46 | $25,060.92 |
| Nurses | 3 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $17,896.40 | $35,792.80 |
| Case Manager | 2 | $3,789.28 | $7,578.56 |
| Intake | 1 | $1,894.64 | $3,789.28 |
| Peer specialists | 2 | $3,358.68 | $6,717.36 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 3 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $5,511.68 | $11,023.36 |
| House Keeping staff | 3 | | |
| Supervisor | 1 | | |
| House Keeping  cost | | $5,167.20 | $10,334.40 |
| Totals | 40 | $80,081.27 | $160,162.54 |

**50 Residents**

| Insurance | Current Ins rate | |
|---|---|---|
| 3.1 res @ $5250 | 32 | $168,000.00 |
| 3.5 Res @ $6750 | 18 | $121,500.00 |
| | | $289,500.00 |
| Sober House Rents | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| Revenue | | $308,850.00 |
| Payroll | | $176,548.90 |
| WV SUTA | | $833.88 |
| workers comp | | $674.67 |
| Payroll Expense | | $178,057.45 |
| Activities for Residents | | $800.00 |
| American electric power | | $9,400.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $500.00 |
| Culligan - drinking water | | $434.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $1,500.00 |
| Events | | $500.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $14,700.00 |
| Hughes office | | $520.00 |
| Joint Commission | | $333.33 |
| Lauttamus security | | $37.00 |
| License and fees | | $25.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $232.50 |
| Maintenance | | $550.00 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $100.00 |
| Miscellaneous exp | | $1,500.00 |
| Office exp | | $450.00 |
| OH County PSD - water bills | | $1,275.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD - Food Permit | | $25.00 |
| Resident Needs | | $650.00 |
| Supplies- cleaning | | $475.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $225.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $225.00 |
| WV BRIM- Insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| General/Fixed expenses | | $45,897.26 |
| Profit/Loss before Creditors | | $84,895.29 |
| Administration Fees  (attorneys) | | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unsecrued Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| total Debt Paayments | | $33,221.63 |
| Net cash flow | | $51,673.66 |

| 44 employees at 50 Residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 4 | | |
| Supportive Counselors | 4 | | |
| Clinical Cost | | $19,347.85 | $38,695.70 |
| MHT | 11 | $18,115.06 | $36,230.12 |
| Nurses | 3 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $17,896.40 | $35,792.80 |
| Case Manager | 2 | $3,789.28 | $7,578.56 |
| Intake | 1 | $1,894.64 | $3,789.28 |
| Peer specialists | 2 | $3,358.68 | $6,717.36 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 3 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $5,511.68 | $11,023.36 |
| House Keeping staff | 3 | | |
| Supervisor | 1 | | |
| House Keeping  cost | | $5,167.20 | $10,334.40 |
| Totals | 44 | $88,274.45 | $176,548.90 |

**55 Residents**

| Insurance | | Current Ins rate |
|---|---|---|
| 3.1 res @ $5250 | 35 | $183,750.00 |
| 3.5 Res @ $6750 | 20 | $135,000.00 |
| | | $318,750.00 |
| Sober House Rents | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| Revenue | | $338,100.00 |
| Payroll | | $181,888.34 |
| WV SUTA | | $873.58 |
| workers comp | | $674.67 |
| Payroll Expense | | $183,436.59 |
| Activities for Residents | | $850.00 |
| American electric power | | $9,600.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $550.00 |
| Culligan - drinking water | | $435.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $1,800.00 |
| Events | | $500.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $15,000.00 |
| Hughes office | | $520.00 |
| Joint Commission | | $333.33 |
| Lauttamus security | | $37.00 |
| License and fees | | $50.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $270.00 |
| Maintenance | | $583.33 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $125.00 |
| Miscellaneous exp | | $1,500.00 |
| Office exp | | $450.00 |
| OH County PSD - water bills | | $1,325.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD - Food Permit | | $50.00 |
| Resident Needs | | $700.00 |
| Supplies- cleaning | | $500.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $225.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $225.00 |
| WV BRIM- insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| General/Fixed expenses | | $47,069.09 |
| Profit/Loss before creditors | | $107,594.32 |
| Administration Fees | (attorneys) | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unsecured Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| total Debt Paayments | | $33,221.63 |
| Net cash flow | | $74,372.69 |

| 46 employees at 55 Residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 4 | | |
| Supportive Counsel | 4 | | |
| Clinical Cost | | $19,347.85 | $38,695.70 |
| MHT | 11 | $18,115.06 | $36,230.12 |
| Nurses | 3 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NI | 1 | | |
| Medical Cost | | $17,896.40 | $35,792.80 |
| Case Manager | 2 | $3,789.28 | $7,578.56 |
| Intake | 1 | $1,894.64 | $3,789.28 |
| Peer specialists | 3 | $4,822.72 | $9,645.44 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse account | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 4 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $6,717.36 | $13,434.72 |
| House Keeping staff | 3 | | |
| Supervisor | 1 | | |
| House Keeping cost | | $5,167.20 | $10,334.40 |
| Totals | 46 | $90,944.17 | $181,888.34 |

