CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

MAY 04 2026

Time:___4:30___am/pm

**IN THE UNITED STATES BANKRUPTSY COURT**

**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**IN RE:**

**Heart 2 Heart, Inc Case No 25-00087**

**Debtor Chapter 11 and creditor Chapter 11**

**5/04/2026**

I come before the court to make a motion challenging the testimony of Sarah Dean former employee of Serenity Hills Life Center Program. I am asking the court to strike her testimony from the record. The reasons include it was not ethical, not credible and retaliatory in nature.

The lawyer that represented Heart 2 Heart at the time of the hearing, stated that she had ask for a delay and it was denied by the court. She decided she needed more time after receiving the information from myself, showing that the witness was not credible.  At the time of the hearing the lawyer was not prepared.

The witness Sarah Dean used her professional license to influence and put weight on herself as witness before the court.

<u>Not Ethical</u>. Some facts that court did not know is that Sarah Dean was my personal therapist from around 2021 to around April or May of 2023. She was my therapist for around two years while I went through two of my most traumatic events in my life. She was my counselor through my divorce and the closing and reopening of Serenity Hills Life Center. She knew all my childhood traumas, she knew I was in recovery for over 40 years and she knew I had PTSD.

I did not know at the time of hiring her, that she should ethically should not have worked for me. She came to work for me a few months after I terminated the counseling because I became very busy. See some of things concerning the ethical codes and rules.

- **Dual Relationships: Ethical codes from organizations like the American Counseling Association (ACA) strongly advise against entering into business or social relationships with former patients. These roles can blur professional judgement and lead to exploitation.**

- **Risk of Harm: Professional guidelines warn that entering such relationship can cause psychosocial harm to a former client if the employment relationship fails, potentially undoing the progress made during therapy.**

- **The ACA (Counselors): It advises avoiding any non -professional interaction that could be exploitive.**

**The ADA code of ethics purpose: The Code of Ethics serves six main purposes.**

**A.S.d.** Nonprofessional interactions or Relationship (Other Than Sexual or Romantic) Counselors avoid entering into nonprofessional relationships with former clients, their romantic partners, or their family members when interactions is potentially harmful to the client. This applies to both is person and electronic interactions or relationships.

**I.1.a. Knowledge-** Counselors know and understand the ACA Code of Ethics and other applicable ethics from professional organizations or certification and Licensure bodies of which they are members. Lack of knowledge or misunderstanding of an ethical responsibility is not a defense against a charge of unethical conduct.

1.2.e Unwanted complaints Counselors do not initiate, participate in, or encourage the filing of complaints that are retaliatory in nature or are made with reckless disregard or willful ignorance of facts that would disprove the allegation.

*Make note that in November 2024 the state comes in for their two-year inspection and we pass. Sarah Dean sends a text message congratulating me.

**Exhibit 5. November 26, 2024. 3:29 pm text message From Sarah Dean to Sharon Travis.**

Hey, good freaking job, chick!! You should be proud of yourself.

The State (OHFLAC) is called in around January 2025. Sarah Dean admits during the Chapter 11 Court hearing, that she is the one that called them.

I did not know that until she testified that day in court months later. The state does not tell you who called them. Sara Dean was terminated in January of 2025 while the state was there. We did not give her a reason because we were an at will state.

Here are some of my reasons.

1.   She was corrected by me for refusing to put a resident in a different group.

That resident was requesting to be moved because she was bullied by a resident in her group, the resident was shutting down emotionally and wanting to leave. I agreed with the resident. I called the head of the state Medicaid sub waiver program, Keith King who agreed with me. It was only after I text her about what I was told, did she agree to move the girl to a different group. Keith king sent an email that the best interest of the resident by the manager of the state sub waiver program confirming that. I forwarded that to the clinical team *See exhibit 2*

*Text Messages Exhibit 3- a & b*

a) December 18th 2024. 7:13 pm

From Sharon: Sarah, I hope that you trust me that I gave Keith King both sides, and he is sending me an email with confirming the following. It is correct we must respect the right of the resident and that we should allow her to move to a group that will let her feel more comfortable, as her right. I will send the email with his answer once he sends it, or feel free to call him.

b) From Sarah Dean: I trust you. I appreciate this information, and even more the at you are comfortable to explore this with me. It makes little sense to me, and I still feel the same way, as it is valid, but also see the state concerns, and they are valid. I will amends' my thoughts and add this to my long-term memory and how I

operate in the future. Thank you for allowing me to grow in leadership in a safe way. I appreciate that.

**After the last text message and the email correcting her, she starts causing an atmosphere of insubordination. Residents are complaining there is favoritism and how they were not treated fairly. I investigated it and it was true.**

*Exhibit 4- text messages a through h*

**a) January 9 2025 6:36 pm**

From Sharon Travis: Ok, I want to know what is going to be the consequences of the outburst of the two girls yesterday, and before I make a decision. We have testimony also that from RM about vapes concerning KW.

