CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

MAY 2 0 2026

Time: 4:20 am/pm

**IN THE UNITED STATES BANKRUPTSY COURT**

**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**IN RE:**

**Heart 2 Heart, Inc Case No 25-00087**

**Creditor Chapter 11**

**Pro se/ Creditor/Former Employee**

**5/20/2026**

**TO THE UNITED STATES BANKRUPTSY COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA. A MOTION FOR THE REMOVAL OR REPLACEMENT OF THE OMBUDSMAN. THE OMBUDSMAN HAS NOT BEEN ACTING IN THE BEST INTEREST OF PATIENTS, HAS VIOLATED DUTIES UNDER 11 U.S.C $ 333, HAS BEEN IMPARTIAL, ACTED OUTSIDE HER AUTHORIZED SCOPE, ABUSE OF PROCESS, BREACH OF CONFIDENTIALITY, BREACH OF DUTY/ MISCONCONDUCT AND BANKRUPTY FRAUD. I ALSO MAKE A MOTION TO CHALLEGE THE OMBUSMAN 4th REPORT,5TH REPORT, 6th REPORT (Missing from the record) AND 7th REPORT AND THE FACTS REPORTED AT THE NOVEMBER 10TH MOTION TO EXTEND AND THE HEARING ON FEBRUARY 18th. A motion for an evidentiary hearing is requested.**

**I come to this court in all respect of the Court. Knowing that truth and justice is what the judicial system was put in place to uphold. I believe the court has all intentions of upholding the law with no bias or respecter of persons.**

**I know that an Ombudsman of a chapter 11 has the duty of monitoring the quality care of patients, to formally report to the court every 60 days and to immediately report to the court of patients decline.**

**If the judge has ordered an expansion of duties for the Ombudsman I have not seen it in the docket. I will proceed as though there is no expansions of duties.**

The Ombudsman in a chapter 11 follow the U.S. Bankruptcy Code (11.U.S. C $ 333) And the Federal Rule of Bankruptcy procedure (Rule 2007.2 and 2015.1) as I am sure this court is aware of.

Under (11U.S.C$333(a)(2)(A) they are mandated to be a Disinterested Person. The legal standard for impartial, independent, and free of conflicts of interest.
Showing confidentiality and neutrality. They act as advocates for a fair process.
An Ombudsman colluding with one staff member over another, and specifically reporting biased or negative information, violates standard ethical guidelines for Ombudsman, which require neutrality, confidentiality, and impartiality which can violate labor laws if they result in illegal retaliation, discrimination and hostile work environment.

I have presented a timeline for the courts to review.

I will try to unravel to the court what I have found and already knew in a comprehensive manner using facts, that include emails, text messages, documents, state laws, and rebuttals with facts and researched facts.

I will set out to show the court that the Ombudsman had acted in bad faith, failing in her duty of impartiality and fairness. Acting with dishonest intent, bias and willful neglect rather than simple error and ignored evidence.

The ombudsman colluded with Certain staff over others against other staff, holding private meetings with staff members against the staff member, isolating the party.
Bias in Facts and recommendations that consistently favored certain persons over others.
Listening to disruptive employees' over the CEO Created a high-risk situation that severely damaged the reorganization process.

Consequences for the case caused:

1. Misleading court report- based on skewered and malicious fabricated information, the bankruptcy court received a distorted view of the company's operation and progress.

2. Operational disruption. The CEO had to lead recon structuring. The Ombudsman undermined the CEO's authority based on input from disruptive employees. It impeded the debtor's ability to operate efficiently, violating the goal of a successful reorganization.

3. Dereliction of duty. failing to perform the obligations required by their position, particularly the duty to protect the health, safety and right of the residents. Did not report serious violation of the clinical team that harmed the residents. She on the other hand reported information putting the CEO and at times the Board of Directors in a bad light. If the facts were properly vetted, would have easily been proved untrue.

4. Misleading and or bad faith reports set off a chain of events causing the business to be lost eventually to a Trustee.

Leaked information to the employees about the removal of the CEO and that she would come into fix things. This was told to the staff member and repeated before the hearing happened. Acting out of the scope of her practice by calling a creditor and doing business on behalf of the debtor.

Impartial facts were not presented. In a fair investigation, to meet the standard of a fair investigation, it is standard to allow the accused to be allowed to respond. The CEO was not asked questions about anything she was accused of before presenting it to the court and information that was provided to her was overridden by anything the Clinical team and especially the Nursing Director and Nurse Practitioner provided.

Deborah Fish arrived at Serenity Hills Life Center on April 9th 2025. She was pleasant enough,

but I soon knew that she was forming a friendly relationship with the Nurse Practitioner. This was understandable to a point because I know that is where most of the residents reside and that is where she would get access to the residents more.

It starts becoming uncomfortable when I would find out when she was coming from the Nurse practitioner and not myself. She was doing interviews in the Nurse Practitioners office, when there were neutral spaces available. Sometimes she came and was gone and I did not know she had been there.

**Acting out of her scope of Practice.**

A) Timeline # 63 & 64. Exhibit H. The Ombudsman called a WellPoint Representative about an audit that was done that came back as failed and money was owed. She called her in order to talk about us preparing to provide documents to possibly change the outcome. Bankruptcy Law limits an ombudsman role, meaning all official negotiations on behalf of the debtor, legal correspondence should be handled by the retained Bankruptcy attorney.

B) Timeline 11, 12, 16 & 24-A.  Exhibit P. The Ombudsman on the November 10th hearing for a second extension by the debtor wrote in her report that the debtor needed to focus on her getting the census up and acted like that was not happening. Exhibit P shows we were increasing the census because of the CEO's new 6-month program.

An Ombudsman's primary mandate is to protect patient health, safety and rights. Not to manage business metrics like patient census. While they report on how care is impacted by facilities conditions, they do not dictate what the patient census should be for financial or operational arguments, such as extending a chapter 11. This was outside of her scope as she was continually was allowed to insert her opinions into the court.

C) Timeline, 32, 33, 34, 35 and 36 The Ombudsman tried to get the CEO to allow the two counselors under investigation to do individual therapy, though the CEO was still allowing them to do supervised group therapy. They were charged with serious harmful statements to the residents that upset their treatment and the facility. This was unwarranted interference.

An Ombudsman is never allowed to advocate or interfere with an investigation of an abusive staff member, nor can they legally justify allowing a harmful staff member to continue services under the argument that it is best for the patient benefit. She was acting outside of her scope of practice.

D) Timeline # 5, Exhibit M & D1. The ombudsman Emailed the CEO with an attachment on June 20, 2025 Giving the CEO an outline of things she should do to run the business which I, as the CEO was doing most of them already, some I could not for financial reasons. The Ombudsman then she put a list together of things not to do, which Included malicious false allegations that someone from clinical was stating to her. I, as the former CEO had a business coach that ran a hospital for many years and worked for the WVSBDC, I also relied on the head of the sub waiver program and had been trained in the rules extensively. The only time I got involved with the staff was if they are breaking policies of the facility, federal and state guidelines. Also, if I think they are harming the residents. She was listening to staff that were constantly not being compliant and I had as the CEO to intervene. She was interrupting and creating drama with the team where they already were weaponizing her because I made them follow all federal and state guidelines. She was out of her scope of practice.

## Breach of Confidentiality

A) Timeline #58-M Exhibit A, C and D -November 26, 2025. I was told that Counselor (A), Who was under investigation for saying inappropriate things to the residents (Later Found

guilty and fired). The residents were told that a hearing was going to take place and I, the CEO was going to be fired (I think they meant CRO was going to take over).  Counselor (A) told the residents the ombudsman was coming in afterwards to fix things. They were explaining something that already past, that they knew of prior to it happening, I remember that she did come in right afterwards. Of course, they were talking about the November 10th 2025 hearing and the appointment of the CRO. I remember the Ombudsman coming in and gloating. Telling me to retire and get some kind of plaque in my memory. The Ombudsman knew of these allegations and investigation prior to the report and did not report the actions to the court. Of course, she was named in the investigation report.  The investigation had ended on December 12th, 2025. An as far as I can see she did not file her six report that would have covered that time frame. In which she is supposed to every 60 days. This also fits under bias and concealing her own behavior.

## Violation of (11U.S.C$333(a)(2)(A) Being mandated to be a Disinterested party. She was not Impartial, independent.

A)  Timeline # 7, 8 July 25th. 2025. The Clinical Director screamed and got into an argument with a Counselor B and told her to get out of the building. The yelling was done where residents could hear. The Ombudsman did not report it.

B)  Timeline 17, 18-A, 18-B and 18-C October 27th and 28th ,2025 and Exhibit L, C1 and G The Ombudsman does not report that a Case Manager E Quits and tells a blind resident that she is going to cause all kind of trouble for the facility, and take resident files. She breaks in the next day after her key fob is dismantled. The investigations and video show she comes in the next day, breaks into the facility destroys resident's information (HIPPA VIOLATION) and takes resident information. She did not share that on her 4th report.

C)  Timeline #19 September 17,2025. Then Timeline 17,18 A, B, and C1 Then Timeline #24 November 10, 2025 Her Third report to the court is good. She states the clinical and

administrative team are committed to resident care and program completion. Her change came after the incident with the case manager (C) that occurred on October 27 and 28, 2025. Timeline #24. November 10, 2025, she files a completely different report in with negativity. Requesting no extension be granted and a CRO be appointed. This is when the Ombudsman really takes a turn of bias and listening to gossip and not properly vetting facts. Be weaponized by disruptive employees against the CEO.  She does not report the facts seen on the video of the incident, but after the Case manager(C)calls in OHFLAC, the Ombudsman work with them, to target the CEO. Neither does OHFLAC who the person making decisions is named in a lawsuit (which is a conflict of interest) nor the ombudsman state anything in their reports about Case manager breaking in and Violating HIPPA

D)  Timeline## 24- A November 10th, 2025 Her November 10th hearing do deny an extension. She states besides her encouragement for substantive movement in the chapter 11 the efforts, the debtor has not taken substantive actions. The debtor did take substantive actions, creating a six months program that would start bringing the census up, in which it did. See Exhibit P. We also got a very crucial Joint Commission Certification in that was now required by the state. This denotes the Gold standard in care Quality. She did not report on the achievements because of her bias to the certain employees against the CEO and it would not fit her narrative.

E)  Timeline # 24-C November 10,2025- The Ombudsman says that under information and belief stating that my board consists of My sister (WV Law allows) my pastor, which is untrue, (He is a deacon of a church, but not mine), and my Pastors wife, which is untrue (the other women is married and lives in Florida, she was an original board member) and The employee who we use for her accounting skills and knowledge. The Ombudsman is now using malicious fabricated information to harm the CEO and her efforts for an extension. I know hearsay does not have as much weight on the court, but it was put on the record to add

negativity. All she had to do was ask me, the CEO. She was making allegations of the integrity of the board with no evidence. Our board is a Christian organization and we ethically follow our bylaws and conflict of interest policies. Everyone is always encouraged to think for themselves and many times they have.

F)  Timeline # 24-D November 10th. 2025. She states staffing issues and reverts back to the hearing of the PCO. She is speaking of the two witnesses Sarah Dean and Robert Boles. The two people I just filed a complaint against for lying under oath and being unethical. It is hard to find staff, good staff and everyone is experiencing that as you will see in the timeline. She was not there at the hearing. Retaliatory testimony put weight upon this court. She is pulling out everything to damage the CEO and the Board of Directors.

G)  Timeline # 25 November 17th, 2025. The Patient Care Ombudsman's fourth report to the court. Continued negative report based on information and not verified with the CEO. She continues with her bias purposely targeted reports.

H)  Timeline #25 -A November 17th, 2025. Exhibit G, L and C1. The Ombudsman states that the Case Manager (C) was fired, the others were carrying the load is unsustainable soon.

It had been a little over two weeks and I believe we might have been interviewing or the new case manager was already hired. Even when you hire someone it takes time for then to give their two weeks' notice to their other employee. We had just separated from a case-manager that was not doing some of her discharges and saying inappropriate things to residents, violated HIPPA. See exhibits L, C1, and G. See the Investigation report that was done prior to this report, that she had access to and was aware of.

The Ombudsman did not report on the case manager (C), because this person was giving false information to cause problems as she stated she would to the resident in the

investigation report. Her being gone was a positive for the residents. No reports on this case managers (C) actions were reported in her November 17th fourth report. Again serious matters were not reported, that the CEO was trying to as a part of Recon Structuring, trying to deal with uncompliant and unprofessional staff, that was harming the residents. Her interfering with bias reports and covering facts on the clinical staff, was causing a toxic environment.

I) Timeline # 25 -B November 17th, 2025. Exhibit G, I and C1. Ombudsman states a possible HIPPA Violation by the CEO. Posting things about a former resident on Facebook. This is a classic case of her being impartial and hiding information. The CEO did not speak about a resident. The resident stated she was at Serenity Hills and got kicked out first. The Ombudsman says possible. Then why mention something about a former resident, when she covered up for an actual HIPPA Violation by the former Case Manager (C) and that she knew about. As previously mentioned she took residents files when she left and neither the ombudsman or OHFLAC mentioned it. (This is all on camera) Because both were targeting the CEO at this point.

J) Timeline# 25-C November 17th 2025. Exhibits E, B, and Q pg. 6 Paragraph 6. The Ombudsman states that Graduation may be extended by the CEO even after approval has been granted by the treatment team. There was no evidence of this and the CEO was not questioned about this accusation. Then it went before the court as though the CEO may be doing this. I believe this came from the case manager(C) that was no longer there and stated she would start trouble and her friend Counselor (A) that would eventually be fired for repeating this same accusation to clients along with other unprofessional things that harmed residents. You will see in exhibit E and B that the treatment made those decisions, but ultimately the insurance company made the decision if it was medically necessary for longer stay. If it was court ordered they would sometimes grant longer stay. (Exhibit Q pg. 6

paragraph 6.) In this exhibit at a court hearing of the resident S W. Serenity Hills Case Manager (D) (Present case manager) explains to the judge that insurance company makes the decision. The ombudsman spoke to one party over another, accepting the other party over that other complaint as facts, and without speaking to the other person accused. This does not meet the standard of fair and impartial, when it could have easily been proven wrong.  I found out about this after it was filed. I asked the Ombudsman if she could come in to investigate this because I knew it was wrong, and she said she would, but did not. This was a slanderous statement that was untrue and could have easily been disproved. I was quickly learning that the Ombudsman wanted to use her position to create a narrative.


K)   Timeline # 25-D November 17. 2025.Exhibit K1, U, W and V. Intake of residents. The Ombudsman states CEO does not hold a necessary license or accreditation to complete all required assessments. The PCO occasions insufficient information and some medications were misspelled, this can have an impact on the intake, 72 hours period, and the residents over all stay.


The Ombudsman was Listening to the Nursing Department whom I filed a harassment charge against later. The Ombudsman's bias is so obvious that I no longer naively believe otherwise. She was told this from the beginning that I had permission from Keith King the head of the Medicaid sub waiver program to do the referral form and the nurse had to approve the resident after seeing it. I did not need a license and my job description stated referral assistant, not intake specialist. The referral form says Referral Information (Exhibit K1). I spelled Medications how the possible client told me it was spelled. The nurses are supposed to get a list of their medication from jail, detox or rehab prior to them being accepted or them coming in. An example of their erroneous allegations is in Exhibit U, W, and V. The CRO is told I sent in residents that were not accepted. He sent me an email correcting me. I forward the emails showing the acceptance of the residents from the nurse practitioners'

email. I also mention their prior lies being taken to the courts and being unlawful.

The nurses do the intake when they come in (That is law), they should have their true med list before they come in. This was an example of nurses not doing their jobs and blaming it on me and Maliciously fabricating information to the willing Ombudsman who was biased. The Ombudsman never ask me about any of this, prior to presenting it to the court.

L)   Timeline # 27 A, B, C, Timelines 28, 29, 30, 31, 32, 33, 34. 35. 36 November 26th 2005.Exhibit A, Exhibit C, Exhibit D, and Exhibit H1.

On November 26th The CEO found out Therapist (A) was saying highly improper things to the Residents about the CEO and things about the Bankruptcy. The residents stated it was causing them harm. This was not reported in the December 9th Report. Counselor (A) was telling resident things I believe that the Ombudsman was using before the court that I was holding persons back. Counselor (A) was investigated and found guilty and terminated. The residents had knowledge of the court hearing on November 10th, 2025 and were told the CEO was going to be fired and that the Ombudsman was coming in the next day to fix things. I did not have knowledge I believe of this information. The Therapist and the residents did know. She did show up right after the hearing. Residents Testimony Exhibit C & D Exhibit A, Investigation Report.

The Ombudsman puts in details about the CEO in her report based on one side, but only speaks of an investigation of the counselor in her December 9th report. The results of the investigation Is finished on December 12,2025 finding the Both Counselor (A) and(B) guilty. With counselor (A) being terminated and counselor (B) getting written up. As far as I can see, her 6th report was not filed and there was no report on the harm caused to the residents by Therapist A and B. I believe from what the residents stated. This was one

of her Maliciously fabricated sources of the CEO holding persons back. I believe the Ombudsman purposely held back that six report because it is not filed. This was to protect the Counselor (A) and herself because she is named in the Counselor A's investigation.

Timeline #37, 39, 41 and 59. December 3, 2025 The Ombudsman is called to a meeting because an audit is done and the staff have not been doing all their Notes for groups. If this is not done and billed could cause serious compliant issue with Medicaid. This is really serious issues compared to what she was reporting. This also effects the residents care, because it keeps track of how they are doing. I as the CEO am telling them they must get it done and the again, reiterate that on December 15 via group chat in which the CRO is included.  It was pretty bad and she was provided with the list of notes not done. (See Exhibit H1) I was trying to get them in compliancy. She only stated, make sure you do your notes going forward.

Patient Care Ombudsman appointed under a chapter 11 is required to report findings that that clinical staff are failing to complete notes. Especially if that failure impacts patient care. That was not done in either the December 9, 2025 fifth report, the missing sixth report or any other report. This was a cover up of the clinical staff, who she always presented they were doing their jobs, but the CEO was not.

   M) Timeline # 40, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51. Exhibit Y Starts on December 4th.2025 through December 8, 2025.
Counselor (A) who was under investigation at the time, made bodily threats to the CEO. sticking her finger up to the CEO's face for correcting her for taking residents aside privately while under investigation. There were witnesses to the action, as reported to the Sheriff's department. See exhibit Y (restraining order).

The following was provided by staff (A) to a Mental Health Technician (MHT) about what

happened on that day. Counselor (A) bragged to the MHT that the Ombudsman colluded with the nursing department and treatment team and called Lisa from OHFLAC against the CEO. The CEO did not know it was OHFLAC until days later when they arrived. According to OFLAC'S own report they were called on December 4th ,2025 about the CEO, stating she took the girls into a group and yelled and cursed trying to get the residents to tell them who called OHFLAC.  The Ombudsman did not report any of the accusations against the Counselor (A) under investigation. The Ombudsman worked with the Counselor (A) under investigation, who just threatened the CEO, used her position and power to be weaponized against the CEO to protect Counselor (A).

The state of course was not able to find anyone to confirm that particular allegation , because it was not true. They then went on a fishing expedition, because Marie was being targeted. (That will be for a separate motion).

An ombudsman typically attempts to resolve issues internally and directly with the organization before escalating it to a formal state investigation. She did not go to the CEO and ask her about the event. There was no internal investigation done prior. That was not done. The Ombudsman was mentioned in the investigations of Counselor (A). So, it would make sense for her to coverup the incident by trying to continue to defame the CEO, so she would not be taken seriously.

A chapter 11 Ombudsman is generally not allowed to collaborate with staff against another staff members in a way that violates their core mandate, of neutrality. She was guilty of this. All though the argument could be made that she was informing OHFLAC of a matter of concern. She did not try to resolve it internally first. She knew Staff (A) was under investigation for serious actions. She did not report that. This was her once again covering up for Clinical staff and siding with them to cause harm to the CEO. Not reporting It to the court.

The ombudsman actually showed up with OHFLAC to target the CEO and nothing of what the Counselor was doing was mentioned in a report by the Ombudsman and by OHFLAC. It did not fit either of their narratives.

The same day that OHFLAC comes in on December 8th, 2025. I again get a text from the Ombudsman talking about that Counselor (A) not being able to come in after she knew she had threatened me, where resident could see her. Instead of her reporting these disruptive and toxic employees, she still advocated for them and they knew this and it was causing such a contentious situation in the facility. The Ombudsman was causing in my view and review of the situation more harm than good for the residents, the facility and the Reorganization.

N)  Timeline See # 58 December 10 through 12, 2025. Exhibit A, C and D.
The investigation on Counselor (A & B) was completed and Counselors (A) was terminated as recommended by the investigation team and Counselor B was Written up and allowed to stay. The Ombudsman did not report their serious actions and the effect it had on the residents to the court, because there was no reporting from December 9th,2025 through January 30th, 2026. (Report 6 is missing from the docket) This is improper for not reporting every 60 days which is required by law in a chapter 11. She covered up information pertinent to the care of the residents. This was biased and selective reporting.

O) Timeline 52 -A & B. Exhibit R and X. OHFLAC came in on the December 8th, 2025.
They were called on the December 4, 2025. The state does not find the original complaint, but witness said Marie was yelling and screaming. CRO would not let us do an external appeal. A Human Rights committee took place with residents that were there at the time, which stated that Marie did not curse or yell at anyone. CRO was there at the Human Rights Committee and did not offer that to the courts to clear Marie and he had that information. The Ombudsman did not report that to the court of the investigation by the human rights

committee stating that she did not scream at residents, because she was mentioned in Counselor (A) the investigation report. She did not report the harm that Counselor A caused the residents. It did not fit her narrative that the clinical team was doing a good job and the CEO was not.

P) Timeline 57-A, B, C, D. December 9th 2025. Please view The Ombudsman 5th report. See all rebuttals.

The Ombudsman talks about being understaffed, which is important to note but keeping toxic, or staff that is not being compliant is the lesser of two evils. This cost the business more. She did not mention or ask why these two employees were fired. She knew the reasons they were under investigation, The Ombudsman relied totally on the opinions of the Nursing department and clinical team, who at this time were being not compliant themselves with notes, not doing individuals as they should.

She notes that no individual therapy was being done at the time. The investigation shows that Counselor(A) was not seeing residents before the investigations and many of her notes were not done. There was a serious investigation being done and the I, the CEO was trying to root out the problems, which included employees causing harm to the patients and the business. If she would have not been biased, and the staff knew her bias, then I could have led my team.

The 6-month program was being gutted by the Clinical director, and because the CRO was coming in and the Ombudsman was empowering the clinical team by covering up for them ,with her being biased, it empowered them to not follow the program schedule. It Kept the CEO from doing what was needed to get the facility on tract. The CEO had a good program schedule, but it was not being implemented.

All through her December 9 2025 5th report, information provided to her by the nursing department and facts that are simply untrue. please follow the timeline outlined on this to see she is purposely controlling the narrative with facts given by one side, but she is hiding serious problems. The Ombudsman's friendship with the Nurse practitioner has caused total bias.  She has failed to do her duty with dishonest intent.

Bankruptcy Fraud

When a court appointed Ombudsman uses their influence to replace corporate leadership, and files a false or a misleading report to validate the new management that is legally referred as bankruptcy fraud.

