**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CLERK U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

AUG 3 1 2026

Time: 3:38 am/pm

In re: Heart 2 Heart Volunteers, Inc.,
*Debtor.*
Case No. 5:25-bk-00087
Chapter 11

Creditor/ Pro se

**UNITED STATES BANKRUPTCY COURT**

**MOTION TO REMOVE CHAPTER 11 TRUSTEE FOR CAUSE**

**PURSUANT TO 11 U.S.C. § 324(a)**

COMES NOW **Sharon "Marie" Travis**, an interested party and established creditor of the above-captioned bankruptcy estate (hereinafter, Movant), and respectfully moves this Court pursuant to **11 U.S.C. § 324(a)** and **Federal Rule of Bankruptcy Procedure 9014** for an order removing **Robert Johns** as the Chapter 11 Trustee of the estate, and in support thereof, respectfully states as follows:

## I. JURISDICTION AND VENUE

**1. This Court has Jurisdiction over this matter pursuant to 28 U.S.C§§ 157 and 134.**

**2. This is a core proceeding pursuant to 28 U.S.C§**

**157(b)(2)**

**3. Venue is proper in this district pursuant to 28 U.S.C§§ 1408 and 1409**

## II. INTRODUCTION AND STANDING

1. **Creditor Status:** The Movant is a recognized creditor of the bankruptcy estate with a direct financial stake in the outcome of these proceedings, satisfying the "party in interest" requirement under the Bankruptcy Code.

2. **Statutory Basis for Removal:** Under **11 U.S.C. § 324(a),** this Court may remove a trustee "for cause" after notice and a hearing. Cause includes gross mismanagement, incompetence, financial default, regulatory non-compliance, bad-faith retaliation, discrimination, physical waste of estate assets, conversion of property, suppression of safety investigations, and actions that actively jeopardize the preservation of the estate.

3. **Summary of Grounds:** The current Chapter 11 Trustee has demonstrated systemic administrative default, operational neglect, retaliatory bad-faith conduct, discriminatory practices, and a reckless disregard for fiduciary duties, including: (i) a total reporting blackout spanning multiple months; (ii) severe environmental and public safety non-compliance regarding critical estate infrastructure (untreated

plant since December 2025); (iii) protracted administrative exposure of a former officer's personal credit; (iv) the bad-faith rehiring of terminated, high-risk personnel tied to past financial claw backs and patient abuse; (v) the harboring of personnel who have committed fraud upon this Court; (vi) retaliatory bad-faith termination for whistleblowing; (vii) operational abandonment and surrender of control to unqualified staff; (viii) physical waste and destruction of real property value (120 acres left to overgrowth); (ix) malicious, retaliatory litigation tactics designed to intimidate a legitimate creditor; (x) wrongful conversion of personal property and bad-faith ransom/rent schemes; (xi) strategic administrative harassment and denial of access to records; (xii) discriminatory discharge and disparate treatment based on age; and (xiii) the willful suppression and failure to investigate reported patient abuse.

## III. FACTUAL BACKGROUND AND GROUNDS FOR "CAUSE"

**A. Complete Breakdown in Mandatory Financial Reporting and Failure to File Monthly Operating Reports (MORs) on Time:** The Trustee has committed a severe, multi-month default on his reporting duties, establishing clear "cause" for immediate removal under 11 U.S.C. § 324(a) through the following Failures under 11 U.S.C.§324, Under 11U.S.C§§1106(a)(1),704(a)(8), and Federal

Federal Rule of Bankruptcy Procedure 2015(a), a Chapter 11 trustee is strictly required to file periodic reports and Monthly Operating Reports (MOR) that accurately reflect cash flow, receipts, and overall financial health.

The Trustee has breached these core duties through the following structural failures:

1. **Strict Statutory Mandate:** Under 11 U.S.C. § 1106(a)(1), § 704(a)(8), and Federal Rule of Bankruptcy Procedure 2015, a Chapter 11 trustee is strictly required to file periodic reports and detailed Monthly Operating Reports (MORs) accurately reflecting cash flow, receipts, disbursements, and overall financial health.

2. **Complete Abdication of Reporting:** The Trustee has failed to file any mandatory MORs or financial disclosures on time, establishing a persistent pattern of chronic delay throughout 2026. Filings consistently lagged past statutory deadlines-including the February report filed 27 days late and the June report delayed by 31 days.

Table 1: Chronological Default & Revenue analysis (2026)

| Reporting Period | Due date 21st of the Month | Actual Filing Date | Days Late | Reported Revenue |
|---|---|---|---|---|
| January 2026 | February 21, 2026 | February 25, 2026 | 4 days late | $ 35,681(carried momentum from prior control period) |
| February, 2026 | March21,2026 | April 17, 2026 | 27 days late | -$18.00 dollars (immediate drop |

| | | | | |
|---|---|---|---|---|
| | | | | into negative operating income) |
| March 2026 | April 21, 2026 | May1, 2026 | 10 days late | -$8,449(deepened negative operational deficit) |
| April 2026 | May 21, 2026 | June 11 2026 | 21 days late | $ 26,168 |
| May, 2026 | June 21, 2026 | June 30, 2026 | 9 days late | $ 13,848 (sharp downward trend |
| June 2026 | July 21, 2026 | August 21, 2026 | 31 days late | $10,519(withheld past its 21 deadline) |
| July 2026 | August 21,2026 | August 21, 2026 | On time after it was reported and (bundled) | $37, 596 less legacy grant including $33,750 leaving core income $3,846 |

3. **Total Financial Darkness:** This extended failure completely blinds the court, the U.S. Trustee, and creditors, accountability requirements and operating standards.

4. **Prejudice and Lack of Transparency:** By operating without financial transparency regarding estate cash flow, vendor payments, and asset preservation, the Trustee denies stakeholders the ability to monitor the estate, warranting immediate removal.

5. **Strategic Delay of Financial Disclosures to Mask Core Operating Deficits:** The Trustee withheld the June MOR past its July 21deadline, choosing instead to hold it and file it with the July MOR on August 21, 2026. This

concurrent filing bundled an overdue, weak June performance ($10,529) alongside a July top-line figure of $37,596-heavily inflated by a -$33,750 legacy grant secured years ago, by the movant prior to the bankruptcy, masking a core operational income of just $3,846 the June and July MORs-withholding until August 21- to conceal severe operational underperformance. By stalling and waiting for grants funds for June received in July. This is quarterly ($33,750 See exhibit A) is the amount due quarterly, the Trustee artificially inflated July's revenue to $37,596 (masking an actual core operating income of just $3,846). The trustee can nor rely on preexisting, legacy grant funds, that he played no role in securing to mask ongoing operational stagnation and substitute for self-sustaining solvency. ***See Exhibit A & B***

**B. Severe Regulatory and Environmental Neglect (Treatment Plant)**

1. **Federal Statute**: Under **28 U.S.C. § 959(b),** a trustee is strictly mandated to manage and operate estate property in their possession according to valid state and local laws. As situated in the same manner that the owner would be bound.

