**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

In re: Heart 2 Heart Volunteers, Inc.,
*Debtor.*
Case No. 5:25-bk-00087
Chapter 11

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

SEP 01 2026

Time: 3:40 am/pm

Creditor/ Pro se

# MOTION TO REMEDY MANIFEST INJUSTICE AND MISCARRAGE OF INJUSTICE BY RESTORING FULL CORPORATE AUTHORITY AND MANAGEMENT TO THE DEBTORS BOARD OF DIRECTORS INCLUDING THE FORMER BOARD PRESIDENT

## I. Introduction of creditor standing

1. **Moving Party**: Sharon Travis, acting pro se as a creditor and party of interest in the above -styled Chapter 11 proceedings

2. **Core relief sought**: An order rectifying a manifest injustice and miscarriage of justice by fully restoring operational authority, to debtor's board of directors, including the former board president. Ensuring that nominal board status translates into active, lawful stewardship of the estate.

## II. Jurisdiction and Legal Basis

1. **Statutory Authority:** Brought pursuant to 11 U.S.C 105(a). invoking the courts broad equitable powers to correct an abuse of bankruptcy process, remedy systematic inequity, and prevent continuing miscarriage of justice against creditors and the estate.

2. Equitable Correction of Power vacuums: Addressed to the court's

inherent power to ensure that corporate governance structures are not reduced to powerless, nominal facades while estate assets and stakeholder interest suffer.

## III. Statement of facts

1. Lawsuit against OHFLAC by Serenity Hills Life Center and the person named in the lawsuit still makes decision concerning any complaints and has targeted the CEO.

2. On February 27, 2025, the Appellant filed a voluntary petition for Chapter 11.

3. On March 3, 2025 proposed order approving counsel Kirk Burkley

4. On March 12, 2025 Counsel made motion to wave ombudsman for financial Reasons. This is what the board of directors is told.

5. March 18,2025 a hearing is held on a motion to not have an ombudsman and two former staff show up and testify against the debtor. The staff members were Sara Dean and Robert Boles who testified false information and the movant has proven through documentation both either frauded the court, and Purgery. The lawyers stated the objection was because he wanted us to save money. The board would not have had an objection to an ombudsman. It turned into us having to defend ourselves.

6. On April 4, 2025 order appointing Health Care Ombudsman.

7. On April 11, notice of appearance by Deborah Fish, PCO.

8. On May 15, 2025 PCO Deborah Fish writes her first report for April and May. She states that the CEO is helping with intake and they need a full-time intake. All staff are dedicated to the residents, their care and successful completion of the program.

9. On May 16, 2025 A motion to extend for filing a Chapter 11 Plan.

10.Between May and July 2026, we, hired a case Manager M M.

11.On July 17, 2025 the PCO submits her second report and her summary states in its conclusion that patient care has been maintained since her appointment and it is not materially compromised. Although staff turnover remains a challenge, operations are stable and current employees continue to meet the needs of program requirements. She is becoming close with the nurse practitioner (Medical Director) and I as the CEO rarely see her. She does not tell me when she is coming and does not report to me when she is there.

12. Between June and August 2025, we hired two new counselors D. J. and C. W.

13.In August the CEO started a new program six-month program that would help would help the Census go up and it started to work, but it would take a few months or so to show the census climbing.

14. On September 17 2025, the PCO files her third report covering July 15th through September 17, 2025. Her conclusion: Pursuant to Section 333(b)(3), patient care has been maintained since my appointment and is not materially compromised. Although staffing remains a challenge, operations are stable as current employees continue to meet resident needs and program requirements. The Debtor has been responsive to my communications and provided access to employees. While improvements are necessary and ongoing, I find that the clinical and administrative teams remain committed to resident care and program completion. (September 30th, 2025 via text she is talking about the census

needing to go up after telling us not to bring anyone in august, because she thought there was not enough staff (There are no laws on staff to client ratio in WV) We were working on our joint commission certification that we had to have in on October 28th, 2025. The new state law was that if you did not have it by January 1, 2026, then you could not be reimbursed by Medicaid or any insurance.

