UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV
OCT 01 2026
Time: 3:50 am/pm

In re: Heart 2 Heart Volunteers Inc.
Debtor.
Case No. 5:25-bk-00087
Chapter 11
Sharon Travis Creditor/ Pro Se

# RESPONSE TO COMBINED OBJECTION AND MEMORANDUM IN OPPOSITION TO MOTION TO REMEDY MANIFEST INJUSTICE AND MISCARRIAGE OF INJUSTICE BY RESTORING FULL CORPORATE AUTHORITY AND MANAGEMENT TO THE DEBTORS BOARD OF DIRECTORS INCLUDING THE FORMER BOARD PRESIDENT

## THE TRUSTEE'S DECEPTIVE OPENING NARRATIVE OF "STABILIZATION"

The Chapter 11 Trustee opens his Objection by asserting that since his appointment, **the Debtor's operations have stabilized and patient care has improved, as evidenced by the periodic reports filed by the** Patient Care Ombudsman. This self-serving summary attempts to paint a picture of a salvaged facility to justify keeping the legitimate Board of Directors locked out of power. However, this opening narrative is completely deceptive. The Trustee and the Ombudsman are relying on a false baseline of "improvement" to mask a severe clinical and operational crisis. In reality, the facility has not stabilized; it is in rapid collapse.

- **The Core Referral Pipeline is Explicitly Broken:** The external personnel responsible for referring patients from correctional facilities (jails) have explicitly updated the record stating **they will no longer send residents to the facility under this current Trustee**.

- **The Refusal is Driven by Documented Lack of Care:** Crucially, these vital jail referral sources are refusing to send individuals to the facility **because of the devastating results they are seeing regarding patient lack of care, as explicitly detailed and documented by** Investigator Cornell.

- **Unqualified Clinical Leadership and Illegal Operations:** The facility is currently being run by a **Nurse Practitioner who lacks the legal qualifications** to manage an operations framework of this scope. Worse, the facility's active clinical leadership rests on a **fraudulent Clinical Director who is actively breaking the law by holding herself out to be a licensed Psychologist**—a claim explicitly disproven by the State Board of Psychology, and who was previously terminated by Prior Management for cause for failing to do her job.

- **The Remedy: An Experienced Management Company and Qualified Staff:** To completely resolve these structural failures, **reinstating the Board will immediately install a highly experienced professional management company to oversee operations and employ fully qualified, licensed, non-toxic personnel.** This structured turn away from harmful staff is necessary to insulate the facility from ongoing regulatory exposure and restore the trust of judicial pipelines.

- **The Ombudsman Covered Up Actual Patient Abuse:** The Ombudsman's reporting is inaccurate, heavily biased, and applies an intolerable double standard. While she previously treated minor administrative gaps as immediate health hazards under the Board, **she actively left severe patient abuse unreported under the Trustee's watch**, completely abdicating her statutory safety mandate.

- **Severe Omissions Formally Exposed via Reporting Timeline:** To fully expose these fabrications, **the Creditor will lay out a definitive, chronological timeline of the Ombudsman's reports directly demonstrating exactly what she failed to report to this Court.** By matching the dates of known operational failures against her silent dockets,

the record will conclusively prove that the Ombudsman knowingly omitted critical failures to preserve the Trustee's false narrative of stabilization.

- **The Facility is Bleeding Assets:** The Trustee's claim of operational health is flatly shattered by his own recent mandatory court filing, which details a staggering operational **loss of over $18,000 for the period**.

The Trustee and the Ombudsman are using the phrase "improved patient care" as a shield to hide an estate in rapid decline. A court of equity cannot accept an opening narrative of "stabilization" when a broken jail referral pipeline, Investigator Cornell's findings on a lack of care, an unqualified and fraudulent clinical leadership team, unreported abuse, intentional reporting omissions, and thousands of dollars in monthly deficits prove the estate is being actively destroyed.

**THE COMPLETE NARRATIVE: THE RETALIATORY ORCHESTRATION TO UNJUSTLY DISPLACE CORPORATE GOVERNANCE**

To understand the manifest miscarriage of justice that has occurred, the Court must look past the opposing parties' defensive assertions and examine the chronological, interconnected narrative of events. The removal of the Board of Directors and the subsequent hostile reporting by the Patient Care Ombudsman (PCO) were not driven by objective operational failures. Instead, they were the direct result of a retaliatory campaign engineered by compromised employees and weaponized through surprise testimony to mislead this, Court.

The reports of the ombudsman are inaccurate and biased.

**1. The Pre-Trial Retaliation: Hidden Financial Ruin and Employee Malice**

The narrative used to displace corporate management began with a calculated act of employee retaliation designed to mask severe operational and financial wrongdoings. At the inception of these proceedings, the Debtor moved to waive the appointment of a Patient Care Ombudsman to save the bankruptcy estate critical financial resources.

In direct response to this motion, the U.S. Trustee brought forward two witnesses: **Sarah Dean** and **Robert Boles**. The Trustee presented them as objective professionals, entirely concealing their severe conflicts of interest and failing employment statuses from the Court:

- **Sarah Dean** had already been **terminated for cause** due to severe wrongdoings and misconduct.
- **Robert Boles** was actively facing **imminent termination** for documented misconduct and orchestrating a hostile work environment.

These individuals did not appear out of a genuine concern for patient care; they appeared in direct retaliation for their failed employment statuses and to preemptively protect themselves. While these individuals were actively under management, they engaged in severe wrongdoings that directly crippled the financial standing of the facility. Because of their active concealment, the Board of Directors was unable to immediately diagnose the depth of the damage. It was only *after* they were removed from the facility and a Wellpoint Insurance audit was performed that management uncovered the truth: these two individuals had cost the business **over $500,000 in regulatory claw-backs**. They sabotaged the facility

from within and then used the U.S. Trustee's hearing to retaliate.

