Heart 2 Heart Inc
Case #25-00087
United States Northern District

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF WV

OCT 01 2026

Time: 4:02 am/pm

Asking the court to supplement the docket

This is the correct Contract. The original contract was a negotiating contract This is the finale. I brought the wrong one

Sharon Travis
Creditor
10/1/2026

Finale copy

# PROPOSAL AND MANAGEMENT AGREEMENT

Comprehensive Operational Turnaround, Financial Stabilization, and Strategic Positioning

---

Prepared by

**NEXTSTEP BHC, L.L.C.**

Prepared for

**Sharon Travis for being reinstated, the Board of Directors if they are reinstated to power**

**Concerning Heart 2 Heart Volunteers Inc dba Serenity Hills Life Center**

**This offer is exclusive to them .**

667 Stone Shannon Rd, Wheeling, WV 26003

September 2026 (Revised)

**CONFIDENTIAL**

# PART I: TURNAROUND PROPOSAL

## 1. Executive Summary

Serenity Hills Life Center occupies a licensed, operating behavioral health facility in a market with demonstrated, unmet demand for substance use and mental health treatment. The underlying asset is sound, but the facility requires disciplined execution. It needs a cost structure sized to its census, a reliable process for filling and keeping beds, a financial plan that services existing debt on a realistic schedule, and leadership with the authority to make the necessary changes.

NEXTSTEP BHC proposes to assume full operational management of Serenity Hills under a comprehensive turnaround engagement. The engagement will first stop the operating losses, then establish reliable debt service, then grow revenue, and finally position the facility for whichever outcome ownership prefers: continued operation as a profitable stand-alone business, or an advantageous sale to a strategic or financial buyer.

The engagement is priced at a base management fee of Eighty Thousand Dollars ($80,000) per annum, paid biweekly, plus reasonable, pre-approved expenses, with a Three Thousand Dollar ($3,000) retainer due at contract execution. Base fee payments end when the contract ends. In addition, Manager will earn a performance fee equal to twenty percent (20%) of the facility's net profit after all expenditures, including payroll. Once a payment plan with creditors is in place, the performance fee will be twenty percent (20%) after expenditures and creditors payments of the net profit remaining after creditor payments under that plan. Manager's compensation above the base fee is therefore earned only when the facility is actually profitable.

The first ninety (90) days are an evaluation period, with the target of the facility beginning to show a profit by the end of the third month. If the first ninety days go well, the engagement continues under the Turnaround Plan. If the facility performs substantially better than planned, the parties may renegotiate terms by written amendment.

## 2. Turnaround Objectives

The engagement will be measured against the following objectives, each with defined milestones agreed with ownership during the assessment phase:

- **Operating expense reduction.** Reduce controllable operating expense to a level consistent with industry benchmarks for the facility's licensed capacity and payer mix, without compromising clinical quality or regulatory standing.
- **Debt servicing.** Establish a realistic, negotiated debt-service schedule and fund it from operating cash flow rather than from new borrowing or ownership contributions.
- **Revenue enhancement.** Increase net revenue through census growth, payer contracting, revenue cycle discipline, and the addition of service lines and levels of care that the market will support.

- **Operational realignment.** Re-establish clear lines of authority, accountable leadership in every key role, and operating systems that produce reliable data and consistent clinical outcomes.
- **Exit optionality.** Deliver a facility that a buyer would pay a premium for, with a clean compliance history, documented processes, stable staff, diversified referral sources, and audited-quality financials, and that is equally attractive to retain.

## 3. Phase One: Assessment and Stabilization (Days 1 to 30)

Manager will begin with an intensive, on-site assessment of every function of the facility. The assessment forms the basis for the action plan Manager will present to ownership at the end of the period. Stabilizing actions will be taken during the assessment wherever the need is evident.

- **Financial forensics.** Complete review of the general ledger, accounts payable aging, accounts receivable aging, payroll, vendor contracts, leases, and all outstanding debt instruments, producing a thirteen-week cash flow forecast and a schedule of all creditor obligations.
- **Revenue cycle audit.** Audit of the full revenue cycle from admission through collection, including verification of benefits, utilization review, authorization management, claim scrubbing, denial management, and cash posting.
- **Staffing and organizational review.** Analysis of every position against census, acuity, licensure requirements, and staffing ratios, with identification of vacancies, redundancies, and performance gaps in key roles.
- **Compliance and clinical quality review.** Review of licensure, accreditation, survey history, plans of correction, policies and procedures, incident reports, and clinical documentation to identify any exposure that could threaten the license, payer contracts, or a future sale.
- **Market position review.** Assessment of referral sources, payer contracts, competitive landscape, digital presence, and admissions conversion data to establish a baseline for the marketing and client acquisition strategy.