**60 Residents**

| Insurance | | Current Ins rate |
|---|---|---|
| 3.1 res @ $5250 | 35 | $183,750.00 |
| 3.5 Res @ $6750 | 25 | $168,750.00 |
| | | $352,500.00 |
| Sober House Rents | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| **Revenue** | | **$371,850.00** |
| Payroll | | $191,928.20 |
| WV SUTA | | $953.00 |
| workers comp | | $674.67 |
| **Payroll Expense** | | **$193,555.87** |
| Activities for Residents | | $900.00 |
| American electric power | | $9,800.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $550.00 |
| Culligan - drinking water | | $440.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $1,800.00 |
| Events | | $600.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $15,500.00 |
| Hughes office | | $600.00 |
| Joint Commission | | $333.33 |
| Lauttamus security | | $37.00 |
| License and fees | | $50.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $307.50 |
| Maintenance | | $625.00 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $150.00 |
| Miscellaneous exp | | $1,575.00 |
| Office exp | | $500.00 |
| OH County PSD - water bills | | $1,350.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD - Food Permit | | $50.00 |
| Resident Needs | | $750.00 |
| Supplies- cleaning | | $600.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $225.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $302.00 |
| WV BRIM- Insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| **General/Fixed expenses** | | **$48,485.26** |
| **Profit/Loss before creditors** | | **$129,808.87** |
| Administration Fees | (attorneys) | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unscreued Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| **total Debt Paayments** | | **$33,221.63** |
| **Net cash flow** | | **$96,587.24** |

| 48 employees at 60 residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 5 | | |
| Supportive Counselors | 4 | | |
| Clinical Cost | | $21,956.42 | $43,912.84 |
| MHT | 11 | $18,115.06 | $36,230.12 |
| Nurses | 4 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $20,307.76 | $40,615.52 |
| Case Manager | 2 | $3,789.28 | $7,578.56 |
| Intake | 1 | $1,894.64 | $3,789.28 |
| Peer specialists | 3 | $4,822.72 | $9,645.44 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 4 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $6,717.36 | $13,434.72 |
| House Keeping staff | 3 | | |
| Supervisor | 1 | | |
| House Keeping cost | | $5,167.20 | $10,334.40 |
| **Totals** | **48** | **$95,964.10** | **$191,928.20** |

**65 Residents**

| Insurance | | Current Ins rate |
|---|---|---|
| 3.1 res @ $5250 | 38 | $199,500.00 |
| 3.5 Res @ $6750 | 27 | $182,250.00 |
| | | $381,750.00 |
| **Sober House Rents** | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| **Revenue** | | $401,100.00 |
| Payroll | | $200,970.80 |
| WV SUTA | | $1,012.56 |
| workers comp | | $674.67 |
| **Payroll Expense** | | **$202,658.03** |
| Activities for Residents | | $950.00 |
| American electric power | | $10,000.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $575.00 |
| Culligan - drinking water | | $450.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $2,000.00 |
| Events | | $667.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $15,600.00 |
| Hughes office | | $600.00 |
| Joint Commission | | $345.00 |
| Lauttamus security | | $37.00 |
| License and fees | | $50.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $382.50 |
| Maintenance | | $650.00 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $1,500.00 |
| Miscellaneous exp | | $1,600.00 |
| Office exp | | $500.00 |
| OH County PSD – water bills | | $1,400.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD – Food Permit | | $50.00 |
| Resident Needs | | $800.00 |
| Supplies- cleaning | | $650.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $275.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $302.00 |
| WV BRIM- Insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| **General/Fixed expenses** | | **$50,823.93** |
| **Profit/Loss before creditors** | | **$147,618.04** |
| Administration Fees    (attorneys) | | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unsecrued Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| **total Debt Paayments** | | **$33,221.63** |
| **Net cash flow** | | **$114,396.41** |

| 51 employees at 65 Residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 5 | | |
| Supportive Counselors | 4 | | |
| Clinical Cost | | $21,956.42 | $43,912.84 |
| MHT | 12 | $19,536.04 | $39,072.08 |
| Nurses | 4 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $20,307.76 | $40,615.52 |
| Case Manager | 2 | $3,789.28 | $7,578.56 |
| Intake | 2 | $3,789.28 | $7,578.56 |
| Peer specialists | 3 | $4,822.72 | $9,645.44 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 1 | | |
| CEO | 1 | | |
| Office cost | | $8,986.70 | $17,973.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 4 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $6,717.36 | $13,434.72 |
| House Keeping staff | 4 | | |
| Supervisor | 1 | | |
| House Keeping  cost | | $6,372.88 | $12,745.76 |
| Totals | 51 | $100,485.40 | $200,970.80 |