**b) January 9, 2025, 6:36 pm**

From Sarah Dean: In the past, we have removed smoke breaks and phone time. We have also called POs or lawyers to reiterate the importance of staying focused and stop misbehaving. I didn't tell, but I raised my voice to stop acting that way, and you can't do that to Sharon! We will have to remove you. Basically, a come-to-Jesus conversation. We have calls out to lawyers and am waiting to hear back from them in hopes they will support what we are telling them to. These steps have worked in the past. Is there anything else you want is to do?

**c) January 9, 2025 6:36 pm**

From Sharon Travis: If more consequences are not given, she will be removed from the program. I remember you holding back a girl for mouthing off to you. We need to have a major talk. Do you like working under me.

January 9.2025

From Sharon Travis: Both girls might be removed. I am putting two more write-ups for Shayla for lying to the treatment team and then her outburst. I will not like the way you are approaching me with your staff or addressing my concerns. I do not. When I go to dismiss a girl under my department out of the room, and you tell her

to stay undermined my authority.

f) January 9, 2025

From Sarah Dean. I went back on my notes and the book club was a comment was not Shayla. It was the one with Graves&#39; disease Kiera? I am at my office today so I will be readily available. I understand you see my comments disrespectful, but I am truly trying to figure this out. If you want to look for another clinical director, I completely understand. I will continue to be respectful with my concerns and seeking answers as I can. The conversation needed to have Bridgett in the room for clarification.

I can submit my final invoice to Tara and give you the appropriate 2 months&#39; notice. Think about it and let me know. I don't want to fight with you or turn it into something ugly. I am heading out the door, so I'll talk to you later if you like.

g) January 9, 2025

From Sharon Travis: I do not either. If this is what you want. I need team Sharon, and I do not feel that anymore. It is not what I want bit if a change is not had, I do not know what else to do. I work too hard to feel like my team is against me.

**h) January 9, 2025**

From Sarah Dean: It is confusing sometimes, but we will get it. Do you not like having me work there?

She was causing Chaos with her staff by not following rules and regulation of the facility. She was being insubordinate and disrespectful because she was corrected. She was treating residents differently from one another. *See **Exhibit 1**.*

The ombudsman brought to the court's attention that Serenity Hills Life Center had an Audit done by an insurance company It was a 100% fail. This was the responsibility of the clinical team for Sarah Dean to make sure her team was doing what was expected. Then next it was Robert Boles who was to make sure everything was compliant and they did not.

Retaliation- Sarah Dean retaliated against me for correcting her and for head of the sub waiver program

agreeing with me in favor of the client. She then admitted at the Chapter 11 hearing that she called state (OHFLAC) in a month after we passed and after she was corrected.

If you look at the videos when she testified in the chapter 11 hearing, she comes in smiling and waives at me deviously when she walks in. When she testifies you will see that when she is asked questions, she turns not ahead of her to the person asking questions. She turns her head sideways to me smiling at me while she is answering at times in an animated way.

She has come to every hearing with Robert Boles and smiles and waves deviously to hurt me. Recently Robert Boles and her showed at a hearing concerning something else, to a person she did not know and did not work there at the same time. It is though they are stalking me. This was my counselor and this has caused mental harm. They report back to Sheila Weese the nurse practitioner who is behind a lot of the problems and who I have filed a complaint of harassment and retaliation and nothing was done.

Sarah Dean did not come in professionally with a concern for the residents, she came in because she was fired and she made a lot of money from Serenity Hills. She came in to cause harm and make the courts believe she was there for real concern of the residents. If there was a real concern of Serenity Hills Life Center, then would she not have complained about it to the state when they were in the building the month before. She called the state because she thought she was going to lose her job. Please look at the cameras to see her unprofessional behavior to her former client in which, she has caused a lot of pain,

Sincerely,

Sharon "Marie" Travis

Dear Clinical team,                    **EXHIBIT 1**

I am writing you concerning our conversations the other day and the importance as a team that we are all on the same page.

First, I want to explain that Serenity Hills Life Center is primarily for addiction with or without co-occurring disorders, which I know is probably something you already know. The reason I am stating this is to lay down the foundation of this letter. I have worked in addiction for 9 years and ran a treatment center for over 7 years and an outpatient program for 2. I have been in recovery for over 40 years, was married to a person in addiction who died from his addiction, and, as you know, I have a daughter in addiction. I know that you also have worked in the mental health field, have a master's and a bachelor's degree. I feel that we have a great team, but also as the CEO, I must have us all on the same page and know I am not questioning the progress on your client's mental health or your success in your counseling skills. I do applaud you all. I rarely ever intervene with a resident in the treatment team and have never had a bad word with any of the counselors.