The ombudsman had a duty to report to the courts the health and safety of residents. She cannot cherry pick and violate her core mandate of neutrality. Reporting findings that support her desired narrative, while ignoring or suppressing contradictory evidence from the rest of the report. The Ombudsman acts as an officer of the court and the judge relies on her unbiased reports to protect the patients. Breach of Duty/ Misconduct must remain a disinterested person. acting in a retaliatory or targeted manner violates her obligation to the court. I present to the court that she missed her 6th report that was suppose to be filed to the courts from December 9, 2025 to about February 7th 2026. If this was done I apologize to the courts but it was not on the docket.

A) Timeline # 67 February 1st, 2026. Exhibit B1.  A letter from the Utilization Nurse stating that an Audit was done on February 1st reflecting the month of January. It was a very bad fail of an audit and this was reported verbally to the ombudsman and it was sent via email to the nurse practitioner, the CRO, Clinical Director, Medical Biller, and the CEO. It was ordered by the CEO.

This was not reported on by the Ombudsman 6th report, because we cannot find one on the docket. She knew and should have received a copy of the report from the CRO.  Incorrect or lack of clinical documentation, degrades patient safety, compromises care, it is considered a breach of standard of care. For patients in West Virginia, this omission can cause severe consequences across both clinical care and legal. An Ombudsman is legally required to monitor patients care, critical failure in facility documentation, directly compromises the safety and quality care. I was not advised if this was taken care of an would have required another audit. Unfortunately, there was no one in charge monitoring them obviously.

**TimeLine # 69 Ombudsman's Report number 7. Filed March 27th 2026.** Representing a time period between January 30, 2026 to March 27. 2026. See 69- A, B, C, D, E, F, G, H, I, J.

The Ombudsman states that she interviewed the CRO, which I do not think anyone see's much, the trustee, who is there once a week, Residents and staff. The person who is really in charge is the Nurse Practitioner. The CEO whom is the only one who knows how to run all the departments and knew all the rules were not ask questions and was eventually terminated. They relied on keeping the nurse practitioner (Medical Director) happy. Whom both the CRO and the Trustee stated they needed her license. Whom has never worked in a treatment facility prior to working at Serenity Hills, does not know anything about running a business the CRO and the trustee had, no former experience in a drug treatment center.

B)  Timeline 69- B March 27th 2026 Part of Report 7. Exhibit K1.
The Ombudsman states the Trustee continued with intake issues. Incomplete forms, delays in sending assessments to nursing staff, insufficient follow ups to prospective residents.

The previous issues all falsified, but the ombudsman continues her Bias, still without verifying information from the Former CEO. The Trustee relied on the false information

provided by the Nurse Practitioner and the Nursing Director in which I filed a complaint against and was not investigated. False information provided to the trustee and then reported to the courts is Bankruptcy Fraud. I the CEO was in charge of referrals information gathering only, The Ombudsman rubber stamped everything that the Nurse Practitioner and the Nurse Supervisor, which was an abdication of her duty.

The CEO only had forms filled out online and they were always complete. See exhibit K1. That is the only form I had to get information on.  They were sent immediately to the Nursing department via email. No referral was presented paper form to protect myself from false allegations since the CRO was appointed. They were caught in untruths to the CRO see exhibit (U). Email 2/17/2026 sends me and Email sternly correcting me after one of their untruths stating I brought in residents that were not approved. Exhibit (W), Is an Email that I forward showing that the patient is approved. She said was not approved this person and that she sent to detox that did not need it (See exhibit X1) I also address them False information about intakes in the mail stating it is illegal in Exhibit (U). Exhibit (V) is also the email showing the other girl they were claiming was not accepted, was accepted. When I forwarded the email, I put the Ombudsman's name on it.

It actually was the nursing department that started delaying the approvals on purpose, after the hearing prior to the possible trustee. They heard that I stated that I brought in more residents then any referral person. To keep our numbers down, they purposely were delaying approvals. Some were 10 days delayed. I complained to the CRO and he told me to send him the ones that were delayed. I forwarded him a lot of emails that I had sent to the nurses for their approval and they had not answered. They usually will accuse me of what they do. He was overwhelmed with all of the emails and sent this text message.

Text Message from CRO to CEO-Tuesday, February 24th 1:47 pm: If there are any intake referrals that still need answers, please list them in one email. All of these different emails

are hard to follow. I have spoken to Sheila about the need to get answers on all of them ASAP. It looks like she has approved a couple via recent email.

As far as follow up with residents, if the nurses delayed their acceptance, that was the only delays on my side. I took calls 7 days a week and 24 hours a day. This was the Ombudsman creating her narrative without all the facts purposely and carelessly.

C) Timeline # 69 -C. Report 7 continues. Exhibit S pg. 3 Under resident issues & needs # 2 The Debtor Implemented a new system and continues to make steady progress on resident supplies.

As you will see at the Quality Assurance Committee meeting, (Exhibit S page 3) we were never without supplies, except Q tips once. If his new system is a steady progress, it sounds like she is sugar coating the words for it not going well.

D) Timeline # 69-D the Ombudsman states that counseling needs. new Therapist hired and started in Mid-January has an ongoing positive impact on the recovery.

I just want to be clear that this hire was from myself, the former CEO. The therapist would tell you that. I hired her in mid-December actually and she had to give a month notice to her former employer, so she came in Mid-January. I also hired the new case manager that is as well. I believe the Ombudsman is trying to give the credit to the CRO's appointment.

E) Timeline 69-E,70-B, D, F, G, I The CRO following the hearing had revised the grievance process. Who furnishes copies for her to review. Recent substantial number of grievances related to a 24-hour window is currently conducting an internal investigation.

This is a very important issue. She had gotten complaints given to her as told to me by

the CRO. I had seen the complaints because they were addressed to Will (CRO), but given to me to open and then they were scanned into the accountant's computer and then she would send them to the CRO.

*Complaints she received and did not mention in her report.

Timeline # 70-B 2/10/2026 Resident J. C. Made a formal complaint against the Medical Director for taking her off a medicine that was making her angry. Telling her that she was going to do a gene test to see which medicines work best for her, after waiting and being on no medication at all for a while, and getting writeups, because she needed medications. When she asks the nurse after waiting, the nurse turned around and put her back on the same medicine that made her feel angry to begin with. After the grievance it was taken care of but should have been investigated and was not. This was an ongoing situation. When I was CEO it would be taken care of, because she would not listen to residents about what was their concerns and if she did it was many times delayed. Missing from her report number 7. OHFLAC should have been called.

Timeline # 70-D 2/18/2026. Resident WB made a formal complaint for being humiliated and told if she did not get a bath, they would send someone in with her to make sure she got a bath. She states that she was yelled at and intimidated. There should have been an investigation and there were not. The Ombudsman received this complaint. OHFLAC should have been notified. Missing from her Report Number 7.

Timeline # 70-E 2/19/2026 Resident WB stating the clinical Director was mentioned cursing at her and humiliating her. She circles psychological abuse. No investigation was done. The Ombudsman new about it. OHFLAC should have been notified. She did not report it to the court in her 7th Report or notify OHFLAC

**Timeline # 70- F. 2/19/2026 The CEO calls the CRO in concern for this resident WB, because he states they are going to kick her out which is not right after a complaint. I ask him to call the Keith king the Sub waiver program. He tells me he calls Keith King and is told maybe she needs a higher level of care. I find out she was put back in jail. Ombudsman did not follow up with this resident. Like she said she talk to former residents about other issues.**

**Here is the text message that follows**
**2/20/2026 12:30 pm -Text message from the CEO to the CRO. I thought you stated you were told she needed to go to a higher level of care. Was jail what you meant. This girl has the mentality of a child. I am concerned that we did not do our duty of care to make sure she went where she needed to go.**

**I get no answer from the CRO.**

**The Ombudsman should have reported this, a complaint was made, no formal investigation, then she was kicked out. That looked like retaliation. She did not report this to the courts because it did not fit her narrative.**

**Timeline # 70-I March 27,2025 and about a week before.**
**Resident S C states she wrote a complaint about the Case Manager being rude and laughing at her concerning their discussions about her concerns. They told her that her complaint was lost. Why did they not get her to write another one? I am told that she did not want to make the clinical team mad.**

**S C's Mother Deana Simmons called me and related that her daughter told her that the Ombudsman came in and there were a lot of complaints and that she told her of her**

complaints and she never heard anything.  Deana Simmons her mother gave me permission to relay this information via text. Her mother said that her daughter is willing to state these facts to the court if needed.

Timeline # 70 -K on April 16th, 2026. Exhibit Q. S C went to court and she had 4 good letters and the Case Manager that she complained about gave her a bad report and she ended back in jail. See the exhibit Q and please read timeline # 70 k. She reported this to the Ombudsman on March 27, 2026 when she was there.  if investigated and properly addressed this might not have happened.

Time line 70-J   Exhibit G1 This was in January or February.
Resident A H was serious about her recovery and she never had any write ups. Early on when she requested a bed at our Sober Living House, she was accepted. This was her home plan for a long time? That was our protocol, that if they did well that we did not discriminate unless they did not meet the criteria of the residential hand book.  For no reason that anyone is aware of, the nurse practioner (Medical Director) told the House Manager that A H could not go to the Sober Living House. This broke this girls' heart and the organization that sent her there were upset and confused as I, the CEO was.  The CRO who was allowing the Nurse Practitioner (Medical Director) to run the show even the Sober House, which was never under Serenity Hills. See the exhibit letter G1. From the organization that sent her there and her disappointment and concern about sending anyone to Serenity Hills again.

### The Ombudsman's Conclusion of her Seventh Report

F)  Timeline # 69-F the Ombudsman state at the end of her 7 th Report. That the trustee has brought stability, fostered a sense of impartiality, and inspired the staff members to communicate more effectively, residents feel heard and improved outcomes. Atmosphere within the facility is more positive.

**Conclusion to This Motion**

I will answer her last statement of her report on the wonderful state of Serenity Hills Life Center with actual facts and a summary of what I have presented to the courts.
I will reiterate that it is my belief that the Ombudsman mislead this court through out her tenure because of her bias relationship with Medical Director, clinical staff, and on occasions colluding with current and former staff against the former CEO and the Corporate Body to put them in a bad light. Often working with OHFLAC (That we are in a lawsuit with) that was also targeting the CEO, to further cause damage. Using her influence to replace the Corporate leadership and now validate the new management with false and misleading reports.

As you can see as she is painting a picture of both the CRO and now Trustees as though they have saved the day. The Nurse practitioner is the one truly in charge and they listen to everything she wants. The only things that is different at Serenity Hills is that all parties have empowered the Medical Director to be in charge, in which she desired. I believe this is the reason for all of her false reports against the CEO. The CRO is hardly there if ever. The Trustee comes in once a week. The Trustee always gave her what she wanted. Even though the medical director has more knowledge of the facility, then them both, she has only been in a treatment center for two years and did not know all the compliance aspects of the different departments she is in charge of.

They have not changed anything.

- The census was down to 32 at the time of her report. I think we averaged 40 at the time of the hearing for a trustee. She does not state that is because of a lot of women getting kicked out. We went from I believe 40 to 32 in a week because of this. All at once the census is not important. When she told the CEO that I should be at 40.

- A new stove has not been purchased and it was on its last leg a long time ago as she mentioned as a problem in the past. She does not mention that now.

- She does mention that there is no new dryer that is needed as she did in the past. Is this no longer a problem since the CEO is not there?

- She states the new system of purchasing residents' products are progressing. When according to the human right committee meeting on her allegations. We had no problem.

- The ombudsman speaks of a new complaints method that is in place now. The actual problems that the ombudsman is being told by patients is not being reported. Nor are the written grievances that she receives. They are not being heard and she is purposely hiding facts that effects the residents to the court and the actual conditions on the ground.

- The clinical staff who she states are positive are not being monitored for compliance as far as I seen from December to March. Every audit I asked for, they were uncompliant. I could not see if it was corrected because I was not informed. The CRO had told the Utilization nurse, not to do the audit anymore, I had seen the CRO believe them with no evidence and cover wrongs.

- According to S C, there were a lot of complaints to the ombudsman and she does not mention that in her report, instead she says they feel heard and have improved outcomes. I would not say being kicked of the program is good outcomes. I would not say not reporting their complaints is being heard. She falsely and purposely frauds the court with a report she knows is not accurate.

- Residents who had problems with getting their meds and complained, would come to me. I stated for them to file a complaint and they said Marie this has been going on for a long time with a lot of residence. The one girl said nothing ever gets done and that she was leaving in a week.

- In reality there are staff that are frightened to speak up in fear of retaliation. They are in recovery and this is their jobs.  Some their first jobs ever. Timeline 70 exhibit L. Where an MHT because she said a resident was doing well, was not allowed to drive her to court any more, according to the resident. (we do not want retaliation on a staff member) When I was on leave and trying to call HR, the receptionist was afraid

to answer the phone if it was me, because she might be fired. She had someone send me a text to tell me that. Women who worked there to this day know the Nurse practitioner dislikes me and are afraid to talk to me, because they might be fired. Some of these women are ones that wrote letters to the court on how I affected their lives in a positive way. A resident SC told her mother that they are trying to push Ms. Marie out, is what she was told and she is the only one that cares about us.

- If the taxes are paid or there is extra money that has come in, that is due to our continuous grant money that was due to come in that I secured.

- Insurances I heard are being paid now on time after I spoke with them after Christmas. Which was our biggest problem.

I pray that as the founder of Serenity Hills Life Center, but now as a pro se creditor, and for my love for this mission, that you will see with no blind eyes, what has been done. I have worked hard to try to bring clarity to a web of deception. I hope your honor, that I have done so and you grant my requests.

Sincerely,

Sharon Travis

TIMELINE

1. **May 5th 2025 9:36 Am Email from Deborah Fish to Sharon "Marie" Travis.**

Thank you. I hope the new staff starting today all work out. I know you have a lot going on right now, a gentle reminder- organization, delegation. and a new (I know it has to be the right) intake person will allow you the time to do for H2H what you do best.

2. **May 17th 2025 10:05 Text Messages**

From Deborah Fish to Sharon Travis- is a long text – To sum it up- she says she is coming in for the weekend an she asks about security locking system, she ask if it is fix.

Sharon Travis to Deborah Fish-No he has not, but the contract is signed.

Deborah Fish to Sharon Travis- No problem, I reported the contract was signed. That is the best we can do.

3. **May 18th ,2025 5:52 pm Text Message**

Deborah Fish to Sharon Travis

I was at the facility today. Everything was good.

4. **May 18, 2026 703pm text message**

Sharon Travis to Deborah Fish

Awe that makes me happy.

5. **June 20th 2025 3:44 pm Email from Deborah Fish to Sharon Travis with an attachment Exhibit M Email exhibit D1**

She starts, out with an email stating how wonderful I am, then she attaches an out line telling me how to run the business and What not to do, which includes things being said by the nurse department of things I am doing as management and things I am being accused of that is not happening. Already advocating for staff that is outside of her scope. She firs starts out with the email below, then read Attachment M:

Marie, let me start by saying your passion for Serenity Hills Life Center is second to none. It is clear you care about the women served and Serenity Hills. I know you have a vision about the future, the first steps to make the vision come to fruition is the reorganization of the business. In my Ombudsman role I am required to make requests, provide recommendations and guidance on behalf of the residents to improve the quality of care and move the bankruptcy case forward towards completion. Based on my experience, work, and time in this case I believe it would be helpful for you to have a refined role and list of action and take no action items to make it easier for you to organize your day, focus on reorganization, and

improve the quality of care. I understand reorganization process can be daunting and the debtor is making some process, we agree SH needs more admissions and to hire one or two additional therapists. Additionally, I strongly suggest that you hire an intake person or find a way to use Therapist C who is already on staff to takeover that role until you can hire a full-time person. From operational side those three hires are key along with improvements that are underway in the clinical/treatment side, I agree with you the current staff have the best interest of the residents and the facility at heart. They are all working hard to fill in until you can add staff. Hoping the working outlines helps. Both you and your council may have additions and comments to make it better, I am open to any discussions and/or comments that will improve your goal of growing the company by adding services and resources to impact the lives of more women who need the services provided by Serenity Hills.

6. <u>July 25th,2025 Counselor B verbal conversations made a complaint against the Clinical Director</u>.

The Clinical Director had told Counselor B to get out of the Case Manager office. They had got into an argument and he told her to get out of the building. I was told it got really loud and residents could hear it.

Counselor B had told me what happened and I told her that I would talk to him. I told her that is she wanted a formal investigation that I would proceed. I gave this information to the Ombudsman.

I spoke to the clinical director and told him that this was unacceptable.

7. <u>Aug 1, 2025 8:40 Email Exhibit E1 from Ombudsman to Sharon" Marie" Travis</u>

Mare, what is the status on the complaint you reported last Friday. Who was assigned and how was it resolved.

8. <u>August 2, 2025 8:40 am Email Exhibit F1 from Sharon Travis to Ombudsman</u>

We wanted to do the investigation and she said she did not want it done and she said she thought she had to fill in one of the boxes. I told her that I had to get a paper having her stating that. I had an emergency at home will get done unless you think I should not continue.

9. <u>August 15th 2025 11:55 am Email from Deborah Fish to Sharon" Marie" Travis</u>

Did you hear from Mr. King about what Travis can and cannot do? Is he able to do groups? If so, which ones. Did you hire a new therapist? What is the status?

10. <u>SEPTEMBER 17th – PERIODS JULY 15TH THROUGH SEPTEMBER 17th 2025 NOTICE OF FILING OF PATIENT CARE OMBUDMAN'S THIRD REPORT PURSUANT TO BANKRUPTY CODE SECTION 333</u>
   - States that we are getting Joint Commission Certified.
   - She states patient care has been maintained and is not materially compromised.

- Debtor is responsive to my communications and provided access to employees
- I find that clinical and administrative teams remain committed to resident care and program completion.

### 11. September 18th. 2025 11:31 am Email

Marie, I checking on intake. how are you doing bumping up the new numbers?

### 12. September 23rd, 2025 12:02 pm Email from Deborah Fish to Sharon Travis

Marie, When I was at the facility, we discussed raising the census, we discussed increasing the census especially given the split of 3.5 and 3.1 residents and the fact that at least 6 residents were about to graduate. As of today, there are only 31 residents. We also discussed with the new staff the resident number could substantially increase. You did a great job hiring the staff necessary to work with these residents and now it's time to increase the number of residents. It appears to me, based on our prior census level and staffing. That the facility could maintain 40 and maybe 42 residents. A commitment to maintaining 40 to 42 is a full-time job and it is my recommendation that the facility hire a fulltime intake person. I'm sure I sound like a broken record as I have raised this every month as a issue Marie, you have a lot to do as a CEO and those responsibilities will only increase with the added staff and residents. This is not a criticism, no one can do two full time jobs and now more than ever we need residents.

### 13. September 30th, 2025 2:58. Pm Deborah Fish to Sharon "Marie" Travis

Marie, While I generally do not see a benefit in rehashing what was said or not said and especially in this case because we are trying to move forward to obtain a JACO certification (Mandated by the state by 12/31/2025) and a confirmed plan of reorganization. I believe it is necessary to reinstate the facts especially my recommendations to hire n intake person.

I agree with you in august, after the therapist didn't start, I did not think in the it was the best interest of the current residents to increase intakes beyond your current numbers which most of the month were between 29 – 33.

14. *NOTE SHE STATES THAT SHE KNOWS THAT I AM BUSY GETTING JACO CERTIFIED AND BELIEVES I HAVE UNTIL DECEMBER 31st 2025. THAT IS CORRECT FOR THE STATE.  BUT MY JACO INFORMATION DICTATED BY JACO HAD TO BE IN BY OCTOBER, 28th, 2026 THE DAY I WAS ARRESTED AND RELEASED. IF EVERYTHING WAS NOT IN, THE INFORMATION AND CHANGES IN FOR JACO, WE WOULD HAVE BEEN CLOSED BY JANUARY 1st, 2026.
15. * ALSO, I HAD TO COME UP WITH SOMETHING TO SAVE THE BUSINESS WHICH WAS THE SIX-MONTH PROGRAM. I DID NOT KNOW THAT MY TWO NEW THERAPIST AND

CASEMANAGER WOULD MALICIOUSLY FABRICATE THAT I WAS HOLDING PEOPLE BACK. IN WHICH I DO NOT MAKE THAT DECISION. RESIDENTS WERE GIVEN AN OPTION PRIOR ON THERE REFFERAL APPLICATION FOR THE SIX MONTH OR # MONTH. ULTIMATLEY IT IS THE INSURANCE COMPANIES THAT MAKE THAT DECISION BASED ON MEDICAL NECESSITY. IF THERE IS A COURT ORDER INSURANCE COMPANIES WILL SOMETIMES HONOR THIS.

16. <u>October 15th, 2025 Deborah Fish to Sharon "Marie "Travis</u>

Marie I was hoping you are working hard on getting intakes! You need them.

17. <u>OCTOBER 27th, 2025</u> – CEO has meeting with Clinical Director and Nurse practitioner. They have a question for the case manager the CEO goes to ask her. The Case Manager gets mad and starts getting disrespectful. The CEO walks out. She goes back to the Nurse practitioner and states we need to fire her. We were planning to fire her after we found someone because she was missing a lot of discharges. I went back to her office and she was packing her belongings. She starts erasing one of the two calendar white boards and she said this one is mine. That evening residents are upset because they hear her stating that she is leaving and going to cause trouble. We Believe that she has quit.

18. <u>October 28th, 2025 Case Manage Incident</u>

A) Nurse Practitioner S W turns off the case managers access via key fob to the building in the morning. According to Millennium door data, Case Manager M M tries to enter the building the Staff entry door and is denied from 11:39.97 am,11:39.42 am, 11:39.46 am,11:39.49 am. She tries to get in to the front door at 11:40:41 am and it states she is denied access, but it is well known that we have a problem with that door not working and she enters. EXHIBIT L

B) Exhibit G Investigation report of the incident. It shows she erases residents' doctors' appointments and patients scheduled court hearings and other patients' appointments. The CEO tries to push her hand away lightly and then lets her continue, she also takes resident information. She later calls the police on the CEO.

C) Exhibit I & Exhibit C-1- the workforce judge states in his finding on January 16, 2026 that Case manager was not fired, that she quit the day before and that she came in to the building without access, stating to a resident that she was going to cause all kind of problems for the CEO, that her testimony was not credible, and it was not any fault of behalf of the employer.

19. <u>November 6. 2025 OHFLAC is called in from November 6 – 13 2025 State Investigation</u>.

20. *Note First I would Like to say and the court is aware that the person who makes all the decisions for OHFLAC at this time is named in a lawsuit by Serenity Hills Life Center. There is a complaint going to be filed for possible violating conflict of interest rules with OIG and The West Virginia Ethics Commission. The same type of accusation was made before that were brought on during the closing. They were found not true and residents came and testified. One resident stated that they only ask questions to the friends of the girl that made the complain as though they were targeting person that would say negative things about the facility. Also, the counselor under investigation was their counselor and the tried to influence the resident to sign a petition on her behalf so she would not get fired. See investigation EXIBIT G. Girls were also upset that they could not talk to their boyfriends and this Therapist would encourage them to rebel. I was not on the ground at the facility much any more so these ladies did not know me personally.

21. *Note Also, we can certainly presume that the person involved in this complaint was the case manager from the October 28th that just she stated she was going to cause trouble to the blind resident and others heard her say she was going to get the place shut down. This was also confirmed in his belief by the workforce judge. Exhibit I and C1

22. OFLAC Findings
a) Their investigation concludes-A visually impaired women and a woman in a wheel chair and the blind women's' needs were not being met. She states that the items that she requested she had not received, Brooks, Braille and a walking stick.