2. **The estate's treatment facility**—The estates commercial wastewater treatment facility, which is critical to public health and environmental

safety-has **not been tested since December 2025, after the former CEO lost control of decisions:** marking roughly eight months of total regulatory default and supposed to be done quarterly.

3. **Verified Noncompliance:** Direct verification obtained from the Department of Environmental Protection confirms this complete by Christopher Dudek. WVDEP Water and Waste Environmental Inspector Supervisor. ***Exhibits C, D and E Show*** lapses, exposing the estate to catastrophic environmental liabilities, heavy state fines, and potential regulatory shutdown.

4. **Controlling Supreme Court Case Law:** *Midlantic National Bank v. New Jersey Department of Environmental Protection, 474 U.S Supreme Court* established that a bankruptcy trustee cannot ignore or violate local and state laws, nor can they abandon property in contravention of state statutes or regulations that are reasonably designed to protect public health and safety. Grossly neglecting commercial wastewater treatment plant directly violates this duty.

5. **Automatic Stay Exception (Government Enforcement):** 11 U.S.C § 362(b)(4) Explicitly exempts state environmental enforcement and regulatory police powers from the bankruptcy automatic stay. This means (WVDEP) can

step in, issue compliance orders, and levy penalties against the estate despite the ongoing bankruptcy. The only reason this has not been done is because they are trying to fill the position in this area.

**6. West Virginia Penalties and Fines:**

West Virginia Water Pollution Control Act (W. Va. Code § 22-11-24)

Failing to operate, monitor, or test a commercial treatment facility in compliance with state standards exposes the operator/estate to severe penalties. This is especially important because the trustee is failing to submit mandatory quarterly testing to the state.

**7. Daily Civil and Criminal Penalties:** Fines ranging from $2,500 up to 25,000 per day of violation for unpermitted or negligent discharges/failures.

**8. Willful Violations:** Can escalate to fines up to $50,000 per day and potential criminal misdemeanor/felony charges for severe administrative neglect.

C. **Business Checking Account, Administrative Incompetence and Personal Liability Exposure:** Under 11 U.S.C § 345 and U.S. Trustee guidelines, Breach of fiduciary duty. trustee must immediately secure estate funds and retitle

accounts into their official capacity.

**1. The Trustee breached this fundamental duty by failing to assume control of the estate checking accounts upon taking office, as established by the following timeline:**

**a). March 5, 2026** The Trustee was appointed.

**b). March 20th, 2026** The Movant is put on leave.

**c). April 13, 2026** Via text message, Movant ask the accountant if she can throw away the credit now because she has verbally told her prior to get a new card.

d**). April 13,2026** Accountant responds "it is still good for the peers to use"

**e). April 13, 2026** Movant says "do you not have another card yet", then says "it is a good idea to get a new one because my name is on it, since I am not making the financial decisions".

**f). April 13th 2026** Accountant responds "I will see what the trustee wants to do".

**g). May 1, 2026** The Trustee fires Movant.

**h). May 8, 2026** Movant receives an email from United bank returning a request from the accountant telling her that she cannot be

put on something at the bank because Sharon Travis would have to give her permission. This is the first time Sharon Travis knows she is still on the account. **(See Exhibit F)**

**i). May 15, 2026** Movant send a text to Accountant "did you turn that card off in my name". No response.

**j). May 17th,2026** Movant calls United Bank to find out is she is still on the account, they say yes and she tells them to turn off the card and send her confirmation and they do.

**k). May 18th, 2026** United Bank sends me the documents showing the accounts were in my name. Also, that there has been purchases on the May 11th using the card with Movant name on it. **(See Exhibit G, H, I, J, K, l, M, N, O, P, Q, R, S)**

**l). Around May 20th, 2026** The movant complains about it to a few people Someone notifies the Trustee and he then puts the accounts and changed to proper titles.

**2. Conclusion:** In total, the Trustee left estate accounts un-retitled in Movants name for 76 days, including nearly 3 weeks after her termination, directly exposing her to unauthorized transactions and severe personal liabilities. the

Trustee left corporate bank accounts, credit cards, and financial instruments tied directly to the Creditor's personal name and credit for nearly two and a half months. This Trustee's breach of his duty exposed the former CEO and founder to unauthorized transaction liability, potential investigative confusion with tax or regulatory authorities, and the stress of untangling transactions she didn't make. Furthermore, these accounts were only corrected after the Creditor independently contacted financial institutions to force compliance, underscoring the Trustee's lack of active oversight.

D. **Reckless Rehiring of Toxic, Fraudulent, and Abusive Personnel and Improper Operational Delegation:** The Trustee engaged in

severe operational mismanagement by reinstating a cadre of high-risk individuals whom Movant had previously fired or forced to quit for cause during her tenure as CEO. Compounding this, the Trustee coordinated behind Movant's leave, holding secret interviews at the facility on April 29, 2026—just two days before Movant's termination—to bring back these problematic personnel under the direction of a nurse practitioner. This reckless breakdown is established by the following facts:

1. **Secret Backchannel Coordination:** While Movant was on leave, text message records confirm that the Trustee met at the facility on April 29, 2026, with terminated personnel to coordinate their reinstatement and orchestrate

Movant's ouster.

**2. Rehire/Volunteer of Compromised, Perjuring, and Insubordinate Compliance Officer (Robert Boles):** Robert Boles quit preemptively as Movant was preparing to fire him for gross insubordination and a complete failure to perform mandatory compliance duties. Upon his departure, staff discovered ripped-up documents in the trash and missing investigative files regarding his friends.

Furthermore, Boles previously provided false testimony and perjured himself under oath to the court by claiming Movant voted on her own grievance, despite official board minutes conclusively proving she abstained. Which is on the court Docket. Provided in her Motion to strike his testimony. Despite this documented history of perjury, document destruction, and retaliation, the Trustee recklessly rehired him. Boles subsequently submitted a defamatory, false letter to the compliance board attacking Movant's character, and his wife engaged in public social media harassment against Movant. Then put him in charge of Movants Documents for her proof of claim. Risking spoliation of evidence by a known adversary. This adversary that the movant claimed destroyed documents and ripped up documents on his departure previously. Furthermore, Boles gross administrative incompetence as a Compliance officer caused a direct financial loss of over $500,000 dollars from an insurance claw back.