15. On October 27, 2025 There is an incident with M. M. (Case manager).

We had discussed firing her because she was missing her discharges, but we were waiting to find a replacement first. The CEO, Clinical Director and Medical Director were in a meeting and we had a question for the Case manager. The CEO

went to the case manager M. M. to ask the question and she got smart with the CEO. The CEO went back to the meeting and stated "we need to let go". When we went back to her office, she was packing up. We thought she quit. That night the CEO received a call from the Mental Health Technicians stating "the patients are crying because the case manager said she was going to cause problems for the facility and get it shut down. They are afraid they will go back to jail". She told one patient in her office, that she going to take all the files and see how the CEO would like it. (Doc. 70 Timeline 17 Exhibit K)

16.On October 27, 2025 Second motion to extend Exclusive Period for filing a Chapter 11 plan. (Doc. 29)

17.On October 28, 2025 motion to extend objection due. (Doc. 31)

18. On October 28, 2025 the Case Manager M. M.'s key fob access turned of at the facility, so she would not have access to the residents if she tried to come back to the building. She tried to come into the side entry about 4 times and was denied access. She came into the front door and it stated access denied. The company verified this showing she came in unauthorized and went to her office. She began to erase the patients court appointments from the whiteboard and the CEO tried to push her hand lightly away from the board, and said "what are you doing" then let her continue to erase it. She filed a battery charge against the CEO.

19.October 30, 2025 Serenity Hills Life Center receives their Joint

commission

Certification. A joint commission review is designed to be one of the most rigorous and comprehensive evaluations in healthcare and to get certified is not an easy task. They focus on patient safety and continuous operational readiness.

20.November 4, 2025 an investigation is done into the incident with the Former Case Manager M. M., the video and witness testimony states that she was denied access and that she not only came in to destroy property and the Ceo lightly tried to stop then let her continue, but she also took documents and violated HIPAA and took property out of the building. Patient K. H. reported that the case manager stated while she was in her office" I am leaving and I am taking patients files, and everything and they will see how they would be screwed without her".

22. On November 6, 2026 OHFLAC was called by M. M. Former Case manager.

23. On November 10, 2025 an objection and a response by the ombudsman to

the extension. She makes unvetted accusations to the judge, bringing hearsay to the court and stating the CEO has not done anything get the debtor in a better place and does not mention the new 6-month program or the new Jaco certifications that

the CEO had worked on and just received, while bringing in patients. She brings up a hearing concerning her appointment. She discusses the board of directors in a negative manner going by hearsay and the facts that she stated our not true. The CEO is not asked about these prior accusations and PCO has never spoken to the board of directors. She demands a CRO. She abandoned her statutory duty to monitor patient welfare and injected herself into corporate bankruptcy matters. She does not state the residents are in danger. Her change happened after the incident with the Case Manager M. M.

**24.**On or about November 11, 2025 the attorney Berstein and Burkley started reaching out telling the board that we had to get a CRO because the Ombudsman has turned against us and he said some of the things that she was saying. The CEO stated they were not true. He says that it was best because he believed that the judge would not give us an extension if we did not do what she said. We did not want to, but they talked us into it because of what the ombudsman put in her motion to object to the extension.