**2. The Evidentiary Ambush and the Denial of Due Process**

The introduction of Dean and Boles was executed as a procedural ambush. The U.S. Trustee brought these individuals into the hearing without providing any prior notification to the Debtor regarding the scope or substance of their expected testimony.

Management immediately recognized their severe bias and provided bankruptcy counsel with an extensive, highly specific list of cross-examination points to expose their falsehoods. However, because this evidence was sprung on the defense without warning, counsel explicitly stated to management that the team was completely unprepared to proceed and required an extension to digest the surprise allegations. That extension was denied. Counsel was forced into a complex evidentiary hearing entirely unprepared, ensuring that the true, retaliatory story of these witnesses was hidden from the Court at the most critical juncture of the case.

**3. The Tainted Baseline: How Perjury Tainted the Entire Case**

The judge accepted the surprise testimony of Dean and Boles as absolute, credible truth. This initial error fundamentally corrupted the entire trajectory of the bankruptcy, including the critical November 25, 2025 hearing and the subsequent Motion for Trustee hearing.

The Court continuously used this false narrative as a baseline to evaluate the facility. Later, when the PCO began testifying against management, the Court viewed her testimony through the lens of Dean and Boles' initial lies, operating under the assumption that "nothing had changed." In reality, the foundation of the Court's perspective was built on documented perjury that management was subsequently able to completely disprove with ironclad evidence:

- **The Sarah Dean Timeline and Credential Fraud:** In her employment materials and court narrative, Ms. Dean explicitly asserted that she worked for the facility in **2022**. This is a physical and historical impossibility, as the facility was **completely closed and non-operational** throughout the entirety of 2022. Official contract records conclusively show she was not retained until **September 2023**. This timeline was deliberately fabricated to align with deceptive statements she previously made to the *West Virginia Board of Examiners*.

- **The Robert Boles Grievance Fraud:** Mr. Boles provided patently false testimony claiming that Sharon Travis voted on her own internal grievance. This claim was completely obliterated by the physical corporate records subsequently provided to the Court by Ms. Travis, proving the accusation was manufactured out of whole cloth.

Former CEO was forced to wait months until she was let go and out from the control of the debtors lawyers to put together what concrete evidence could be compiled to formally prove to the Court that these witnesses were wholly uncredible. By then, the structural damage to corporate governance had already been done based on a completely fabricated baseline.

**The Expansion of the Narrative: The Retaliatory Turn of the Ombudsman**

Once the initial tainted baseline was established by Dean and Boles, the coordinated effort to permanently displace the Board expanded to the Patient Care Ombudsman. For the first **eight (8) months** of her appointment, the PCO conducted regular inspections and repeatedly submitted favorable reports regarding the facility's operations.

The PCO was fully informed of the exact administrative referral workflow on the **very first day she arrived at the facility**, where the CEO explicitly stated they handled preliminary referrals under authorization from **Keith King, Manager of the State Sub waiver Program**. For nearly a year, the PCO never once flagged this practice as a patient care concern.

The PCO's narrative completely flipped into hostility only *after* the facility was forced to terminate (If she did not quit)(She quit found by the Workforce) a subsequent case manager for gross misconduct. Security video evidence captured this case manager committing an **actual HIPAA breach** by illicitly taking confidential patient data, alongside physically erasing patient appointments off the facility's scheduling board. Prior to her termination on October 28, 2025, this case manager explicitly stated to a resident that she *"was going to cause trouble"* and that they *"would see how much they needed her."*

To execute this threat, the terminated case manager weaponized the Office of Health Facility Licensure and Certification (**OHFLAC**)—an agency that the

Debtor, Serenity Hills, is actively suing. When OHFLAC arrived at the facility at the case manager's prompting, the PCO completely abandoned her statutory role as an independent, "disinterested" court monitor under 11 U.S.C. § 333. Instead, she adopted the adversarial narrative of the disgruntled staff and the hostile state agency, using her subsequent **Report No. 4** to retroactively manufacture a crisis out of whole cloth

**The Ombudsman's total failure to provide the mandatory 14-day notice required under *FRBP Rule 2015.1* constitutes a severe violation of due process and has resulted in a profound miscarriage of justice.**

For eight months, the Ombudsman issued positive reports. However, without prior notice or an opportunity for the Respondent to review or contest the allegations, the Ombudsman abruptly shifted positions, submitting a report filled with material untruths regarding facility leadership. By withholding this notice, the Ombudsman entirely blindsided the Respondent, depriving them of the opportunity to present critical, objective evidence to the Court and the U.S. Trustee before the November 25, 2025 hearing—specifically, that leadership had successfully achieved **Joint Commission (JCAHO) certification** and had already implemented an active, 6-month census development program.

**Furthermore, the Ombudsman acted entirely outside the legal scope of her appointment under *11 U.S.C. § 333* by attempting to dictate corporate governance and business operations.** A Patient Care Ombudsman is appointed solely to monitor and report on the *quality of patient care*; she is not a business consultant, nor does she possess the authority to manage or evaluate corporate

census strategies. Yet, at the hearing regarding the extension, the Ombudsman stepped far outside her statutory boundaries to criticize business metrics and demand the appointment of a **Chief Restructuring Officer (Restructuring Trustee)** *11 U.S.C. § 1104*. This false reporting and overreach directly manipulated the U.S. Trustee, who stated on the record that he would seek a dismissal or forced sale if a CRO was not appointed.