The Phase One deliverable is a written Turnaround Plan with prioritized actions, owners, timelines, financial targets, and a monthly reporting framework against which Manager will be held accountable for the remainder of the engagement.

## 4. Operational Realignment and Expense Reduction

Facilities in financial distress typically carry a cost structure built for a higher census, along with vendor arrangements, staffing patterns, and administrative practices that have not been re-examined as conditions changed. Manager will review and realign each of these areas.

- **Labor.** Right-size staffing to census and acuity using flexible scheduling, cross-training, and elimination of agency and overtime dependence; consolidate administrative functions; and establish a productivity standard for every department, within the staffing limits in Section 7.1.
- **Vendors and purchasing.** Rebid or renegotiate every material vendor relationship, including pharmacy, laboratory, food service, laundry, medical supply, IT, insurance, and professional services, and cancel contracts that no longer serve the operation.

- **Occupancy and fixed costs.** Review lease, utility, maintenance, and capital commitments; defer non-essential capital spending; and pursue restructuring of any obligations that are out of line with the facility's economics.
- **Financial controls.** Install budget-to-actual reporting by department, a formal approval process for spending, and a monthly operating review so that cost discipline becomes a permanent system.
- **Process redesign.** Redesign admissions, clinical, nursing, utilization review, discharge, and billing workflows so that each hand-off is documented, measured, and owned. Documented processes allow the facility's improvements to survive a change in personnel or ownership.

## 5. Revenue Enhancement

Cost reduction will stabilize the facility. Revenue growth will restore its value. Manager will pursue revenue improvement in the following areas:

- **Census growth.** Drive census through the marketing and client acquisition strategy in Section 8, with a daily census target and an admissions team accountable for converting inquiries into admissions.
- **Payer contracting and credentialing.** Renegotiate commercial contracts, pursue in-network status where it improves volume and collectability, credential the facility and its providers with every payer that matters in the market, and confirm Medicaid and other public program participation is fully leveraged.
- **Revenue cycle performance.** Tighten verification, authorization, concurrent review, and documentation practices to reduce denials and length-of-stay cuts; establish a denial-appeal function; and clean up aged receivables that can still be collected.
- **Level-of-care and service capture.** Ensure that the level of care billed matches the level of care delivered and documented, and that ancillary services such as laboratory, medication management, family programming, and aftercare are captured and billed appropriately.
- **Service line expansion.** Add service lines and levels of care as described in Section 7 to extend the continuum, retain patients longer within the Serenity Hills system, and open new payer and referral channels.

## 6. Debt Servicing and Financial Stabilization

Manager will address the facility's existing debt as a core part of the engagement. Within Phase One, Manager will prepare a complete schedule of obligations and a realistic assessment of what operating cash flow can support. From that basis Manager will:

- **Creditor engagement.** Open direct dialogue with secured lenders, landlords, taxing authorities, and major trade creditors to negotiate forbearance, re-amortization, interest concessions, or settlement of legacy balances where appropriate, and to restore credibility through consistent performance against whatever schedule is agreed.

- **Cash flow prioritization.** Build a debt-service reserve funded from operating cash flow and prioritized ahead of discretionary spending, so that payments are made on time and creditor relationships become an asset rather than a liability.
- **Restructuring support.** Where the facility is subject to a restructuring, workout, or plan of reorganization, manage operations in strict conformity with its terms and produce the reporting required by lenders, trustees, or the court.
- **Reporting.** Deliver monthly financial statements prepared on a consistent basis, a rolling cash forecast, and a covenant and obligation tracker, so that ownership and creditors have a single, reliable view of the facility's position.

A facility that services its debt on schedule can be refinanced, recapitalized, or sold on favorable terms. Debt servicing therefore supports both stabilization and exit positioning.

## 7. Staffing Authority and Service Line Expansion

### 7.1 Restaffing of Key Positions

A turnaround depends on having capable, accountable people in every key role. Manager will evaluate every position at the facility, including the Executive Director or Administrator, Clinical Director, Director of Nursing, Medical Director, Director of Admissions and Business Development, Utilization Review, Revenue Cycle and Business Office leadership, Human Resources, Quality and Compliance, and Facilities.

Staff changes are limited to no more than twenty-five percent (25%) of the facility's staff. Before any change is made, Manager will meet with the Board of Directors to discuss the current staff, including which persons Manager believes should stay and which should be replaced. After that discussion, Manager may bring in whomever it chooses to fill the positions being replaced. All changes will be made in compliance with applicable employment law and existing contracts, with the objective of building a stable leadership team that will remain with the facility after the engagement concludes. Manager may place interim leaders from its own network while permanent recruitment is under way.