**72 Residents**

| Insurance | | Current Ins rate |
|---|---|---|
| 3.1 res @ $5250 | 44 | $231,000.00 |
| 3.5 Res @ $6750 | 28 | $189,000.00 |
| | | $420,000.00 |
| Sober House Rents | | $7,800.00 |
| Peer Grant | | $11,250.00 |
| Commission | | $300.00 |
| Revenue | | $439,350.00 |
| Payroll | | $223,131.02 |
| WV SUTA | | $1,111.83 |
| workers comp | | $674.67 |
| Payroll Expense | | $224,917.52 |
| Activities for Residents | | $1,000.00 |
| American electric power | | $10,200.00 |
| Brewer- fire inspections | | $116.67 |
| citynet - Internet | | $1,293.83 |
| Computers, software, IT Guys | | $600.00 |
| Culligan - drinking water | | $470.00 |
| Dish- Cable sober house | | $87.00 |
| Emergency Funds | | $2,000.00 |
| Events | | $667.00 |
| Fire Fees | | $130.00 |
| First Choice Fire extinguisher | | $195.00 |
| Frontier- phone | | $90.87 |
| Garbage | | $278.03 |
| Go daddy emails | | $221.00 |
| Gordon Food - Resident Food | | $16,000.00 |
| Hughes office | | $600.00 |
| Joint Commission | | $333.33 |
| Lauttamus security | | $37.00 |
| License and fees | | $50.00 |
| Medez- Medical billing program | | $2,160.30 |
| Onboarding | | $500.00 |
| Maintenance | | $720.00 |
| Maintenance- sewage plant | | $1,225.00 |
| medical supplies | | $200.00 |
| Miscellaneous exp | | $1,800.00 |
| Office exp | | $500.00 |
| OH County PSD - water bills | | $1,450.00 |
| OH County Fire fees | | $260.76 |
| OH CO HD - Food Permit | | $50.00 |
| Resident Needs | | $850.00 |
| Supplies- cleaning | | $670.00 |
| SBA (small business adm) | | $64.10 |
| sprinkler inspection | | $117.00 |
| Stericycle- Medical waste | | $275.00 |
| Subaru (leased #4703) | | $693.53 |
| Subaru (leased #4751) | | $693.52 |
| quality envirnomental | | $302.00 |
| WV BRIM- Insurance | | $3,677.00 |
| westfax | | $39.95 |
| Yahn Electric- security | | $96.87 |
| General/Fixed expenses | | $50,714.76 |
| Profit/Loss before creditors | | $163,717.72 |
| Administration Fees | (attorneys) | $12,500.00 |
| USDA Payment | | $13,823.00 |
| SBA Payment | | $641.00 |
| PCAP Payment | | $2,961.88 |
| Unsecrued Creditors | | $1,295.75 |
| CEO Reimbursements | | $2,000.00 |
| total Debt Paayments | | $33,221.63 |
| Net cash flow | | $130,496.09 |

| 56 Employees/72 Residents | | per pay | per month |
|---|---|---|---|
| clinical Director | 1 | | |
| Counselors | 6 | | |
| Supportive Counselors | 5 | | |
| Clinical Cost | | $26,624.99 | $53,249.98 |
| MHT | 13 | $21,899.94 | $43,799.88 |
| Nurses | 4 | | |
| Utilization Nurse | 1 | | |
| Medical Director/NP | 1 | | |
| Medical Cost | | $20,307.76 | $40,615.52 |
| Case Manager | 3 | $5,683.92 | $11,367.84 |
| Intake | 2 | $3,789.28 | $7,578.56 |
| Peer specialists | 3 | $4,822.72 | $9,645.44 |
| Secretary | 1 | | |
| Medical Biller | 1 | | |
| HR/inhouse accountant | 2 | | |
| CEO | 1 | | |
| Office cost | | $11,139.70 | $22,279.40 |
| Maintenance | 2 | $4,206.96 | $8,413.92 |
| Kitchen staff | 4 | | |
| Kitchen Manager | 1 | | |
| Kitchen Cost | | $6,717.36 | $13,434.72 |
| House Keeping staff | 4 | | |
| Supervisor | 1 | | |
| House Keeping cost | | $6,372.88 | $12,745.76 |
| Totals | 56 | $111,565.51 | $223,131.02 |