Many of these women end up in jail because of their addiction and their behavior. Even though many have mental health issues that are underlying, their behavior has to be dealt with, too. If the lifestyle and behavior are not dealt with, then most likely the addiction will continue. We saw this recently with a girl who was working for us. She was at the house, and we could still see she was still behaving in a manner at the sober house that was very concerning, and eventually she played this out at work and caused a lot of these problems we are dealing with now. We still do not know who brought in the drugs for a recent client who went AMA.

I feel there are possible underlying issues that we need to talk about, and feel free to be honest about this with me. We should be a team at Serenity Hills. I would like to have that conversation with you all to know you have my support and to explain to you how I also have to make decisions that are best for Serenity Hills and all of the residents here. It is not a you against me or me against you, because a house divided will not stand.

My vision at Serenity Hills was to create a safe place for these women to get well, but I cannot do that if we allow a few to sabotage the recovery of these women. We have lost women in the past because of the bullying and drama. I worked hard to get the program turned around, and it worked. We are always going to have girls come in who have behavior issues, and if it gets bad and it does not change around in order for them to remain in the program, then they will have to be removed for the good of all. These women are given many chances because we care. That is something we do not do lightly. Because this is an organization that I founded, and my heart is trying to help all. I most certainly would never want to dismiss someone from the facility unless I felt that the circumstances warranted it. Just like a toxic staff member can spread like a cancer, so can the toxic behavior of a resident who feels that there is no accountability.

I have stuck with this team when you dismissed someone, even when I disagreed with your decision. I need you to understand my decisions. The treatment team decides on the resident's

mental health and their progress, but their behavior is what the courts are concerned about. Are they changing, and what is their likelihood of being a repeat offender? That is why accountability must be had. Just like if two parents are not backing each other up, then the child will manipulate one against the other. Many of these women start using at a young age, and in a way, they have not matured. We must be on the same page for the good of the residents.

I feel my qualifications to run my group were questioned. Because of what happened in my group. Per regulations, if I have two years' experience working with groups, which I do, or working in recovery, I can be a supportive counselor. I have 9 years of experience, and I have 40 years in recovery again. Using peers is considered evidence-based practice. It is not my group that is the problem; it is the attitude of a couple of women, who are sabotaging the girls in their group and the rest of the facility. I bring a lot of lived experience to my groups, which has helped them a lot. I have had no problems prior, and you can ask girls who have previously been through the program. The regulation states a bachelor's degree or two years' experience.

I remember when Kepro was in one year, we asked them if a person was in a 3.1, still showing trauma, could we still put them in the trauma group? He said yes, but he also stated that if you are still having these issues, then you should question whether they are ready to be in a lower level of care. I state this because if these outbursts are blamed on their triggers and trauma, then are they ready for this level of care? In our program, behavior matters because it fuels their wrong choices, which led many of these women to be incarcerated to begin with.

I take a different approach to triggers. When they tell me, "Miss Marie, I get triggered when someone is following asleep in their groups." I tell them to get used to it. In life, you are going to be dealing with a lot of things that trigger you, and you will have to deal with them. These girls are tough women. They have survived a lot of traumas in their lives. They can handle the truth, and we do need to prepare them for the next level, and that is the real world. Each level of care prepares you for the next level of care. In the 3.1 level of care, it is preparing you for sober house living or going out on their own, and they should be fully prepared to handle it, or they could relapse.

Soon afterwards, Haley and Brianna ask to speak with me alone. They said they have worked too hard to be caught in S P and KW's drama. They stated that they have tried to get through to them with no success. They state it would take 10 years for these girls to understand what they know and that they were not going to hang out with them anymore. They tried to help them, but they would not listen.

This weekend, I heard there was a lot of negativity coming from the 3.1s. I asked MG, and she said, " Yes, Ms. Travis, it is awful, but I try to stay out of it. I took a car to get the hygiene order, and 3 girls asked to go with me, who were 3.1s. I asked them about the negativity, and they stated that C.W was out in the hall negatively gossiping about me and the eyelashes being unfair, and she bragged that no one can kick her out, but the treatment team. This has to stop, and she is affecting everyone. When I got back, I called them all in to the library and stated that this gossiping and negativity was going to stop, and that gossiping about me to the residents is affecting their treatment and the relationship they have with me, if they believe her gossip. I asked them all if they had ever experienced someone falsely gossiping about them, and they said

yes. I told them it only bothers me as far as it affects the girls that are here and their treatment. I told them that I was not speaking to everyone, but if you are in the 3.1 level, then you need to act like you are ready to be in that level of care.