*REBUTTAL WITH FACT: They women in the wheel chair chose to be in the Wheel Chair she could walk and no one was told prior to her coming that she was in a wheelchair. The blind women were told by the facility to the nurses that she was independent, because they called.*

b) The girl in a wheel chair could not climb the steps and could not participate in the emergency drills, that she could not go downstairs for visits and that she was told there was an elevator.

*REBUTTAL WITH FACTS: The women in the wheel chair got out of her wheelchair to climb stairs to go on visits downstairs and also through are emergency drill. We did not know she was going to be in a wheel chair prior to coming. I was told she wanted to get in it later*

*because her hips hurt. If I did not know she was in a wheel chair why would I say we had an elevator. She never mentioned being misinformed before.*

c) The facility did not have ramps and was not handicap accessible.

*REBUTTAL WITH FACTS: WE HAVE BEEN OPEN SINCE 2019. WE HAD TO BE HANDICAP CLEARED TO OPEN. OR WE COULD NOT HAVE OPENED. WE DO NOT NEED RAMPS BECAUSE THE SIDEWALK COMES UP TO THE DOORS.*

d) Registered Nurse Supervisor confirmed that they did not know about the person in a wheelchair and the blind girl before they came in.

*REBUTTAL OF FACTS:  ALL RESIDENTS ARE ACCEPTED TO COME IN BY THE NURSES AND THIS IS NOT A FACTUAL STATEMENT. THIS IS A PART OF THE ON GOING UNFACTUAL STATEMENTS TO TAKE THE BLAME OFF OF NURSING. THE PLACE THE BLIND GIRL CAME FROM TOLD THEM THAT SHE WAS ABLE TO TAKE CARE OF HERSELF. WE CAN GET THAT FROM THE PRIOR FACILITY IF NEEDED. NO ONE KNEW ABOUT THE GIRL IN THE WHEEL CHAIR> I DO NOT KNOW IF SHE WAS IN ONE WHEN SHE CAME IN.*

e) A consumer stated Marie called a meeting to tell them that the state was coming in and that she told them to tell them she was a nice person and that the CEO was not aggressive. Consumer stated that another consumer said that the CEO shoved the Case manager and that the police came in and triggered her.

*REBUTTAL OF FACTS: THERE WAS A MEETING WITH STAFF ABOUT THE INCIDENT. IT WAS THE COUNSELORS THAT MET WITH THE RESIDENTS NOT THE CEO. THIS IS A TOTALLY UNTRUE FACT.*

f) The CEO being arrested had a negative effect on her recovery and stated others did also.

*REBUTTAL OF FACTS: THE CASE MANAGER (E), IS THE ONE THAT QUIT THE DAY BEFORE AND BROKE INTO THE FACILITY, TOLD RESIDENTS SHE WOULD START TROUBLE, DESTROYED BUSINESS PROPERTY AND THEN MADE FALSE ALLEGATIONS (SEE EXHIBIT G & I) CASE MANAGER (E) IS THE ONE THAT BROUGHT IN LAW ENFORCEMENT.*

g) Staff -Mental Health Counselor stated that the residents do not feel safe at this time because of the CEO.

*REBUTTAL OF FACTS: I BELIEVE THIS STATEMENTS WERE MADE BY THE EITHER COUNSELOR A OR B THAT WERE HER GOOD FRIENDS THE CASE MANAGER. THEY LATER CAME UNDER INVESTIGATIONS FOR HARMING RESIDENTS. ONE WAS FIRED AND THE OTHER GIVEN ANOTHER CHANCE. I DO NOT BELIEVE THEY WERE CREDIBLE WITNESS.*

h) Stating a Facebook page stating the CEO addressed a resident stay on Facebook, which they believe was a HIPPA violation.

*REBUTTAL OF FACTS: THE FORMER RESIDENT ONLINE ALREADY STATED THAT SHE WAS AT SERENITY HILLS LIFE CENTER. IT WAS A BRIEF CONVERSATION. I DID NOT SPEAK ABOUT ANY KNOWLEDGE I HAD ABOUT THE RESIDENT.*

23. *NOTE THE OHFLAC SURVEYORS WERE TOLD THAT THE CASE MANAGER (E), HAD TAKEN INFORMATION WITH THE RESIDENTS NAME OUT OF THE BUILDING THE VIDEO OF THE INCIDENT WAS CLEAR. NO MENTION IN THEIR REPORTOF THE TRUE HIPPA VIOLATION OR SAYING THINGS THAT UPSET THE RESIDENTS.

24. November 10th, 2026 OBJECTION AND RESPONSE OF PATIENT CARE OMBUDSMAN TO THE DEBTOR" SECOND MOTION TO EXTEND EXCLUSIVITY PERIOD FOR THE CONFIRMATION OF A PLAN OF REORGANIZATION.

    Page 2 "6 The Ombudsman states:

    A) PCO has worked in good faith since her appointment to encourage substantive movement in the chapter 11 case, however, those efforts have not resulted in the Debtor taking all substantive action necessary to address the Debtor's obstacles in the Chapter 11 Case. She also talks about the in #12 on her report on the need for the census to increase and her reported calls on the census to increase.

*REBUTTAL OF FACTS: ON TIME LINE # 10 THE SEPTEMBER 17TH 2025 REPORT THERE WAS POSITIVE REVIEWS FROM THE OMBUDSMAN. THE ONLY THING SHE HAS STATED CONSISTANTLY IS TO GET A NEW INTAKE. WE COULD NOT AFFORD ONE. I HAD PUT A NEW PROGRAM IN PLAY AND I HAD TO BE JOINT COMMISION CERTIFIED BY OCTOBER 28th, 2025. THE CENSUS DID GO DOWN, BUT A NEW 6 MONTH PLAN WAS PUT IN PLACE EXHIBIT P SHOWS THAT THE CENSUS STARTED INCREASING. HIRING A NEW INTAKE WAS OUTSIDE OF HER SCOPE OF PRACTICE.*

    A) PCO suggest that the appointment of a CRO is necessary to achieve successful reorganization in this case. Currently the creditors remain inactive, and it remains there is no accountability to the Board of Directors.

*REBUTTAL The OF FACTS: THERE WAS NO PROOF THAT WAS PUT BEFORE THE COURT THAT AN CRO WAS NEEDED. I HAD A NEW SIX-MONTH PROGRAM IN THAT WAS GOING TO START INCREASING RESIDENTS. SHE NEW THE JACO CERTIFICATION WAS FINISHED AND GOT CERTIFIED. PROGRESS WAS BEING MADE. WHAT TURNED HER ATTITUDE AGAINST MANAGEMENT WAS THE INCIDENT AT THE FACILITY, THAT WENT INTO THE PAPER. THAT I WAS NOT PROVEN GUILTY OF ANYTHING. WORFORCE JUDGE STATES WE DID NOTHING WRONG.*

B) Upon information and belief, the Board consist of CEO, her sister, her pastor and her pastor's wife an employee of the Debtor. The PCO questions the independence of the Board of Directors.

REBUTTAL OF FACTS:  YES, MY SISTER WAS ON THE BOARD (WV LAWS ALLOW THIS), BUT MY PASTOR WAS NOT ON THE BOARD (THE MAN WAS A DEACON AT A CHURCH BUT NOT MINE) THE OTHER WOMEN LIVED IN FLORIDA AND IS MARRIED. SHE USE TO LIVE IN WHEELING AND WAS AN ONE OF OUR ORIGINAL BOARD MEMBERS. THE OTHER PERSON DID WORK FOR US BECAUSE SHE HAD ACCOUNTING EXPERIENCE. THE OMBUDMAN TOOK MALICIOUS FABRICATION FROM A THIRD PARTY AND MADE IT A PART OF THE RECORD.

MAKING ALLEGATIONS OF THE INTEGRITY OF THE BOARD WITH NO EVIDENCE. OUR BOARD IS A CHRISTIAN ORGANIZATION AND WE ETHICALLY FOLLOW OUR BYLAWS AND CONFLICT OF INTEREST POLICIES. THEY WERE ALWAYS ENCOURAGED TO THINK FOR THEMSELVES.

C) Page 6 line 1 and 2 she states staffing issues and reverts back to the hearing on the PCO.

REBUTTAL OF FACTS: THE TWO INDIVIDUALS THAT SHE IS SPEAKING OF IS SARAH DEAN AND ROBERT BOLES. SHE HAD STATED TO ME THAT SHE HAD SPOKEN TO FORMER EMPLOYEES. AS THE COURTS HAVE SEEN I RECENTLY FILED MOTIONS TO STRIKE THEIR TESTIMONY FROM THE RECORD. ONE FOR LYING UNDER OATH AND THE OTHER FOR ETHICS, BOTH ARE RETALIATION. THEIR TESTIMOMY HAS HAD UNFAIR WEIGHT UPON THIS COURT.

25. NOVEMBER 17 2025, NOTICE OF FILING OF PATIENT CARE OMBUDSMAN" S FOURTH REPORT PURSUANT TO BANCRUTY CODE SECTION for period September 17, 2025 through November 17,2025

A) She reported that the case manager was fired, while the others were carrying the load it was un sustainable soon.

REBUTTAL OF FACTS: Exhibit I - the workforce judge states that Case manager was not fired, that she quit the day before and that she came in to the building without access, stating to a resident that she was going to cause all kind of problems for the CEO, that her testimony was not credible, and it was not any fault of behalf of the employer. There actually is no law that, that you have to replace them.

B) Possible HIPPA Violation Potential. Posting things about a resident on Facebook.

*REBUTTAL OF FACTS: THE OMBUDSMAN DID NOT REPORT ON THE CASE MANAGER E WHO HAD ACTUALLY VIOLATED HIPPA AS VIDEO EVIDENCE SHOWED. THE FORMER RESIDENT HAD POSTED THAT SHE GOT KICKED OUT AND WAS EXPRESSING HER ANGER. YES, THE CEO DID RESPOND BUT SHE NEVER REVEALED HER TIME THERE. STATING POSSIBLE HIPPA VIOLATIONS WITHOUT FACTS IN NOT FAIR AND NOT REPORTING ON AN ACTUAL VIOLATION WAS BIASED AND CONCEALING EVIDENCE.*

C) Resident the CEO Graduates may be extended by the CEO even after approval has been granted by the treatment team.

REBUTTAL OF FACTS: THERE IS NO EVIDENCE OF THIS ACCUSATION AND ACTUALLY THIS WAS A MALICIOUS FABRICATION FROM EMPLOYEES, THAT WE LATER HAD TO INVESTIGATE. THE INVESTIGATORS FOUND OUT THAT THEY WERE MALICIOUSLY FABRICATING THIS AND TELLING RESIDENTS THE SAME. WHEN SHARON TRAVIS ASK THE OMBUDSMAN INVESTIGATE THOROUGHLY AFTER THE HEARING, ABOU THESE ACCUSATIONS SHE STATED SHE WOULD AND DID NOT. SEE EXHIBIT E AND B SHOWING EMAILS FROM THE TREATMENT TEAM AND THEM GIVING REASONS FOR HOLDING RESIDENTS BACK. EXHIBIT Q Pg. 6 Paragraph 6 IS A NEWSPAPER ARTICLE ABOUT A RESIDENT IN COURT THAT IS A SERENITY HILLS AND A JUDGE AS THE CASE MANAGER (F) ABOUT THE LENGTH OF STAY AND SHE SAYS IT IS THE INSURANCE COMPANY THAT MAKES THAT DECISION. SHE IS A PART OF THE TREATMENT TEAM.

THE OMBUDSMAN DID NOT QUESTION ME ABOUT THIS. WHERE THE OMBUDSMAN SPOKE TO ONE PARTY OVER THE OTHER AND ACCEPTING THEIR COMPLAINTS ABOUT ANOTHER AS FACTS IS NOT CONSIDERED IMPARTIAL.  IN A FAIR INVESTIGATION, TO MEET THE STANDARD OF A FAIR INVESTIGATION, IT IS STANDARD TO ALLOW THE ACCUSED AN OPPORTUNITY TO RESPOND. LATER IN THIS I PRAY THAT YOU SEE COLLUTION AND BIASED EVIDENCE IS SHOWN.

D) Intake of residents. The CEO does not hold a necessary license or accreditation to complete all required assessments. The PCO occasions sufficient information and some medications were misspelled, this can have an impact on the intake, 72 hours period, and the residents over all stay.

*REBUTTAL OF FACTS: FIRST, I WILL SAY THAT I WAS TOLD BY KEITH KING, THE HEAD OF THE SUBWAIVER I WAS ABLE TO GATHER THE REFERRAL INFORMATION. THE OMBUDSMAN WAS TOLD THIS. I WAS NOT AN INTAKE PERSON, I WAS A REFERRAL ASSISTANT. ALL I DID WAS GATHER INFORMATION. AS FAR AS IF THERE WAS MISSPELLING OF MEDICATION, THAT CAME FROM CLIENT FROM JAIL. IT WAS NOT MY JOB TO SPELL A MEDICATION. IT WAS THE JOB OF THE NURSES TO CALL THE JAILS AND GET A LIST OF THEIR MEDICATIONS, PRIOR TO ACCEPTING THEM.  THE NURSE PRACTITIONER WOULD SIGN A PAPER ACCEPTING THE*

*POTENTIAL RESIDENT OR AT THE END IT WAS DONE BY EMAIL. I DID THIS SO SHE COULD NOT SAY SHE DID NOT ACCEPT THEM. THIS IS MALICIOUS FABRICATIONS FROM A NURSING STAFF THAT THE OMBUDSMAD WAS FRIENDS WITH. SHE BELIEVED EVERYTHING THE NURSE PRACTITIONER AND NURSE SUPERVISOR TOLD HER, WITH NO FOLLOW UP CLARIFICATION FROM ME. THE NURSE WOULD HAVE HER MEDLIST BEFORE THE RESIDENT CAME TO TREATMENT, SO THIS IS A TOTAL FABRICATION THAT IT WOULD AFFECT THEIR FIRST 72 HOURS. OHFLAC WHO I BELIEVE IS TARGETING ME, OHFLAC WHO EVERYONE BELIEVES IS TARGETING ME DOES NOT MENTION THIS IN THEIR REPORT.*

26. **NOTE THE OMBUDMAN KNEW THE CASE MANAGER, HAD TOLD THE RESIDENTS THAT SHE WAS GOING TO CAUSE PROBLEMS, SHE ALSO KNEW THAT THE CASE MANAGER TOOK RESIDENTS INFORMATION OUT OF THE BUILDING AND BROKE INTO THE BUILDING. THIS WAS NEVER MENTIONED TO THE COURTS OR TO OHFLAC**

27. *<u>NOTE ON NOVEMBER 26th 2025</u> I THE CEO, CAME IN TO HELP GET PAPERS FILLED OUT FOR THE RESIDENTS BECAUSE THERE WAS NO CASEMANAGER. A NEW ONE WAS HIRED, BUT SHE WAS IN TRAINING. I WANTED TO GET THE GIRLS PAPERWORK FILLED OUT.AN MHT CALLED ME AN SAID A NEW RESIDENT WANTED TO TALK TO ME. SHE STATED THAT SHE WAS HEARING ALL KIND OF RUMORS LIKE I HOLD PEOPLE BACK. I SAID THAT I HAVE NOTHING TO DO WITH THE LENGTH OF STAY. SHE SAID OTHER THINGS. SHE WAS TOLD THAT I SAID WAS AT MY DAUGHTERS COURT HEARING AND I REALLY WAS AT A BANKRUPSY HEARING AND I WAS GOING TO BE FIRED. THAT THE OMBUSMAN WAS COMING THERE THE NEXT DAY. THERE WERE A LOT OF NEW GIRLS AND I WAS CONCERNED ON WHAT THEY WERE HEARING. I CALLED THEM TOGETHER TO EXPLAIN THESE THINGS WERE NOT TRUE AND GIRLS THAT WERE REALLY HAPPY BEFORE WERE STRESSED BECAUSE OF WHAT WAS BEING SAID TO THEM, BUT THEY WOULD NOT SAY WHO. THEY STATED THAT I WAS MAKING THEM STAY LONGER. I STATED THAT I HAVE NOTHING TO DO WITH THE LENGTH OF STAY. SOME OF THE GIRLS STARTED MOUTHING OFF ABOUT NOT BEING ABLE TO TALK TO THEIR BOYFRIENDS AND I SAID THIS HAS ALWAYS BEEN OUR POLICY. I HAD NOT BEEN AROUND ANY OF THE GIRLS MUCH LIKE I USE TO IN THE PAST BECAUSE I WAS DOING INTAKE. LATER ON, TWO GIRLS TOLD ME THAT IT WAS THE TWO FEMALE THERAPIST. RESIDENTS SAID THAT THIS WAS AFFECTING THEIR RECOVERY AND THAT WE DID NOT NEED TO HEAR ALL OF THIS. I WAS IN SHOCK. YOU CAN SEE BELOW I CALLED THE OMBUDSMAN. (DID NOT YELL AT RESIDENTS) I TOLD HER EVERY THING.*

28. <u>**November 26, 2025 9:31 pm Text message**</u>

Sharon Travis to Deborah Fish – Sharon Travis-I did not mean to call late. buy I was with the patients today and I think I know what is going on. The counselors have been causing problems. I need to talk to you.

Deborah Fish to Sharon Travis- I am available until noon today and between 8-3 Let me know what time works for you.

Sharon Travis to Deborah Fish-Okay this is really important. I have to start an investigation on the two counselors. (Counselor A & B) They have been saying things that are not good. I will have to do an investigation.

29. November 27, 2026 8:43 am  Text Message

I am available until noon today and tomorrow between 8-3.

Deborah Fish to Sharon Travis-Let me know what time works for you. Let me know when. If you plan to commence an investigation let me know who will be in charge of it.

Sharon Travis to Deborah Fish – Ok. It will not be me. I do not do investigations I pick 3 people and give them policies as guidelines.

Deborah Fish to Sharon Travis- Yes, I know. Thank you    .

Sharon Travis to Deborah Fish, I have to move quickly.

Deborah Fish to Sharon Travis- I understand at the same time you have 39 residents that need therapy. You are currently short staffed.

Sharon Travis to Deborah Fish – yes this is serious stuff I know. It is awful.

30. November. 28th, 2025 Friday- texted message

Sharon Travis to Deborah Fish

Are you able to talk? I will commence investigations on Monday. I am meeting with them all this weekend to get all of their information with the POs. I was with them yesterday to help them feel at ease with the program and calm their fears and disclaim false information that has been given to them. You have been caught up in a web of lies and misinformation. Patients are telling things because that is what is told to them. I will get someone on the treatment team that will tell you that I do not make those decisions.

Deborah Fish to Sharon Travis- I am available.

31. * NOTE: I AM UNDERSTANDING WHY OMBUDSMAN STATED THAT FORMER RESIDENT TOLD HER I HELD THEM BACK. IT WAS AT LEAST I KNOW COUNSELOR (A) WAS TELLING THE RESIDENTS THAT. COUNSELOR (A) AND CASE MANAGER A WERE GOOD FRIENDS. I KNOW THAT COUNSELOR B WAS FRIENDS WITH THEM BOTH. I SPOKE WITH DEBORAH FISH AND TOLD HER EVERYTHING.

**32. November 30, 2025 Sunday – text message**

Sharon Travis to Deborah Fish – Ok I need to talk to you

Deborah Fish to Sharon Travis- Now or tomorrow

Sharon Travis to Deborah Fish- I do not Know what is more harmful, firing these women or letting them stay. I have two statements from residents and it is bad. Can you talk.

Deborah Fish to Sharon Travis- Like I said you would immediately have to substantially decrease the census. Yes.

33. *NOTE: I DECIDED FOR THE SAKE OF THE RESIDENTS THAT I WOULD ALLOW THE TWO COUNSELORS A AND B UNDER INVESTIGATIONS TO DO GROUPS ONLY. WE USUALLY SEND THEM HOME FOR SOMETHING THIS SERIOUS, BUT THEY COULD DO GROUPS AND NO INDIVIDUALS. THEY COULD NOT SPEAK TO THE RESIDENTS PRIVATELY. WE PUT AN MHT IN THE GROUP TO MAKE SURE THAT NOTHING INNAPROPRIATE WAS SAID.*

**34. December 3rd, 2026 1:53 pm Wednesday – text messages**

Deborah Fish to Sharon Travis -Are you available to talk to Counselor (A) Counselor(B) about individual therapy?

35. *NOTE: DEBORAH FISH WAS ADVOCATING FOR THE COUNSELORS UNDER INVESTIGATION TO DO INDIVIDUAL THERAPY. YOU WILL FIND OUT LATER THAT COUNSELOR (A) WAS NOT DOING HER INDIVIDUAL THERAPY. PRIOR TO THE INVESTIGATION.*

36. *NOTE: DEBORAH FISH KNEW WHAT WAS BEING SAID BY BOTH COUNSELORS (A) AND (B) AND SHE SAID IT WAS UNETHICAL. SHE KNEW HOW HARMFUL IT WAS TO THE RESIDENTS AND THE FACILITY AND SHE DID NOT REPORT THIS TO THE COURT ON HER DECEMBER 9th ,2025 REPORT.EXIBIT A, INVESTIGATION REPORT ON THERAPIST A & B*

37. *NOTE: A MEETING IS CALLED BECAUSE AND AUDIT WAS DONE BY THE UTILIZATION NURSE AND THE CLINICAL STAFF WERE NOT SEEING RESIDENTS AND I THINK SOME TREATMENT PLANS AND NOTES. IT WAS TOTAL LACK OF PATIENT CARE. COUNSELORS (A) UNDER INVESTIGATION LIES AND SAID SHE MET RESIDENTS FOR COUNSELING AND SHE HAD NOT.I HAD DEBORAH FISH THE OMBUDSMAN ON THE CALL AND SHE SAID TO THE STAFF GOING FORWARD DO YOUR NOTES. I SAID NO THIS IS STATE REULATIONS YOU HAVE TO DO NOTES. I TOLD THEM THEY HAD SO MANY DAYS TO GET THEM DONE.*

38. *NOTE: THE OMBUDSMAN DID NOT REPORT THIS FAILURE THAT IMPACTS PATIENT CARE, SAFETY, OR RIGHTS. FAILURE TO DOCUMENT IS A BREACH OF PROFESSIONAL STANDARDARDS AND STATE/FEDERAL REGULATIONS WHICH OMBUDSMANIS ARE TRAINED TO UPHOLD.*

39. <u>December 3rd, 2026 4:43 pm -Wednesday Text message</u>

Sharon Travis to Deborah Fish – You will be shocked tomorrow when you see what Samantha has for you. ( Utilization Nurse)

Sharon Travis to Deborah Fish- Deb are we having a meeting at 12:25

Deborah Fish to Sharon Travis- Yes, I am on the call waiting for everyone to join.

40. <u>December 4th, 2025 Attack by THERAPIST (A)</u>

Counselor (A) is seen talking to a resident individually. Remember during the investigation she was not allowed. I took her aside and told her she was not allowed to do that while the investigation was going on. You will see that in the investigation notes. She got in my face and was threatening me pointing her finger in my face and telling me she was wanting my me up. There was a witnessed that testified to seeing her being aggressive with me. Her hand went in my face and I pushed it away. She then went into the kitchen where she was on the phone telling someone what happened and said she wanted to beat me up. When she seen that persons were in the Kitchen she told them not to say anything. Later statements were recorded to the police by two witnesses and I got a restraining order granted after a hearing.

41. NOTE: THE OMBUDSMAN DID NOT REPORT THE FAILURE TO DOCUMENT CLINICAL NOTES.  CLINICAL NOTES DIRECTLY IMPACTS THE PATIENTS SAFETY, CARE QUALITY, AND LEGAL COMPLIANCE.