**3. Rehire of an Individual Fired for Cause, Fraudulent Credentials, and Unauthorized Data Misappropriation (Sarah Dean):** Movant previously fired Sarah Dean for cause. Dean faces an active ethics complaint arising from the professional conflict that she was Movant's former counselor before coming to work at Serenity Hills. To cover up this ethical breach, Dean lied to the court by falsely claiming she worked at Serenity Hills in 2022—even though official records and witness testimony from Tara Singer prove the facility was shut down during 2022. She actually started work in September 2023.Furthermore, Dean defrauded the court and falsified her resume by claiming to be a psychologist who performed psychological testing. **Most egregiously, in her June 1, 2026 response to the ethics board, Dean weaponized confidential, internal Serenity Hills budget records from 2023 to misrepresent Movant's compensation. As a clinical staff member, Dean had no legitimate access to executive budgets, proving that confidential corporate financial records were illicitly accessed and leaked—facilitated during her re-entanglement with the facility under the Trustee's administration.** Despite this documented web of deception and data misappropriation, the Trustee reinstated her and continued to fight for her reinstatement after learning via motions her previously employment issues, ethics complaint and falsifying her resume that he presented to the court.

**4. Rehire of Personnel Terminated for Patient Mistreatment**

**(Erica Biggers):** The Trustee reinstated Erica Biggers, making her the daytime supervisor and access to patients. whom Movant had fired for chronic absenteeism and severe mistreatment of patients—misconduct formally established by supervisor testimony during workforce hearings.

**5. Improper Operational Control and Collusive Staffing:**

The Trustee improperly relinquished executive management of the facility to a Medical Director, and ignored a harassment complaint made against her by the CEO. Operating in coordination with the Medical Director, this toxic rehires—who were personal friends and allies of the Medical Director—worked actively behind the scenes to engineer Movant's downfall, turning the facility's leadership over to an unvetted clique. Sarah Dean was also the Clinical Director over the facility at the time period that the audit was done by the insurance company that causes the over $500,000 claw-back. that the debtor has to pay.**( see exhibit T, U, V)**

**E. Wrongful Termination Bad-Faith Retaliation,**

**Threatened Court Whistleblowing, and Unethical Regulatory Pretext:** The Trustee orchestrated a retaliatory ouster of the CEO under the false guise of state compliance, exploiting an unethical regulatory arrangement that bypassed facility governance and legal authority. This bad-faith termination is established

by the following facts:

**1. Retaliation for Threatened Court Whistleblowing:** The Trustee's sudden moves against Movant were triggered by explicit retaliatory animus—occurring just two days after Movant informed the Trustee that she intended to go directly to the bankruptcy court to report severe, unaddressed patient abuse and corporate mismanagement because of her concern for the board's responsibility. The time line and motive are directly backed by documentary evidence. This includes emails, text message and records already on the Docket in other motions.

**2. Unethical Regulatory Quid Pro Quo and Coercive to be Put on "Leave" Condition:**

The Trustee justified putting movant on leave by claiming OHFLAC demanded it. In truth, this exposed an inherently corrupt unethical Regulatory arrangement OHFLAC conditioned its agreement not to issue formal citations against the facility strictly on Movant being placed on leave. Leveraging administrative leave as a backroom bargaining chip to shield the facility's public record—especially when OHFLAC lacked any legal authority to dictate corporate personnel actions and no formal abuse finding existed—demonstrates bad-faith collusion rather

than legitimate regulatory enforcement. Notably, OHFLAC's public record contains zero citations or findings substantiating any misconduct by Movant for the March 20th investigation, exposing the phantom accusations mentioned in her firing as a manufactured pretext. Meanwhile, OHFLAC completely ignored severe, legitimate complaints filed by Movant and others. Unethical Regulatory Quid Pro Quo, Conflicted Collusion, and Manufactured Pretext: The Trustee justified putting Movant on leave by claiming OHFLAC demanded it. In truth, this exposed an inherently corrupt, backroom arrangement. The OHFLAC official driving this demand was operating under an egregious, undisclosed conflict of interest: he is personally named as an adversary in an active lawsuit filed by Serenity Hills. OHFLAC's "demand" was an illegitimate bargain—agreeing to shield the facility from formal citations regardless of actual conditions, solely on the condition that Movant be removed. Notably, OHFLAC's public record contains zero citations or findings substantiating any misconduct by Movant, exposing the phantom accusations mentioned in her firing as a manufactured pretext. Meanwhile, OHFLAC completely ignored severe, legitimate complaints filed by Movant and others. This corroboration harmed the lawsuit that they have against OHFLAC and played into their hands of trying to harm the main witness

in the lawsuit. Exposing a deeply corrupt "scratch-my-back" arrangement: the Trustee Actively for his own desires colluded with the facility's legal adversary (OHFLAC)to suppress public records, shield the new administration, and trade away the debtor's interests—all to orchestrate the CEO removal while legitimate complaints from CEO and anonymous whistleblowers were quietly swept under the rug.

**3. Violation of Due Process and Kangaroo Court Isolation Tactics:**

The Trustee's handling of perpetrated investigation violated the facility's own established rules and regulations. Which explicitly mandate that the subject of an investigation be interviewed last. Furthermore, under **Section 7 and Section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. Sections 157 and 158(a)(1),** employers are prohibited from using sweeping, blanket gag orders or to cut off communication, or suppress discussions regarding workplace conditions, grievances, and administrative misconduct. Here, the administration weaponized a pretextual rule into an oppressive, building-wide blackout in direct violation of federal labor standards. Staff were terrorized into silence; the facility secretary was believed that she would be terminated, so she hangs up on Movant's attempts to reach Human Resources and had someone text the movant to

let her know she was hanging up because she would be fired. Workers were warned they could not communicate to the movant at all. Proving the "investigation" was an unlawful retaliatory blackout rather than a legitimate *inquiry* instead, she was completely shut out, barred from the building and denied due process.

**F. The Trustee Had a Strict Regulatory Duty to investigate and Address the Documented Harassment:** As the court trustee operating the Facility, the Trustee stands legally in the shoes of the employer and is bound by the exact same statutory rules and regulations governing workplace safety and civil rights. Under 28 U.S.C. § 959(b) and Title VII of the Civil Rights Act, a trustee has absolute, non-discretionary regulatory mandate to maintain a workplace free from discrimination and to immediately investigate any reported harassment. The Trustee flagrantly breached these governing regulations. Despite receiving the Employee's formalized harassment complaint on April 7,2026 through email sent to HR and then to the trustee as emails validate. Then again mentioned in emails and then on a finale letter in response to the termination of the letter sent to the respondent. the Trustee conducted absolutely no investigation, failed to implement

and correct action, and entirely ignored the report to protect the accused harasser's license. By abandoning mandatory duty to investigate known civil rights violations, the Trustee engaged gross regulatory non-compliance, establishing independence cause for his immediate removal. The Movant possesses concrete evidence through emails and text messages that the Medical Director and the Nurse supervisor were harassing, lying to the ombudsman and OHFLAC, then this went to the courts. They humiliated the CEO to staff and caused a hostile work environment. **(See exhibits W, X, Y)**

**G. Physical Waste and Destruction of Estate Asset Value:**

1. The Trustee has completely abandoned grounds maintenance across the facility's 127 acres (leaving 80 historically maintained acres choked with weeds).