25. November 17, her **fourth** Report. Covering September 17, 2025 to November 17, 2025 Ombudsman again writes a report that is damning to the CEO that she had just on her **third report** had nothing really bad to say. The PCO says the Case manager is fired. The PCO does not mention that the investigation on November 4 and 5th, 2026 found that she had stolen residents' census with their

birthdates on it, which is a HIPAA violation, that she destroyed property, broke in the building and said she was going to cause problems for the facility (which was all on camera). This had patients crying for fear the place would get shut down. Instead, she reports that that CEO might have violated HIPAA. She states we did not have Case manager and we just hired one, but we were waiting for her to finish out her two weeks at her job. She reports that the CEO may be holding patients back even after staff say they can leave. She does not discuss these accusations with the CEO. These unvetted serious accusations of Insurance fraud went out on a public forum in the court record, with no evidence (this is actually impossible, insurance company make the decision on how long they stay), she talks about the intake of residents and the problems which is hearsay from the nursing department, that could have easily been disproved. There are emails showing the nurses had been giving inaccurate information. She says the CEO does not hold a license accreditation to do intake. The CEO's resume was for assistant referrals, and the CEO had told her in the past she had gotten permission from Keith King to do referrals and he was the head of the state addiction program under DHHR. The CEO has documented evidence and witness that this is all not true. The CEO was never asked about these accusations and they went straight to the court. The CEO was not given a chance to prove that they were not true. Some the PCO already knew was not true.

patients will remain in treatment with zero disruption to their schedules, therapeutic relationships, or housing stability. Restoring the board eliminates administrative chaos, protects vulnerable populations, and ensures that patient welfare remains uninterrupted throughout the transition.

VI. Conclusion Because the original grounds for the trustee's appointment have been proven fraudulent through documentation, and a concrete, creditor-protecting execution plan is ready for immediate implementation, equity requires the immediate restoration of full corporate authority to the debtor's board of directors.

WHEREFORE, the Debtor respectfully requests that this Court enter an order terminating the appointment of the Trustee, restoring full corporate authority and management to the Board of Directors including restoration of founder, and granting such other and further relief as is just and proper.

Respectfully submitted,

Sharon Travis

930 main Street Apt 303 Wheeling, WV. 26003

304-281-0474

**26.**November 25, 2025 A hearing is held on the extension and the lawyer says that he and the Ombudsman had come to an agreement on getting a CRO. He states though he does not agree with everything she has put in the report. He states that our numbers have increased and had a profit of $45,000 dollars that month and our census is up more than it ever has been and continues. The gentleman from the U.S. trustee office stated that he has been listening to the Ombudsman and that if we would not have agreed, then he would have ask for a conversion or a dismissal. The judge listening to her and the U.S. attorney was listening to her.

27. November 26, 2025 The CEO came in to help fill out papers for the Case management since it was behind. This was to help the counselors since they were helping with case management. They new case manager was being trained. The CEO was told by patients that two of the counselors that were best friends with the former case manager were saying inappropriate things that were upsetting them. Counselor D J and Counselor C W. They said it was affecting their treatment.

28. November 26, 2025 9:30 pm The CEO sent a text message to the PCO Stating "I need to talk to you about the 2 counselors and what they are saying".

29. November 27,2025 8:43 am The CEO texted message the PCO

that They were going to commence an investigation and PCO reminds her that they have 39 patients that need therapy. The CEO acknowledges this, but says this is serious stuff.

30.November 28, 2026, CEO texts the PCO and tells her that she will be commencing an investigation and that she had to calm the fears of residents. I told her that she was getting caught up in a web of lies. (Doc. 70 Timeline 30)

31.November 30, 2025, The CEO allows the counselors that will be under investigation to do groups with someone monitoring them. Usually, something this serious, they are put on leave and stay off sight. The CEO did not allow them to do individuals. The CEO allowed this for the resident's sake.

32.November 30, 2025 The CEO text the PCO to tell her they need to talk and that she does not know if it is worse to keep them or fire them. The CEO says" I have two statements from residents and it is bad". The PCO says that she would immediately have to decrease my census. Insinuating she had power to do that.

33.November 30, 2025, The CEO has the utilization nurse do an audit and it comes back that the staff are not doing all of their clinical notes and this is very serious and She tell the PCO about it.