**The structural bad faith of this overreach is conclusively proven by the Ombudsman's subsequent conduct.**

Notably, the very business and administrative complaints she used to force the appointment of a CRO are issues she has completely ceased reporting on now that the Trustee is in place. Because these operational matters were never within her lawful scope to begin with, her targeted reporting on them was a bad-faith mechanism designed to force management out. To allow a material change in corporate control to stand based on unnoticed, out-of-scope, and false reporting represents a plain legal error that this Court must correct to prevent a lasting miscarriage of justice.

**The Ombudsman's Reports: Chronological Inconsistencies and Major Factual Omissions in the Proffered Testimony**

1. **Doc. No. 126-5/15/2025 The First Report Ombudsman cover April 4 to May 13, 2025**

The first report had a list that was given I presume by Sarah Dean and Robert Boles testimony. The fact of the matter she did not find anything and we had not

done anything different prior to her coming in. Because the problems reported were untrue.

**CONCERNS ADDRESSED** ***It was my understating that the following concerns existed at the time of my appointment:***

• Issues relating to staffing

• Issues relating to Intake of residents

• Issues relating to compliance with policies

• Issues relating to the grievance process

• Issues relating to security of the building The PCO has investigated all of these concerns, and the Debtor has addressed or is continuing to address all of the issues listed above.

(This our security system broke caused by a power outage and would cost a lot of money. We got it fixed)

2. **Doc. No. 135- 7/17/2025. Ombudsman's second report does not have a section of issues of concern. She mentions below:**
   - Security: The Debtor has contracted with Yawn Electric to replace the circuit board that controls the locking mechanisms on the doors of the residential building. Given the Debtor's cash flow, this contract is delayed in favor of hiring staff to work directly with the residents. While it would be best to have the system working properly, the PCO understands the Debtors' decision. There is no immediate harm to the residents.
   - CONCLUSION Pursuant to Section 333(b)(3), patient care has been maintained since my appointment and is not materially compromised. Although staff turnover remains a challenge, operations are stable as current employees continue to meet resident needs and program requirements. See *Time table Exhibit we had 35 staff members at that time.*

3. **Doc. No. 139- 9/17/2025 Ombudsman's third report does not have a heading of areas of concern. She mentions being short staffed.**

**OMBUDSMANS CONCLUSION** Pursuant to Section 333(b)(3), patient care has been maintained since my appointment and is not materially compromised. Although staffing remains a challenge, operations are stable as current employees continue to meet resident needs and program requirements. The Debtor has been responsive to my communications and provided access to employees. While improvements are necessary and ongoing, I find that the clinical and administrative teams remain committed to resident care and program completion. **(Note we had 40 staff members at that time according to the monthly report and they only have 35 as of August 2026)**

4. October 28th Incident. On October we Have an incident with a case manager who we think quit and we find out she made accusations to patients that she was going to cause trouble and to make the debtor regret her absence, The investigation team found that the Case manager broke in, destroyed property, had taken patients census with their private information and destroyed property. The workforce found her not credible that she quit and it was no fault of the employer. You used the Ombudsman as a weapon. She calls OFLAC and she know they have a target on the facility. This is all on the record.

5. **Doc. No. 160- 11/17/2025 Ombudsman Fourth report**
**The PCO Exceeded Her Scope and Relied on Inadmissible Hearsay**

**Violation of the "Disinterested Person" Standard:** Under 11 U.S.C. § 333, a PCO must remain a completely neutral, disinterested monitor. When a PCO absorbs the grievances of employees under investigation—and subsequently

terminated—without attempting to interview management, verify clinical workflows, or review the existing court docket, the PCO crosses the line into personal bias and fails the statutory standard.

**Procedural Rule Violations and Reliance on Inadmissible Hearsay:** By failing to provide the mandatory 14 days' notice required under ***FRBP Rule 2015.1(a)***, the PCO completely bypassed the checks and balances required for federal bankruptcy reports. Furthermore, under ***Federal Rule of Bankruptcy Procedure 9014***, the Federal Rules of Evidence apply to these proceedings. The unsworn rumors provided by former staff constitute classic inadmissible hearsay under Rule 802 and cannot form the evidentiary basis for a court order.

**Fourth Report Ombudsman's Concerns**

> **Bullet Point 1**: Case Manager: The Debtor currently operating without a case manager. Having terminated the employment of the case manager. There has not been a case manager at the facility since October 28, 2025. While the other staff members are sharing the load, it is a burden and not sustainable and will begin to affect resident care if not remedied soon.

**Testimony of Facts That Did Not Occur Regarding the Case Manager Position and Actual Staff Sabotage:**

Ombudsman's Report No. 4 notes that the facility operated without a permanent case manager after October 28, 2025. The PCO entirely omits the critical context: the former case manager quit, but would have been fired for cause due to gross misconduct, theft of data, and active operational sabotage. **The facility possesses video evidence capturing this individual committing an actual HIPAA violation by illicitly taking confidential patient information, alongside physically erasing patient appointments off the facility's scheduling board.**

Prior to her termination, this employee explicitly stated to a resident that she *"was going to cause trouble"* and that the facility *"would see how much they needed her.* "The PCO cannot justify keeping an employee who actively violates federal HIPAA laws, compromises patient data security, and maliciously disrupts clinical scheduling. Terminating her was a mandatory legal and ethical necessity to protect the residents from active harm and data breaches. Furthermore, the PCO's claims of an "unsustainable" burden are entirely moot. The Debtor had **already successfully hired a qualified replacement case manager**, who was simply completing a standard two-week notice at her previous employment before starting. The current staff successfully managed the workload during this brief transition without any decline in resident care.