### 7.2 Service Lines and Levels of Care

Manager will assess the market, the facility's physical plant, its licensure, and its payer relationships to determine which additions to the continuum of care are feasible and profitable, and will design, license, staff, and launch them when and where appropriate. Candidates include:

- **Detoxification services.** Medically monitored withdrawal management (ASAM 3.7-WM) to capture patients at the front of the continuum and reduce dependence on outside detox referrals.
- **Additional ASAM levels of care.** ASAM 3.5 and 3.1 residential programming, partial hospitalization (2.5), intensive outpatient (2.1), and outpatient (1.0), enabling patients to step down within the Serenity Hills system rather than leaving it.
- **Clinical specialization.** Co-occurring mental health programming, medication-assisted treatment, trauma-informed tracks, and specialized programming for populations the regional market underserves.

- **Continuum extensions.** Sober living, alumni and recovery support, family programming, and telehealth continuing care that extend engagement and generate referral loyalty.

Every addition will be supported by a written feasibility analysis, a pro forma, a licensing and accreditation pathway, and a staffing and marketing plan before launch. Manager will not add a service line that dilutes clinical quality or that cannot pay for itself within a defined ramp period.

## 8. Marketing and Client Acquisition Strategy

Census is the primary driver of a treatment facility's financial performance and value. Manager will build and operate a complete client acquisition program with defined targets and measured results.

- **Positioning and brand.** Define who the facility serves best, what distinguishes it, and how it will be described to patients, families, referral sources, and payers. Refresh the brand, messaging, collateral, and website accordingly.
- **Professional referral development.** Build a structured referral development program covering hospitals and emergency departments, primary care and psychiatric practices, courts, probation and drug courts, employee assistance programs, unions, first-responder organizations, other treatment providers, and community organizations across West Virginia, eastern Ohio, and western Pennsylvania. Assign accounts, set contact cadences, and measure referrals by source.
- **Digital and direct-to-consumer acquisition.** Deploy search, paid media, review management, content, and social channels with tracked conversion so that spend is directed to what produces admissions. Establish a 24/7 admissions line with trained staff, measured response times, and defined conversion targets.
- **Payer and contract channels.** Pursue in-network agreements, employer and union relationships, and single-case agreements that bring predictable volume.
- **Measurement.** Track inquiries, verifications, admissions, referral source performance, cost per admission, and payer mix weekly. Adjust tactics monthly. Report results to ownership as part of the standing management report.
- **Community presence.** Position Serenity Hills as a visible, credible presence in the regional recovery community through events, education, and partnerships that generate both referrals and reputation.

## 9. Go-Forward Positioning: Profitable Operation or Advantageous Sale

The turnaround is structured so that ownership can make its long-term decision from a position of strength. The near-term target is for the facility to begin showing a profit by the end of the third month, which will be reviewed at the ninety-day evaluation. By the end of the twelve-month initial term, Manager intends to deliver:

- **Profitability.** Consistent positive operating cash flow after debt service, with a cost structure and revenue base that support it.
- **Financial transparency.** Monthly financials on a consistent basis, a normalized EBITDA presentation, and the documentation a buyer's diligence team will expect.

- **Regulatory standing.** A clean survey and accreditation record, current policies, resolved plans of correction, and documented compliance systems.
- **People.** A stable, credentialed leadership team and clinical staff under appropriate agreements.
- **Revenue quality.** A diversified referral base and payer mix that does not depend on any single source.
- **Growth platform.** A continuum of care with room to grow, so that a buyer sees an expansion opportunity rather than a repair project.

Should ownership elect to pursue a sale, Manager will assist in preparing the facility for market, assembling the data room, coordinating with ownership's transaction advisors, and managing operations through diligence and closing so that performance holds steady through the transaction. Should ownership elect to retain the facility, Manager will transition operations to the permanent leadership team it has built and, if desired, continue in an advisory capacity.

## 10. Governance and Reporting

Manager will report to ownership through a monthly written management report and a standing monthly review meeting covering census, financial performance against budget, cash and debt-service status, staffing, compliance and quality indicators, marketing performance, and progress against Turnaround Plan milestones. Manager will provide a thirteen-week cash forecast updated weekly during the stabilization phase and monthly thereafter. Decisions reserved to ownership, including sale of the facility, incurrence of new debt, material capital commitments, and changes to the facility's licensed scope, will be brought to ownership with Manager's analysis and recommendation.