I came to the treatment team to report the behaviors and to let you know that they needed to be dealt with. I had relayed to the clinical director that K W had 3 write-ups and was to be put on probation. Per the policy of Serenity Hills, that was not done. I also stated the incident with Shayla screaming in class, and it was not because of a trigger; it was a behavior issue. She also told me that she and the other girls were passing around books, which they were not allowed to do. There was also a write-up relayed to Jeff for K W earlier in the week, having an outburst at a residential meeting, and written up by Jeff, before her second outburst at a meeting later in the week. Those are all that was reported. No action was taken on any of these clients. Because there were no actions taken on these clients, they acted out at a residential meeting with bullying and disrespect, yelling and carrying on over eyelashes and wigs, and no one was addressing them individually about those items, but I was going over the rules to get everyone on the same page and their focus back to treatment. They proved my point that I was trying to tell you all at the meeting. We have a problem! I always tell my MHTs that more girls get kicked out because they are not writing them up and keeping them accountable. Then they get worse and then get kicked out. It is up to us not to own their bad behavior, and that is coming from my recovery experience in addiction and my experience in this program for 7 years.

My concern is the message we are sending to the women here who are truly here for the right reasons. Is there fairness in our process, and are we applying it in a consistent manner? See below:

- S. H. was held back for two weeks for talking to her boyfriend on the phone. This was with one write-up, as told to me by MHTs.She has a second one now for putting eyelashes on the new resident, when she is not supposed to have any.

- K D held back for two weeks because she took the vape off the charger. She had only 1 warning prior.

  Here is the difference between these two women.

- K W has had prior incidents of bullying clients, but that has seemed to disappear. We have 4 write-ups as of January 8th after the meeting, and I believe two more are coming. When I inquired about the actions being taken, I was told," Do we not have something in place for taking cigarettes away from them?"

- S P has 3 write-ups and 1 warning, and another warning is coming; I have not heard of any actions being discussed with me.

These actions have to be taken right away. It was crucial to my decision-making.

Serenity Hills has always followed the guide of 3 writeups, probation, and then you are out. On rare occasions, when we believe that there was a way of turning things around, we gave them a second chance. We gave one woman a chance because the counselor was not redirecting her behavior and making it worse. The counselor was fired, and the resident later admitted that she had been negative all her life, and the counselor was not helping her.

It is my job as the CEO to make sure I protect the integrity of the treatment milieu. I have, on very rare occasions, had to discharge to prevent and respond to disruptive behaviors that negatively impact the treatment environment. I hope you can concur that a therapeutic milieu is a crucial but fragile dimension of addiction treatment that can be compromised or lost. The goal of a therapeutic milieu is to create a safe and supportive space where residents can work toward their therapeutic goals. I feel that this has been jeopardized by this continued behavior. I have to make decisions based on what the what I see, what the residents are complaining about, and how they are being affected.

I am going to make what we call an administrative discharge of K W. I will make the calls concerning her to those involved in her case. I will also write a letter stating the reasons for her discharge from the program. I alone will do this along with the case manager. I know you stated that her treatment was meeting its markers, but her actions and behaviors are not lining up with the behavior expected in her level of care and our residential rules. She is causing chaos in the facility with her behavior and affecting others in the program.

S P is on probation. She has 3 write-ups and one warning. My concern is that she will blow up over K W's discharge. I have hope for SP. I think she will need a lot of support. I expect a behavior contract and goals she can meet to help her with these behavior issues.

I will be writing a policy on behavior contracts and a clear path for consistency with consequences of behavior. I will be going over that with Shelia, who just got certified in ASAM, and Sara.

You will be receiving letters written by a few of the residents concerning K W and about something they witnessed.

I hope that you understand that this was a heart-wrenching decision, but with no other decisions made, I do believe this would have gotten worse.

Sincerely,

Marie Travis

Exhibit 2



Shared To <serenityhillscenterceo@gmail.com>

## Group therapy

**King, Keith** <keith.king@wv.gov>                                    Thu, Dec 19, 2024 at 7:05 AM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Marie,

As we discussed on the phone the overall viewpoint is that a member in Medicaid can choose their service provider. Furthermore, if a member is not receiving therapeutic benefit from a group, clinical coordination should capture the issue, have face to face discussion with the member and re-assign to a more instrumental therapy/counseling service.

**A picture containing text, clipart Description automatically generated**

**Keith King**
1115 Waiver Program Manager
Bureau for Medical Services
West Virginia Department of Human Services
350 Capitol Street Rm 251
Charleston, WV 25301-3706
P: 304-352-4307
F: 304-558-4398

NOTE:  The information contained in this electronic message is legally privileged and confidential under applicable state and federal law and is intended for the individual named above.  If the recipient of the message is not the above-named recipient, you are hereby notified that any distribution, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Keith King, Bureau for Medical Services, and discard this communication immediately without making any copy or distribution.