42. <u>December 4, 2025 the OHFLAC is called was called in on 12-4- 2025</u> and the According to their report they receive an allegation that CEO yelled and cursed at consumers and intimidated and coerced them in to telling them who called OHFLAC

A few girls stated I yelled and called them liars and their boyfriend's pimps.

43. ****NOTE THIS IS VERY IMPORTANT **** I AM THREATNENED AGRESSIVELY BY THERAPIST (A) THAT IS BEING INVESTIGATG ON DECEMBER 4,2026 AND THERE ARE WITNESSES. LATER I WIN A PROTECTIVE ORDER AGAINST THERAPIST (A). ACCORDING TO A MENTAL HEALTH TECHNITION, THERAPIST (A) BRAGGED TO HER THAT THERAPIST (A) IS ON THE PHONE WITH THE OMBUDSMAN, THE NURSE PRACTITIONER AND THE TREATMENT TEAM WITH A LADY NAMED LISA. THE STATE CLAIMS THEY

WERE CALLED THE SAME DAY DECEMBER 4th 2025. THE OMBUSDMAN DENIES THAT THIS HAPPENS. SEE TEXTS WITH OMBUDMAN ON THE BELOW DECEMBER 5, 2026 TEXT. THE COMPLAINT IS THAT I WAS THREATENING RESIDENTS TO TELL ME WHO CALLED OHFLAC. I AM PRESUMING THAT THAT MEANT THE LAST TIME THEY WERE HERE. OHFLAC COMES IN ON DECEMBER 8TH AND THE OMBUDSMAN IS SITTING IN WITH THEM. LISA THE PERSON THE MENTAL HEALTH TECHNITION MENTIONED WAS A SURVEYOR FOR OHFLAC. (WHICH IS OKAY TO DO) THE OMBUSDMAN LIED AN TOLD ME IT WAS A COINCIDENCE. WHEN THE OMBUSDMAN WAS A PART OF THE PHONE CALL ON DECEMBER 4TH 2025 WITH OHFLAC AGAINST ME, SHE KNEW THAT COUNSELOR(A) WHO WAS UNDER INVESTIGATION HAD SAID HARMFUL THINGS TO THE RESIDENTS. SHE KNEW THAT THERE WERE WRITTEN STATEMENTS. SHE ALSO NEW ON DECEMBER 5TH THAT I HAD BEEN THREATENED BY THE COUNSELOR (A). SHE DID NOT REPORT ANY OF THAT TO OHFLAC OR TO THE CHAPTER 11 COURTS ON THE DECEMBER 9TH FIFTH REPORT. *** TAKE NOTE THAT THE RESIDENTS WRITTEN STATEMENT MENTIONED BEING TOLD THAT THERE WAS GOING TO BE A HEARING AND THE CEO WAS GOING TO BE FIRED THE NEXT DAY AND THE OMBUDSMAN WAS COMING IN TO FIX THINGS*** THE RESIDENT TOLD ME VERBALLY, THE OMBUDSMAN DID SHOW UP. I RECALL THAT ALSO.AFTER THE CRO HEARING, SHE CAME IN AND TOLD ME AFTER THE CRO WAS APPOINTED TO RETIRE AND GET A PLAQUE OR SOMETHING WITH MY NAME ON IT OUTSIDE.

44. *NOTE WHEN AN OMBUDSMAN COLLUDES WITH OTHER EMPLOYEES AGAINST ANOTHER EMPLOYEE IT IS CONSIDERED MISCONDUCT, COLLUSION OR BREACH OF FIDUCIARY DUTY. THE OMBUDSMAN IS SUPPOSE TO BE A "DISINTERESTED PARTY".

45. THE OMBUDSMAN NEW THAT THE EMPLOYEE WAS ENGAGING HER TO RETALIATE AGAINST THE OTHER EMPLOYEE.

46. PATIENT CARE OMBUDSMAN THAT COVER-UPS AND DOES NOT REPORT TO THE COURTS SERIOUS INFORMATION EFFECTING RESIDEMT CARE IS CALLED A COVER UP. DERELICTION OF DUTY AND MISCONDUCT.

47. December 5th,2025

MHT Tells the me (CEO) that counselor (A) who was under investigation that tells her that the treatment team and the Nurse practioner are on the phone and the ombudsman with a woman named Lisa.

48. December 5th,2025 2:10 pm text Message

Sharon Travis to Deborah Fish – Ok just so you know they were sent expressing details. Were you on call with the clinical team including the nurse practitioner and a lady named Lisa? Are you able to talk?

Deborah Fish to Sharon Travis.  No.

Sharon Travis to Deborah Fish – I am being told that my MHT is being told everything by Counselor(A)

Deborah Fish to Sharon Travis – I do not know what you are talking about.

49. December 5th 7:45 2025

Sharon Travis to Deborah Fish Friday – I forgot to tell you that Therapist (A) threatened me the other day and then went into the kitchen and was talking to someone on the speaker phone stating that they said that it sounded like Erica and that she would beat my ass. This is getting out of hand. That alone should get her fired without an investigation.

50. December 8, 2025 10:37 am text message
Deborah Fish to Sharon Travis – I heard you fired the MHT supervisor over the weekend and directed Counselor (A) to not come in today. This is the second week of no individual therapy session what is your plan to resolve this?

51. *NOTE: WE ALLOWED COUNSELOR (A) TO STAY ON THE PROPERTY AND DO GROUPS, BUT WHEN COUNSELOR (A) THREATENED ME IN FRONT OF RESIDENCE, SHE WAS NOT ALLOWED ON PROPERTY. THE OMBUDSMAN KNEW THE HARM COUNSELOR (A) WAS CAUSING TO THE FACILITY AND HOW IT HURT THE RESIDENTS. THE OMBUDSMAN WAS TOLD BY SHARON" MARIE "TRAVIS  THAT I WAS VERBALLY ATTACKED AND THREATENED, BUT SHE WAS UPSET AND USING THAT RESIDENTS WERE NOT BEING SEEN. WHEN THIS COUNSELOR WAS ALREADY NOT SEEING THEM. SHE KNEW THAT SHE WAS BIASED AND WERE HAVING SECRET CONVERSATION WITH THIS STAFF MEMBERS AGAINST ME. AT THAT POINT AND THERE AFTER I WAS SURE THE OMBUDSMAN WAS TRYING TO PROTECT CLINICAL AND TARGET ME.

52. December 8th – 16th 2025 OHFLAC in on a complaint called in on December 4th, 2025

A) That the CEO screamed and cursed at the, was aggressive, calling them liars and called their boyfriends pimps

*REBUTTAL WITH FACTS EXHIBIT R, HUMAN RIGHTS COMMITTEE, HAS TWO RESIDENTS CHOSEN TO BE ON THE HUMAN RIGHTS COMMITTEE. THEY WERE CHOSEN FOR THERE OUTSTANDING BEHAVIOR AND COMMITMENT TO RECOVERY BY THE MHT SUPERVISOR. SHARON TRAVIS WAS NOT PRESENT FOR THIS PORTION WAS QUESTIONED BY THE CRO THAT WAS PRESENT. NOTES WERE TAKEN AND THE CRO APPROVED THEM AS ACCURATE. THEY WERE RESIDENT T W AND RESIDENT J D.*

*BOTH RESIDENTS STATED THAT THEY DID NOT HEAR MARIE CUSSING AND CALLING THEM LIARS.*

*T W SAID SHE DID NOT HEAR ANYTHING ABOUT PIMPS.*

*J D SAID IN RESPONSE TO NOT ALLOWING THEM TO TALK TO THEIR BOYFRIENDS. SHE STATED THE REASONS WHY WAS SOME MIGHT HAVE PIMPS AND BAD PERSONS IN THEIR LIVES, SHE DID NOT THINK MARIE MEANT ANYTHING BAD BY IT.*

*FACTS: I SAID WHAT I ALWAYS SAY AND THAT IS THAT WE CAN NOT CONFIRM IF THEY ARE ACTIVELY USING AND IT SAFER FOR THEM TO FOCUS ON THEIR RECOVERY*

*EXHIBIT R Human Rights Committee Meeting 1/30/2026*

*EXHIBIT X. Jeff Prohasjka the MHT that has been there since our opening in 2019. States that he has never heard Marie (Sharon) yell or scream at residents.*

B) That I did case management work and I had been since October 28th, 2025

They said this was confirmed by the Clinical Director and The HR.

*REBUTTAL WITH FACTS. I HELPED THEM TWO DAYS FILL OUT PAPERWORK WHILE THE CASE MANAGER WAS BEING TRAINED. THAT WAS TOWARD THE HOLIDAY OF THANKSGIVING. AROUND NOVEMBER 26 and 27, 2025.*

*I KNOW THAT TARA HR, TOLD THEM WHEN THEY ASK HER, THAT EVERYONE IS HELPING OUT. SHE AND I NEVER TALKED ABOUT ME HELPING OUT PRIOR TO THE STATE COMING IN AND SHE HAD NO IDEA WHEN I HELPED OUT. THIS IS THE STATE TARGETING ME.*

*THE CLINICAL DIRECTOR HAD A LIST OF COUNSELORS ASSIGNED TO CASE MANAGEMENT AND I WAS NOT ON THAT LIST. THE CLINICAL DIRECTOR HAD NO IDEA WHAT I WAS DOING AND HOW OFTEN. I DID NOT SEE I HIM.DID THIS AFTER HOURS AND ONCE NEAR THANKSGIVING.*

53. *NOTE THE ORIGINAL COMPLAINT AND WAS THERE FOR EIGHT DAYS ON A FISHING EXPEDITION. I WILL PRESENT THE HEARING TESTIMONY OF A FORMER WITNESS THAT

STATES THEY HAND PICKED RESIDENTS THAT WERE PATIENTS THAT WERE NOT COMPLIANT OVER RESIDENTS THAT WOULD SAY POSITIVE. THIS WAS DURING THE HEARING AFTER THE CLOSING.

54. *NOTE THIS FALSE INFORMATION THAT WAS INITIATED BY THERAPIST (A) WHILE SHE WAS UNDER INVESTIGATION AND THE DAY SHE AGRESSIVLY VERBALLY THREATENED ME TO ATTACK ME DECEMBER 4TH,2025. SHE KNEW THAT WITNESSES HAD HEARD HER REPEATING WHAT SHE DID. I BELIEVE SHE WAS AFRAID AND WEAPONIZED BOTH THE OMBUDSMAN AND OHFLAC. SHE KNEW THAT THE OMBUDSMAN WAS BIASED AND USING ALL THE FALSE INFORMATION THAT SHE WAS PROVIDING AGAINST ME, SHE ALSO KNEW THAT THE STATE AS EVERYONE KNEW WAS TARGETING ME. SHE ALSO KNEW THE COURTS WERE BELEIVING EVERTHING. ON DECEMBER 4th, 2025 SHE AND THE NURSE PRACTITIONER, THE TREATMENT TEAM, AND OMBUDSMAN SECRETLY JOINED TO SAVE HER AND CALL OHFLAC TO CAUSE ME HARM.

55. December 9, 8:01 am text message From the Ombudsman to Sharon Travis

Marie my understanding is counselor(B) has been at the facility working, she did her notes and has been doing groups, you have not complained to me about her since you put her under investigation and that was a week ago. What about allowing DJ to do individual therapy today. Please let me know your position on that.

56. December 9, 2025 NOTICE OF FILING PATIENT CARE OMBUDSMAN'S FIFTH REPORT PERSUINT TO THE BANKRUPTY CODE SECTION 333 REPORTFROM NOVEMBER 17th ,2025 to DECEMBER 9th 2025

AREAS OF CONCERNS:

A) The facility remains understaffed. Since my last report two employees were terminated and two are under investigation (One has limited responsibility and the other is not at the facility). One Case Manager is hired and training today.

REBUTTAL WITH FACTS: THE TWO PERSONS THAT WERE FIRED WERE FOR GOOD CAUSE.

- MHT STAFF (D)WAS FOR A NO CALL NO SHOW AND CONTINUED REPORTS OF THREATENING RESIDENTS FOR REPORTING HER.
- EDUCATION DIRECTOR/ SUPPORTIVE COUNSELOR STAFF (E) (EDUCATION DEPARTMENT WAS A PERSON THAT WAS DESTRACTED FROM HIS JOB DUTY OF EDUCATION BY THE NURSE PRACTITIONER TO DO WORK FOR HER. HE LATER STATED THAT SHE TOOK CREDIT FOR HIS WORK. HIS JOB WAS TO TEACH EDUCATION ON HIS

*JOB DESCRIPTION WHEN HE FIRST ARRIVED. HE LATER ON WAS HELPING WITH THE STAFF GROUPS, BUT WAS COMIMG UP MISSING FROM THE BUILDING AND DURING GROUPS MANY TIMES HE WOULD PLAY GAMES INSTEAD OF DOING CLINICAL BILLABLE GROUPS. FOR ALL THE GROUPS THAT HE WAS DOING THERE ARE NO NOTES FOR ANY OF HIS GROUPS AS AUDITED. I FOUND THIS OUT AFTER THE CRO TOOK CONTROL AND REPORTED IT. I WAS NEVER REPORTED BACK TO ON ANYTHING ABOUT CLINICAL. THIS IS SERIOUS STUFF AND HIS DIRECTOR DID NOT REPORT IT. HE WAS UNDER ME FOR EDUCATION AT FIRST, THEN LATER HELPED OUT WITH GROUPS.*

- *THE TWO COUNSELORS THAT WERE UNDER INVESTIGATIONS WERE FOR SERIOUS ACCUSATION OF HARM TO THE RESIDENTS AND THE OMBUDSMAN KNEW OF THE ACCUSATION AN RESIDENT STATEMENTS.*
- *THIS HAPPENS WHEN YOU HAVE STAFF THAT YOU HAVE TO FIRE FOR THE SAKE OF THE BUSINESS.*
- *THEN YOU HIRE MORE AND I DID. I HIRED THE TELEHEALTH THERAPIST WE HAVE NOW, NOT THE CRO, HR OR THE TRUSTEE.*

B) No Residents are receiving individual therapy. The debtors are required to provide individual therapy to all residents. The residents in the six-month program are not receiving education required in the 6- month program policy.

REBUTTAL WITH FACTS: YES, WE WERE SHORT BECAUSE THE CLINICAL DIRECTOR WAS NOT DOING HIS JOB OF OVERSIGHT OF HIS TEAM. THE EDUCATION DIRECTOR UNDER ME WERE BEING DIRECTED BY THE NURSE PRACTITIONER TO DO WORK FOR HER AND THEN HE STATED SHE TOOK CREDIT FOR IT. MEDICAL DIRECTOR TRIED TO BE IN CONTROL INCLUDING THE CLINICAL DIRECTOR AND UNDERMINED MY AUTHORITY. A TOXIC WORK ENVIRONMENT WAS NOT CREATED BY SHARON "MARIE" TRAVIS. IT WAS CREATED BY THEIR OWN DOING. WHICH INCLUDED LACK OF LEADERSHIP IN THEIR DEPARTMENTS, UNPRODUCTIVE NEGATIVITY (CONSTANT COMPLAINING WITHOUT SOLUTIONS), UNDERMINING AND LYING ABOUT COLLABORATORS (SABOTAGE AND LIED ABOUT THE CEO AND OTHERS TO CREATE TENTIONS), RESISTANT TO CHANGE AND CORRECTION (DID NOT LIKE CORRECTION ON COMPLIANCY AND OR UNDERSTANDING OF NEW PROGRAMS FOR THE BENEFIT OF SUSTAINABILITY, THEN GUTTING THE NEW PROGRAM ONCE THE CRO TOOK OVER)

THERE IS NO POLICY ON EDUCATION. THERE IS A HANDBOOK STATING THERE WAS AN OFFERING. THAT COULD BE IN ANY FORM.

C) At present, the CEO handles all inquiries and Conducts initial assessments of prospective residents. Ongoing issues with resident intakes were evident when PCO visited the facility on November 26 and directly observed missing paperwork and insufficient Documentation. Specially, one resident lacked initial intake form while the other had no paperwork what so ever. Furthermore, due to the holiday weekend, The

Debtor did not have staff available weekend, the debtor did not have did not have staff available to complete the required assessment within 24 hours, so the Clinical Director came in on Friday to perform his evaluation. These deficiencies highlight a need for Improvement.

REBUTTAL WITH FACTS:

THE INFORMATION PRESENTED WAS BY THE NURSING DEPARTING AND NOT DISCUSSED WITH THE CEO FOR HER SIDE. AGAIN, THE CEO DID NOT NOR WAS QUALIFIED TO DO ASSESSMENTS. ONLY REFERRALS WITH AN ACCEPTANCE FROM THE MEDICAL DIRECTOR.AS STATED PRIOR KEITH KING FROM THE SUBWAIVER PROGRAM STATED I WAS ABLE TO DO REFERALS, BUT IT HAD TO BE SIGNED BY THE MEDICAL DIRECTOR FOR APPROVAL. THE DOCUMENT SHARON "MARIE" TRAVIS WAS ACCOUNTABLE FOR WAS (EXHIBIT Y). YOU CAN SEE IT STATES ON THE DOCUMENT, THAT IT IS A REFFERAL FORM, NOT AN INTAKE FORM. A DOCUMENT THAT THE NURSE HAD TO SIGN, WHICH THEY MADE A COPY OF AND KEPT. AT THE END I SENT IT BY EMAIL AND GOT IS ACCEPTED BY EMAIL, BECAUSE THEY WERE DISHONEST ABOUT SHARON"" MARIE " TRAVIS. THE ONLY OTHER DOCUMENT I WAS INVOLVED IN WAS SENDING AN ACCEPTANCE LETTER TO THE ATTORNEYS FOR THEIR CLIENTS VIA EMAILS. WHAT DOCUMENTS WERE MISSING? THE NURSES WERE NOT CREDIBLE WITH THE EVIDENCE I WILL SHOW. THEY AND ONLY THEY ARE RESPONSIBLE FOR THE INTAKES PAPERS. WE COULD NOT AFFORD AN INTAKE PERSON AT THAT TIME SO, I HELPED OUT PRETTY MUCH TAKING CALLS All HOURS OF THE DAY AND EVERYDAY.

EXHIBIT J ATTACHED OHFLAC GUIDELINES. BEHAVIORAL HEALTH 503.

CONCERNING THE NONFACTS OF THE HOLIDAY WEEKEND AN NOT HAVING STAFF AND THE CLINICAL DIRECTOR HAD TO COME IN. THIS INFORMATION TO THE OMBUDSMAN CAME FROM THE MEDICAL DIRECTOR AND OR NURSING SUPERVISOR. EITHER WAY THE MEDICAL DIRECTOR IS RESPONSIBLE. LAYING INNACCURATE FACTS TO THE OMBUDSMAN WHO ONLY GETS HER SIDE AND OBVIOUSLY DOES NOT KNOW THE STATE MEDICAID GUIDELINES.

WEST VIRGINIA, LICENSED SUBSTANCE ABUSE DISORDER FACILITIES OPERATE UNDER SPECIFIC GUIDELINES. FOR MEDICAID- FUNDED AND LICENSE BEHAVIORAL HEALTH CENTERS, AN INITIAL INTAKE OR SERVICE PLAN MUST GENERALLY BE COMPLETED WITHIN 72 HOURS Of ADMISSION. HOWEVER, A FULL MEDICAL/PHYCHIATRIC EVALUATION MUST TYPICALLY TAKE PLACE WITHIN 24 HOURS OF ADMISSION. *** IF MEDICATION OR MEDICAL IS INVOLVED THEN IT HAS TO BE DONE BY A DOCTOR OR A PHYSICIAN. ***

IF MY MEMMORY IS CORRECT THE NURSE PRACTITION WAS ON VACATION EITHER WAY IT IS HER JOB TO MAKE SURE IT IS BUSINESS AS USUAL AND THERE IS SOMEONE QUALIFIED AT ALL TIMES TO FILL IN HER SHOES. IF THERE WAS MENTAL HEALTH INVOLVED AS THEY STATED OR MEDS INVOLVED, THEN THE CLINICAL DIRECTOR BY LAW

*WAS NOT ALLOWED TO DO IT ANYWAYS. THIS WAS ANOTHER EXAMPLE OF THE MEDICAL DIRECTOR NOT BEING COMPLIANT AND FINDING SOMEONE TO FILL IN WHILE SHE WAS GONE. OUR PAST NURSE PRACTITIONER WOULD FIND SOMEONE MONTHS AHEAD.*

*THIS WAS ANOTHER EXAMPLE OF THE OMBUDSMAN NOT ASKING QUESTIONS TO SOMEONE THAT HAS BEEN TRAINED EXTENSIVLY IN THE STATE RULES.*

*REBUTTAL CONTINUED: EMAILS SHOWING THE NURSES MALICIOUSLY PROVIDING FALSE INFORMATION:*

- *2/6/2026 10:18 AM- EXHIBIT U - EMAIL FROM CRO TELLING ME THE NURSES STATING I ACCEPTED RESIDENT WITH OUT THEIR PERMISSION AND ONE HAD TO BE DETOXED, WHICH CAUSED UNDUE STRESS AND RESULTING IN NO BILLABLE SERVICE.*
- *2/8/2026 1:04 PM EXHIBIT W -FOWARDED TO THE CRO THE ACCEPTANCE EMAIL FOR RESIDENT ABOUT HIM STATING SHE NEEDED DETOXED. I STATE SHE DID NOT NEED DETOXED AND STATE TO HIM I WOULD PROVE IT. I ADDRESS THEIR CONTINUED LIES THAT WERE GOING TO THE COURTS AND WHICH IS ILLEGAL. (see acceptance at bottom of page)*
- *SEE EXHIBIT X- THE LICENCED DR. FROM BBC REHAB STATING THAT SHE HAD BEEN THROUGH THEIR DETOX AND THEIR 28 DAY REHAB AND THAT SHE DID NOT NEED DETOXED. WE SENT THIS GIRL OUT TO DETOX AND SHE DID NOT NEED IT. THIS WAS OUTRAGIOUS. SHE WENT TO A DIFFERENT TREATMENT CENTER AND WHO WOULD BLAME HER.*
- *EXHIBIT V EMAIL FROM NURSING OKAYING THE INTAKE OF RESIDENT THEY SAID HAD SUICIDAL IDEATION. THEY SAID THEY DECLINED HER, I SHOWED THE OPPOSITE. I GOT RETALIATED WITH HARRASSMENT THE NEXT DAY AND NOTHING WAS DONE.*
- *DEBORAH FISH WAS ALSO FORWARDED EXHIBIT W AND I BELIEVE EXHIBIT V HR WAS FOWARDED A COPY ON 2/17/2026.*

D)  Summery, was that patient care has diminished since my last report. Staffing remains and issue. The current staff continue to do their best under the circumstance to meet basic needs and program requirements. However, given staff shortages, the program requirements are not being met.