2. This gross neglect constitutes physical waste of estate property, actively destroying asset value and creditor recovery potential.

3. They had to get a local farmer to come and bail it into hay according to CEO's friend who is a lawyer who lives across the street and the CEO seen the it herself when came to get my property.

## H. Retaliatory Litigation Tactics and Harassment of a Creditor

1. **In retaliation for the Movant presenting hard evidence of court Fraud;** Trustee orchestrated judicial harassment along with the U.S. Trustee by mobilizing the U.S. Movant's separate Chapter 7 trustee to attack legitimate creditor standing. Trying to get her chapter 11 case opened so that she would have to pay for one of Heart 2 Heart Vol. Inc. Predatory lenders.

2. **Pretextual claims regarding a post-filing "raise":** This ignores the reality that personal vehicle refinancing proceeds were injected entirely into the business to fund payroll, and after the chapter 11 was filed she seen the accountant paying for the payments and in order to be compliant she had to give herself a raise to pay for the payments herself. If it was not reported, that was on the accountant. She did all the reporting and I am sure it was an accident on her part. CEO was not taking her full elected pay for the sake of the business and as the docket shows she made less then the cleaning lady in some years.

## K. Point 11: Conversion of Personal Property, Unlawful Seizure, and Bad-Faith Ransom.

1. The Trustee committed wrongful conversion and bad-faith seizure of Movant's personal property (including three industrial freezers, a

refrigerator a boardroom table, and stored personal items placed in the facility's unused basement). The Trustee barred the Movant from retrieving these items, demanded impossible receipts despite on-site staff validation. Trying to convert personal property to estates use. Not following the policy of protocol for the removal of property and her not getting her property for months.

2. Now Trustee attempted to compel payment or charge rent for the Movant's own property, that was used by the facility. To prove that they needed the property the trustee paid for it after the judge accepted the movants divorce property agreement. To prove the bad faith tactics.

**L. Point 12: Strategic Intimidation, Denial of Access to Records, and Weaponized Harassment:**

1. The Trustee engaged in deliberate obstruction of creditor rights by denying access to records needed to file her full timely proof of claim. Furthermore, the Trustee exhibited bad faith by strategically assigning an individual with a severe, known personal conflict and harassment history (whose family publicly disparaged the Movant) to oversee the receipt retrieval process, weaponizing psychological distress to deter the Movant from exercising legal rights as a creditor. Sending a box filled with only partial receipts and no receipts

of 2022 when the Movant paid large sums of money for attorney to represent the estate against OHFLACS closing, paid for the business facility to stay well, for payroll of HR, for the employees on the grant until that was paid, and for grounds and utilities.

**M. Discriminatory Discharge and Disparate Treatment Based on Age**

1. The Trustee subjected the Movant—a 66-year-old female executive—to discriminatory discharge and disparate treatment, enforcing pretextual rules against her while ignoring or excusing far more severe infractions committed by younger and male staff members. **(See exhibit X)**

2. SHLC has never ordered employees not to talk to a person in a investigation, only that they could not talk about the investigation.

3. Has never treated staff differently in an investigation because we knew we could not and we followed policy's that were made to reflect the state and federal laws.

**N. Suppression of Patient Abuse Reports and Regulatory Breach**

1. The Trustee willfully ignored, suppressed, and failed to investigate formal reports of patient abuse brought forward by the Movant,

choosing instead to shield abusive staff, thereby breaching fundamental healthcare operating standards and exposing the estate to catastrophic liability.

**O. Failure to Achieve Operational Compromise of regulatory Compliance:**

Since assuming control in March of 2026, the Trustee has overseen a measurable decline in both facility census and revenue, demonstrating a clear failure to preserve or enhance the value of the estate. Instead, he has caused the estate to decline and become liable for his wrong decisions and lack of compliance as a trustee and letting the facility take on liabilities to the estate. The only tick ups in financial is when the grant that the respondent secured comes in. The decision to bring in a Trustee and a CEO has caused more harm to the estate than help and has cost the estate more debts and liabilities as the movant have tried to report, with no results.

P. **Everything is not as wonderful as the Ombudsman Reports:** there has been RN nurses that have quit, a therapist has quit and MHTs have quit. The new activity schedule she stated that is now provided was because the movant provided activities and once I was gone there was not any. The survey she stated that they had put in for the patients has been in place since the opening of the company in

2019. The fulltime intake specialist is not doing as well as the CEO did in referrals.

## III. PRAYER FOR RELIEF

**WHEREFORE,** Movant respectfully requests that this Honorable Court:

1. Schedule an expedited hearing on this Motion pursuant to **Fed. R. Bankr. P. 9014**;
2. Enter an order finding "cause" under **11 U.S.C. § 324(a)** and immediately removing **Robert Johns** as Chapter 11 Trustee;
3. Order the Board of Directors to be restored including the President.
4. Order the outgoing trustee to provide an immediate, complete accounting of all estate assets and financial transactions managed during his tenure; and
5. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**Sharon Marie Travis**
Creditor, Pro Se
930 Main Street Apt 303
304-281-0474

Sharon Marie Travis
8-31-2026

CERTIFICATE OF SERVICE

In re: Heart 2 Heart Volunteers, Inc.,
*Debtor.*
Case No. 5:25-bk-
Chapter 11

I, Ms. Travis, hereby certify under penalty of perjury that on this 31th day of August, 2026, I served a true and correct copy of the foregoing parties , addressed to the following parties of record:

Chapter 11 Trustee:

Robert Johns
Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311

Counsel for the Chapter 11 Trustee:
BRIAN R. BLICKENSTAFF [WVSB No. 9449] Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311

Counsel for the Debtor:
KIRK B. BURKLEY, ESQ. Bernstein-Burkley, P.C. 707 Grant Street Suite 2200 Gulf Tower Pittsburgh

The Patient/Administrative Ombudsman:
Deborah Fish-Patient Care Ombudsman
211 West Fort Street
Suite 705
Detroit, MI 48226

Office of the United States Trustee:
GARY O. KINDER, ESQ. Assistant U.S. Trustee 300 Virginia Street East, Room 2025 Charleston, WV 25307