34. December 3, 2025 The PCO text the CEO at 1:53 to ask her if the CEO is able to talk to the counselors about doing individual. She is advocating for

two women under investigation for serious harmful allegations. She knows what they are accused of. You will find later that that one of the Staff CW was not doing any individuals before she was put under investigation.

35. December 3, 2025 4:43 pm CEO Texted the PCO about a meeting she has already been told verbally on the phone about. This is concerning the staff not doing their clinical notes, which effects patients care and if you bill for it and it is not done then you have to pay the money back or it is fraud. The CEO tells them at the meeting that they have to get their notes done right away. The PCO was present via phone.

36. December 4, 2025 The CEO sees the counselor C.W. that is under investigation talking to a patient alone, which she is not allowed to do at this time. The CEO pulls her aside and tells her during the investigation that she cannot have private conversations with patients. She started to threaten the CEO in front of patients and put her hand in the CEO's face and was very aggressive. At that point the CEO could no longer let C. W. on sight during the investigation. A restraining order is granted on December 16th against C. W. (Doc 70 exhibit Y) (Doc. 70 Timeline 40)

37.December 4th 2025 The same day that the CEO is attacked and

according to OHFLACS record they are called on December 4, 2025. They do not arrive until December 8, 2025.The CEO did not know this until later that they were called on that date until they showed up on the December 8, 2025.

38. December 5, 2025 Mental Health technician tells the CEO that Counselor C.W. tells her that the treatment team, the Nurse Practitioner and the Ombudsman was on the phone with a women named Lisa. (she is a surveyor for OHFLAC) This shows that the Ombudsman instead of asking questions from the CEO about any concerns was not acting as a disinterested party.

39.December 5, 2025 2:10 pm Text message from CEO to PCO. The CEO tells PCO about hearing that she was on a call with the treatment team and that the counselor C. W. is telling them everything. The PCO denies it and says she does not know what they are talking about.

40.December 8, 2025 10:37 text message. From the PCO to the CEO. She speaks that she heard the CEO fired the MHT supervisor and told C. W. Therapist not to come in. She said this is the second week with no therapist for individual sessions. She knows that she physically threatened the CEO and she is under investigation. The Supervisor was not showing up for work and threatening residents. The CEO had to make decisions to protect residents and instead, the PCO was concerned with staff.

41.December 8, 2025 OHFLAC comes in and the PCO is with them

and she tells the CEO it is a coincidence. She is colluding with staff against another staff member and she does not tell them about things that C. W. is under investigation for. This delayed the investigation for the Counselors C.W. and D. J. because now it is all about OHFLAC. OHFLAC states that the CEO had been yelling and screaming at the residents in a meeting, in their efforts to target the CEO, by getting some of C. W. patients to testify. This evidence is refuted at a human rights committee, when residents that were there an on the committee stated that never happened.

42. December 9th, 2025, 8:01 am Text message from PCO to CEO. She says itis her understanding that the one counselor has been doing her notes and can she do therapy. The investigation was not done because they called in OHFLAC, so it was ready to begin.

43.December 9, 2025 and unusual fifth report comes in short of it 60 days due date. Time period November 17, through December 9,2026. She reports that OHFLAC was there on December 8, 2025. She states that she came in on **November 26, 2025**. This was the day after the hearing for the CRO. The PCO puts her concerns about the CEO firing 2 Staff and two are under investigation, she states one case manager hired, 6-month program is not being utilized, then she goes into things happening in intake that were not true and unvetted. Again, only unvetted hearsay and nothing was discussed with the CEO to get her side of it. The

CEO claims these accusations are not true. What she does not mention in her fifth report is that the case manager said disturbing remarks to the residents and that the investigation showed that she broke in the building and had stolen residents' information with their birthdates on it (which is a HIPAA Violation). The PCO left out the staff not doing their documentation, which had to be corrected by the CEO Documentation effects patient care,