**Bullet Point 2:** Potential HIPPA Violations: The CEO may have violated HIPPA by posting information about a former patient on Facebook.

**Testimony of Facts That Did Not Occur Regarding the Alleged HIPAA Violation and Scope of Authority:**

The PCO asserts that the CEO "may have violated HIPAA by posting information about a former patient on Facebook." This allegation is legally frivolous, procedurally improper, and completely unsubstantiated. As a threshold matter, the statutory role of a PCO under 11 U.S.C. § 333 is strictly limited to monitoring the quality of care provided to **current** patients residing at the facility. A social media interaction with a *former* resident who has already left the program has zero impact on the safety, health, or clinical conditions of current patients. The PCO possesses no regulatory authority to act as a HIPAA enforcement agent. Furthermore, the PCO admits she does not know if a violation occurred, stating only that the CEO "*may*" have committed one. A court-appointed officer should not fill formal reports

with unverified speculation. **To date, the facility has never received any official HIPAA violation notice, complaint, or citation from any regulatory agency.** In reality, the former resident in question initiated the public discussion regarding their own stay. Under HIPAA, patients have a unilateral right to disclose their own information. The CEO merely asked the resident why they were upset and did not disclose any protected health information. The PCO's ironic decision to investigate a groundless social media rumor while ignoring the terminated employee's actual video-recorded HIPAA breach further exposes a systemic bias.

> **Bullet Point 3:** Resident Concerns: The PCO was informed that, during the State investigation, some residents expressed that their needs are not being adequately ad dressed, certain policies are not being implemented consistently, and graduation dates may be extended by the CEO even after approval has been granted by the treatment team.

**Testimony of Facts That Did Not Occur Regarding Resident Concerns and Graduation Dates:**

The PCO's claim that certain policies are inconsistent and that residents' "needs are not being adequately addressed" is a gross mischaracterization of standard clinical boundaries. The PCO completely failed to investigate the nature of these complaints. In reality, as proven by the **written statement of a resident already on the court record at Docket No. 218, Exhibit D,** the complaints made by residents were entirely illegitimate and centered around personal frustrations with necessary facility rules. Specifically, the resident testimony at **Docket No. 218, Exhibit D** confirms that these grievances were "selfish complaints" regarding how cigarette breaks were structured and restrictions preventing residents from speaking to boyfriends—individuals with whom those residents had previously used substances. Enforcing these boundaries is a strict clinical necessity for

substance abuse rehabilitation, not a failure of care. Furthermore, the allegation that the CEO arbitrarily extends graduation dates is flatly contradicted by the record. The length of the 3-month and 6-month programs is **dictated strictly by insurance company coverage determinations** and explicit **court orders**—not by the CEO's personal discretion. As confirmed by sworn resident testimony at **Docket No. 218, Exhibit C**, when residents enter the facility, Miss Marie walks them through the process and explicitly gives them a clear, autonomous choice as to which program length they want to participate in, noting they have the right to change their minds. The therapist under investigation falsely told residents that the CEO was forcing them into longer stays to instigate resident complaints during the State investigation. The PCO completely ignored the existing record at **Docket No. 218, Exhibits C and D** before presenting these malicious, non-clinical rumors as severe operational failures.

> **Bullet Point 4:** Intake of Residents: Currently, the Chief Executive Officer manages all inquiries and performs initial assessments of potential residents. The PCO has previously highlighted this as a concern in past reports. The CEO does not hold the necessary license or accreditation to complete all required assessments during the intake process. The PCO was advised that on occasions sufficient information was not gathered and some medications were mis spelled, this can have an impact on the intake, the 72-hour holding period, and the residents' overall stay.

**Testimony of Facts That Did Not Occur Regarding Referrals vs. Intake Assessments and the PCO's Sudden Retaliatory Turn:**

The PCO's assertion that the CEO "manages all inquiries and performs initial assessments" without holding the proper license completely mischaracterizes the facility's operations. The CEO **does not perform clinical intake assessments**. The formal clinical intake process is handled exclusively by the **nursing department**

alongside **Miss Marie**, a highly respected professional who possesses an outstanding reputation in the community and the courts for her extensive work helping individuals recover. The CEO's role is strictly limited to handling initial inquiries and processing preliminary **referrals**. Crucially, the PCO was fully informed of this exact referral workflow on the **very first day she arrived at the facility**, where the CEO explicitly stated they had full permission to handle referrals. **The PCO operated alongside the facility for eight (8) months across multiple prior reporting periods without ever flagging this practice as an issue.** The PCO's sudden "about-face" in Report No. 4 occurred only *after* the terminated case manager instigated an incident by calling in the Office of Health Facility Licensure and Certification (**OHFLAC**)—an agency that the Debtor, Serenity Hills, is currently suing. The PCO abandoned her independent lens and adopted OHFLAC's adversarial position purely to validate the terminated case manager's retaliatory complaints. To conclusively demonstrate the legitimacy of the CEO's role, a formal letter written for this motion by **Keith King, the Manager of the State Sub waiver Program**, explicitly confirming that the CEO has always possessed the requisite

authorization to process these referrals. *Doc. No. Exhibit*

***Note: The fact is the PCO continues to say the staff are doing their job, when she does not mention them not doing their clinical notes and not that the case manager caused the patients to be very frightened by her threats against the facility. That she broke in and that she violated HIPAA and destroyed residents' property. She lays it all against the CEO and is quiet on the disruptive and non-compliant staff that the CEO is trying to get compliant.***