## 11. Phased Roadmap

| Phase | Timeframe | Focus and Key Deliverables |
|---|---|---|
| **Phase 1** | Days 1 to 30 | Assessment and stabilization: financial forensics, revenue cycle audit, staffing review, compliance review, market baseline. Thirteen-week cash forecast and creditor schedule. Written Turnaround Plan with targets and milestones. Board discussion of current staff. Immediate stabilizing actions, including urgent staffing and cash decisions. |
| **Phase 2** | Days 31 to 60 | Realignment: expense reduction, vendor rebids, staffing right-sizing and key-position restaffing (within the 25% limit), revenue cycle repair, creditor negotiations and debt-service schedule, launch of referral development and digital acquisition, financial controls and monthly reporting installed. |
| **Phase 3** | Days 61 to 90 | Growth and evaluation: census ramp, payer contracting and credentialing, clinical program alignment to best practice, quality and outcomes systems, marketing optimization based on conversion data. Target: facility begins showing a profit by the end of month three. Ninety-day evaluation meeting with the Board. |

| Phase | Timeframe | Focus and Key Deliverables |
|---|---|---|
| **Phase 4** | Months 4 to 12 | If the ninety-day evaluation goes well, the engagement continues under the Turnaround Plan. Positioning: consistent profitability after debt service, additional service lines as supported by the market, permanent leadership team in place, sale-readiness package or long-term operating plan per ownership's election. If successful, a creditor payment plan is presented to the court for acceptance; or, if a Chapter 7 plan is recommended, the team stays until the transition is made to the new company. Transition to permanent management, renewal, or renegotiation of the engagement. |

## 12. Management Fee and Expenses

Manager proposes the following compensation for the full scope of services described in this proposal. The structure combines a modest fixed fee with a performance fee that is earned only when the facility is profitable:

| Item | Terms |
|---|---|
| **Retainer** | Three Thousand Dollars ($3,000.00), due and payable upon execution of the Agreement. The retainer is non-refundable, is in addition to the Management Fee, and compensates Manager for immediate mobilization and the Phase One assessment. |
| **Base Management Fee** | Eighty Thousand Dollars ($80,000.00) per annum, paid biweekly through ADP in twenty-six (26) installments of approximately $3,076.92. Payments end when the contract ends. |
| **Performance Fee** | Twenty percent (20%) of the facility's Net Profit, calculated monthly. Net Profit is the facility's net revenue less all expenditures, including payroll. Once a payment plan with creditors is in place, the Performance Fee is twenty percent (20%) of Net Profit remaining after creditor payments made under that plan. No performance fee is due for any month with no profit. Payable within thirty (30) days after month-end, with a quarterly reconciliation. |
| **Reasonable Expenses** | Reimbursement of reasonable, documented out-of-pocket expenses incurred in performing the services, including travel, lodging, meals while traveling, and materials. Any single expense or related group of expenses exceeding $500.00 per month requires Client's prior written approval. Invoiced monthly with supporting documentation. |
| **Excluded Costs** | Facility operating costs, including salaries of facility employees, interim staff placed on Client's payroll, recruiter fees, licensing and accreditation fees, marketing media spend, software, and vendor costs, are Client's costs and are approved through the budget process, not Manager's fee. |

| Item | Terms |
|---|---|
| **Fee Adjustments** | The base management fee and performance fee percentage are fixed for the twelve-month Initial Term. If the facility performs substantially better than planned, the parties may renegotiate terms by written amendment. Any expansion of scope beyond this proposal, including management of newly acquired facilities, will also be addressed by written amendment. |

The base fee is modest relative to the scope of responsibility and the value at stake. The performance fee is earned only from profit the facility actually produces after its expenses, and after creditor payments once a plan is in place, so Manager's compensation grows in step with the facility's recovery and never ahead of it.

# PART II: MANAGEMENT AGREEMENT

This Management Agreement (this "Agreement") is entered into as of ____________________ (the "Effective Date"), by and between NEXTSTEP BHC, a behavioral health consulting and management company ("Manager"), and Serenity Hills Life Center, a behavioral health treatment facility located at 667 Stone Shannon Rd, Wheeling, WV 26003 ("Client"). Manager and Client are each a "Party" and together the "Parties."

## Recitals

WHEREAS, Client owns and operates a licensed behavioral health treatment facility (the "Facility") and desires to retain a qualified manager to conduct a comprehensive operational and financial turnaround of the Facility;

WHEREAS, Manager specializes in behavioral health operations, turnaround management, financial restructuring, clinical program development, and facility marketing, and is willing to provide such services on the terms set forth herein;

WHEREAS, the Parties intend that the turnaround position the Facility for sustainable profitability, orderly servicing of its debt obligations, and, at Client's election, an advantageous sale;

NOW, THEREFORE, in consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## Article 1: Engagement and Scope

**1.1 Engagement.** Client engages Manager, and Manager accepts engagement, to provide comprehensive turnaround management services for the Facility as described in Part I of this document (the "Proposal"), which is incorporated into this Agreement by reference. In the event of conflict between the Proposal and this Part II, this Part II controls.