57.  *SUMMARARY REBUTTAL: THE OMBUDSMAN CONTINUEDTO BE BIASED BECAUSE OF THE FRIENDSHIP WITH THE MEDICAL DIRECTOR, BREACHING HER LEGAL DUTIES TO MONITOR CARE AND REPRESENT PATIENTS INTEREST UNDER 11U.S.C. 333/ SHE FOCUSED ON FACTS THAT SHE DID NOT GET A FAIRLY ASSESSMENT, ONLY TAKING ONE SIDED INFORMATION. SHE ABUSED HER ROLE AND POWER TO INFLUENCE THE*

COURT. SHE LEFT OUT SERIOUS FACTS INFORMATION. CONCEALMENT OF INFORMATION IS A SERIOUS VIOLATION OF HER DUTIES. IMPORTANT INFORMATION BELOW:

- IMPORTANT DOCUMENTION ON RESIDENT CARE AND GROUPS THAT WERE VITAL TO RESIDENT CARE AND COMPLIACE WAS LEFT OUT. THE CEO ADVISED THEM IT HAS TO BE DONE. THIS COULD AFFECT THE RESIDENTS CARE AND THE FACILITY COMPLIANCE.
- EMPLOYEES THAT WERE CAUSING HARM TO THE RESIDENTS, AFFECTING THE RESIDENTS RECOVERY, WERE PROPERLY INVESTIGATED AND REMOVED FOR ANY FURTHER HARM. SHE DID NOT REPORT ON THE HARM THE COUNSELOR HAD CAUSED AND THAT THE CEO HAD REMOVED THEM AND WAS LOOKING FOR NEW REPACEMENTS.
- TWO WERE COUNSELORS, ONE WAS TERMINATED AND THE OTHER WAS GIVEN A VERBAL WARNING. ANOTHER WAS A SUPERVISOR, WHO WAS NOT DOING HER JOB DUTIES, LEAVING HER SHIFT EARLY AND THREATENED RESIDENTS THAT REPORTED HER. MARIE TOOK CARE OF THESE DISPUPTIVE STAFF.
- CASE MANAGER BROKE INTO THE BUILDING AND TOOK CLIENTS INFORMATION OUT. SHE ALSO TOLD RESIDENTS SHE WOULD CAUSE TROUBLE FOR THE FACILITY. SHE ERASED RESIDENTS INFORMATION.
- SHE PURPOSELEY MISLEAD THE COURTS ON THAT THE STAFF WAS DOING THEIR BEST, WHEN THEY WERE NOT DOING THEIR NOTES. THIS WAS AN ONGOING PROPLEM.
- INSTEAD LETTING ME MARIE FIX THINGS, HER BIASED ONE-SIDED VIEW WHICH ATTACKED MARIE WITH FACTS THAT COULD BE EASILY PROVEN UNTRUE. HURTS THE RECONSTRUCTION PROCESS FOR THE CEO.

58. December 10- 12th, 2025 NOTE: INVESTIGATION REPORT ON THERAPIST A AND B CONCLUDES. Exhibit A, C & D

COUNSELOR (A) I RECOMMENDED TO BE FIRED FOR INNAPROPRIATE COURT INFORMATION TO THE RESIDENTS, IN A GROUP SETTING CALLABORATED MY MULTIPLE WITNESSES, LACK OF THERAPY OR NOTES.

SOME OF THE FOLLOWING FACTS ON COUNSELOR A:

A) Stating that Marie came in to one of the following groups while Counselor(A) showing a non-clinical movie. Told the residents she was getting fired for them watching one of the movies.
B) Resident came in on November 7th and had not had therapy with the resident, that would be about a month without therapy.
C) She would find them other places to go.
D) A resident wrote a statement for Marie about what was said and she stated she was not pressured. She told her room mate who told Therapist A.

E) *Therapist told the girls to write a statement that was opposite to what the statement alluded to.*

F) *Told the residents that Marie was going to court and she was going to get fired and the Ombudsman was coming in to fix things.*

G) *She told them to hold sit ins and not to go to groups.*

H) *She states that Marie Controls whether the girls on in the 3 month or the 6-month program.*

I) *She talks in the group about Marie touching a former employee.*

J) *She stated the court date for Marie daughter was really her going to court and getting fired.*

K) *Witnesses see Therapist A getting aggressive with the CEO.*

L) *She told the investigators that her documentation was completed and the investigators stated they were not. Her excuse is she was not trained. This is not true she was shown how to do it by clinical staff.*

M) *One written statement (Exhibit C) stated that whenever the hearing would happen that she would be forced out of her position the next day. She informed the group that the Ombudsman was called in to look through all the information as well a part of the revamping of the facility. That Marie would push people into the 6-month program to make more money because of bankruptcy.*

N) *The resident in written exhibit C testifies that she knew it was untrue about pushing them into the 6-month program because she had asked her which program she wanted to sign up for and she was not pressured at all and that Miss Marie had an outstanding reputation in the community and the court system.*

O) *EXHIBIT B The resident in Exhibit B stated they were told things that had nothing to do with recovery.*

P) *EXHIBIT B Many residents were complaining it was affecting their treatment, it made them feel uncomfortable.*

Q) *T C Mental Health Supervisor using Counselor A phone as a hotspot for the TV seen a call come on from Former Case Manager E .*

*COUNSELOR B*

59. *Monday December 15th 8:13 am text message from Sharon Travis to the Group:*
*Everyone needs their notes done by Thursday every week and that is for every person. There are 15 billable groups for the 3.5 and 3.1 have 5. Each person must be audited. If they were taken out of the for a hearing then that will have to be made up. If there are doctors' appointments or for medical reasons then it needs documented. They are allowing those to be counted as billable group. This is mandated a proof shown before we bill and it could hurt us getting paid if we do not have it.*

60. *Group chap of nurse practitioner. CRO, Clinical Director. the Program Coordinator and the former CEO (Sharon Travis). Will is the CRO, but states and has come in once in December, but does not officially start come on board until after New Year.*

61. *DECEMBER 19, 2025 -EXHIBIT Y -THE MAGISTRATE ORDERED PERSONAL SAFETY ORDER AGAINST COUNSELOR A, FOR PROTECTION OF SHARON MARIE TRAVIS.*

62. *NOTE WILL (CRO) SPOKE TO ME AN STATED HE WAS GOING TO CALL INSTEAD HE GOT THE OMBUDSMON WHICH I THOUGHT WAS OUT OF HER SCOPE.

63. December 26th 2025 3:10 pm EMAIL SEE EXHIBIT H

All, Pursuant to Will's request, following his call with Marie. I sent the email below regarding the audit.

Dear Ms. Kent

Please be advised Will Frederick and I are the court appointed Chief Reconstructive Officer and Health Care Ombudsman for the facility. We are working with the facility to respond to your letter dated December 9th, 2025 and we appreciate the deadline extension you granted on January 26th, 2026. Please provide us with the claims detail report referenced on page 2 of your letter. We are assuming that the claims detail report is specific and will enable us to provide you with resident by resident documentation or information to respond to your request would be greatly appreciated.  Please feel free to reach out to either of us if you have any questions. My contact is below. Will's email is above and his phone number.

64. *NOTE IN A CHAPTER 11 IT IS INAPRORIATE FOR AN OMBUDSMAN TO CALL AN INSURANCE COMPANY ON THE DEBTORS BEHALF. BANKRUPTSY LAW LIMITS AN OMBUDSMAN'S ROLE, MEANING ALL OFFICIAL NEGOTIATIONS, LEGAL CORRESPONDENCE SHOULD BE HANDLED THE RETAINED BANKRUPTSY ATTORNEY. THIS WAS OUT OF HER SCOPE OF PRACTICE.

65. January 5, 2025 (Exhibit X)   A written statement from Jeff Prohajka. Longest employed Mental health since the original opening.

I have not heard Marie yell or scream at the residents nor have I ever been aware of a resident not being allowed a visit due to her disability.

66. 1/30/2025 Human Rights committee (EXHIBIT R)

Human Rights Committee Meetings /CRO was present and CRO approved notes

By compliance of the state two residents have to be on the human rights committee. They are chosen because they have no write ups and showing they are serious about their recovery. There were two residents. You have to report state complaints and investigations.

Marie was not allowed into the second part two of the meeting because of the complaint from OHFLAC about her screaming at the girls.

Page 3 last Second part of the meeting. Regarding the CRO's questions to the Residents TW and JD, concerning accusations against the CEO. Chaired by B E, supportive counselor.

When ask about the CRO cursing the residents, called them liars and any discussion about pimps

A) Neither TW nor JD heard the CEO cussing or calling them liars.
B) TW heard nothing about Pimps.
C) JD When a discussion arose regarding not being able to talk to the boyfriends during the holiday weekend. The CEO stated that some of your boyfriends might have been pimps. This statement hurt some of the residents feeling

Rebuttal Fact: I said what I have always said we do not know if they are in recovery and we have no way of checking on it. I said they could be actively using. A few girls got argumentive, but I held my ground and did not yell.

67. February 1st, 2026 Exhibit(B) The Utilization Nurse does an audit and sends out a stern letter to the staff making them aware of all the missing notes and the possible legal consequences. This was a professional negligence and a breach of the standard of care.  The Ombudsman knows about this and does not report it. The CRO knows about it, but takes their word for it that it is taken care of.

68. FEBRUARY 9th, 2026 MISSING OMBUDMANS MISSING SIXTH REPORT PURSUANT TO THE BANKRUPTSY CODE SECTION 333

69. *March 27th ,2026 for periods January, 30th 2026 to March 27th 2026. January 30- NOTICE OF FILING OMBUDSMAN'S SEVENTH REPORT PURSUANT TO BANKRUPTSY CODE SECTION 333.*

a) *It was based on discussions with staff, interviews with current residents and interviews with Will Frederick and Robert Johns and clinical staff.*

b) *She states after the trustee appointment, issues persisted with resident intake, including, incomplete or missing forms, delays in sending assessments to nursing staff, insufficient follow-ups, delays in sending assessments to nursing staff, and insufficient follow ups with prospective residents. A new intake specialist was hired: she is an RN and has commenced work.*

**REBUTTAL WITH FACTS: -** the fact is there was no missing paperwork because everything was done online and sent via email since December of 2025 to protect myself from the nursing department lies and harassment. They are the ones that were delaying approvals and I believe they were doing it purposely. They started delaying the approvals after the hearing prior to the February 18th hearing. where I stated that I had brought more persons in then anyone.  I took calls 7 days a week all day long. They did not want me to be successful so that the trustee could take over and she could be in control. It was continued Harassment through misinformation to get me fired and weaponize the Ombudsman.

 The texted below is from The CRO is a response to the emails that I sent him with a list of all the patient that the nursing had delayed. I would send the referral to see if it was accepted and they would not answer. Some were 10 days late or more. that see text below

February 24th,2026 William Frederick the CRO to Sharon Travis text

CRO to Sharon Travis: If there are any intake referrals that need answers, please send them in one email. All these different emails are hard to follow. I have spoken to Sheila about the need for us to get answers on all of them ASAP. It looks like she has approved a couple.

I do not have access to the emails, when I was on leave, the trustee gave the Nurse practitioner my email.  I protested, but no answer. I do Have the more information on the email, but I believe this text above speak for itself. The Nurse Practitioner continue to Harass me through untrue Facts and the Ombudsman continues violating the core principles of neutrality and impartiality.

c) *Debtor implemented new ordering system and continues to make steady progress in resident supplies.*

*REBUTTAL WITH FACTS: Exhibit S held on 1/30/2026   at little late 4th quarter Quality Insurance Committee Meeting took place. Will Frederick was at this meeting via phone and signed off on the meeting notes as accurate. The MHTs were ask about what the Ombudsman and stated that the residents reported not having products. The MHT supervisor stated that was not true. We were only out of Q-tips one time.*

*Residents put their request on Wednesday and receive the product they are out of on Friday. If the weekend comes and they are out of products then they have to wait until Monday.*

*There was no access of the products on the weekend. As I have stated to the Ombudsman, a lot of rehabs do not supply products. This complaint is unfounded and not true.*

d) *Residents counseling needs. new therapist was hired and started Mid -January, Therapy has had ongoing positive impact on recovery.*

*REBUTTAL OF FACTS: The new Therapist was actually hired by Sharon" Marie "Travis and had to wait for her to come on board and she will tell you that.*

e) *The CRO following the Following hearing had revised the grievance process. All grievances are now directed to the CRO, who furnishes copies for her review. Recent substantial number of grievances relating to a 24-hour window is currently conducting an internal investigation.*

*FACTS THAT NEED TO BE KNOWN BY THE COURT: Yes, complaints came in addressed to the CRO and they were scanned in the HR computer and they were sent to the CRO by the HR department. The CRO verbally relayed that he gave a copy to the Ombudsman.*

*There were two complaints that came in that were not addressed by the Ombudsman and one was pertaining to the Medical Director and Medication not addressed until there was a grievance filed. This resident suffered for a good while. There was no Investigation done on this serious complaint as policies state.*

*There was a complaint made against the Clinical Director for yelling, and intimidating the resident. The complaint stated that the Clinical Director told the resident that if she did not get a bath then he would have someone sit in the bathroom with her to make sure she took a bath. There was no investigation with this complaint as required by our policies. The resident was kicked out of the program soon afterwards, which seemed retaliatory. She had a disability and is now back in prison, where she does not belong.*

f) *The trustee has brought stability, fostered a sense of impartiality, and inspired the staff. As a result, residents experience improved outcomes. Staff members communicate more effectively, residents feel they are being heard and overall atmosphere within the facility is more positive.*

*The Trustee is there once a week and below you will see the that all that she stated during this 60-day period was not accurate. If kicking people out of the program is a good outcome, I disagree.*

**70. _FACTS THAT SHOW WHAT WAS REALLY HAPPENIND DURING THE_**

A) **2/7/2022** It is reported to the CRO by Marie that a resident is wanting to leave because of what the Clinical Director is saying negative about the program. Will is put on the phone as Sharon Travis talks with her. Sharon finally talks who in to talking to a counselor, because no counselor has seen her and she has been there for weeks. She still leaves the program. Sharon discussed this via text on March 7th.

B) **2/10/2026 J C** She was put on a medication that was causing anger issues. The nurse practitioner took her off of it and then the Nurse Practitioner said she would do a gene test on her and took her off of the medicine. Later when she asks about the gene test she put her back on the meds that were causing the problems to begin with. She continued to ask for the gene test. She complained to Sharon Travis that she got all kinds of write ups because it was affecting her behavior. After she made a formal complaint the nurse finally got her on the right meds.

C) *Note – The Ombudsman knew of this report and did not report.

D) **2/18/2026** Patient Complaint W B complained that the treatment team intimidated her, deprived her of her civil rights telling her that they were going to have someone sit in the bathroom while she showered. She wanted to go home.

E) **2/19/2026** Patient complaint W B – She complaints that the treatment and Specifically the clinical Director is humiliating her, cursing at her, and threatening her. She had been there for a while. She circled psychological abuse.

F) **2/20/2025** Text from Sharon Travis to Will Frederick the CRO concerning W B who made the complaint.

I thought you stated that you were told that she needed a higher level of care. Was Jail what you meant. This girl has the mentality of a child. I am concerned that we did not due our duty of care to make sure she went to where she needed to go.

G) *Note-W B She made a complaint, there was no investigation done and just because it was reported that she did not bath they kicked her out.

H) **2/20/2025 J S** stated that she was being spoken rudely to by the Case manager.

I)  <u>Complaint made in March that they supposedly lost and then on March 27th 2026.</u>
Resident S C stated that she made a complaint against the Case Manager for being rude to her. Her mom called me and stated that the Ombudsman was there and the girls were giving her complaints, but they never heard anything about it.

J)  <u>January or February was her out date</u>-Resident A H who had no write ups and was in our long term 6-month program and she was doing very well and was promised a bed at the sober living house upon completion of her stay. If you are doing well and no writeups you get a bed there automatically if they desire it. We do not discriminate against anyone. That was her home plan that was already done with her case manager. Out of the blue the nurse practitioner when was truly running the show told her she could not go and did not give a reason.

K)  <u>April 16th S C went to a sentencing hearing Exhibit Q</u>. She was a resident of Serenity Hills. A little background. A detective who always sent residents to Serenity Hills under my leadership and had good outcomes wanted to send Sarah to our six-month program. She did not have the insurance that we accepted, therefore they sent her to Clean and Clear rehab for a month until her insurance was turned over to an Insurance company that we excepted. She was doing extremely well there, but the judge wanted her in our program. S C fought coming to us, but did as the judge ordered, only to come to a treatment that was no longer the same. She tells her mother who related to me, that Sarah states that they are trying to push Miss Marie out of the building and she is the only one that cares about us and that the program she was told is not the same any more. I was asking a while back to send a letter to the judge stating that she had already did two months out of her six months at the Clean and Clear, so she would only have to do 4 months at our rehab. (no insurance company would okay 8 months). I wrote this when I still had some authority to the courts as asked by the detective. There was a contention between the case manager who insisted she must do six months. So, you will see in the court hearing attached, that she had gotten good letters from her therapist, but the case manager says the opposite and she is put back in jail. (See attached court testimony Via newspaper article of the reported hearing)

L)  <u>Retaliation against the MHT who drove her</u>. According to S C they punished the Mental Health Technician that drove her, because she stated that she had seen her doing well in the program. I am told that the Mental Health Tech was not allowed to drive any more residents to court. According to what former resident S C had related.

M)  Two residents were kicked out in February because the Nurse supervisor did not kick their traditional Medicaid over to and insurance that were take and it turned into an insurance that we did not take. There was no investigation for what they caused these girls because they kicked them out because of our error. They were court ordered.

FROM OHFLAC' S WEBSITE        EXHIBIT D

CHAPTER 503 BEHAVIORAL LIFE CENTERS

**503.14.2 Psychiatric Diagnostic Evaluation (No Medical Services) Procedure Code: 90791 Service Unit: Event (completed evaluation) Telehealth: Available with GT modifier Service Limits: Two events per year Prior Authorization: Required. Refer to Utilization Management**

**Exhibit A**

**Therapist (counselor)**

**Internal Investigation**

12/10/2025

Outlined below are the findings of our investigation on ████████ and ████████, therapists at Serenity Hills Life Center. We have compiled interviews with the CEO, Marie Travis, and several residents.

**Marie's statement findings:**

In the days leading up to Thanksgiving, Marie stated that she entered one of C███████'s groups and found that they were watching a movie. She stated that she told C███████ this was not allowed, and that C███████ returned to the room and told the residents she was "getting fired" for showing them movies.

Marie also reported that C███████, a resident, told her that "counselors told me you were getting fired" and that C███████ did not trust the counselors.

Marie reported that it was reported to her by Taylor, mental health technician supervisor, that C███████ was projecting her phone to the TV and that she received a call from a former case manager. This was visible to the residents at the time.

On or around Thanksgiving Day, Marie reported that she held a residential meeting to discuss reports of residents concerned over Marie leaving or going to jail. Marie stated that she discussed with the residents that she was not going to jail or leaving the facility, and that residents stated that the counselors told them this. She also reported that the residents stated that "C███████ was trying to make us hate you" and that she told them about Marie going to court for harming the former case manager. According to her, the residents stated "We don't need to know about this stuff."

tell them what to do. ███████ confirmed that this conversation was in relation to groups, not just activities. ███████ reported that she has been here since November 7th and has not had any therapy from C██████. In relation to D█████'s groups, she said that D█████ did not bring court up herself and that she tried to steer the groups away from "drama."

**Brit██████'s statement findings:**

B███████ reported that she neither therapist discussed court with the residents in the group setting, however that C██████ frequently discussed complaints in the group setting. She also denied that G███████ and D█████ spoke negatively about Marie.

**R█████'s statement findings:**

The investigators interviewed R████ to confirm what she had stated in her statement. R█████ stated that D██████ told the residents in a group session that Marie was "emotional and bankrupt." She also told them that Marie had court that day for her daughter and for "twisting an employee's arm for coming into the building." R█████ reported that D█████ would play music in group that was meant to be recovery-oriented, but included cursing and sexual innuendo. She also reported that at the onset of group discussions, D█████ would ask the residents how they were, but she did not stop them from complaining. She stated that she felt that D█████ "wanted it to happen" and "engaged in it with them." R████ reported that C██████ told the residents she would find them other places to go, other than here, and that she would bring in brochures to other facilities. She noted, however, that C██████ never brought brochures in. R████ reported that Marie asked the residents at dinner one evening who was talking to them about transferring to another facility. When no one would speak up, R████ stated that she said it was C██████ and D██████. Later, during a case management session (11/30/2025) with Marie, Marie asked her if she would write a statement and to note that she was not instructed on what to say. R████ agreed and reported that

she wrote the statement upon her own volition. R███ stated that the evening after writing this statement, she confided in her roommate, S███ey, about the statement. The next morning, S███y told her that O███ell asked her to write an opposing statement to say the opposite of everything R██ said. R██ stated that it was alluded to that S███y told Ch████ about her statement for Marie. Last night, R██ stated that she overheard S███y telling other residents that it was Rosa's fault O███ell was fired. This interview corroborates her written statement.

Ch███s statement findings:

Ch███ reported that O███ll told them during group sessions that Marie was going to court, getting fired, and other people were coming in to "fix things." She also stated that Ch███ll said that Marie has "narcissistic qualities." Ch███a reported that Ch███ll, during a group session, told them that if they want "change, they need to hold a sit-in and not go to any activities." When asked for clarification, Ch███a confirmed that Ch███ll told them to not go to groups. Ch███ stated that Ch███ll told them that Marie controls whether they do 3 or 6 months and that "Marie needs the money because of the bankruptcy." Ch███a stated that she did not experience this from Marie and that Marie told her she could "change her mind at any time." During a case management session (11/30/2025) with Marie, Marie asked her if she would write a statement. Ch███a agreed and reported that she did not feel coerced into this statement. In relation to D███, Ch███a reported that D███n did not condone the negative talk in her sessions and tried to steer Ch███ll back on topic when D███n sat in on a session. This interview corroborates her written statement.

D███'s statement findings:

D███ denied comments during the group session related to Marie touching a former employee and Marie having emotional or money problems. In relation to the inappropriate context of music

shown, D█████ stated that she attempted to find the clean versions of songs, but that they did not include any sexual innuendo. She also stated that the songs were used to demonstrate how people express anger in artistic ways and that she stopped doing so when Marie asked her to.

**Chantell's statement findings:**

Ch█████reported that she did not bring to the residents' attention that Marie was involved with court proceedings, but that the residents asked her questions about it. She stated that when the residents would talk to their family members at night, their family members would tell them about the incident and then they would ask Ch█████ll for clarification. Ch█████ell stated that it is her job to assist the residents in processing information and she tried to calm them in regards to what they were hearing. She stated that she let the residents know that someone would be coming in the interim to assist SHLC, which was already stated in a facility-wide meeting with the residents. Ch█████ stated that she also did not tell the residents that the court date was not for Marie's daughter. She stated that Brit████e (resident) stated that she already knew Marie's daughter and told the group that this new court date couldn't be for her daughter because her "daughter's court date is in January." Ch█████ reported that she did not state that Marie was being forced out of her position, only that the CRO would come in IF anything happened. She said she simply wanted to provide emotional support. Ch█████ also reported that the residents stated that Marie would hold meetings with them at night about certain events and that the residents would come to group the next day to ask for clarification. In relation to her stating that an ombudsman was coming in, Ch█████ll denied this, but noted that she said a "CRO" was coming in to assist. She reiterated that the residents were already told this information in a facility-wide setting.

Chantell stated that complaints would start at the onset of group discussions when she asked how they were. However, she reported that this would only go on for 7-10 minutes and then she would pull them back to the group topic.

In relation to telling the residents to stage a "sit-in," Chantell stated that some residents were saying that their needs were not being met. For example, she stated that Chelsea said in group that she came specifically for education assistance and that since this was no longer being offered, she felt she was not getting all of what she came for. Therefore, Chantell told them, as a group, that when Marie gives them extra cigarette breaks or fun activities to not go to them until their needs get met. She stated that she did not want them to be swayed by fun activities when their needs are not being met here. Chantell stated that she did not tell them not to go to groups, only not to partake in the 'fun' activities.