Shawn Travis
8/31/2026

UNITED BANK



07486 0461815 0007-0012 0000000000000000

## Credits (Continued)

| Date | Description | Deposits |
|---|---|---|
| Apr 10 | DEPOSIT | $1,225.00 |
| Apr 10 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3409521506*1841620 480\ | $11,400.00 |
| Apr 13 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3409640438*1841620 480\ | $1,600.00 |
| Apr 14 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3409712099*1841620 480\ | $225.00 |
| Apr 15 | ACH DEPOSIT WVTREASURYREGMED HCCLAIMPMT 1043717 937MDGO6429723*155 6000814*2026041438 03939 \ | $4,850.00 |
| Apr 15 | ACH DEPOSIT THE HEALTH PLAN HCCLAIMPMT 8202610501002682 *1550585592~ | $48,325.00 |
| Apr 16 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3409982168*1841620 480\ | $1,225.00 |
| Apr 17 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410090064*1841620 480\ | $12,775.00 |
| Apr 20 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410209397*1841620 480\ | $1,225.00 |
| Apr 21 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410279099*1841620 480\ | $450.00 |
| Apr 22 | ACH DEPOSIT WVTREASURYREGMED HCCLAIMPMT 1043717 937MDGO6433545*155 6000814*2026042039 18911 \ | $9,350.00 |
| Apr 23 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410550122*1841620 480\ | $175.00 |
| Apr 24 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410659208*1841620 480\ | $1,225.00 |
| Apr 27 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410779639*1841620 480\ | $12,200.00 |
| Apr 28 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3410852180*1841620 480\ | $1,675.00 |
| Apr 29 | ACH DEPOSIT THE HEALTH PLAN HCCLAIMPMT 8202611901002745*1 550585592~ | $53,275.00 |
| Apr 30 | ACH DEPOSIT Wellpoint WV5C HCCLAIMPMT 3411114858*1841620 480\ | $1,750.00 |

## Balance By Date

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| Mar 31 | $11,435.68 | Apr 10 | $40,672.44 | Apr 22 | $39,389.61 |
| Apr 01 | $69,696.16 | Apr 13 | $38,418.84 | Apr 23 | $39,564.61 |
| Apr 02 | $16,138.87 | Apr 14 | $36,409.41 | Apr 24 | $35,158.49 |
| Apr 03 | $23,837.54 | Apr 15 | $89,405.57 | Apr 27 | $43,639.66 |
| Apr 06 | $19,471.33 | Apr 16 | $35,748.75 | Apr 28 | $36,705.90 |
| Apr 07 | $5,284.11 | Apr 17 | $47,885.23 | Apr 29 | $89,508.45 |
| Apr 08 | $41,664.18 | Apr 20 | $45,562.16 | Apr 30 | $4,034.38 |
| Apr 09 | $41,294.76 | Apr 21 | $30,768.75 | | |

No. 5:25-bk-00087 Doc 385 Filed 08/31/26 Entered 08/31/26 16:05:52 Page 27 of 42

Exhibit T 1pg

Gmail Sharon Travis <serenityhillscenterceo@gmail.com>

# Heart 2 Heart

**Sharon Travis** <serenityhillscenterceo@gmail.com> Wed, Mar 25, 2026 at 2:13 PM
To: rjohns@johnswvlaw.com, Frederick Will <wfrederick@meridianmp.com>

--Dear Bob,

I wish you could understand that Serenity Hills Life Center needs to come to a close, and Heart 2 Heart Volunteers Inc. needs to stay in the hands of the founder. You only know of me through the consequences of the shutdown and reopening that have brought us. This would include the targeting of OHFLAC and Chapter 11. It also allowed former fired employees to cause problems because everything was public. Our facility ran beautifully until the incident, and two new employees caused problems.

The text I sent you was not to threaten you, but to express my real concern about the compliance of the facility and the responsibility and harm it would cause to the facility and the laws being broken. You are right, you have to know you are committing fraud, but if you know your mistake and do not report it, it then becomes fraud. These are payments being made.

I truly believe that the property needs to be sold at the Heart 2 Heart Volunteers dba Serenity Hills Life Center to pay off the debts to a capable and good company. I truly believe that Serenity Hills Life Center could satisfy the debtors, and we could then come out of bankruptcy.

Both companies seem okay with Heart 2 Heart holding on to the sober house and some of the property, which could be carved out. I might have a previous plot that already has the division.

Heart 2 Heart Volunteers Inc. does not want to be involved in anything under the state. We do not want to lose our lawsuit against the state, in which we have a right. Serenity Hills Life Center is not the only program that we have. We do a lot of great volunteer work for the sick also, we have the sober house house and we have the QRT grant for first responders, which continued after we closed temporarily. See the links to our other websites, podcasts, and work that we do. I will send this information also to the court. We would like to go back and continue in these works with our current board in place, see below.

https//www.heart2heart-livingfree.com

Serenityhillslifecenter.org

https://positivelywv.com/s=sharon+travis&et_pb_searchform_submit=et_search_proccess&et_pb_include_posts=yes&et_pb_include_pages=yes

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

Exhibit a

2 pgs

# JOHNS & ASSOCIATES, PLLC

Phone No. 304-720-2300 • Fax No. 304-720-2311
101 Brook Hill Drive, Charleston, West Virginia 25311

May 1, 2026

***Via USPS, Email and Certified Mail***
Sharon Marie Travis
930 Main Street, Apt. 303
Wheeling, WV 26003

Re: Termination of Employment / Heart 2 Heart Volunteers, Inc.

Dear Ms. Travis:

The purpose of this letter is to advise you that your employment with Heart 2 Heart Volunteers, Inc. ("H2H") has been terminated, effective immediately.

To review, by Order dated February 19, 2026, the U.S. Bankruptcy Court for the Northern District of West Virginia granted a motion by the United States Trustee for the appointment of a Chapter 11 Trustee. On March 5, 2026, I was appointed to serve as the Trustee for the bankruptcy estate of Heart 2 Heart Volunteers, Inc.

Following my appointment, I assumed operational control of the organization and quickly developed concerns that your continued service as President and CEO would contribute substantially to ongoing operational deficiencies. Many of these operational deficiencies were identified during the February 18, 2026 hearing before Judge Bissett. And I have become aware of additional concerns. In particular, I learned that several potential referral agencies declined to refer patients to H2H because of your affiliation with the organization.

I also became aware of several resident concerns following a resident evacuation event that was caused by an electrical outage. Based on the nature of those concerns and my own observations, I chose to place you on paid administrative leave. I also appointed a special committee to investigate the residents' concerns. Among other things, the Investigation Committee concluded that your resident interactions have been unprofessional, creating a hostile and unsafe environment. Additional concerns were noted about your failure to implement the facility's Plan of Correction following several recent OHFLAC investigations.