**44.**December 10th the Investigations begins on the two staff members and ends in December 12th. In the investigation the counselor C. W. was telling patients in groups that the CEO was going to jail or leaving the facility. R. C. stated many residents said it was affecting their treatment. C. R. Stated that she was told in their therapy group that whenever that hearing happens that the CEO was going to be fired and she would be replaced the next day. She stated then the ombudsman would come in and look through any and all information and be a part of revamping the facility. **This is very important because this was told to the staff members by the ombudsman before the hearing on November 25th about the CRO. This was then told to residents. The ombudsman came in the day after the hearing just like the residents reported as stated in her December 9, 2025 fifth report.** C. W. was recommended by the investigation team to be terminated and she was. They recommended D. J not to be fired. There is so much that was said. This shows her bias and colluding with staff against the CEO.

**45.** December 19, 2025 The magistrate ordered a personal restraining order against counselor C. W. for the protection of the CEO. (Doc.70 Exhibit Y and Timeline 61)

46. 12/23/2024 Order Authorizing employment and retention of William Freiderick CRO.

**47.** December 23, 2025 Order to employee CRO William Frederick.

**48.** December 26, 2025 The ombudsman in reference to an insurance audit that had failed while under the former clinical director and former Compliance officer during their tenure. The PCO sends a letter on behalf of the Debtor to the insurance company under the direction she states of the CRO. She exceeded the scope of her authority.

49. January 5, 2026 Written notes from our longest employed Mental Health Technician, stating that he has never seen the CEO yell or scream at any resident or been aware of a resident not being able to visit due to a disability. Referring to the states OHFLAC's recent findings.

50. January 14, 2026 A workforce Hearing takes place concerning the incident

with Case manage M. M. accusations on October 20th 2025. The result was that the employer was found without cause, that the Case Manager testimony was filled

with inconsistencies and court found that she had quit the day before. (Doc. 70 exhibit I)

51.January 30, 2026 Quarterly Human Rights Committee / CRO is present and approves of the notes. The CEO was not allowed in the second part of the meeting where Residents on the HRC stated that the CEO never screamed and yelled at patients in a meeting that OHFLAC reported she did.

52. February 1,2026 The utilization nurse sends out an audit and a stern warning to staff about not doing their notes and the possible legal consequences. The CRO and Ombudsman are aware of this and nothing is done. Utilization nurse was told not to do any more audits by the CRO

53.January 16, 2026 to set hearing for January 23rd 2026 for expediating hearing. The reason for this hearing was because the CRO had hired a Managing company with a criminal background that was friends with one of the debtors' attorneys. He signed a contract without the boards written consent as in his contract. The Board had rejected the company in the summer and now the company was brought back in through the CRO. The company's owner had a long list of corporate criminal actions. Serving time in jail. The CRO signed a contract without the board's approval as his contract stated he must. The CRO stated if we did not accept it by the end of the day that he would resign. We accepted his

resignation as his email stated. The lawyer and the CRO then reneged on the resignation.

54. January 23, 2026 The expediated hearing takes place. Of course, the CRO, the ombudsman and the Lawyer where negative. because we asked to get a new lawyer, because he was not doing any evidentiary hearing to refute the ombudsman's claims, the lawyer talked the board into bringing a CRO and was not honest about what it entailed. CRO that brought in the managing company who had the criminal history and were friends of the Debtor's lawyers in his office. It felt like a hostile takeover to the board.

55. February 9, 2026 This is when the missing 6 report should have been filed at this time. According to the ombudsman's 60-day requirement. Since the last fifth report was shortened and was entered right before the investigation for Counselor D. J. and Counselor C. W... This report would should have included the investigation of the mental abuse cause to a protected class by two counselors and POC being mentioned in the report, how the CEO was attacked by C. W. with witnesses including patients watching, how the patients knew about the hearing for the CRO and that the CEO would be fired prior to the hearing, how the patients were manipulated by the C.W. and D. J. and how the report showed that C.W. was not seeing her patient prior to the investigation, what the counselors were saying in their groups were affecting their treatment, how the Ombudsman was a part of

calling OHFLAC on December 4 and not on the staff under investigation, but on the CEO in coordination with the staff under investigation, that had just threatened the CEO. On December 4th as reported by staff.