6. **11/27/2025 Extension filed by the debtors' employees**

**7. 11/10/2026 13 days after the incident at the facility with the case manager and conflict of interest OHFLAC being called in by the case manager the following Objection was made asking for a CRO. She does not mention that patients are being harmed.**

> **Bullet point 1**.PCO has worked in good faith since her appointment to encourage substantive movement in this Chapter 11 Case, however, those efforts have not resulted in the Debtor taking all of the substantive action necessary to address the Debtor's obstacles in this Chapter 11 Case.
> **Bullet point 2**.PCO suggests that the appointment 2 No. 5:25-bk-00087 Doc 157 Filed 11/10/25 Entered 11/10/25 15:28:50 Page 3 of 7 of a CRO is necessary to achieve a successful reorganization in this case. **Currently, the creditors remain inactive, and it appears there is no accountability to the Board of Directors. Upon information and belief, the board consists of the CEO, her sister, her pastor, her pastor's wife, and an employee of the Debtor. As raised in testimony at the hearing for appointment of a Patient Care Ombudsman, the PCO questions the independence of the Board of Directors. 7. As this Court can see from a cursory review of the docket in this Chapter 11 Case, the only substantive pleadings filed in this Chapter 11 Case by the Debtor are: (i) employment applications for Debtor's counsel and special; (ii) the Bankruptcy Schedules and Statement of Financial Affairs; (iii) the PCO pleadings (iv) Monthly Operating reports and (v) the First and Second Motions to Extend the Exclusivity period. The Debtor filed its petition on February 27, 2025, and the PCO has no confidence that there will be progress in the near term, as suggested in the Second Motion, without the appointment of a Chief Restructuring Officer ("CRO").** ***Here says of untrue facts and brings up Sarah Dean and Robert Bole's initial testimony. She stated to me she had talked to former staff members.***

**Testimony of That Did Not Occur. Ombudsman's Report Relies on Intentionally Deceptive Omissions and Thoroughly Discredited Testimonies to Manufacture a False Narrative of Corporate Mismanagement.**

Specifically, the report continues to cite and weaponize statements from **Sarah and Robert Boles**—individuals who have already been demonstrated to be completely uncredible and unreliable on the record. While resurrecting these discredited claims, the Ombudsman completely omitted critical, objective milestones achieved by leadership that directly contradict her assertions.

Most glaringly, the Ombudsman failed to mention that the facility had just successfully achieved **Joint Commission (JCAHO) certification**, a rigorous standard demonstrating compliance with the highest levels of patient care and safety. Furthermore, she entirely ignored the implementation of a new, highly effective **six-month program**. As confirmed by counsel at the time, this program was already succeeding and generating strong financial returns for that month. By deliberately burying these major achievements and relying on discredited witnesses, the Ombudsman actively misled the U.S. Trustee and this Court. This demonstrates a pattern of biased, out-of-scope reporting intended to manufacture a crisis rather than provide an objective evaluation of the facility.

**Bullet point 3**. OBJECTION 8. Although the PCO does not believe that the Debtor has established cause for the extension requested in the Second Motion; the PCO does believe the Debtor should be given the opportunity to hire a CRO and move the case forward. This facility has immense potential, and it may have the financial wherewithal to propose a plan if a CRO is retained by the Debtor. 3 No. 5:25-bk-00087 Doc 157 Filed 11/10/25 Entered 11/10/25 15:28:50 Page 4 of 7 9. The Debtor has failed to establish cause for the extension pursuant to Section 1121(d) of the Bankruptcy Code. Section 1121(d)(1) of the Bankruptcy Code grants this Court authority to extend the exclusive period given to debtors to file a plan, but only upon the request of a party in interest that is able to show "cause" for needing such extension. See In re Dow Corning Corp., 208 B.R. 661, 664 (Bankr. E.D. Mich. 1997). Under , a Patient Care Ombudsman is appointed for the sole, narrow purpose of monitoring and reporting on the *quality of patient care*. A PCO is

not a financial examiner, a business consultant, or an expert in corporate restructuring. Yet, in Paragraphs 8 and 9, the PCO presumes to issue a legal opinion on whether the Debtor established statutory "cause" under , even going so far as to research and cite case law (*In re Dow Corning Corp.*) to block the Debtor's exclusivity extension.

**Testimony that did not occur aggressively lobbying the Court to deny the extension**

Unless the Debtor acquiesced to hiring a **Chief Restructuring Officer (CRO)**, the PCO flagrantly weaponized her position to force corporate restructuring. She did this while completely ignoring—and concealing from the Court—the actual, operational "cause" that justified the extension. Specifically, the Debtor had just implemented an active, **new six-month clinical and operational program** which, as confirmed by counsel on the record, was already highly successful and had generated significant positive revenue for that month.

It is a severe miscarriage of justice for an officer appointed exclusively to evaluate clinical care to instead use her platform to influence the Judge regarding corporate leadership, dictate corporate governance, and block standard bankruptcy extensions. The PCO's insertion of herself into these business matters was a bad-faith overreach designed to manipulate the U.S. Trustee and strip the CEO of operational control.

> **Bullet Point 4.** In order to determine whether the Debtor has met its factors, it is clear that the Debtor has failed to establish the requisite "cause" under Section 1121 of the Bankruptcy Code, and the Second Motion should only be granted if it is conditioned upon of the appointment of a CRO.The

> Debtor has struggled to maintain a census of residents which is crucial to financial planning for a Chapter 11 plan. The Debtor knew it needed to focus on the census, the PCO reported on the need for consistent intakes and had numerous calls and meetings with the CEO to discuss intakes.