**1.2 Services.** Manager's services shall include: (a) operational assessment, realignment, and day-to-day management of the Facility; (b) expense reduction and installation of financial controls; (c) revenue enhancement, revenue cycle management, and payer contracting; (d) financial stabilization, cash management, and debt-service planning and creditor engagement on Client's behalf; (e) staffing management, including evaluation and restaffing of key positions, subject to Section 2.2; (f) assessment, development, licensing, and launch of additional service lines and levels of care; (g) clinical program alignment to evidence-based practice and regulatory requirements; (h) marketing, referral development, and client acquisition; (i) compliance, quality, and risk management support; (j) monthly reporting to Client; and (k) preparation of the Facility for a profitable go-forward operation or sale, as Client elects.

**1.3 Standard of Performance.** Manager shall perform the services in a professional manner consistent with the standards of experienced behavioral health management companies, in compliance with applicable federal and state law, licensure requirements, accreditation standards, and payer requirements.

**1.4 Independent Contractor.** Manager is an independent contractor. Nothing herein creates an employment, partnership, joint venture, or agency relationship except as expressly delegated in Article 2.

## Article 2: Management Authority

**2.1 Delegation of Operational Authority.** Client delegates to Manager, for the Term, the authority to direct and manage the day-to-day operations of the Facility, including admissions, clinical operations, nursing, utilization review, revenue cycle, purchasing, vendor management, marketing, human resources administration, and compliance, subject to the reserved matters in Section 2.4 and to Client's ultimate responsibility as licensee.

**2.2 Staffing Authority.** Manager shall have authority, in compliance with applicable law and existing employment agreements, to evaluate, hire, retain, discipline, reassign, restructure, or terminate personnel of the Facility, including key leadership positions, and to place interim personnel from Manager's network, subject to the following: (a) Manager-initiated replacements of Facility personnel shall not exceed twenty-five percent (25%) of the Facility's staff, measured by headcount as of the Effective Date; (b) before making any such replacement, Manager shall discuss with Client's Board of Directors the current personnel, including which persons Manager recommends retaining and which it recommends replacing; and (c) following that discussion, Manager may select and bring in replacement personnel of its choosing. Facility personnel shall remain employees of Client, and Client shall be responsible for payroll, benefits, and employment-related obligations. Manager shall not be liable for employment claims arising from personnel actions taken in good faith and on reasonable grounds in the performance of this Agreement.

**2.3 Service Line Authority.** Manager may assess, design, and recommend the addition of service lines and levels of care. Launch of any new service line or level of care requiring new licensure, material capital expenditure, or a change in the Facility's licensed scope shall require Client's written approval, which shall not be unreasonably withheld.

**2.4 Reserved Matters.** The following require Client's prior written approval from the Board of Directors: (a) sale, merger, or transfer of the Facility or substantially all its assets; (b) incurrence of new indebtedness or guarantees outside the ordinary course; (c) capital expenditures exceeding $25,000 individually or $100,000 in aggregate per contract year, unless included in an approved budget; (d) execution or termination of leases; (e) settlement of litigation or creditor claims exceeding $25,000; (f) changes to the Facility's licensure or accreditation scope; and (g) any action that would require Client's ownership to make additional capital contributions.

**2.5 Budget.** Within forty-five (45) days of the Effective Date, and annually thereafter, Manager shall submit an operating budget for Client's approval. Manager shall operate within the approved budget, and variances exceeding ten percent (10%) of any line item shall be reported to Client with explanation.

**2.6 Bank Accounts and Disbursements.** Client shall designate operating accounts for the Facility. Manager may be granted disbursement authority within approved budgets and dollar limits established in writing by Client. Manager shall maintain complete records of all disbursements and shall not commingle Facility funds with its own.

**2.7 Creditor Engagement.** Client authorizes Manager to communicate and negotiate with the Facility's lenders, landlords, taxing authorities, and trade creditors on Client's behalf regarding payment schedules, forbearance, and settlement, provided that any binding modification of a debt obligation shall be executed by Client.

**2.8 Client Cooperation.** Client shall provide Manager with timely access to all premises, systems, records, personnel, financial information, and third parties reasonably necessary to perform the services, and shall promptly act on reserved matters submitted for approval.