In relation to whether or not she stated that Marie decides whether or not the residents participate in 3-or 6-months, she said that she did not state this in the group setting. However, she did state that she does feel Marie has the final say in what length of time the residents complete. She stated that she told Destinee (resident) that since Marie has the final say, that she should write her a letter about wanting to leave. She also stated that Sydney told her that Marie wanted her to do the 6-months and that treatment team would take care of her concerns.

In relation to the statement Sydney (resident) was writing, Chantell stated she did not tell her to write it, but that Sydney told her she wanted to and was going to move forward with it. Chantell stated that she told Sydney she didn't need her to do that, but Sydney insisted. When asked about whether she told Sydney to write the opposite of Rosa (resident), Chantell stated she did not and that these are "all lies."

Marie stated that it was reported to her by ██████ (staff) and ██████ (staff) that Ch████ threatened to physically harm Marie after an argument.

Marie stated that it was brought to her attention by K████, staff, that S██████, resident, had a list of names that Ch████ asked her to compile. S██████ reported to Marie that it was so that Ch████ would be able to find a job after she was fired.

Marie then provided the investigation team with two statements written by R████ and C██████, both residents, regarding the conversations discussed in Ch████ and D████'s groups. These statements are enclosed in these findings.

Marie stated that she let both counselors, Ch████ and D██████, know that they were not to see residents while this investigation was underway.

**J██████'s statement findings:**

J██████ stated that her and R████ (staff) were out smoking and went into the employee break room. She stated that she heard Ch████ on the phone in the kitchen, but that she could not tell who it was she was on the phone with. J████ stated that Ch████ said "I put my hand in her face, but she touched me how she did ████na." She also stated that Ch████ said "I'll f*** her up."

**R██████'s statement findings:**

R██████ stated that her and J██████ (staff) were outside smoking and then walked into the break room when they heard Ch████ on the phone with someone in the kitchen. She stated that the call was on speaker and sounded like ████a (former staff). R██████ stated that she heard her state Marie "put hands on her" and that "Marie doesn't want to do this, I'm not the one to f*** with." She stated that from where she was, she did not hear any specific physical threats.

**K████'s statement findings:**

████a, staff, reported that after group, she found S████y standing in the doorway of another resident's room. She attempted to tell S████y to go to the next group, but S████y stated "Wait, I'm doing something for C██████," and told her she would tell her about it after the next group. K████reported that after the group, S████y approached her and told her "C██████ wanted us to write a piece of paper, in case she got fired, so she could give it to the state." K████ stated this piece of paper was petition-like and included a list of names. Later that evening, K████, resident, reported to K████ that "girls were passing around a piece of paper to sign for C██████." K████ then contacted Marie and let her know what was going on.

**Sydney's statement findings:**

S████y stated that after a group session, C██████ asked her to write a letter of recommendation. She stated that she "felt like she [C██████] knew she was going to get fired, so it was to secure a job after." Sydney reported that C██████ did not ask her what to write, just to make sure "multiple people" signed it. The day after, around 6 am, Marie contacted S████y and asked her about this paper. This paper was then confiscated and given to Marie. S████y then told C██████ that the list was taken from her. The list contained 13 names, and was likely to include S████'s, once she finished writing it.

**Jo██████'s statement findings:**

Jo████n (resident) consented to give her statement on her interpretation of C██████ and De██████ group practices. She stated that some topics in the group setting would "spiral." In relation to C██████ telling the group about Marie's hearing, she stated that C██████ said "because it's public knowledge she could tell them." She stated that she also told them it was court for bankruptcy. Jo████n stated that the sit-in was not C██████'s idea, but that she told them "if that's what you need to do to get your needs met." However, she said that she stated that she couldn't

Ch████ stated that all of her documentation was completed, however, she was told by investigators that it appeared they were not done. She stated that they were possibly done wrong because she was "never trained" to use the documentation system. To remedy this, Ch████ agreed to complete whatever was unfinished remotely. Ch████ also asked if she would be able to resume group sessions remotely, that she loves the vision of Serenity Hills, and stated she "wanted to come back."

**Recommendation**

Because of multiple corroborating statements surrounding Ch████ discussing **irrelevant court information** in the group setting, multiple witnesses stating **she asked S████y to write the statement**, and because of a **lack of therapy or notes** being completed by her, we recommend that Ch████ be terminated from her position with Serenity Hills Life Center.

Because of the **limited statements** surrounding D████'s involvement in the inappropriate group discussions and the evidence of her **improvement in the content of the group setting**, we recommend that D████ be given a disciplinary action, rather than termination of employment.

Paula ████ 12/12/25

Brianna ████ 12/12/2025

Kayla ████ 12-12-25

<Therapist4@serenityhillslifecenter.org>; Intake 2 <intake2@serenityhillslifecenter.org>; Jaylynn McClarren <SupportCounselor2@serenityhillslifecenter.org>; Marie Travis <ceo@serenityhillslifecenter.org>; Michelle Forshey <MB@serenityhillslifecenter.org>; SamanthaGroh <utilizationnurse@serenityhillslifecenter.org>; Shelia Weese <NP@serenityhillslifecenter.org>; NursingTeam <Nursingteam@serenityhillslifecenter.org>; MHT Serenity Hills <mht@serenityhillslifecenter.org>; Maggie Cha <secretary@serenityhillslifecenter.org>; Tara Singer <accountant@serenityhillslifecenter.org>; dfish@allardfishpc.com <dfish@allardfishpc.com>

**Subject:** Census & Group Division 05/02

# Exhibit B

Good Morning Team,

Attached is the updated census and group division for May 2nd.

Today, May 2nd, the following individuals will participate in their graduation ceremony :

S█████ ████████ ████good

█████████z

Monday May 5th, the following individual will transition to level 3.1 :

S█████████s

█████ T████r will be participating in the program for two more weeks, due to disciplinary write ups regarding behavioral concerns, such as aggressive and confrontational communication, as well as covert or deceptive behaviors that undermine her treatment. These behaviors indicate a need to further work on emotional regulation, interpersonal boundaries and accountability. Continued stay is intended to support Lisa in developing healthier relational patterns to decrease potential relapses.

If you have any questions or concerns, please contact me.

Much appreciated,

*Charlie Endly*
*Supportive Counselor*
*Serenity Hills Life Center*
*(304) 277-4657*
*Supportcounselor@serenityhillslifecenter.org*
*667 Stone Shannon Rd Wheeling WV 26003*

*Email Confidentiality Notice: The information contained in this transmission is privileged and confidential and/or protected health information (PHI) and may be subject to protection under the law, including the Health Insurance Portability and Accountability Act of 1996, as amended (HIPAA). This transmission is intended for the sole use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are notified that any use, dissemination,*

 Gmail

Sharon Travis <serenityhillscenterceo@gmail.com>

Exhibit B.1

## Fw: January Group Notes Audit

**Intake 2** <intake2@serenityhillslifecenter.org>
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Wed, Mar 11, 2026 at 12:50 PM

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

**From:** SamanthaGroﬀ <utilizationnurse@serenityhillslifecenter.org>
**Sent:** Sunday, February 1, 2026 10:06 PM
**To:** Shelia Weese <NP@serenityhillslifecenter.org>; Clinical Director <Therapist4@serenityhillslifecenter.org>; Intake 2 <intake2@serenityhillslifecenter.org>; Michelle Forshey <MB@serenityhillslifecenter.org>; William Frederick <wfrederick@meridianmp.com>
**Subject:** January Group Notes Audit

Good evening, Team,

I am writing to formally express my concerns regarding current group service hours and associated documentation for January's dates of service. Based on recent reviews in preparation for requesting authorization for services, I noticed documented group hours reported do not consistently align with billing standards for minimum group hours per week. Documentation in several instances does not meet required compliance criteria. Accurate reporting of group hours and thorough, timely documentation are essential to meet payer requirements and to also protect both our clients and ourselves professionally within our organization. Failure to meet these standards places us at risk for additional audits, claim denials, potential recoupments, and other legal issues, which I (and I believe all of us, for that matter), would like to avoid. As I understand, level 3.1's require a minimum of 5 hours of group per week, and level 3.5's require a minimum of 15 hours of group per week (Michelle, please correct me if I am inaccurate). Keep in mind, this list does not account for any times the clients may have not been available for services for doctor's appointments/hospitalizations, court, etc. (I did not see any notes within the group documentation indicating lack of services for those specific reasons). If any additional documentation for missing groups can be added into MedEZ, I would greatly appreciate the assistance.

The following documented group hours were noted for an audit of our current 3.1 level clients for the month of January, week per week:

Cooper (Admit 3.1 1/26): (12/29) 15.5, (1/5) 13, (1/12) 14.5, (1/19) 15.5, (1/26) 2.5 (empty note for DOS 1/26)

Brack (Admit 3.1 1/20): (12/29) 3.75, (1/5) 2.5, (1/12) 1.25, (1/19) 0, (1/26) 1.25

Towns (Admit 3.1 1/12): (12/29) 15.5, (1/5) 15.5, (1/12) 1.25, (1/19) 0, (1/26) 1.25

VanCamp (Admit 3.1 1/12): (12/29) 15.5, (1/5) 14.5, (1/12) 1.25, (1/19) 0, (1/26) 2.5

Riley (Admit 3.1 1/26): (12/29) 15.5, (1/5) 15.5, (1/12) 13.5, (1/19) 15.5, (1/26) 2.5 (empty note for DOS 1/26)

Edgell: (12/29) 2.5, (1/5) 11.25, (1/12) 3.75, (1/19) 5, (1/26) 1.25

Herring: (12/29) 2.5, (1/5) 11.25, (1/12) 3.75, (1/19) 5, (1/26) 1.25

Wood: (12/29) 2.5, (1/5) 11.25, (1/12) 3.75, (1/19) 5, (1/26) 1.25

Oliver: (12/29) 3.75, (1/5) 2.5, (1/12) 0, (1/19) 0, (1/26) 1.25

Nuzum: (12/29) 2.5, (1/5) 11.25, (1/12) 3.75, (1/19) 5, (1/26) 1.25

Harper (Admit 3.1 ½): (12/29) 0, (1/5) 1.25, (1/12) 1.25, (1/19) 0, (1/26) 1.25

Radcliffe (Admit 3.1 1/5): (12/29) 15.5, (1/5) 3.75, (1/12) 1.25, (1/19) 0, (1/26) 2.5

Cline (Admit 3.1 1/5): (12/29) 15.5, (1/5) 2.5, (1/12) 1.25, (1/19) 0, (1/26) 1.25

Durhammer (Admit 3.1 1/5): (12/29) 15.5, (1/5) 3.75, (1/12) 1.25, (1/19) 0, (1/26) 1.25

Edwards (Admit 3.1 1/9): (12/29) 1.25, (1/5) 1.25, (1/12) 2.5, (1/19) 5, (1/26) 1.25

Mullins (Admit 3.1 1/12): (12/29) 8.25, (1/5) 15.5, (1/12) 1.25, (1/19) 0, (1/26) 2.5

Fetty (Admit 3.1 1/12): (12/29) 0, (1/5) 0, (1/12) 3.75, (1/19) 0, (1/26) 2.5


The following documented group hours were noted for an audit of our current 3.5 level clients for the month of January, week per week:

Koch: (12/29) 15.5, (1/5) 15.5, (1/12) 14.5, (1/19) 15.5, (1/26) 8.5

Ashley: (12/29) 15.5, (1/5) 13, (1/12) 14.5, (1/19) 15.5, (1/26) 9.75

Abbott: (12/29) 15.5, (1/5) 15.5, (1/12) 13.5, (1/19) 15.5, (1/26) 9.75

Welch: (12/29) 15.5, (1/5) 15.5, (1/12) 14.5, (1/19) 15.5, (1/26) 11

Barr (Admit ½): (1/5) 13, (1/12) 13.25, (1/19) 14.25, (1/26) 11

Coulter (Admit 1/9): (1/12) 12, (1/19) 15.5, (1/26) 11

Weaver (Admit 1/16): (1/19) 2.25, (1/26) 11

Trimble (Admit 1/22): (1/19) 2.25, (1/26) 11

Blake (Admit 1/29): (1/26) 1.25

McGowan (Admit 1/29): (1/26) 1.25

Suarez (Admit 1/30): N/A

Level 3.5 group notes have inaccurate times documented for DOS 1/6 and 1/27, if those would please be updated as well.


Please feel free to reach out if you have any questions/concerns, or additional input.


Sami


*Samantha Goff, BSN, RN*

**Utilization Nurse**


Serenity Hills Life Center

667 Stone Shannon Road

Wheeling, WV 26003

(740) 310. 3425

## Counselor

There were two sessions where Ch████e had told the patients in the group information about a hearing that Miss Marie was supposedly scheduled for some time that week and that whenever that hearing happened she was going to be fired or forced out of her position at Serenity Hills Life Center and that she would be replaced the next day. She also informed the group that UNBUSMAN was called in and here to look through any and all information as well and would be part of revamping of Serenity Hills. Ch████e at one point in time also told the patients that it maybe a good idea to stage a "sit-in" of sorts and to not go to groups or any other scheduled sessions until the needs or wants of the patients were met because they could not be physically moved. She also said that Miss Marie is personally responsible for putting patients in either the 3 month or 6-month programs and that she would push patients into the 6-month program specifically to make money due to some bankruptcy allegation. I knew this to be untrue because I specifically remember when I did my intake interview on the phone with Miss Marie she asked me which program I wished to sign up for and in no way shape or form did I feel pressured or coerced into any program other than the one that I wanted to sign up for. I also did not pay as close attention in the group sessions because I personally know that Serenity Hills and Miss Marie have and outstanding reputation in the community as well as the local court systems for helping many women in their recovery journey.

Ch████ A. R████e

11-30-25

Exhibit C 1

My name is Kayla Pumphrey. I came to mane and told her on the 27th of October I had overheard marlena on the phone while I was sitting in her office- I heard her tell whoever it was that if she was leaving she planned on taking everything with her, pattients files, everything. Then they would see how much they'd be screwed without her.

my name is Taylor Cox I am documenting what Ms. Pumphrea is saying because she is blind and cannot for herself.

Taylor Cox : _Taylor Cox_

Koyla Pumphrey : _____

# Exhibit D

## Counselor

This is R█████C███ I was asked to write a statement pertaining to some things I have witnessed as far as in class with ██ we have been told about things that are not associated with recovery and that are not appropriate for client and counselors to discuss. For example, Mrs. Marie getting into an altercation and having court over someone entering the building without permission and gossip about her twisting her arm and having emotional and money problems. DJ's class purposely was running off of music, complaints, and movies to purposely affect the growth of the program here at Mrs. Marie's. Many people were complaining that it was affecting their treatment, it made them uncomfortable. I was not instructed what to say.

Also, C█████l was speaking inappropriately about Mrs. Marie about her money and court issues and was even offering to bring people brochures from other facilities to help them leave if they wanted. When questioned what people didn't like about the program here it was only selfish complaints such as they didn't like the way our smoke breaks went and they didn't like that they couldn't call their boyfriends. No one had any legitimate complaints.

R███ C███

11/30/25

**M** Gmail

Sharon Travis <serenityhillscenterceo@gmail.com>

---

## FW: Heart 2 Heart

**Deborah Fish** <dfish@allardfishpc.com>  Fri, Jun 20, 2025 at 3:44 PM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Per our discussion today please see the email below and attachment.

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

Detroit, MI 48226

Phone: 313.309.3171

Text: 313. 309.3171

**From:** Deborah Fish
**Sent:** Thursday, June 12, 2025 2:42 PM
**To:** Marie Travis <ceo@serenityhillslifecenter.org>; Gwenyth A. Ortman <gortman@bernsteinlaw.com>
**Subject:** Heart 2 Heart

Marie,

Let me start this by saying your passion for Serenity Hills is second to none. It is clear you care about the women served and Serenity Hills. I know you have a vision for the future, the first step to make that vision come to fruition is the reorganization of the business. In my ombudsman role I am required to make requests, provide recommendations and guidance on behalf of the residents to improve the quality of care and move the bankruptcy case towards completion. Based on my experience, work, and time in this case I believe it would be helpful for you to have a refined role and a list of *action* and *take no action* items to make it easier for you to organize your day, focus on the reorganization, and improve the quality of care. I understand the reorganization process can be daunting and the Debtor is making some process, we agree SH needs more admissions and to hire one or two additional therapists. Additionally, I strongly suggested that you hire an intake person or find a way to use Emily who is already on staff to takeover that role until you can hire a full-time person. From and operational side those three hires are key along with improvements that are underway in the clinical/treatment side. I agree with you – the current staff have the best interests of the residents and the facility at heart. They are all working hard to fill in until you can add staff. Hopefully, this "working outline" helps. Both you and your counsel may have additions and comments to make it better. I am open to any discussion and/or comments that will improve the quality of care for the residents. Again, please accept this outline as an aid in your role as CEO and as a step towards your goal of growing the company by adding services and resources to impact the lives of more women who need the services provided by Serenity Hills.

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

No. 5:25-bk-00087   Doc 273   Filed 05/20/26   Entered 05/21/26 15:31:54   Page 70 of 110

≡ **M** Gmail     🔍 charli     ✕ 🎚

Compose

Inbox     1,987

Starred

Sent

Drafts     114

Purchases     28

Travel

More

Labels

✉

*attachments from any computer.*

---

**From:** Charlie Endly <SupportCounselor@serenityhillslifecenter.org>
**Sent:** Friday, December 5, 2025 10:12 AM
**To:** Clinical Team <ClinicalTeam@serenityhillslifecenter.org>; NursingDepartment <nursing@serenityhillslifece serenityhillslifecenter.org>; Deborah Fish <dfish@allardfishpc.com>
**Subject:** Census & Group Division 12/05

Good Morning, Team, Happy Friday!

Attached is the census and group division for today, December 5th.

We will be facilitating treatment team today and will be evaluating the following individuals for level
J██ D████
B█████ B███
W███ B███

After the meeting concludes, I will inform the team of the transitions that will take place on Monday.

If you have any questions or concerns, please feel free to reach out.

Much appreciated,

*Serenity Hills Life Center*
*(304) 277-4657*
*Supportcounselor@serenityhillslifecenter.org*



## Heart 2 Heart

**Deborah Fish** <dfish@allardfishpc.com>                                      Fri, Aug 1, 2025 at 9:26 AM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Marie,

What is the status on the complaint you reported last Friday. Who was assigned and how was it resolved?

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

Detroit, MI 48226

Phone: 313.309.3171

Text: 313. 309.3171



Sharon Travis <serenityhillscenterceo@gmail.com>

## Heart 2 Heart

2 messages

**Deborah Fish** <dfish@allardfishpc.com>                                   Fri, Aug 1, 2025 at 9:26 AM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Marie,

What is the status on the complaint you reported last Friday. Who was assigned and how was it resolved?

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

Detroit, MI 48226

Phone: 313.309.3171

Text: 313. 309.3171

---

**Sharon Travis** <serenityhillscenterceo@gmail.com>                       Sat, Aug 2, 2025 at 8:40 AM
To: Deborah Fish <dfish@allardfishpc.com>

We wanted to do the investigation and then she said she did not want it done and said she thought that she had to fill in one of the boxes .I told her that I would have to get a paper having her stating that .I had an emergency at home will get that done unless you think I should continue with it.
[Quoted text hidden]
--
**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

Exhibit g   Case maryr

11/4/2025

We are conducting an investigation on the incident occurring between CEO Marie Travis and M█████ N███ on 10/28/2025. We would like to note that none of the cameras used in this investigation contain sound. Outlined below are the findings of the investigation.

On 10/28/2025, at Serenity Hills Life Center, M████ █████n was observed on the 'Dining Hall South' camera attempting to gain entry into the building using the side entrance. Because her key fob entry had been dismantled, she was unable to scan in. ██████a was observed attempting to scan in and open the door three times, at 11:12:16 a.m., 11:12:22 a.m., and 11:12:26 a.m. Immediately afterward, on the 'Kitchen Loading Dock' camera, █████a was observed speaking to ████e, a member of the maintenance staff. According to M███e, M██████ asked him "Is yours still working?" to which Mike responded, "Yes." █████a then stated, "I just got fired and didn't know it." He then observed her walking around the building toward the lobby entrance and out of his vision.

█████a was then observed on the 'Main Lobby West' camera at 11:13:25 a.m. placing her key fob entry on the scanner and opening the front door, gaining entry into the facility. According to Mike (maintenance), key fob locations have to be individually dismantled, so the lobby location may not have been dismantled. Additionally, he notes that the door may not have been latched all the way. █████a is then seen walking down the hallway toward the dining hall.

On the 'South Hall Office' camera, █████a is observed opening her email and placing an undistinguishable phone call on her personal phone. Afterwards, Marie enters the office and they are observed speaking to each other. █████a begins to pack things up and is observed placing a Facility Census in her handbag, containing client confidential information, among other undistinguishable papers at 11:16 a.m. Sheila (FNP, Medical Director) then enters the office and

confiscates ▓▓▓▓'s key. Marie exits the office. ▓▓▓▓ then begins to erase client information, including appointments, discharge information, and visit dates, off of the white board calendar located in her office. At 11:18:52 a.m., Marie re-enters the office, walking toward ▓▓▓▓. Marie puts her hand on top of ▓▓▓▓a's arm and lowers it, attempting to stop her from erasing the board. They are observed speaking to each other. ▓▓▓▓ then picks up her phone and dials an undistinguishable number, while they continue to speak to each other. At 11:19:50 a.m., Marie exits the room and does not return. ▓▓▓▓ is observed packing her things and exits the office subsequently.

Using the 'Dining Hall North' camera, ▓▓▓ (maintenance staff) and ▓▓▓ (FNP, Medical Director) are observed outside the room in the hall during the incident. It is unclear whether or not they are able to see into the room from this angle. On the camera, ▓▓▓e is observed stepping toward the door after Marie's entry and Sheila is looking toward the door. According to ▓▓▓, he was only able to see the white board from his point of view. He states that he stepped closer after he heard Marie state loudly, "No, that's mine." ▓▓▓e alleges that he did not observe any contact between Marie and ▓▓▓▓ due to his location in the hall at the time of the incident. Sheila stated that she was unable to see into the room during the incident.



11-5-25

11/5/2025

11-5-25

 Gmail

Sharon Travis <serenityhillscenterceo@gmail.com>

## Letter Of Concern

**Gloria Busch** <mommabird14@gmail.com>                               Mon, May 4, 2026 at 4:38 PM
To: "serenityhillscenterceo@gmail.com" <serenityhillscenterceo@gmail.com>

May 4,2026

To:  Whom It May Concern

From:  Gloria Busch
New Life Ministry Director
2513 Neal Street
Parkersburg, WV 26101

My name is Gloria Busch. I am the Director of New Life Ministry (NLM), a 2-year mentoring program, sponsored by the South Parkersburg Baptist Church, for female adult substance abusers in Pleasants and Wood Counties.This ministry was founded in 2015, and, to date, has helped 18 women. Referrals are received from the Adult Probation Officers representing both counties, and from Public Defenders.  The first year involves two NLM mentors, and myself, transporting the women to a long term recovery/ rehabilitation center in WV and having a monthly 'in person' visit with each ministry participant along with a weekly phone call check in. The second year involves an every other month in person visit and weekly phone call while offering a variety of resources, and general guidance to help the ladies be successful long term. As the director, I have used six different WV recovery rehab programs, but, after researching the Serenity Hills Life Center web site  and having several conversations with the then CEO, Marie Travis, I  decided to suggest this facility for one of our ministry ladies.  She talked about how well run the program was, and the many benefits of the program that were truly making a difference in her life.