Based on the foregoing, I have determined that the estate of H2H will best be served by relieving you of duties and terminating your employment.

During our prior exchanges, you have indicated that H2H owes you money and that it possesses several items of personal property that belong to you. Because of the bankruptcy estate, you may file a proof of claim, as Judge Bissett noted during the February 18, 2026 hearing. If you have personal effects that you would like to remove from your office, please identify them in writing. Those items that clearly are personal in nature and not belonging to the estate of H2H will be inventoried. We will make arrangements for you to retrieve them at a date and time that I approve.

Because your employment has been terminated, you are no longer authorized to enter upon any premises owned or maintained by H2H without prior approval from me.

If you have any questions or concerns, you are welcome to contact me via email.

I wish you well in your future endeavors.

Very truly yours,

Robert L. Johns, Trustee

RLJ/aim

Exhibit V
3 pgs

Sharon "Marie" Travis

930 main Street Wheeling, West Virginia 26003

May 4 ,2026

**Re: My Termination from employment/ Heart 2 heart Volunteers Inc.**

I am writing to address the letter sent me explaining the reasons for my termination.

At the beginning of your letter you say that you quickly developed concerns that my continued service as president and CEO would contribute substantially to ongoing operations deficiencies. You were only here once a week and you were over at the building with the nurse practitioner following her direction. You state that these operational deficiencies were identified during the February 18, 2026 hearing before Judge Bissett.

That is the problem you came in with a preconception of who I am based on things that I am going to prove are not true. No one identified to me that I was still the CEO (except for the judge) or President as you identify that I was. I did not know if our board of directors still existed or not. I was treated like I was the least important person in the building based on false allegations. I ran this program for 8 years and Heart 2 Heart for 12 years. I wrote the grant that purchased this facility, the grant that purchased the buses, the continual peer grant, wrote every policy, put the program together and bought every single thing in this building. You chose to listen to the nurse practitioner who did not do her job before you came and had her nurse supervisor do most of her work.

The Nurse practitioner has been harassing me, humiliating me and lying about me to get me fired So, she could take control and her plan worked. I had made verbal; text messages to you and Will, that I was being harassed and you did nothing because you said that you needed her license. I finally filed a formal complaint and you did nothing. You gave my email over to the persons that I claimed were harassing me. You gave my email over to a person you know wanted me fired and that I filed a claim of harassment against. This is a serious breach of my confidentiality and I believe was an act of retaliation. You were told by both me and the HR that that was my email. I find out that Sheila Weese has brought in to the office others who have been harassing me. One is Robert Boles, that gave false testimony before the court that I just presented evidence Friday. You also have had Sarah Dean that has an ethics complaint against her. They have access to my personal account, because they are friends with Sheila.

I informed you, The CRO, and the ombudsman of continued serious compliance issues and you continued to ignore it and many times things were covered up. The judge was only reported things of not a serious nature, while she did not report the serious actions that were taking place. Actions that truly affected the residents and that could get us shut down and cause legal issues. You tell me that when they are not doing what they are suppose to it is not fraud. It is fraud if you do not report it and you got paid for it. That is why SHLC owes $500,000 dollars to WellPoint. This is because under the care of Robert Boles the compliance officer and Sarah Dean the Clinical Director they were not doing their jobs.

I will address your accusation that several potential referral agencies are not sending residents here because of my affiliation with the facility. Is that what the nursing staff is telling you because they cannot get the census up. There is only one jail that is not sending them because of me and that is because the false allegation made about me by the former employee, who was friends with the parole officer here in Wheeling. People who were able to walk out their sentences could still come from there. I quickly replaced that jail with two new jails after that. The reason the census is down is because I am not running the place and have not been for 5 months.

I gave you two good rehabs that were interested in this facility that I introduced you. Instead you are bringing this facility down instead of doing what is best for the facility and creditors.

You have been misinformed. The program has been deteriorating and the clinical and nursing are making huge mistakes. The court will receive letters from persons that were in charge of sending people from different jails and they will not any more because of how the program is now. Letters are coming from parents, former residents and employees stating how wonderful the program use to be. Most of the employees here are afraid of getting fired so they cannot speak up.

You discriminated against me and retaliated against me because I said I was going to the court about the noncompliance issues two days earlier and because I wanted to know about the money due to me now. I was treated differently than anyone else that has worked here that was under investigation. You thought that you could prolong an investigation and I would quit, but that did not work. You appointed a biased person to lead the investigation. A person I told not to because he would be biased.

You claim that I acted unprofessional on the day of the transport. I am the one that directed persons and took care of the emergency. You should be grateful that I helped in that emergency and I am the one that kept us compliant. I am the one that kept the clients safe. You sat by and said yes and no. I was only one of the only ones that would transport patients. I was only with the patient to drive them and bring their food and I am not believing nor is anyone, what I am accused of. You were directed by the state to keep me out while the facility while being investigated or you would not be sited. That is unheard of. I have been directed by agencies to send reports on these activities.

You state I did not follow the plans of corrections or implement them. Sir I did not write the plan of corrections nor was I given a copy of them that as I recall. That was done by Will and whomever. As I stated earlier I was not treated with respect or told anything that was going on behind the scene.

You and the CRO have had five months to turn this place around and you have not. It has gotten so bad I would not recommend someone to go there. It is like the blind leading the blind. Even a state official stated to me that the way it is being run that it needs shut down. You are bringing people in on the reputation I have founded and it is not the same. Persons are now going out with negative reviews.

I am named as a creditor in bankruptcy. I need to file a formal proof of claim for the amount. I had requested during the investigation to come on the property to get copy of my receipts. So, I could get them in a timely manner and help your staff because some files are in storage. Denial of information is a breach of your Fiduciary Duty. You have a legal duty to administer the estate for the benefit of the

**creditors. You are intentially acting unreasonably in getting copy of receipts and the recovery of my property, which I argue is also a Breach of your Fiduciary Duty.**

**You want me to make a list of everything that I own there. Could you make a list of everything in your house if you could not physically see it? Again, this is unreasonable and I believe retaliatory.**

**Sincerely.**

**Sharon "Marie" Travis**

**To file a formal Proof of claim denial of information Breach of Fiduciary Duty you have a legal duty to administer the estate for the benefit of the creditor. I have already requested the documents in writing and If you do not**

Gmail

Exhibit W

Sharon Travis <serenityhillscenterceo@gmail.com>

## Sheila and nursing complaint

**Tara Singer** <accountant@serenityhillslifecenter.org> Tue, Apr 7, 2026 at 3:18 PM
To: Sharon Travis <serenityhillscenterceo@gmail.com>, Bob Johns <rjohns@johnswvlaw.com>, William Frederick <wfrederick@meridianmp.com>

Please see the attached complaint from Sharon Marie Travis

Thank you,

Tara Singer
*HR/In-House Accountant*
*Serenity Hills Life Center*
*304-277-4657*

Serenity Hills LIFE CENTER

---

**From:** Sharon Travis <serenityhillscenterceo@gmail.com>
**Sent:** Tuesday, April 7, 2026 3:12 PM
**To:** Tara Singer <accountant@serenityhillslifecenter.org>
**Subject:** Sheila and nursing complaint

[Quoted text hidden]

# Serenity Hills Life Center Complaint

667 Stone Shannon Rd

Wheeling WV. 26003

Date April 7, 2026

Complainant: Sharon Travis

The Complaint is about: Sheila Weese and possibly Dayna Hehr

Sheila Weese has been employed at Serenity Life Center for at least two years. She is employed as the Medical Director.