56. February 18, 2026 Hearing to appoint a Trustee hearing is held and judge let's the CEO cross examine witness on a surprise. She is not prepared and the judge did not grant an extension of time to get an attorney. Ombudsman again negative unvetted testimony.

57. March 5, 2026 The new Trustee is appointed.

58. March 18, 2026 Text from CEO to Trustee About the noncompliance at the facility and stating that she needed to find out if the board is responsible for what is going on under their watch. (Doc. 67 page 6)

59. March 20 2026. He comes in mad and tells me to go to the court and tell them whatever she want. Trustee comes in on a Friday he is mad and tells me I am put on leave. (docket 67 page 6)

60. March 27, 2026 PCO Seventh Report from periods from January 30 2026, through March 27 2024. Four days after CEO was put on leave after telling the Trustee that she was concerned for noncompliance and that she was going to the judge to make sure the board was not responsible. She stated after the Trustees appointment issues persisted with intake, including incomplete missing forms. delays in sending assessments.

May1, 2026 Pro se Correspondence concerning building non-compliance and Duty of care facts to the court. 9:45 pm.

May 1st 2026 The CEO is terminated that afternoon.

61.May 20, 2026 Motion to Remove or replace Ombudsman. The appellant states that the ombudsman is not acting in the best interest of the patients, has violated her duties under 11 U.S.C.§ 333, has been impartial, acted outside of her scope, breach of confidentiality, Breach of Duty, Misconduct and Bankruptcy Fraud.

62.May 22, 2026 -Order to remove or replace ombudsman denied.

63. Notice of Appeal

**Grounds and Proof Requirements for Removal and Trustee appointment.**

1. **Gross Mismanagement or Breach of Fiduciary Duty:** You must prove that the board's actions or total passivity constitute a severe breach of the duty of care or loyalty, resulting in organizational crisis. Ordinary poor business judgment is generally not enough; it requires recklessness, abandonment of duties, or severe internal conflict that paralyzes operations.

2. **Financial Insolvency, Waste, or Dissipation of Assets:** It must be demonstrated that the organization is unable to pay its debts or that current

leadership is actively wasting, hiding, or mismanaging assets, leaving creditors or stakeholders unprotected.

3. **Fraud, Illegality, or Regulatory Violations:** Evidence must show that directors or key executives are engaged in fraudulent activities, embezzlement, or severe violations of state and federal laws that threaten the legal standing of the entity.

4. **Threat to Public Welfare or Patient Safety:** In regulated fields like behavioral healthcare, state regulators or agencies can intervene by proving that substandard conditions, administrative failure, or licensing breaches directly endanger the health, safety, or rights of individuals under the facility's care.

**Legal Threshold** The petitioner must establish that less intrusive remedies—such as internal bylaw enforcement, board restructuring, or standard injunctive relief—are completely inadequate to prevent ongoing harm, making a neutral third-party trustee the only viable path to preserve the organization.

IV. Exposure of Tainted Foundation and Hearsay Reliance The initial appointment of the trustee was predicated upon a severely compromised factual record:

1. Compromised Testimony: The court's removal order relied on prior testimony from two specific employees, Robert Boles and Sarah Dean.

Documentary evidence subsequently surfaced and has been presented to prove that this foundational testimony was fraudulent. Unvetted Hearsay: Judicial reliance on unvetted ombudsman reports

2. bypassed standard evidentiary safeguards and cross-examination, creating a procedural injustice born of an inadequate hearing where the CEO lacked proper preparation or legal counsel.