**Testimony that did not occur. The Ombudsman's assertions in Bullet Point 4 further cement her severe statutory overreach, wherein she improperly acted as an operational manager and used fabricated business metrics to force corporate restructuring.**

Under , the Ombudsman's role is strictly limited to monitoring patient care, not auditing financial viability, dictating intake strategies, or evaluating census metrics for a Chapter 11 plan. In Bullet Point 4, the Ombudsman admits to inserting herself into corporate operations by attempting to manage and direct the CEO regarding resident intakes. She then weaponized these private operational discussions to issue a legal conclusion to this Court, falsely claiming that the Debtor failed to establish "cause" under and demanding that any extension be strictly conditioned upon the appointment of a CRO. Beyond exceeding her legal scope, the Ombudsman's report deliberately misstates the material facts of the facility's operations to mislead the Court. The Ombudsman claims the Debtor "struggled to maintain a census," completely omitting that management was in the middle of executing a rigorous **Joint Commission (JCAHO) certification** process—a major administrative milestone aimed at long-term quality and sustainability. Furthermore, contrary to her false reporting, the facility's **census was actively increasing** as a direct result of the new six-month

program implemented by leadership on exhibits on the docket show . While leadership explicitly noted that this new initiative would take a month or two to realize its full clinical and financial capacity, it was already successfully moving the facility forward.

Using standard, transitional operational timelines as a bad-faith justification to strip a debtor of exclusivity and force a CRO represents a plain error. The Ombudsman used false business metrics to overrule the actual positive progress of the estate, resulting in a severe miscarriage of justice.

> **Bullet Point 5**. Separate from the number, PCO has also addressed the proper procedure for intakes and while there have been some improvements, the procedure still needs significant improvement. The CEO manages the intakes and thus far has been unwilling to hire an intake specialist. The PCO believes a CRO would be in the best position to evaluate the need for and compel the hiring of an intake specialist. Secondly, during the additional time granted in the first extension, the 5 No. 5:25-bk-00087 Doc 157 Filed 11/10/25 Entered 11/10/25 15:28:50 Page 6 of 7 Debtor has failed to stabilize the staff.

**Testimony Never heard. The Ombudsman's assertions in Bullet Point 5 provide the most explicit evidence yet that she has totally abandoned her statutory role to act as an unauthorized corporate executive, using patently false operational metrics to mislead the Court.**

Under , a Patient Care Ombudsman possesses zero legal authority to evaluate corporate hiring choices, dictate corporate leadership roles, or manage personnel staffing models. Yet, in Bullet Point 5, the Ombudsman openly criticizes the CEO's internal management of the intake department and attempts to dictate

personnel choices by demanding the employment of an intake specialist. She goes so far as to suggest that a Chief Restructuring Officer (CRO) should be appointed for the explicit, improper purpose of overriding management and compelling the hiring of specific personnel.

Beyond exceeding her legal scope, the Ombudsman's factual claims regarding intake failures are flatly contradicted by the record. In reality, the CEO was personally, managing intakes **24 hours a day, 7 days a week**, driving unprecedented operational progress. By the middle of the month In February—the six-month program was working right when the hearing for the Trustee took place—the facility reached a historic peak census of **44 residents**, the highest number of patients the building had ever seen under Chapter 11. Strikingly, since the Trustee took over and disrupted this momentum; the facility **has never again reached that level of residency**. The Ombudsman's claim that the intake procedure "needed significant improvement" was a fabricated narrative designed to force an unnecessary restructuring.

Furthermore, the Ombudsman's claim that the Debtor "failed to stabilize the staff" is a bad-faith distortion designed to conceal her own active interference. At the time of this report, management was actively investigating an employee for serious clinical misconduct—the very same employee whom the Ombudsman had improperly colluded with by leaking confidential court outcomes prior to the

hearing. To blame management for a lack of "staff stability" while simultaneously shielding an under-investigation employee from accountability is a gross manipulation of the facts. The Ombudsman's use of distorted HR metrics to force corporate restructuring is a glaring violation of her legal scope and constitutes a clear miscarriage of justice.

> **Bullet Point 6.** This court is well aware of the staffing issues because of the testimony presented at the hearing on the appointment of the PCO. The Debtor is currently seeking to hire a case manager 1 and has four positions posted on Indeed.com. Since the commencement of this case more employees have been terminated, resigned, accepted employment and did not start, or left the same day as their start day than are currently employed. Maintaining a cohesive and consistent staff is necessary for the residents and their continuity of care. Providing the appropriate environment for the residents is the responsibility of the CEO and by extension the Board of Directors. Generally, in a non-profit the Board of Directors is responsible for implementing the institutional mission, financial oversight, strategic planning, establishing policies, hiring, and evaluating the CEO. However, it is the PCO's understanding that the Board of Directors have not been actively involved in the operations of the Debtor. The PCO is of the opinion that appointing a CRO will improve the work environment, foster stability and organization for the Debtor, and thereby increase census and ensure continuity of care for the residents

**Testimony never heard. The Ombudsman's assertions in Bullet Point 6 represent an egregious, bad-faith attempt to dictate non-profit corporate governance, act as a human resources auditor, and strip management of its duty to protect patient safety.**

First, the Ombudsman's reliance on monitoring public job boards like Indeed.com and tracking daily staff resignations or hiring statuses falls entirely outside her

statutory mandate under . Rather than focusing on objective metrics of clinical patient health, the Ombudsman used unauthorized surveillance and multi-level hearsay to draft a negative HR narrative. Furthermore, her analysis of the facility's non-profit Board of Directors and her sweeping opinion that a CRO would "improve the work environment" are completely outside her legal scope. A PCO is an observer of clinical care quality; she is not a corporate governance consultant or a workplace environment arbitrator.