## Article 3: Term and Termination

**3.1 Initial Term.** This Agreement shall commence on the Effective Date and continue for an initial term of twelve (12) months (the "Initial Term").

**3.2 Ninety-Day Evaluation.** The first ninety (90) days of the Initial Term constitute an evaluation period (the "Evaluation Period"). The Parties' shared target is that the Facility begin showing a profit by the end of the third month. Within ten (10) days after the end of the Evaluation Period, Manager and Client's Board of Directors shall meet to review the Facility's performance against the Turnaround Plan. If the Evaluation Period has gone well, the Agreement shall continue under the Turnaround Plan for the remainder of the Initial Term. If Client determines that it has not, Client may terminate this Agreement by written notice delivered within fifteen (15) days after the review meeting, effective thirty (30) days after delivery of the notice.

**3.3 Renewal.** Following the Initial Term, this Agreement shall renew automatically for successive twelve (12) month periods (each a "Renewal Term"; together with the Initial Term, the "Term") unless either Party gives written notice of non-renewal at least ninety (90) days before the end of the then-current term.

**3.4 Termination for Convenience.** After the first six (6) months of the Initial Term, either Party may terminate this Agreement for any reason upon ninety (90) days' prior written notice.

**3.5 Termination for Cause.** Either Party may terminate this Agreement upon written notice if the other Party: (a) materially breaches this Agreement and fails to cure within thirty (30) days after written notice; (b) becomes insolvent, makes an assignment for the benefit of creditors, or has a receiver appointed (provided that a restructuring or reorganization proceeding of Client shall not, by itself, constitute cause where Manager's fees continue to be paid); (c) engages in fraud, gross negligence, or willful misconduct; or (d) loses a license or authorization necessary to perform under this Agreement.

**3.6 Termination upon Sale.** Upon closing of a sale of the Facility or substantially all its assets, either Party may terminate this Agreement upon thirty (30) days' written notice, and Manager shall cooperate in the transition of management to the purchaser.

**3.7 Effect of Termination.** Upon termination: (a) all Management Fee payments shall cease as of the effective date of termination, and Client shall pay the Management Fee and Performance Fee earned through that date, together with approved expenses accrued through that date (the Retainer being non-refundable); (b) Manager shall deliver all Work Product, records, credentials, and property of Client in its

possession; (c) Manager shall provide reasonable transition assistance for up to sixty (60) days at the Management Fee rate then in effect, prorated, if requested by Client; and (d) Articles 5 through 9 and any other provisions which by their nature are intended to survive shall survive.

## Article 4: Compensation and Expenses

**4.1 Retainer.** Upon execution of this Agreement, Client shall pay Manager a retainer of Three Thousand Dollars ($3,000.00) (the "Retainer"). The Retainer is non-refundable, is earned upon receipt in consideration of Manager's immediate mobilization and commencement of the Phase One assessment, and is in addition to, and not a credit against, the Management Fee.

**4.2 Base Management Fee.** Client shall pay Manager a base management fee of Eighty Thousand Dollars ($80,000.00) per annum (the "Management Fee"), payable biweekly through ADP in twenty-six (26) installments of Three Thousand Seventy-Six Dollars and Ninety-Two Cents ($3,076.92), with the final installment of each contract year adjusted so that the annual total equals $80,000.00. The first installment shall be paid on the first regular biweekly payment date following the Effective Date. Partial periods shall be prorated. Management Fee payments shall cease upon expiration or termination of this Agreement.

**4.3 Performance Fee.** In addition to the Management Fee, Client shall pay Manager a performance fee equal to twenty percent (20%) of Net Profit for each calendar month during the Term (the "Performance Fee"). "Net Profit" for a month means the Facility's Net Revenue for that month less all Facility expenditures for that month, including payroll, benefits, and payroll taxes, vendor and operating costs, the Management Fee, and reimbursed expenses, determined on a consistent basis in accordance with the Facility's historical accounting practices. "Net Revenue" means the Facility's gross patient service revenue less contractual adjustments, bad debt, and refunds. Beginning with the first full month after a payment plan with the Facility's creditors has been approved by the court or agreed in writing with the affected creditors (the "Creditor Plan"), Net Profit shall also be reduced by all payments made to creditors under the Creditor Plan for that month, so that the Performance Fee is twenty percent (20%) of Net Profit remaining after creditors are paid. No Performance Fee is due for any month in which Net Profit is zero or negative. Manager shall calculate the Performance Fee monthly and deliver the calculation with the monthly financial statements; the Performance Fee shall be due within thirty (30) days after the end of each month. The Parties shall reconcile the Performance Fee quarterly against the Facility's financial statements, and any overpayment or underpayment shall be settled with the next monthly payment. The Performance Fee shall survive termination with respect to Net Profit earned through the effective date of termination, and Client shall provide Manager reasonable access to financial records to verify the final calculation.