 She completed the six month program and was making plans to move into the sober living home on site, which had already been approved by CEO Marie Travis, when our lady was told by the Nurse Practitioner that SHE had denied our woman's request. This was done without the knowledge of Ms.Travis and I was told,  out of the scope of the nurse's job description! Our ministry participant was denied sober living, and a job there, without even a single write up when she found this news out. Shortly after that, our woman told me that Ms. Travis was no longer at the Serenity Hills facility, and that several staff had been let go, leaving the ladies there in the first 3 months of their stay without anyone to teach their classes.  My understanding from her was that this left a long portion of their day with nothing to do.

This concerns me greatly as I am now having second thoughts about recommending Serenity Hills Life Center to other ladies referred to this ministry seeking help from a strong, solid, and well run program, which is so critically needed in our state. I now also hesitate to recommend this facility to probation officers or attorneys.

Thank you for your time and consideration.


Respectfully,
Gloria Busch
New Life Ministry Director
cell:  304 893-1427



Sharon Travis <serenityhillscenterceo@gmail.com>

## FW: Heart 2 Heart - Serenity Hills Life Center

**Deborah Fish** <dfish@allardfishpc.com>                    Fri, Dec 26, 2025 at 3:10 PM
To: "Kirk B. Burkley" <kburkley@bernsteinlaw.com>, "Gwenyth A. Ortman" <gortman@bernsteinlaw.com>
Cc: Sharon Travis <serenityhillscenterceo@gmail.com>, Shelia Weese <NP@serenityhillslifecenter.org>

All,

Pursuant to Will's request, following his call with Marie, I sent the email below regarding the audit.

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

Detroit, MI 48226

Phone: 313.309.3171

Text: 313. 309.3171

**From:** Deborah Fish
**Sent:** Friday, December 26, 2025 12:05 PM
**To:** 'amber.kent@wellpoint.com' <amber.kent@wellpoint.com>; William Frederick <wfrederick@meridianmp.com>
**Cc:** ceo@serenityhillslifecenter.org
**Subject:** Heart 2 Heart - Serenity Hills Life Center

C-2025-2832

TIN: 472418972

Investigator: Amber Kent

Dear Ms. Kent

Please be advised Will Fredrick and I are the respective court appointed Chief Restructuring Officer and Heath Care Ombudsman for the facility. We are working with the facility to respond to your letter dated December 9, 2025, and we appreciate the deadline extension you granted to January 26, 2026. Please provide us with the claims detail report referenced on page 2 of your letter. We are assuming that the claims detail report is specific and will enable us to provide you with resident-by-resident ( or medical record by medical record) documentation or information lacking or missing. Also, any additional information that would assist us in properly and efficiently responding to your request would be greatly appreciated. Please feel free to reach out to either of us if you have any questions. My contact is below, Will's email is above and his phone number is:  412-480– 8230.

Thank you for your time and assistance,

**Deborah Fish-Patient Care Ombudsman**



*Exhibit H1*

No. 5:25-bk-00087     Doc 273     Filed 05/20/26     Entered 05/21/26 15:31:54     Page 77 of 110

Sharon Travis <serenityhillscenterceo@gmail.com>

## Notes Needed

1 message

Samantha Grish <utilizationnurse@serenityhillslifecenter.org>          Sun, Nov 30, 2025 at 2:03 PM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Hi Marie,

Per our phone conversation, I wanted to follow up regarding the lack of documentation for group and individual therapy sessions. Overall, I am seeing the following concerns:

Stewart- has only documented treatment plans within the past three weeks     *Clinical Director*

Carole- no group notes entered for November

D#- is documenting groups; some notes are marked as void (I am not sure why?)     *Counselor B*

Charnell- is documenting groups; many are missing how/if the client interacted, etc.     *Counselor A*

Bree- last group notes I am finding are from 11/17

Again, many of the clients are either not seeing a therapist weekly, or these visits are not being documented. Per records, Sara A. has not seen a therapist in over a month- 10/15.

If you would reiterate to the staff the importance of logging documentation, I would greatly appreciate it.

Thank you,

Sam

*Samantha Grish, BSN, RN*

**Utilization Nurse**

Serenity Hills Life Center

667 Stone Shannon Road

Wheeling, WV 26003

(              )

*Exhibit I*

# Board of Review
## WORKFORCE WEST VIRGINIA
### 5707 MacCorkle Avenue SE
### Suite 500, Room 104
### Charleston, West Virginia 25304
### 304-558-2636/1-800-635-0189

HEART 2 HEART VOLUNTEERS INC, DBA

667 STONE SHANNON RD
WHEELING, WV 26003

*Case manager*

Case No. R███████

**IN THE MATTER OF:**

| | |
|---|---|
| **Claimant:** | ~~████████~~ J ~~████~~ |
| S.S. No.: | XXX-XX-XXXX |
| Address: | ~~████████████████~~ EE, WV 26037 |

| | |
|---|---|
| **Employer:** | HEART 2 HEART VOLUNTEERS INC, DBA |
| Address: | 667 STONE SHANNON RD  WHEELING, WV 26003 |

This case came on for telephonic hearing before Ryan Sims, Administrative Law Judge, on January 14, 2026.

**APPEARANCES:**

Claimant appeared telephonically individually, and through witnesses ~~████████~~, ~~████████~~, and ~~████████~~. Employer appeared telephonically through Sharon Travis, Chief Executive Officer, ~~████████~~, ~~████████~~, Maintenance, ~~████████~~ Human Resources Generalist, ~~████~~ ~~████~~ Kitchen Manager, Ta~~████~~x, MHT Supervisor, ~~████████~~er, former client, and J~~████~~ca Harrison, ~~████████~~ist.

**ISSUES:**

The employer appealed from the decision of the deputy at Wheeling, West Virginia, dated November 25, 2025, which held: The claimant is not disqualified. The claimant was discharged but not for misconduct.

**FINDINGS OF FACT:**

1. The claimant was employed by the above employer as a case manager, from J~~████~~, 2025 to O~~████~~, 2025, earning $23.00 per hour and scheduled to work over 40 hours per week.

2.    The employer operates a residential substance use disorder treatment facility.

3.    The claimant's primary duties included managing cases of certain patients.

4.    On the evening of October 27, 2025, the claimant cleared out her office of most things and went home, without clear explanation, but tacitly indicating she was quitting.

5.    The claimant had told a patient that she was going to quit soon and that, when she did, she was going to take things to make it difficult on her employer.

6.    The claimant showed a clear intent to quit her job, on the evening of October 27, 2025, when she removed most of her belongings from her office and left the employer's facility.

7.    The claimant voluntarily left employment without good cause involving fault on the part of the employer.

**CONCLUSIONS OF LAW and DISCUSSION:**

While the deputy decision states that the employer discharged the claimant, the credible evidence presented by the employer established that the claimant quit her job by taking her stuff from the office indicating she was quitting. This is bolstered by the fact that, shortly before she did this, she told a patient she intended to quit. Chapter 21A-6-3(1) of the West Virginia Code provides that an individual shall be disqualified from receiving unemployment compensation benefits for the week in which he or she left his or her most recent work voluntarily without good cause involving fault on the part of the employer, and until he or she returns to covered employment and has been employed therein at least thirty working days. The claimant has the burden of proving that there was good cause involving fault on the part of the employer for the claimant to leave employment.

Here, with the burden shifting based on the evidence, and the claimant becoming the moving party in her separation from employment, the claimant did not carry her burden of proving that she quit her employment for good cause involving fault on the part of the employer. The claimant previously told a patient that she was going to quit, and the patient was so concerned that the patient had the encounter documented by having a coworker of the claimant transcribe the events. Thereafter, on the evening of October 27, 2025, the claimant made a personal decision to quit her job by packing up most of her things in her office and leaving the employer's facility.

Moreover, the claimant's testimony was riddled with inconsistencies. For example, the claimant asserted that her key fob had been turned off on the side door but worked on the front door. However, the employer submitted evidence showing the claimant's key fob had been permanently disabled, including when the claimant tried to swipe it at the front door.

Credibility determinations made by an Administrative Law Judge are entitled to deference because the Judge who observed the witness testimony is in the best position to make credibility judgments. Cahill v. Mercer County Bd of Educ., 539 S.E.2d 437 (W.Va. 2000). The Judge may consider several factors to assess a witness' testimony including: demeanor; opportunity or capacity to observe an event; consistency of memory and evasive responses; presence or absence of bias or motive; the consistency of prior statements; the plausibility of the witness' statements; and any contradiction or corroboration of the witness' testimony.

Exhibit K

my name is ████ ████████.
I came to marie and told her
on the 27th of October I had
overheard ████████ on the phone
while I was sitting in her office —
I heard her tell whoever it was
that if she was leaving she planned
on taking everything with her,
patients files, everything. Then
they would see how much they'd
be screwed without her.

my name is Taylor Cox I
am documenting what Ms. ████████
is saying because she is blind
and cannot for herself.

Taylor Cox : *Taylor Cox*



Exhibit K 1

## Referral Information

Date:

Name:                                    Contact Number:

DOB:                    WV Resident?            Soc Sec Num:                    Email:

What is the member's descent (Origin)?   white

Insurance:                    Member #                    Effective Date:                    Active? ☐

Drug?   multiple

Referral Source:

Marital Status:    seperated

Children (Include Age & Custody Arrangements):

Seen a Psychiatrist? (When / How long / for?)

Medications:

Address:

Legal Issues:

Attorney Info:

Parole – Probation Officer & Contact Info:

Program Choice?

**Pregnant?** ☐  **IV User?** ☐  **Hep C?** ☐ **HIV?** ☐  **State ID** ☐  **Contraband List?** ☐

**Schedule Assessment**

## PRESENTING PROBLEM

CURRENT PRESENTING PROBLEM (REASON FOR REFERRAL – PROVIDE SYMPTOM DESCRIPTION, SEVERITY, DURATION:
The purpose of this evaluation is to assess symptoms in order to determine need for residential treatment for Substance
Use Disorder, determine need for changes to medication regimen, and develop an initial plan of care as appropriate.
Client admitted to Serenity Hills Life Center for            dependence. Client will be participating in a
while at Serenity Hills Life Center.

yes        - Dependence - Chronic - Severe

SUBSTANCE Use – Current & History – Indicate Substance Type, Amount, Frequency, Treatment History:

*1. Acute Intoxication / Withdrawal Potential:*

*2. Biomedical Conditions / Complications:*

MEDICAL ISSUES:

KNOWN ALLERGIES:

PRIMARY CARE PHYSICIAN:

*3. Emotional / Behavioral / Cognitive Conditions:*

PSYCHOTROPIC MEDICATIONS (CURRENT & HISTORY):

MEDICATION HISTORY:

CONSUMER PSYCHIATRIC HISTORY – INPATIENT & OUTPATIENT TREATMENT – INCLUDE RESPONSE TO TREATMENT:

FAMILY PSYCHIATRIC & SUBSTANCE ABUSE HISTORY:

## HISTORY

CHILDHOOD HISTORY (BIRTH PLACE, FAMILY STRUCTURE, UNUSUAL CHILDHOOD ILLNESSES, DEVELOPMENTAL ISSUES, RELATIONSHIP WITH PARENTS & SIBS):

PHYSICAL ABUSE:

EMOTIONAL ABUSE:

SEXUAL ABUSE:
no

*4. Readiness to Change:*

WHY DO YOU WANT TO CHANGE NOW:

## LEGAL ISSUES

LEGAL CHARGES – CURRENT (INCLUDE DATE & IF CONVICTED):

CIRCUMSTANCES SURROUNDING CURRENT OR PAST CRIMINAL OFFENSE(S):

LEGAL CHARGES – HISTORY (INCLUDE DATE & IF CONVICTED):

INCARCERATION HISTORY (DATE & LOCATION):

IS THE MEMBER INVOLVED WITH PROTECTIVE SERVICES (CHILD OR ADULT)?

*5. Relapse, Continued Use or Continued Problem Potential*
DO YOU ASSOCIATE WITH OTHER USERS / RECOGNIZE THE SEVERITY OF YOUR PROBLEM:

*6. Recovery/Living Environment* *Current living arrangement (last 3 years)*

## SOCIAL INVOLVEMENT

AVAILABLE SOCIAL SUPPORT – INCLUDE RELIGIOUS & CIVIC INVOLVEMENT:

AVAILABLE FAMILY SUPPORT:

**EDUCATION & OCCUPATION**

HIGHEST EDUCATION LEVEL ACHIEVED:

BEHAVIOR DIFFICULTIES – SPECIFY TRUANCY, SUSPENSIONS, EXPULSIONS:

WHAT IS THE MEMBER'S EMPLOYMENT STATUS?

LENGTH OF EMPLOYMENT:

WORK HISTORY – IF DISABLES, INDICATE DATE AWARDED BENEFITS AND BASIS FOR DISABILITY:

DESCRIPTION OF HOW SYMPTOMS ARE AFFECTION WORK OR SCHOOL PERFORMANCE:

**Will they meet Authorization Criteria, based primarily upon the ASAM questions?**

Exhibit L

| Time Period | Door |
|---|---|
| 10/28/2025 12:00:00 AM THRU 10/28/2025 11:59:59 PM | Front Door; Staff Entry Door |

| Date & Time | Door | Tenant / Site | Origin Name | Employee ID | Status | Additional Info |
|---|---|---|---|---|---|---|
| 10/28/25 11:55:55 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:55:50 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:55:36 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:54:09 AM | Staff Entry Door | Global / Serenity Hills | Sharon Travis | 937850146452 | Unlock | |
| 10/28/25 11:51:04 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:50:50 AM | Staff Entry Door | Global / Serenity Hills | Mike Blackstone | 062838428341 | Unlock | |
| 10/28/25 11:50:49 AM | Staff Entry Door | Global / Serenity Hills | Sheila Weese | 360855644732 | Unlock | |
| 10/28/25 11:48:36 AM | Staff Entry Door | Global / Serenity Hills | Mike Blackstone | 062838428341 | Unlock | |
| 10/28/25 11:43:40 AM | Front Door | Global / Serenity Hills | Sheila Weese | 360855644732 | Unlock | |
| 10/28/25 11:42:23 AM | Staff Entry Door | Global / Serenity Hills | Sharon Travis | 937850146452 | Unlock | |
| 10/28/25 11:40:41 AM | Front Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:39:49 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:39:46 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:39:42 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:39:37 AM | Staff Entry Door | Global / Serenity Hills | Malena Main | 453759117941 | Invalid User | |
| 10/28/25 11:34:45 AM | Staff Entry Door | Global / Serenity Hills | Amanda Quinn | 955539714801 | Unlock | |
| 10/28/25 11:31:36 AM | Staff Entry Door | Global / Serenity Hills | Jim Duill | 890144386520 | Unlock | |



## Insurance Reimbursements

| 2025 | Amount Received | Ave # Residents | |
|------|-----------------|-----------------|---|
| August | $198,096.64 | 31 | payment based on how many residents in July |
| September | $198,125.00 | 33 | payment based on how many residents in August |
| October | $214,975.00 | 29 | payment based on how many residents in September |
| November | $154,155.07 | 36 | payment based on how many residents in October |
| December | $161,729.76 | 39 | payment based on how many residents in November |
| **2026** | | | |
| January | $237,073.64 | 40 | payment based on how many residents in December |
| February | $110,650.00 | 40 | ave as of 2/17/2026 |

Exhibit Q

# Second Chance Slips Away in Courtroom Clash

- Rachel Morrison

- Apr 21, 2026 Updated Apr 24, 2026

**Sean J. Cross, 33, Harrisville, WV,** appeared in Circuit Court for sentencing on April 15, with Third Circuit Court Judge Leslie Maze presiding. Prosecuting Attorney Samuel C. Rogers, II, represented the State, while Attorney Judi McCullough spoke on behalf of the defense.

**Case History**

Cross was charged in May 2024 with 2 counts of Possession with Intent to Deliver (Methamphetamine; Marijuana) after she was found passed out in her vehicle. Bond was later revoked in September 2025 after additional charges were filed in connection with a second incident.

Cross has since attended Clean & Clear before being transferred to Serenity Hills Rehabilitation Center. She was scheduled for sentencing on March 24, however, confusion surrounding reports of her time at Serenity Hills led to the hearing being rescheduled.

A report by Case Manager Stacey McGruder had been received the morning of the hearing, and it was McGruder's seemingly conflicting letter that led to further investigation into the matter.

**Opening Statement**

pg 1

McCullough maintained that McGruder's account of events directly contradicted reports received by others at the facility. "I had several communications regarding Ms. Cross's treatment and course progress," she said. She explained that McGruder's report didn't match up when held in comparison to other reports she received that indicated that her compliance and participation had been excellent.

"The important thing is that she continues to make progress and learn coping behaviors," McCullough added. Referencing her client's relapse in September, she added, "Ms. Cross does as most addicts do and reverts to old habits in hard times."

"I don't think [McGruder's report] accurately describes her time in the program," McCullough stressed. "I choose to rely on the words of those who work with her closely every day." She continued on to say that Cross was committed to her recovery, despite issues she may have had. "She wants to stay and complete the program. She has her mother and grandmother here with her today, who are her support system. She's a good candidate for probation."

McCullough argued that Cross had not been ejected from the program, in spite of mistakes she may have made.

**Defendant Addresses the Court**

Cross chose to address the court, during which, she became emotional. She started by apologizing to the community, adding that she had time to reflect on her actions. "My arrest was God's intervention to help me," she said.

She admitted that she had relapsed, and addressed some of the issues she had at Serenity Hills, including an incident involving an ex-boyfriend's funeral, who she had claimed was her husband. "I went to see an ex-partner. I'm so sorry I tried to lie. He passed away 9 days after I got there."



She concluded by thanking the Judge and Prosecutor for allowing her the chance to go to rehab, before referring to her mother, who has been there to support her at every hearing, despite a recent illness. "I want to give my wonderful mother the daughter she deserves."

## Witness Testimony

Rogers then called McGruder to testify via Teams regarding her report, as well as her interactions with Cross at Serenity Hills. "Everybody here sees her on a different level," she stated, adding that she has access to probation records, criminal records, and other such information. "I see her on a more personal level. She was just rude and nasty. Her attitude didn't go over well."

"You said she had a bad attitude," Rogers asked, "did she lie?"

"Yes," McGruder answered, "she said that she was married." She went on to explain that Cross had listed a man on her contacts as her husband, so that she would be allowed to see him, but was later told by the Probation Officer that Cross was not married.

"Are there rules against contact," asked Rogers.

"Yes," McGruder replied, "no contact with anyone except in certain cases." When asked if she spoke with Cross about lying, McGruder claimed the conversation went badly. "She didn't care. She said it didn't matter. She said she hated it here." She then added, "She was rude and cussed the nurse practitioner." She then added that Cross had been caught contacting a different guy on her phone at a later time.

## Cross-Examination

Pg 3

McCullough was given a chance to cross-examine the witness. She began by asking for clarification about earlier statements that referred to an email by a woman named Marie Travis, which McGruder believed was the inciting incident between them.

According to McGruder, there was some debate over whether Cross was to stay at Serenity Hills for 4 months or 6 months, since she had already gone through 2 months at Clean & Clear. She explained that Travis, the former CEO, had sent an email stating that Cross only had to stay 4 months. She alleged that Cross blamed her when she had to stay 6 months instead.

"She had it in for me after that," McGruder said. "She put a big black X on my back. She made it clear she wasn't happy." She stated that after Cross returned from her last hearing, she shared information with others at the facility, including the letter McGruder had written. "She told everyone what I said."

"Is there a rule that says she can't share her court documents with other people," McCullough asked.

"It's a HIPPA Violation," McGruder exclaimed.

"Who is she violating," McCullough challenged. "It's her info."

"She knows she isn't supposed to share things like that," argued McGruder.

McCullough then referenced another letter that was written regarding Cross's time in the program which described her behavior in treatment. According to that letter, Cross started out hostile, and most of that hostility seemed directed toward McGruder. In addition, the letter described her as "excellent in group," but added that, "she can still be manipulative," but the writer hoped continued treatment would change her for the better.

pg 4

"They describe everyone's behavior as excellent," McGruder stated, and likened the rehab facility to a school setting. "She isn't going to act out in class." She then began to get heated. "The letter also says she's manipulative and untrustworthy. She thinks she can just lie, lie, lie!"

McCullough attempted to steer the witness back to the question of whether or not Cross was progressing in the program. "I never said she isn't making progress. She's participating in class," McGruder said. "But outside of that school setting, she's going to go right back to that behavior."

At this point Judge Maze paused the hearing to deliver a stern warning to Cross. "If you don't stop commenting on the testimony and making faces, I will put you out of the courtroom, and we will continue the hearing without you."

Returning to the testimony, McCullough asked if anything was being done to help Cross change her behavior in the 2 months she's been at the facility. "She's in behavior therapy, but it clearly isn't working," McGruder said.

McCullough pointed out that Cross had not finished treatment yet, and still had 4 months of the therapy left to go. Then she addressed the anger McGruder seemed to show toward Cross throughout her testimony. "You don't like Sarah, do you?"

McGruder responded by saying that she was used to this kind of behavior, and she was used to "being cussed."

"That's not what I asked," McCullough clarified, "I asked if you liked her." McGruder claimed that she did, despite everything she had said up to that point.

McCullough then asked how often McGruder saw Cross, to which she replied that she saw her in the hallways, at lunch in the cafeteria, and during smoke breaks. "Thursday or Friday she came to my office to apologize," she added. "That was a long talk."

pg 5

"And that's when you told her she was just apologizing to make herself look good in court," McCullough asked.

McGruder attempted to explain. " Other people were coming and telling me: This is what Sarah is saying about you."

McCullough returned to her question from earlier. "Do you think there's hope for Sarah to finish the program successfully?"

"She has been attending class like she's supposed to, I'm not denying that," McGruder replied.

McCullough pointed out that despite behavioral issues, Cross had not been kicked from the program. "So, it's contemplated from the start that people are going to screw up and get write-ups," she asked, and McGruder admitted that was true.

**Closing Statements**

Following cross-examination, Judge Maze had her own questions regarding the treatment program. According to McGruder, treatment level is determined by insurance, and Cross is currently at the highest level, which will complete after 6 months regardless of her progress.

Rogers began his closing argument by reminding the court of her criminal history, which included a DUI incident where she nearly hit a patrolling deputy after she had relapsed. She had been out on bond for the charges in this case at the time.

"Her behavior has not only persisted, but gotten worse," he stated. "Not only lying to manipulate the system, but the conduct has persisted. She is still contacting people she isn't supposed to."

Pg 6

Rogers recommended that Cross serve her sentence in prison. "She has been given an opportunity by this court to go and make her own future, and unfortunately I'm afraid she already has. She doesn't seem to understand the gift she's been given."

**Judgment Reached**

Judge Maze expressed concern over Cross's behavior. "She has a very serious substance abuse problem," she said. "It is alarming that she has had the attitude that she has had at Serenity Hills."

"She has been compliant," Judge Maze continued, "but I'm concerned that completion is not determined by progress, but rather a ticking clock set by the insurance company. It's difficult to find that she's making progress when she's already at the highest level."

The Judge then explained that she had planned to show leniency in this case. "The court had every intention of placing Ms. Cross on probation to continue the program. Since then, I have received reports of issues, most of which originate from Ms. Cross attempting to manipulate the system." She then added, "She's determined to do what she wants to do."

Cross was sentenced to 1 to 15 years in prison, with credit for 150 days. Judge Maze recommended that she continue to seek treatment through the GOALS program while incarcerated. "Hopefully your attitude in GOALS will be better than your attitude at Serenity Hills."