This complaint is for harassment, bullying, and retaliation. She was always disrespectful when she was under me. She would yell at me many times in her office, and she would call me crazy and others.

It started getting worse when the CRO took over. She started making false allegations that were not true. She stated that I was bringing in a resident with disabilities. She did this to take the blame off herself. She knows that I am just the referral person who gets the information and takes it to her for her written approval, and by law, she must give the okay for the acceptance.

Again, I was trying to work with the team I was in charge of and following the CRO's lead. The nurse practitioner and the

Nursing director were using the same email. They again made a false allegation against me. Stating that I brought in persons whom they did not permit to come in. I got a scolding email from the CRO. I sent the emails that the nursing staff had sent me, confirming that these two potential clients were accepted. The emails disproved their allegations.

If that was not harmful enough, they did something worse the next day. They went around to the departments and advised the staff that was under me to quit talking to me and to take me off the Mental Health Technician chat. This was both humiliating to me and upsetting the staff. This was definitely a retaliation against me for showing they were not honest.

This has created a toxic environment for me. Constantly harassing me. The next day, CRO told the staff that it was not true. He asked a few questions, but did not make a big deal about anything they were doing or saying.

Just recently, there was an emergency where the electricity went out. It went out at 6.00 pm on March 13, 2026. The Emergency Management was not engaged, although the nurses knew of the outage. I was contacted three hours after the outage. I engaged the team, got the maintenance up to check on the facility, sent the kitchen to the store to get more ice, and had the mental health technician follow protocol. Will gave the okay to get more ice. I asked nursing if the meds needed to be put on ice, and Sheila lied and stated there were no meds that needed to be put on ice. She later stated there were meds

needed on ice. Two witnesses stated that the nurse supervisor later complained that Sheila did not know what meds the residents were on and she went ant put them on ice. I also found a place to transport if needed.

At this time, I am being humiliated by her on chat, being told I am not in charge anymore. I stated that I was getting the information for those who make the decisions now. She continued to argue and try to humiliate me. She only stopped when I stated that I was doing what the judge told me to do, and that was to help the Trustee. He later made the call to transport them, and I had the place already approved if needed.

Every time I verbally complain about her abuse of me to the CRO and now the Trustee, I am told we need her license, and they do nothing about it.

I am now being humiliated more because my email has been given to what I consider the department of my abusers without prior notice to me, and I cannot get my information off. I believe that I have been allowed to be mistreated without any consequence. Not caring how it is affecting my Mental Health.

I am asking for an investigation into all these allegations, which will not include anyone from the treatment team, who are her colleagues.

Sincerely,

Exhibit Y

**Dayna and Sheila**

1 message

**Sharon Travis** <serenityhillscenterceo@gmail.com> Mon, Feb 9, 2026 at 6:11 PM
To: Frederick Will <wfrederick@meridianmp.com>, Jon Beagle <beaglejon@icloud.com>, Tara Singer <accountant@serenityhillslifecenter.org>, greg fors <glford1389@gmail.com>

I was just informed that Dayna and Sheila were screaming at my MHTs and telling them not to listen to them and get their schedules and take me out of the group chat. The patients actually heard this and reported this. I spoke to the MHT supervisor and she also told me I am the one that trains them and has been doing a good job. You told me to stay as their supervisor. Is this what you told the staff?

--

**Marie Travis "CEO"**
**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4171 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

Exhibit X

## BEFORE THE WEST VIRGINIA HUMAN RIGHTS COMMISSION

Sharon M. Travis,

**Complainant,**

v.

**HRC DOCKET NUMBER:** EAREPS-21-27
**EEOC NUMBER:** 533-2026-01777

Heart 2 Heart Volunteers Inc. d/b/a Serenity Hills Life Center,

**Respondent.**

## CERTIFICATE OF SERVICE

I, James A. Spenia, Lead Investigator for the West Virginia Human Rights Commission, do hereby certify that I have served the foregoing **Notice of Discrimination Complaint** by depositing a true copy thereof in the U.S. Mail, Certified and postage prepaid, this day of **August 5, 2026**.

TO:

Sharon M. Travis
930 Main Street, Apt. 303
Wheeling, WV 26003

Heart 2 Heart Volunteers Inc. d/b/a Serenity Hills Life Center
% Heart 2 Heart Volunteers Inc.
667 Stone Shannon Rd.
Wheeling, WV 26003

James A. Spenia
JAMES A. SPENIA
LEAD INVESTIGATOR

**Ann Urling**
**Inspector General**

August 5, 2026

Sharon M. Travis
930 Main Street, Apt. 303
Wheeling, WV 26003

Complainant,

v.

DOCKET NO: EAREPS-21-27
EEOC NO: 533-2026-01777

Heart 2 Heart Volunteers Inc. d/b/a Serenity Hills Life Center
667 Stone Shannon Rd.
Wheeling, WV 26003

Respondent.

**NOTICE OF DISCRIMINATION COMPLAINT**

Pursuant to its work-sharing agreement, the EEOC has transferred the above referenced matter to the West Virginia Human Rights Commission (WVHRC) for investigation and further processing. The charge has been assigned the EEOC and WVHRC charge numbers shown above. A copy of the charge is included with this Notice.

Your attention is directed to the West Virginia Code 16B-17-8(c) and the Rules Pertaining to Practice & Procedure Before the West Virginia Human Rights Commission.

Pursuant to these rules and specifically Rule 4.2, a Written Reply (Position Statement) shall be filed by the Respondent within ten (10) days and a copy shall be served/mailed to the Complainant. Please be advised that the rules have been promulgated which govern representation by out of state counsel.

You are further notified as follows:

1. 71-2-4.4.2(a) Any person against whom a complaint has been filed shall serve upon the Commission and Complainant a written reply to the complaint within ten (10) days of receipt of the complaint.

    a. **Such reply shall contain a statement of the facts and circumstances surrounding the allegations contained in the complaint and may include any documents or other evidence related to the subject matter of the complaint. You are welcome to provide any information or documents, including the identity of potential witnesses that you believe are helpful in explaining your position to the Commission.**

2. A verified answer will not be submitted at this time. If required, at a later date, the verified answer will be submitted in accordance with Rule 77-2-6.1.