3.Ongoing Harm: A judicial ruling built upon demonstrably false testimony and unchecked hearsay creates an ongoing, uncorrected manifest injustice that equity is explicitly designed to fix. Maintaining a costly third-party trustee penalizes the estate rather than protecting it.

V. Plan for Consideration:

1. The Debtor's Three-Month Restructuring and Exit Plan To prove that less drastic remedies and internal management are fully sufficient, the board proposes a structured, time-bound execution plan:

2. Three-Month Transition Window: Full corporate authority is restored to the board for a strict 90-day period to stabilize operations, integrate experienced management if necessary, and execute a definitive debt-resolution strategy without the continuous financial drain of a third-party trustee. Get the

place compliant with all state regulations.

3. Asset Monetization Options: The board will execute one of two viable paths regarding the primary We will carve out of the 127 acres 48-to-50-acre parcel overlooking the river, the 42,000-square-foot facility, the original administration house, garage, and associated equipment:

- Outright Sale: A full sale valued at approximately $4.5 million

to completely clear all estate debt. With the remaining property staying in the hands of the debtor and the debtor running the sober living home and building other sober living homes on site.

- Lease Generation: Renting out this primary tract for $52,000
- to $55,000 per month to generate predictable, sustained

revenue to service creditors. Retention of Operations: The debtor will retain the remaining acreage and dedicated sober living housing structures under independent board control, operating outside the state litigation framework to secure a stable, ongoing revenue stream and to stay out of the way of OHFLAC that seem to be an ongoing targeting because of the lawsuit. This will secure that the debtor can continue their lawsuit without a conflict of interest.

4. Absolute Continuity of Patient Care To safeguard public welfare and patient safety, the board mandates absolute continuity of care. All current

patients will remain in treatment with zero disruption to their schedules, therapeutic relationships, or housing stability. Restoring the board eliminates administrative chaos, protects vulnerable populations, and ensures that patient welfare remains uninterrupted throughout the transition.

VI. Conclusion Because the original grounds for the trustee's appointment have been proven fraudulent through documentation, and a concrete, creditor-protecting execution plan is ready for immediate implementation, equity requires the immediate restoration of full corporate authority to the debtor's board of directors.

WHEREFORE, the Debtor respectfully requests that this Court enter an order terminating the appointment of the Trustee, restoring full corporate authority and management to the Board of Directors including restoration of founder, and granting such other and further relief as is just and proper.

Respectfully submitted,

Sharon Travis

930 main Street Apt 303 Wheeling, WV. 26003

304-281-0474

9-1 2026

# CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**In re: Heart 2 Heart Volunteers, Inc.,**
***Debtor.***
**Case No. 5:25-bk-00087**
**Chapter 11**

**I, Ms. Travis, hereby certify under penalty of perjury that on this 8th day of August, 2026, I served a true and correct copy of the foregoing *Notice of Motion, Motion for Reconsideration,* and *[Proposed] Order* via the Court's Electronic Case Filing (ECF/CM) system and/or by depositing the same in the United States Mail, first-class postage prepaid, addressed to the following parties of record:**
**Chapter 11 Trustee:**
**Robert Johns**
**Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Chapter 11 Trustee:**
**BRIAN R. BLICKENSTAFF [WVSB No. 9449] Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Debtor:**
**KIRK B. BURKLEY, ESQ. Bernstein-Burkley, P.C. 707 Grant Street Suite 2200 Gulf Tower Pittsburgh**

**The Patient/Administrative Ombudsman:**
**Deborah Fish-Patient Care Ombudsman**
**211 West Fort Street**
**Suite 705**
**Detroit, MI 48226**

Sharon Marie Travis
9-1-2026

**Office of the United States Trustee:**
**GARY O. KINDER, ESQ. Assistant U.S. Trustee 300 Virginia Street East, Room 2025 Charleston, WV 25307**

**Dated: August 13, 2026 - Respectfully Submitted- Sharon Marie Travis**