**Additionally, the Ombudsman's assertions regarding the Board of Directors are fabricated out of whole cloth and based on complete speculation rather than firsthand knowledge.** The Ombudsman states as an absolute fact that the Board has not been actively involved in operations, yet she has **never once met with or spoken to a single member of the Board**.

The Ombudsman

weaponizes the fact that a Case Manager position was vacant, while intentionally concealing the severe, toxic misconduct that forced management to act. The Case Manager including **violating HIPAA regulations, destroying corporate property, stealing property, and directly instigating panic by telling vulnerable patients that she was going to cause trouble**.

The Fifth report without the 14-day notice as the FRBP rule 2015.1 (a) states. The hiring of the CRO who made a lot of money and was bringing in a company that had an extensive history of Criminal activity to manage SHLC. A company that the board had

rejected in the summer. They changed their name three days later and suspiciously is brought back in after we are talked into getting a CRO by the debtor's counsel to what he says is because the PCO has turned against us. *See exhibit* Then company that is friends with Harry Greinburg an attorney for Berstein and Burkley. A managing company would be managing it if Serenity Hills get the justice they deserve and take back control of the facility. See exhibit

A, B Harry Greenfield us saying no and he changes his name in Florida

Exhibit C-Timeline

The prayer for relief is to restore the former board to power, so they can continue on what previously was interrupted with a professional managing company.

Sharon Marie Travis
304- 281- 0474
930 Main Street
Apt 303
Wheeling WV 26003

Sharon Marie Travis
10/1/2025

# CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**In re: Heart 2 Heart Volunteers, Inc.,**
***Debtor.***
**Case No. 5:25-bk-00087**
**Chapter 11**

**I, Ms. Travis, hereby certify under penalty of perjury that on this 29th day of September, 2026, I served a true and correct copy of the foregoing *Notice of Motion,* United States Mail, first-class postage prepaid, addressed to the following parties of record:**

**Chapter 11 Trustee:**
**Robert Johns**
**Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Chapter 11 Trustee:**
**BRIAN R. BLICKENSTAFF [WVSB No. 9449] Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Debtor:**
**KIRK B. BURKLEY, ESQ. Bernstein-Burkley, P.C. 707 Grant Street Suite 2200 Gulf Tower Pittsburgh**

**Office of the United States Trustee:**
**GARY O. KINDER, ESQ. Assistant U.S. Trustee 300 Virginia Street East, Room 2025 Charleston, WV 25307**
**Dated: August 13, 2026 - Respectfully Submitted- Sharon Marie Travis**

Thank you Tara, please let me know and I will circulate the meeting link.

Exhibit A

**Gwenyth A. Ortman, Esq.**

BERNSTEIN • BURKLEY
ATTORNEYS AT LAW

601 Grant Street 9th Floor | Pittsburgh, PA 15219

gortman@bernsteinlaw.com | P: 412-456-8141 | F: 412.456.8135

**From:** Tara Singer <accountant@serenityhillslifecenter.org>
**Sent:** Tuesday, May 20, 2025 5:06 PM
**To:** Gwenyth A. Ortman <gortman@bernsteinlaw.com>; Sharon Travis <serenityhillscenterceo@gmail.com>
**Cc:** Harry W. Greenfield <hgreenfield@bernsteinlaw.com>
**Subject:** Re: CRO Update

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

[EXTERNAL SENDER]

[Quoted text hidden]

---

**Sharon Travis** <serenityhillscenterceo@gmail.com> Thu, Jan 22, 2026 at 11:53 AM
To: Tara Singer <accountant@serenityhillslifecenter.org>

Harry greenberg 2

---------- Forwarded message ---------
From: **Gwenyth A. Ortman** <gortman@bernsteinlaw.com>
Date: Tue, May 20, 2025 at 5:00 PM
Subject: CRO Update
To: Sharon Travis <serenityhillscenterceo@gmail.com>, Tara Singer <accountant@serenityhillslifecenter.org>
Cc: Harry W. Greenfield <hgreenfield@bernsteinlaw.com>

[Quoted text hidden]

--
**Marie Travis "CEO"**

No. 5:25-bk-00087 Doc 422 Filed 10/01/26 Entered 10/01/26 16:19:22 Page 28 of 33

**Serenity Hills Life Center**
**304-277-4657 Ext 104/ 304-971-4131 Fax**
**667 Stone Shannon Rd. Wheeling Wv 26003**

Gmail Sharon Travis <serenityhillscenterceo@gmail.com>

# CRO Update

4 messages

**Gwenyth A. Ortman** <gortman@bernsteinlaw.com> Tue, May 20, 2025 at 5:00 PM
To: Sharon Travis <serenityhillscenterceo@gmail.com>, Tara Singer <accountant@serenityhillslifecenter.org>
Cc: "Harry W. Greenfield" <hgreenfield@bernsteinlaw.com>

Hi Sharon and Tara,
We finally have some more information about Keith Greenberg and a draft of the agreement. Harry and I would like to discuss with you both. Are you available tomorrow afternoon for a call?
Best,
Gwenyth

---

**Gwenyth A. Ortman, Esq.**
BERNSTEIN • BURKLEY
ATTORNEYS AT LAW

601 Grant Street 9th Floor | Pittsburgh, PA 15219
gortman@bernsteinlaw.com | P: 412-456-8141 | F: 412.456.8135

CONFIDENTIALITY NOTICE: This electronic communication and any attachments (a) are protected by the Electronic Communications Privacy Act (18 U.S.C. § 2510-2522), (b) may contain confidential and/or legally privileged information, and (c) are for the sole use of the intended recipient. If you have received this electronic communication in error, please notify the sender and delete the entirety of the electronic communication. Any use of the contents of any information received in error, including but not limited to disclosure, copying, or distribution, is strictly prohibited.