**4.4 Expenses.** Client shall reimburse Manager for reasonable, documented out-of-pocket expenses incurred in performing the services, including travel, lodging, meals while traveling, and materials. Any single expense or related group of expenses exceeding Five Hundred Dollars ($500.00) requires Client's prior written approval. Manager shall invoice expenses monthly with supporting documentation, and reimbursement shall be due within thirty (30) days of the invoice date.

**4.5 Facility Costs.** All costs of operating the Facility, including compensation of Facility personnel and interim staff on Client's payroll, recruiting fees, licensing and accreditation fees, marketing media spend, software, insurance, and vendor costs, are costs of Client and are separate from the Management Fee and Performance Fee. Manager shall incur such costs only within approved budgets or with Client's approval.

**4.6 Late Payment.** Amounts not paid within thirty (30) days of their due date shall accrue interest at one and one-half percent (1.5%) per month, or the maximum rate permitted by law if less. If any amount remains unpaid more than thirty (30) days after its due date, Manager may, upon ten (10) days' written notice, suspend services until the account is brought current.

**4.7 Scope Changes.** Services materially beyond the scope of the Proposal, including management of additional facilities, shall be compensated as agreed in a written amendment.

**4.8 Renegotiation.** If the Facility's performance substantially exceeds the targets in the Turnaround Plan, either Party may request to renegotiate the terms of this Agreement, and the Parties shall discuss any such request in good faith. No change shall take effect unless set out in a written amendment signed by both Parties under Section 9.5.

## Article 5: Records, Reporting, and Work Product

**5.1 Records.** Manager shall maintain accurate and complete books and records of the Facility's operations under its management, which shall be the property of Client and available to Client at all times.

**5.2 Reporting.** Manager shall deliver to Client a monthly management report and monthly financial statements within twenty (20) days after month-end, a cash forecast as described in the Proposal, and such other reports as Client reasonably requests.

**5.3 Work Product.** All policies, procedures, protocols, plans, reports, marketing materials, and other deliverables created by Manager specifically for Client under this Agreement ("Work Product") shall be the property of Client. Manager retains ownership of its pre-existing methodologies, tools, templates, and know-how ("Manager Materials") and grants Client a perpetual, non-exclusive, royalty-free license to use Manager Materials incorporated into Work Product for the operation of the Facility.

**5.4 Portfolio Reference.** Manager may reference the engagement in general terms for marketing purposes, without disclosing Confidential Information or financial results, unless Client objects in writing.

## Article 6: Confidentiality and Privacy

**6.1 Confidential Information.** Each Party shall hold in confidence all non-public information of the other Party, including financial information, patient information, business strategies, and the terms of this Agreement ("Confidential Information"), shall use it solely for the purposes of this Agreement, and shall protect it with at least the care it uses for its own confidential information. Exceptions apply for information that is public through no fault of the receiving Party, was lawfully known to the receiving Party before disclosure, is independently developed, or must be disclosed by law, with prompt notice to the other Party where permitted.

**6.2 Protected Health Information.** Manager acknowledges that it will have access to protected health information and substance use disorder treatment records. The Parties shall execute a Business Associate Agreement under HIPAA, and Manager shall comply with HIPAA, 42 C.F.R. Part 2, and applicable West Virginia privacy law.

**6.3 Duration.** Confidentiality obligations survive termination for five (5) years, and indefinitely as to protected health information and trade secrets.

## Article 7: Representations and Warranties

**7.1 Mutual.** Each Party represents that it has full authority to enter into and perform this Agreement and that doing so does not violate any agreement or law binding upon it.

**7.2 Manager.** Manager represents that it possesses the expertise and resources to perform the services and that no person providing services under this Agreement is excluded from participation in any federal or state healthcare program.

**7.3 Client.** Client represents that it holds all licenses necessary to operate the Facility, that it has disclosed to Manager all pending or threatened litigation, regulatory actions, survey deficiencies, and material debt obligations, and that information provided to Manager is accurate and complete.

**7.4 Disclaimer.** EXCEPT AS EXPRESSLY STATED HEREIN, MANAGER MAKES NO WARRANTIES, EXPRESS OR IMPLIED. MANAGER DOES NOT GUARANTEE ANY SPECIFIC FINANCIAL RESULT, CENSUS LEVEL, CREDITOR OUTCOME, OR SALE PRICE, ALL OF WHICH DEPEND ON FACTORS OUTSIDE MANAGER'S CONTROL.