Cross was remanded into custody to serve her sentence.

pg 7



**1/30/2026**
**4th Quarter Meeting**
**Human Rights Committee**

Exhibit R

## Committee Member

1. B̶r̶e̶a̶n̶n̶a̶ M̶c̶E̶l̶w̶a̶i̶n̶, Supportive Counselor

2. Will Frederick CRO

3. K̶a̶y̶l̶a̶ B̶e̶d̶f̶o̶r̶d̶ – Mental Health Technician

4. J̶e̶s̶s̶i̶c̶a̶ D̶e̶a̶t̶o̶n̶ (resident) J D

5. T̶a̶m̶i̶k̶a̶ W̶a̶r̶d̶ (resident)T W

6. Marie Travis-Chair

7. A̶a̶n̶ B̶a̶r̶b̶o̶u̶r̶ (Outside member)

Residents are chosen by the Mental Health Technician based on having no write-ups and on their showing that they are serious about their recovery process. Also Maturity.

AGENDA

First Part: All Members included.

1.  Members who were residents were asked if there were any concerns or complaints as representatives for the residents' rights.

2.  They stated that sometimes lunch and dinner were not on time.

    *Answer: The chair stated that we will discuss this concern with the Kitchen. It has been discussed and ratified.*

3.  Mostly wanting to get more coffee. (At present, they get coffee before and after breakfast. Each meal and at internal AA/NA meetings.)

    *Answer: The chair stated that there were plenty of coffee breaks and that would not change. That there was a budget.*

4.  They discuss wanting to clean their own rooms.

    *Answer: It has always been a concern to allow the residents to have chemicals because of some of their mental health conditions. Also, if paper towels are flushed down the septic system, it would cause problems.*

    Solution: *We will allow them to scrub their floors. Also, they MHTs would spray cleaner, give them a paper towel, and they must return the paper towel to be thrown in the trash (Which was their main concern). Salt from snow storm was being trampled into the building.*

5.  They stated some women complained about not having cigarettes.

Some women do not have the money for cigarettes.

*Answer: They can be put on the Nicotine patch because we do not have it in our budget for cigarettes.*

6. They stated that, besides those concerns, everything was good.

7. They said that they liked the new telehealth counselor.

Second Part: All Members included except Sharon "Marie" Travis, and chaired by Breanna McElwain, Supportive Counselor.

Regarding the CRO's questions to the residents, TW and JD, concerning accusations against the CEO.

1. Regarding the incident with the former employee, ▮▮▮▮▮▮ains, and the CEO, neither resident had any knowledge of the incident.
2. Concerning allegations made about the CEO during a residential meeting, in which it was said she cursed at the residents, called them liars, and called their boyfriends pimps.
3. Answer: Neither resident, TW, nor JD heard cussing or calling them liars.
4. TW did not remember there being any discussion about pimps.
5. JD resident reported that the CEO, Marie Travis, stated "that some of you might have had pimps or bad people in your lives," regarding not being allowed to speak to their boyfriends during the holiday weekend.
   The resident did not believe that the CEO meant to cause harm with these statements. Some residents were hurt by the statement.

Exhibits



**LIFE CENTER**
A Place of Hope and Healing

# 1/30/2026
## 4th Quarter Meeting
## Quality Insurance Committee

## Committee Members

1. Charlie Endly- absent – on vacation

2. Breanna McElwain

3. Will Frederick

4. Dayna Hehr

5. Taylor Cox

6. Raven Williams

7. Marie Travis - Chair

pg 1

## Agenda

### Clinical

1. The new telehealth counselor is doing a great job. They are getting their individual therapy, and it is making a huge difference in their peace of mind.
2. MHTs are doing a great job and are some of the best MHTs that we have had.
3. Nurses should make recommendations early on if any outside evaluations are needed. This would include mental health, physical, cognitive, or learning disability evaluations.
4. There were discussions about the treatment team needing to apply write-ups evenly to the residents when it comes to disciplinary actions. Mental Health technicians were hearing complaints about favoritism—the need for consistency.
5. The need for a 24-hour counselor on call for the staff to know who to call.

pg 2

**Residents' issues and needs.**

1. Mental health technicians were asked about residents not having personal hygiene products, as reported by the ombudsman.
2. Taylor, the supervisor, reported that the only thing that they were out of was q- tips and that was one time. Stating that this report was not true.

Vehicle Safety

1. Talked about the vehicles having the transportation emergency policy up in the front seat
2. Having a transportation Emergency training for those who drive but have not been trained as of yet.
3. Making sure all maintenance on vehicles is checked monthly.

Cleaning

1. They need a sweeper because sweeping up salt was hard it and different Mop Heads.
2. The suggestion from Marie Travis was to get the shop Vacuum from maintenance to sweep up the salt.
3. Need a new sweeper.

Patient Safety

1. Boundaries training needs to be had.
2. Behavioral contracts are put on two residents. Stating the need to notify the PO of the resident's behavior.

pg 3

Exhibt U

🗂 Outlook

---

Fw: Intake Protocols - Immediate Clarification

---

**From** Intake 2 <intake2@serenityhillslifecenter.org>
**Date** Tue 2/17/2026 10:26 AM
**To** Tara Singer <accountant@serenityhillslifecenter.org>


**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

---

**From:** William Frederick <wfrederick@meridianmp.com>
**Sent:** Friday, February 6, 2026 10:18 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Cc:** Sharon Travis <serenityhillscenterceo@gmail.com>; Marie Travis <ceo@serenityhillslifecenter.org>
**Subject:** Intake Protocols - Immediate Clarification

Marie,

We had an agreement that intakes would continue only with approval from the medical staff. It has come to my attention that the two most recent intakes were declined by medical, yet were still accepted into the facility.

The first was declined due to suicidal ideation and behavior; the second due to active Ativan use. Despite this, both were admitted. As of this email, the first client left against advice, and the second required hospitalization for withdrawal and detox. These situations placed an undue burden on staff and resulted in no billable services.

**To be clear, the state does not mandate that the facility accept any patient.**

Effective immediately, all intakes must meet the following conditions:
- Prior approval by medical staff
- Intake completed during office hours, Monday–Thursday only

These conditions are non-negotiable moving forward.

Thanks,
Will

 Outlook

---

Fw: M██ G████'s acceptance letter

---

From Intake 2 <intake2@serenityhillslifecenter.org>
Date Tue 2/17/2026 10:28 AM
To    Tara Singer <accountant@serenityhillslifecenter.org>

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

**From:** Shelia Weese <NP@serenityhillslifecenter.org>
**Sent:** Thursday, January 29, 2026 11:19 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Subject:** Re: M██ G████'s acceptance letter

M██ G████ is accepted to the facility. You may let her attorney know.

---

**From:** Intake 2 <intake2@serenityhillslifecenter.org>
**Sent:** Wednesday, January 28, 2026 1:31 PM
**To:** Shelia Weese <NP@serenityhillslifecenter.org>; NursingDepartment <nursing@serenityhillslifecenter.org>
**Subject:** Fw: M████ G████'s acceptance letter

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

**From:** Intake 2 <Intake2@serenityhillslifecenter.org>
**Sent:** Wednesday, January 28, 2026 12:13 AM
**To:** Intake 2 <intake2@serenityhillslifecenter.org>
**Subject:** Re: M███ G███sby's acceptance letter

Please let me know if this one is accepted.

Marie Travis "CEO"

*exhibt W*

 Outlook

---

**Fw: Deloris Starkey's Medication list**

---

From Intake 2 <intake2@serenityhillslifecenter.org>
Date Tue 2/17/2026 10:35 AM
To    Tara Singer <accountant@serenityhillslifecenter.org>

.

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

From: Intake 2 <intake2@serenityhillslifecenter.org>
Sent: Sunday, February 8, 2026 1:04 PM
To: William Frederick <wfrederick@meridianmp.com>; Deborah Fish <dfish@allardfishpc.com>; Shella Weese <NP@serenityhillslifecenter.org>; Intake 2 <intake2@serenityhillslifecenter.org>
Subject: Fw: ▓▓▓▓▓▓▓ Medication list

This email is sent by Sheila, the Nurse Practitioner, to okay D▓▓▓ S▓▓▓▓ to come into the program, as sent to me. Nowhere does it state that she must detox off of Ativan first, and I will call BBC rehab to see if you informed them to do so, which I am sure you did not. I will get them to send me a letter verifying this, also. I do not know why this is being done, and I do not know who is accepting the referrals I send you, because you both are sending me emails from Sheila's email. Please refrain from providing false information about me and the intakes. This has been going on for a while, and you know I do not do approvals; Sheila does, so it is illegal to provide false information that goes to the courts.

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

From: Intake 2 <intake2@serenityhillslifecenter.org>
Sent: Friday, February 6, 2026 11:13 AM
To: William Frederick <wfrederick@meridianmp.com>
Subject: Fw: ▓▓▓▓▓▓▓▓▓▓▓▓ on list

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

From: Intake 2 <intake2@serenityhillslifecenter.org>
Sent: Thursday, February 5, 2026 9:31 AM
To: Shella Weese <NP@serenityhillslifecenter.org>
Subject: Re: ▓▓▓▓▓▓▓▓ Medication list

Thank you

Marie Travis "CEO"
Serenity Hills Life Center
304-277-4657 Ext 104/ 304-971-4171 Fax
667 Stone Shannon Rd. Wheeling Wv 26003

---

From: Shella Weese <NP@serenityhillslifecenter.org>
Sent: Thursday, February 5, 2026 9:03 AM
To: Intake 2 <intake2@serenityhillslifecenter.org>; William Frederick <wfrederick@meridianmp.com>
Subject: Re: ▓▓▓▓▓▓▓▓▓ Medication list

Hi Marie,
D▓▓▓ St▓▓▓▓ acceptable for the facility on the condition of her discontinuing the Ativan. Ativan is a medication that isn't prescribed at our facility.

Exhibit X

I have not heard Marie yell or scream at the residents. Nor have I ever been aware of a resident not being aloud a visit due to a disability.

JEFF PROHASKA    1/5/26

Exhibit X-1

**BBC Rehab**
2048 VIP Way
Fairmont, WV 26554
681-404-100

To whom it may concern,

████████████, ██████ 12/██/████2, was admitted to BBC Rehab on 12/04/2025 for Alcohol detox and 28-day program and discharged 02/05/2026. Deloris had an active order for Ativan 1mg PO QD PRN, which she was aware that she would not be discharged with. ██████s was administered prn Ativan once daily through January 16th, 2026. D████s was administered one dose of Ativan 1mg on February 4th, 2026 and February 5th 2026, as she was experiencing intense anxiety about transitioning to a long-term treatment program. Due to the dosage and frequency of Ativan that was administered in February 2026, detox from the Ativan is not medically necessary and she does not qualify for any detoxification program.

Jennifer Lauderman, LPN, BA
BBC Rehab LPN/Supportive Therapist

Dr. Muhammad Salman MD
Medical Director

Consequently, the claimant failed to carry her burden of proving that she quit the job for good cause involving fault on the part of the employer.

Accordingly, the claimant was not discharged by the employer. The claimant left work voluntarily without good cause involving fault on the part of the employer and is disqualified from receiving unemployment compensation benefits.

## DECISION:

The decision of the deputy is reversed. The claimant left work voluntarily without good cause involving fault on the part of the employer. The claimant is disqualified until claimant returns to covered employment and has been employed therein at least thirty working days.

If West Virginia is in an Extended Benefit Period when your regular benefits are exhausted, this decision, if it becomes final, will have the effect of denying entitlement to Extended Benefits in accordance with the West Virginia Unemployment Compensation Law [§21A-6A-1(12)].

This decision, if it becomes final, may result in an overpayment of benefits to the claimant, which will be collected as provided for in the Statute.

This, the 16th day of January, 2026.


Ryan M. Sims
**ADMINISTRATIVE LAW JUDGE**
**BOARD OF REVIEW**
**WORKFORCE WEST VIRGINIA**

RMS/rhn
Date Mailed: 01/16/2026
By: rhn

RIGHT OF FURTHER APPEAL: This decision is final unless a party appeals to the UC Board of Review within EIGHT DAYS. If any party in this decision desires to take a further appeal, such appeal must be filed in writing within EIGHT DAYS from the date the decision was mailed to you, or not later than **01/24/2026**.

If a party in this case misses the hearing, and can show just cause, the case may be remanded for a Hearing De Novo. To request a remand, please submit a detailed, signed written statement explaining why you missed the hearing. This statement must include your name and case number. This statement must be submitted within EIGHT CALENDAR DAYS from the date the decision was mailed to you, or no later than **01/24/2026**.

The appeal or remand motion may be mailed directly to Jeffrey K. Mullins, Chairman, UC Board of Review, 5707 MacCorkle Avenue SE, Suite 500, Room 104, Charleston, WV 25304, faxed to 304-558-1363, or emailed to wfrfbor@wv.gov and must be **postmarked** no later than the above date, unless such

**M Gmail**

## FW: Heart 2 Heart

**Deborah Fish** <dfish@allardfishpc.com>                                          Fri, Jun 20, 2025 at 3:44 PM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Per our discussion today please see the email below and attachment.

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

Detroit, MI 48226

Phone: 313.309.3171

Text: 313. 309.3171

**From:** Deborah Fish
**Sent:** Thursday, June 12, 2025 2:42 PM
**To:** Marie Travis <ceo@serenityhillslifecenter.org>; Gwenyth A. Ortman <gortman@bernsteinlaw.com>
**Subject:** Heart 2 Heart

Marie,

Let me start this by saying your passion for Serenity Hills is second to none. It is clear you care about the women served and Serenity Hills. I know you have a vision for the future, the first step to make that vision come to fruition is the reorganization of the business. In my ombudsman role I am required to make requests, provide recommendations and guidance on behalf of the residents to improve the quality of care and move the bankruptcy case towards completion. Based on my experience, work, and time in this case I believe it would be helpful for you to have a refined role and a list of *action* and *take no action* items to make it easier for you to organize your day, focus on the reorganization, and improve the quality of care. I understand the reorganization process can be daunting and the Debtor is making some process, we agree SH needs more admissions and to hire one or two additional therapists. Additionally, I strongly suggested that you hire an intake person or find a way to use Emily who is already on staff to takeover that role until you can hire a full-time person. From and operational side those three hires are key along with improvements that are underway in the clinical/treatment side. I agree with you – the current staff have the best interests of the residents and the facility at heart. They are all working hard to fill in until you can add staff. Hopefully, this "working outline" helps. Both you and your counsel may have additions and comments to make it better. I am open to any discussion and/or comments that will improve the quality of care for the residents. Again, please accept this outline as an aid in your role as CEO and as a step towards your goal of growing the company by adding services and resources to impact the lives of more women who need the services provided by Serenity Hills.

**Deborah Fish-Patient Care Ombudsman**

211 West Fort Street

Suite 705

*Counselor Exhibit Y*

IN THE MAGISTRATE COURT OF _____OHIO_____ COUNTY, WEST VIRGINIA

Magistrate Court Case No. 25-M35S-00150

Sharon Travis
_____
Petitioner *(First/Middle/Last)*

_____
By Parent/Guardian/Custodian *(if applicable)*

v.

Chantell Williams
_____
Respondent *(First/Middle/Last)*

| Law Enforcement |
| :---: |
| Completed Service Verification on Page 4 |
| ☐ Yes |
| ☐ No |

## PERSONAL SAFETY ORDER FOLLOWING FINAL HEARING

*W. Va. Code § 53-8-7; § 53-8-10*

On the __16th__ day of _____December_____, 20 25_____, the petitioner filed with this Court a PETITION, pursuant to *West Virginia Code § 53-8-4*, alleging certain acts or offenses by the respondent and requesting this Court grant appropriate relief.

The Court held a Final Hearing in this matter on the __19th__ day of _____December_____, 2025_____, based upon the following: *(Check one as applicable.)*

☐ Service was waived by the respondent.

OR

☐ A Temporary Personal Safety Order was previously issued and served upon the respondent, scheduling this matter for a Final Hearing.

OR

☑ The respondent appeared at the hearing on the Temporary Personal Safety Order, and both the petitioner and respondent expressly consented to waiving the hearing on the Temporary Personal Safety Order.

The following were present for the hearing:

*Sharon Travis and Chantell Williams*

Based on the matters set forth in the PETITION, and based upon a preponderance of the evidence, the Court finds as follows:

A. This Court has jurisdiction and this county is a proper venue to hear the PETITION.

B. The respondent has committed the act(s) described below against

☑ the petitioner.

☐ the following child(ren): _____.

☐ the following incapacitated adult(s): _____.

Magistrate Court Case No. 25-M35S-00150

C. The petitioner has reasonable apprehension of continued, unwanted, or unwelcome contacts by the respondent, based upon the following act(s) committed by respondent *(Check any or all that apply.)*:

☐ Sexual Offense(s) or Attempted Sexual Offense(s) as defined in *West Virginia Code § 53-8-1.*

☐ Stalking in violation of West Virginia Code *§ 61-2-9a(a).*

☑ Repeated credible threats of bodily injury knowing or having reason to know that the threats caused reasonable fear for safety in violation of *West Virginia Code § 53-8-4(a)(3).*

-OR-

Without admitting any act:

☐ The respondent consents to the entry of a Personal Safety Order.

D. The Court also finds that *(Check any that are applicable OR check Not Applicable.)*

☐ a weapon was used, or threatened to be used, in the offense(s) for which the PETITION was filed.

☐ the respondent has violated a prior Personal Safety Order.

☐ the respondent has been convicted of an offense involving the use of a firearm.

-OR-

☑ Not Applicable

The Court further makes the following findings of fact in relation to the conclusions stated in Paragraphs A,B,C, and D:

> *The Petitioner, under oath, swears and has proved by clear and convincing evidence that she/he is in fear of his/her safety due to the threats and/or actual violence from the respondent in a hearing by those present before the Magistrate.*

Based upon the foregoing, the Court ORDERS the relief designated below with regard to the following protected person(s):

**(Check and complete as applicable.)**

☑ Respondent shall refrain from attempting, committing, or threatening to commit any sexual offense, as defined in *West Virginia Code § 53-8-1(9);* any stalking as defined in *West Virginia Code § 61-2-9a(a);* or any repeated credible threats of bodily injury as defined in *West Virginia Code §53-8-4(a)(3).*

☑ Respondent shall refrain from contacting, attempting to contact, or stalking the person(s) named above, directly or indirectly, or through third party, regardless of whether those third parties know of this Order.

**MPSORFH - Personal Safety Order Following Final Hearing**
Revised: 06/13/2025; ⚖ WVSCA Approved: 11/4/2021; Docket Code: **MSFIN**

Page 2 of 4

Magistrate Court Case No. 25-M35S-00150

☑ Respondent shall refrain from entering the residence of the person(s) named above.

☑ Respondent shall stay away from the place of employment, school, and residence of the person(s) named above.

☑ Respondent shall not visit, assault, molest, or otherwise interfere with the persons(s) named above; and if any such protected person is a child, respondent shall not engage in such conduct with siblings or minors residing in the household of the child.

☐ Based upon the matters found in Paragraph D of the Findings stated above, the respondent is prohibited from possessing a firearm as defined in *West Virginia Code § 61-7-7.* (*Check one below.*)

    ☐ Respondent shall surrender all firearms and ammunition possessed or owned by the respondent to the law enforcement officer serving this Order.

    ☐ Respondent shall transfer all firearms and ammunition possessed or owned by the respondent to a qualified third party. The law enforcement officer serving this Order shall determine if the third party is qualified to possess firearms and is not otherwise prohibited by law from possessing firearms.

    *If no qualified third party is available, the respondent shall surrender all firearms and ammunition possessed or owned by respondent to the law enforcement officer serving this Order.*

If the respondent is required to surrender firearms and ammunition, the respondent shall provide, within 5 days of the date of this Order, written documentation to the Magistrate Court Clerk of all firearms and ammunition surrendered or transferred. The written documentation shall include the description of each firearm and the name of the law enforcement agency or third party having possession of the respondent's firearms.

☐ Respondent shall pay the fees and costs of this proceeding in the amount of $ _____

to the Magistrate Court unless a fee waiver request has been granted.

☑ Other relief the Court deems necessary:

*No contact by any means (verbal, physical, third party, text, cellphone, email, social media etc.) Stay away at least 500 feet from residence, employment, school, etc.*

---

**VIOLATION OF THIS ORDER MAY RESULT IN CRIMINAL PROSECUTION AND, IF CONVICTED, INCARCERATION, FINE, OR BOTH.**

---

This Order shall remain in effect until the __19th__ day of __December__, 20 _26_.

A copy of this Order shall be served upon the parties by the Court or law enforcement. Copies of this Order shall be transmitted immediately, but no later than the next business day to any law enforcement agency having jurisdiction to enforce this Order, including the county sheriff, the local office of the state police, and any municipal police force, to be placed in a confidential file by such law enforcement agencies pursuant to *W. Va. Code § 53-8-2(a).*

☐ The Clerk shall serve a copy of this Order by first-class mail upon the following:

*(specify any non-party(ies) to be served, e.g. Board of Education)*

Issued this      12-19-2025 3:50 pm             _____
            (Date and Time)             Magistrate's Signature

Magistrate Court Case No. 25-M35S-00150

---

**NOTICE TO PARTIES**

YOU HAVE THE RIGHT TO APPEAL THIS ORDER TO THE CIRCUIT COURT WITHIN 20 DAYS OF THE ENTRY OF THIS ORDER. YOUR APPEAL MUST USE THE *PETITION FOR APPEAL OF ORDER GRANTING OR DENYING FINAL PERSONAL SAFETY ORDER* FORM THAT CAN BE OBTAINED FROM THE MAGISTRATE COURT CLERK'S OFFICE OR ON THE WEBSITE OF THE SUPREME COURT OF APPEALS OF WEST VIRGINIA. THE COMPLETED APPEAL FORM MUST BE FILED WITH THE MAGISTRATE COURT CLERK'S OFFICE.

IF YOU CANNOT AFFORD THE COSTS OF THESE PROCEEDINGS, YOU MAY FILE A FEE WAIVER REQUEST WITH THE MAGISTRATE COURT CLERK'S OFFICE.

---

**SERVICE BY COURT**

Served upon petitioner on this ___19th___ day of ___December___, 20_25_, by ___Tom Howard___,

☑ Magistrate / ☐ Magistrate's Assistant/Clerk/Deputy Clerk.

_____
Signature

Served upon respondent on this ___19th___ day of ___December___, 20_25_, by ___Tom Howard___,

☑ Magistrate / ☐ Magistrate's Assistant/Clerk/Deputy Clerk.

_____
Signature

Served upon _____ by first-class mail on .
*[specify non-party(ies) served]*

this _____ day of _____, 20_____, by _____

_____
Signature

---

**SERVICE BY LAW ENFORCEMENT (if party not present at conclusion of hearing)**

Served upon petitioner by _____ in _____

County, WV, on _____ at _____ ☐ a.m. ☐ p.m.
(date)         (time)

_____
Law Enforcement Signature

Served upon respondent by _____ in _____

County, WV, on _____ at _____ ☐ a.m. ☐ p.m.
(date)         (time)

_____
Law Enforcement Signature

---

**FOR COURT USE ONLY**

Law enforcement agencies to which a copy of this Order was transmitted:

WPD, OCSD, WVSP

*(Place an asterisk next to the agency responsible for completing service, if known.)*

MPSORFH - Personal Safety Order Following Final Hearing
Revised: 06/13/2025; ⚖ WVSCA Approved: 11/4/2021; Docket Code: MSFIN

Page 4 of 4