3. The West Virginia Human Rights Commission's Rules and Regulations specifically rule 71-2-3.14 provides that where a charge of discrimination has been filed, or an action brought by the agency against any party under the Act, the Respondent shall preserve all personnel or other records relevant to the charge or action until final disposition of the complaint or action. The term "personnel or other records relevant to the complaint of action," for example, would include personnel/employment or any other records relating to the aggrieved person and to all other persons similarly situated to the aggrieved person. The "date of final disposition of the complaint or action" means the date the West Virginia Human Rights Commission issued its final closing order. A failure to preserve the above-mentioned records will be considered a violation of the West Virginia Code 16B-17-14 as amended, and will subject the violator to the penalties specified therein.

4. The West Virginia Code: 16B-17-9(7) prohibits threats, retaliation and any form of reprisals against any person who has filed a complaint or assists in prosecution of complaint.

Please note that requests to transfer the case back to the EEOC will not be considered unless there is a legitimate reason such as lack of jurisdiction by the West Virginia Human Rights Commission. However, if after the investigation a party is not satisfied with the final determination, the party may request that EEOC perform a substantial weight review. This request must be filed within 15 days of the date of receipt of the final determination from the West Virginia Human Rights Commission. At that time EEOC will review the Commission's investigation to determine whether the evidence supports their conclusion under the appropriate laws.

For future inquiries on this matter, you may contact the West Virginia Human Rights Commission at (304) 558-2616. Please use the West Virginia Human Rights Commission docket number shown above. For further information on the Commission's Rules of Practice and Procedure, you may visit oig.wv.gov/human-rights-commission on the internet.

Sincerely,

James A. Spenia

JAMES A. SPENIA
LEAD INVESTIGATOR

Enclosure: Copy of Complaint with Certificate of Service

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION Philadelphia District Office**

801 Market Street, Suite 1000
Philadelphia, PA 19107-3127
National Contact Center: (800) 669-4000
National Contact Center TTY: (800) 669-6820
Philadelphia Status Line: (866) 408-8075
Philadelphia Direct Dial: (267) 589-9728
TTY (215) 440-2610
FAX (215) 440-2632, 2848 & 2604
PHLSTATEANDLOCAL@eeoc.gov

**EEOC Charge No. 533-2026-01777** **Date: August 5, 2026**

Your charge of employment discrimination as filed with the West Virginia Human Rights Commission (WVHRC) will also be forwarded to the Philadelphia District Office of the U.S. Equal Employment Opportunity Commission (EEOC) for dual filing. This dual-filing is done in order to preserve your federal rights as explained below. The EEOC charge number will be assigned by the WVHRC in addition to WVHRC's own charge number. This letter, which will be sent to you by the WVHRC, constitutes your notification of the dual-filing with EEOC. The Respondent named in your charge will also be notified by WVHRC of the dual-filing with EEOC.

The EEOC will refrain from any processing of your charge until such time as the WVHRC completes its processing and issues final findings and orders. At that time, the WVHRC will notify the EEOC of the closure so that EEOC can review the WVHRC finding. Those final findings and orders may be adopted by EEOC and the EEOC case would then be closed based on the WVHRC proceedings.

However, under Section 1601.76 of EEOC's regulations, you are entitled to request that EEOC perform a Substantial Weight Review of the WVHRC's final finding. To obtain this review, you must request it by writing to EEOC within 15 days of your receipt of WVHRC's final finding in your case. Otherwise, EEOC will generally adopt the WVHRC's findings.

To request the Substantial Weight Review, you should address your request to the address shown in the letterhead above, to the attention of the State and Local Unit. In addition, you should provide as much specific detail as possible as to why you are dissatisfied with the WVHRC investigation or finding.

While your charge is being investigated by the WVHRC, you should address any concerns or additional information concerning your charge or the WVHRC investigation directly to the WVHRC. This will ensure that such concerns or information are provided to the appropriate person(s). **Please do not contact EEOC directly as EEOC will not be able to assist you while the charge is being processed by WVHRC, Also, please do not submit documents or evidence to EEOC since WVHRC will be actively investigating the charge and will maintain the active case file.**

The dual-filing of the charge with EEOC will preserve your rights to file a private lawsuit in federal district court as follows:

a. If your charge is filed under Title VII of the Civil Rights Act of 1964, as amended (Title VII) (that is, based on race, sex, color, religion or national origin) or under the Americans with Disabilities Act of 1990, as amended (ADA) (that is, based upon mental or physical disability), you can only file a lawsuit in Federal Court if EEOC first issues you a Notice of Right to Sue. To obtain such a Notice, you must wait for 240 days from the date you filed your charge with WVHRC. You must thereafter make a written request for issuance of the Notice of Right to Sue. This request can be sent directly to EEOC at the address shown in the letterhead above or you can send the request to the WVHRC for forwarding to EEOC. Upon its receipt, EEOC will issue you the Notice of Right to Sue and you would have 90 days in which to file suit. The issuance of the Notice of Right to Sue will normally result in EEOC terminating all further processing.

b. If your charge is filed under the Age Discrimination in Employment Act of 1967 as amended (ADEA), (that is, based on age 40 or older), you do not have to request a Notice of Right to Sue from EEOC if you wish to file a lawsuit in Federal Court. Instead, you must wait at least 60 days from the date you filed your charge with the WVHRC, regardless of the status of the WVHRC or EEOC processing. Thereafter, you can file a private lawsuit directly in Federal Court without first contacting EEOC in any manner.

If based upon EEOC's review of WVHRC's final finding, the EEOC determines that the finding should be accepted as the basis for EEOC's closure, you will be notified in writing. If the WVVHRC closure is for any reason other than a successful settlement or a withdrawal, the EEOC closure will also include a Notice of Right to Sue. This applies to charges filed under Title VII, the ADA and or the ADEA. In such an event, you would then have 90 days from the date of your receipt of the Notice of Right to Sue to file suit in federal district court.

EEOC's regulations require that you notify EEOC of any change in address and keep us informed of any prolonged absence from your current address. However, if the WVHRC is still processing your charge, you should forward any such notification or change of address directly to the WVHRC. You should also cooperate fully with the WVHRC in its processing of your charge.

Should you contact EEOC to request a Substantial Weight Review or to request a Notice of Right to Sue, please include the EEOC Charge Number shown at the top of page 1 in your correspondence to EEOC.

Sincerely,

/s/ Jamie R. Williamson

Jamie Williamson
District Director