---

**Tara Singer** <accountant@serenityhillslifecenter.org> Tue, May 20, 2025 at 5:06 PM
To: "Gwenyth A. Ortman" <gortman@bernsteinlaw.com>, Sharon Travis <serenityhillscenterceo@gmail.com>
Cc: "Harry W. Greenfield" <hgreenfield@bernsteinlaw.com>

Yes, will see what time Marie is available.

---

**From:** Gwenyth A. Ortman <gortman@bernsteinlaw.com>
**Sent:** Tuesday, May 20, 2025 5:00 PM
**To:** Sharon Travis <serenityhillscenterceo@gmail.com>; Tara Singer <accountant@serenityhillslifecenter.org>
**Cc:** Harry W. Greenfield <hgreenfield@bernsteinlaw.com>
**Subject:** CRO Update

[Quoted text hidden]

---

**Gwenyth A. Ortman** <gortman@bernsteinlaw.com> Wed, May 21, 2025 at 11:34 AM
To: Tara Singer <accountant@serenityhillslifecenter.org>, Sharon Travis <serenityhillscenterceo@gmail.com>
Cc: "Harry W. Greenfield" <hgreenfield@bernsteinlaw.com>

Exhibit B

Gmail Sharon Travis <serenityhillscenterceo@gmail.com>

## Needing documentation on this business

**Process Sunbiz Online** <process@sunbizonline.org> Fri, Sep 18, 2026 at 9:23 AM
To: Sharon Travis <serenityhillscenterceo@gmail.com>

Hello Marie,
Good morning,

Thank you for your email.

The company you mentioned, **ASK BEHAVIORAL HEALTH LLC**, registered on May 23, 2025. This company does not have another name linked within the State of Florida

Florida Limited Liability Company
ASK BEHAVIORAL HEALTH LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L25000245319 |
| **FEI/EIN Number** | 41-2742408 |
| **Date Filed** | 05/23/2025 |
| **Effective Date** | 05/23/2025 |
| **State** | FL |
| **Status** | ACTIVE |

Also, you can check the following link:

https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=ASKBEHAVIORALHEALTH%20L250002453190&aggregateId=flal-l25000245319-ad16948d-35f7-4679-bc3f-8295dd99abb8&searchTerm=ASK%20BEHAVIORAL%20HEALTH%20LLC&listNameOrder=ASKBEHAVIORALHEALTH%20L250002453190

If you have any other questions, let me know.

Thank you.

Regards,
[Quoted text hidden]
--
Angel
Processing Department.

Take the next step We'll handle the boring stuff ❤

**SUNBIZ ONLINE TEAM**
Customer Service +1 (305) 244-9500

2031 Harrison St.
Hollywood, FL 33020

sunbizonline.org

***Corporate Taxes | Company Registration | Checking Account | EIN Request | ITIN Request | Bookkeeping | Payroll Service | Apostille Request | Sale Tax Service | Notary Service.***

EXHIBIT

Exhibit C

| Date after bankruptcy | Financials under CEO | Staff Count | Ombudsman Hearsay V Facts | Trustee Appointment | Financials under the Trustee | Staff Count | Ombudsman v facts |
|---|---|---|---|---|---|---|---|
| March 2025 | Revenue $172,908.66<br><br>Gain $2037.12<br><br>A few days late first report<br>Doc No. 98 | 31 at time of relief | | March 2026 | Revenue $219,377<br><br>Loss -$8449<br><br>Filed 11 days late<br>Doc. No 253 | 32 | |
| April 2025 | Revenue $184, 632<br><br>Gain $26,751<br><br>Filed on time<br>Doc No. 127 | 31 | **First Ombudsman report**. She brings up the list made by Robert Boles and Sarah Dean and she pretty Much say they do not exist, we get a good report<br>Doc. No. 126 | April 2026 | Revenue $276,173<br>Gain $26,168.00<br>The peer grant that I won was not included which was $32,577.00 then it would have been in the negative<br>Filed 21 days late. Doc | 32 | |
| May 2025 | Revenue $135,507.62<br><br>Loss-53,801<br><br>Filed on time<br>Doc. No. 132 | 33 | | May 2026 | Revenue $ 199,000 Revenue Gain13,848<br>Again, grant came in for $33,750 dollars that I secured.<br>Filed 9 days late. Doc.314 | 36 | |

EXHIBIT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| June 2025 | Revenue $201,211.00<br><br>Gaine $6,058<br><br>Filed on time<br>Doc. No. 137 | 31 | | June 2026 | Revenue $223,442<br><br>Gain $10,519.00<br>Filed 31 days late<br>Doc. No. 382 | 36 | |
| July 2025 | Revenue $208,101.00<br><br>Gain 12,110<br><br>Filed on Time<br>Doc. No. 138 | 35 | **Second Ombudsman Report**<br>Everything looks good just worried about staff turnover.<br><br>Doc. No. 135 | July 2026 | $209,850<br><br>Gain $37,595.27 which includes the grant I wrote and won for $33, 750 that come quarterly. If you minus the grant the revenue wouls have been<br>Filed on time<br><br>Doc. No. 838 | 37 | |
| August 2025 | Revenue<br><br>$231,269.00<br><br>Gain $42,209.00<br><br>Filed on time<br>Doc. No. 140 | | | Aug 2026 | Revenue $164,000<br><br>Loss - $18,175.27<br><br>Filed 4 days late<br><br>Doc. No.419 | 35 | |