## Article 8: Indemnification and Limitation of Liability

**8.1 By Manager.** Manager shall indemnify and hold harmless Client from third-party claims to the extent arising from Manager's gross negligence, willful misconduct, or material breach of this Agreement.

**8.2 By Client.** Client shall indemnify and hold harmless Manager from third-party claims arising from the operation of the Facility, including patient care, employment matters, creditor claims, and regulatory matters, except to the extent caused by Manager's gross negligence, willful misconduct, or material breach, and from claims arising from Client's failure to act on Manager's recommendations or from inaccurate information provided by Client.

**8.3 Insurance.** Client shall maintain professional and general liability, employment practices, property, and directors and officers or management liability insurance customary for facilities of its type, and shall name Manager as an additional insured where available.

**8.4 Limitation.** EXCEPT FOR BREACHES OF ARTICLE 6, INDEMNIFICATION OBLIGATIONS, OR WILLFUL MISCONDUCT, MANAGER'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE MANAGEMENT FEES PAID IN THE TWELVE (12) MONTHS PRECEDING THE CLAIM, AND NEITHER PARTY SHALL BE LIABLE FOR INDIRECT, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES, INCLUDING LOST PROFITS.

## Article 9: General Provisions

**9.1 Governing Law and Disputes.** This Agreement is governed by the laws of the State of West Virginia. Disputes shall first be addressed through good-faith negotiation between the Parties' principals; if unresolved within thirty (30) days, either Party may submit the dispute to binding arbitration under the Commercial Rules of the American Arbitration Association, seated in Ohio County, West Virginia. Either Party may seek injunctive relief in court to protect Confidential Information.

**9.2 Non-Solicitation.** During the Term and for twelve (12) months thereafter, neither Party shall solicit for employment the other Party's employees or contractors who were materially involved in the engagement without the other Party's written consent, except that personnel placed by Manager at the Facility may be hired by Client on terms agreed in writing.

**9.3 Assignment.** Neither Party may assign this Agreement without the other's written consent, except that Client may assign to a successor in a sale of the Facility, subject to Section 3.6, and Manager may assign to an affiliate under common control.

**9.4 Notices.** Notices shall be in writing and delivered by hand, certified mail, nationally recognized overnight courier, or email with confirmation of receipt, to the addresses on the signature page or as updated by notice.

**9.5 Entire Agreement; Amendment; Waiver.** This Agreement, including the Proposal and any Business Associate Agreement, is the entire agreement of the Parties on its subject matter and supersedes all prior agreements and understandings. It may be amended only in a writing signed by both Parties. No waiver is effective unless in writing, and no waiver of one breach waives any other.

**9.6 Severability.** If any provision is held unenforceable, it shall be modified to the minimum extent necessary and the remainder shall continue in effect.

**9.7 Force Majeure.** Neither Party is liable for delay or failure to perform caused by events beyond its reasonable control, provided it uses reasonable efforts to resume performance.

**9.8 Counterparts.** This Agreement may be executed in counterparts, including by electronic signature, each of which is an original and together one instrument.

## Signature Page

IN WITNESS WHEREOF, the Parties have executed this Management Agreement as of the Effective Date.

**MANAGER: NEXTSTEP BHC**

By: ______________________________

Name: Robert Tomasiello

Title: COO

Date: ___09/29/2026______________________

**CLIENT:**

By: ______________________________

Name: ______________________________

Title: ______________________________

Date: ______________________________

# CERTIFICATE OF SERVICE

## UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**In re: Heart 2 Heart Volunteers, Inc.,**
***Debtor.***
**Case No. 5:25-bk-00087**
**Chapter 11**

**I, Ms. Travis, hereby certify under penalty of perjury that on this 29th day of September, 2026, I served a true and correct copy of the foregoing *Notice of Motion,* United States Mail, first-class postage prepaid, addressed to the following parties of record:**

**Chapter 11 Trustee:**
**Robert Johns**
**Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Chapter 11 Trustee:**
**BRIAN R. BLICKENSTAFF [WVSB No. 9449] Johns & Associates, PLLC 101 Brook Hill Drive Charleston, WV 25311**

**Counsel for the Debtor:**
**KIRK B. BURKLEY, ESQ. Bernstein-Burkley, P.C. 707 Grant Street Suite 2200 Gulf Tower Pittsburgh**

**Office of the United States Trustee:**
**GARY O. KINDER, ESQ. Assistant U.S. Trustee 300 Virginia Street East, Room 2025 Charleston, WV 25307**
**Dated: August 13, 2026 - Respectfully Submitted- Sharon Marie Travis**